## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

**CRYSTAL GOOD, as parent and next friend**
**of minor children M.T.S., N.T.K. and A.M.S.;**
**West Virginia Residents;**
**MELISSA JOHNSON,**
**a West Virginia Resident;**
**LINDSAY HUFFMAN,**
**a West Virginia Resident;**
**ALADDIN RESTAURANT, INC.,**
**a West Virginia Limited Liability Company;**
**GEORGIA HAMRA**
**a West Virginia Resident;**
**JOHN SARVER, d/b/a MOUSIE'S CAR WASH,**
**a West Virginia Resident;**
**NITRO CAR CARE CENTER, LLC.,**
**a West Virginia Limited Liability Company;**
**CAROLYN BURDETTE,**
**a West Virginia Resident;**
**COLOURS SALON AND BOUTIQUE, LLC,**
**a West Virginia Limited Liability Company;**
**on behalf of themselves and all others similarly situated,**
**Plaintiffs and Class Representatives**


**v.**                                          **Civil Action No. 2:14-CV-01374**
                                                **HON. JOHN T. COPENHAVER**


**AMERICAN WATER WORKS COMPANY, INC.**
**a Delaware corporation;**
**AMERICAN WATER WORKS SERVICE COMPANY, INC.**
**a Delaware corporation;**
**CHEMSTREAM, INC.,**
**a Delaware corporation;**
**EASTMAN CHEMICAL COMPANY,**
**a Delaware corporation;**
**J. CLIFFORD FORREST,**
**a Pennsylvania resident;**
**FREEDOM INDUSTRIES, LLC,**
**a West Virginia corporation;**
**WEST VIRGINIA AMERICAN WATER COMPANY,**

**a West Virginia corporation;**
**MOUNTAINEER FUNDING, LLC,**
**a West Virginia corporation;**
**WV FUNDING, LLC,**
**a West Virginia corporation;**

**Defendants.**

## FIRST AMENDED CLASS ACTION COMPLAINT

**PLAINTIFFS**, individually and on behalf of all others similarly situated, based on their personal knowledge, information and belief, for their complaint for damages, equitable, statutory and injunctive relief  allege as follows:

### NATURE OF THE ACTION

1. On January 9, 2014, approximately 300,000 West Virginians lost their water supply after the discovery of a spill of a coal processing chemical mixture from a facility owned and operated by Freedom Industries, LLC[1] upstream from West Virginia-American Water Company's water treatment plant in Charleston West Virginia.

2. The chemical, 4-methylcyclohexane methanol along with other chemicals, commonly referred to as Crude 4-MCHM, spilled into the Elk River just above its confluence with the Kanawha River in downtown Charleston.

3. Crude 4-MCHM then began to enter the intake for the water treatment plant making essential adequate and fair warning about the true dangers of Crude 4-MCHM and its breakdown chemicals.

---

[1] On January 17, 2014 Freedom Industries LLC, previously named as a defendant in this action, filed a Chapter 11 petition in the United States Bankruptcy Court for the Southern District of West Virginia,  Case No. 14-20017 (RGP).  This action is stayed by operation of law as to that defendant.

4.  The foreseeable risks of harm posed by Crude 4-MCHM could have been reduced or avoided by reasonable instructions or warnings accompanying the sale and delivery of Crude 4-MCHM in the stream of commerce, through the MSDS process and when it became clear that Crude 4-MCHM had been released into the environment; those omissions render the product not reasonably safe.  Exposure to Crude 4-MCHM in the environment through human pathways has created a need for a medical monitoring program to protect the public from the risk of exposure to Crude 4-MCHM.

5.  Freedom Industries LLC breached its duties under statutory and common law, causing the leak to occur. Furthermore, West Virginia American Water Company failed to recognize and appreciate the risk presented by this facility's presence just upstream from their intake, and should, at a minimum, have determined what chemicals were stored or processed at the site, assessed the risk they presented to the water supply and, at a minimum, secured an alternate water supply to use in the event of foreseeable emergency.

6.  Certain Plaintiffs and Class Members operate businesses that lost revenue because of the spill and resulting "do not use" order affecting Class Member service businesses dependent upon water like restaurants, car washes and beauty shops across the service area.

7.   Certain other Plaintiffs and Class Members were exposed to the contaminated water and the polluted air and thus require medical monitoring.

8.  Plaintiffs and Class Members have incurred costs for water replacement, travel and other expenses directly related to the contamination of their water supply.

3

9.  In addition to damages and medical monitoring, the Plaintiffs petition this Court for injunctive relief to protect Class Members from further danger.

**PLAINTIFFS**

10. Plaintiff Crystal Good is above the age of majority and lives in Charleston, West Virginia in proximity to the facility. She is the parent and next friend of minor children M.A.N., M.S.N. and K.A.S. Ms. Good, a unmarried mother of three, was exposed to the contaminated public water and to the fumes emanating from the facilities of Defendant Freedom Industries. She and her family observed in themselves sentinel symptoms associated with the exposure including nausea, dermatitis, and vomiting. She has incurred expense and suffered annoyance, aggravation, loss of use and inconvenience because of the disruption of her household caused by the contamination of the water. She lost the use and enjoyment of her leasehold. She represents Class Members who were exposed and seek medical monitoring for themselves and as the next friends of their minor children as well as those residents who incurred expenses and/or experienced annoyance, aggravation, emotional distress, loss of use and inconvenience.

11. Plaintiff Melissa Johnson is above the age of majority and lives in Culloden, West Virginia. Ms. Johnson is pregnant and was unknowingly exposed to the contaminated water on January 9, 2014. She has incurred expense and suffered annoyance, aggravation, loss of use and inconvenience because of the disruption of her household caused by the contamination of the water. She lost the use and enjoyment of her property interests. She represents expectant parents seeking

medical monitoring not only for themselves but also for their unborn children as well as those residents who incurred expenses and/or experienced annoyance, aggravation, emotional distress, loss of use and inconvenience. Plaintiff Johnson also represents Class Members who incurred experienced reasonable fear of potential harm because of the contaminated water and who sought medical advice or attention due to the aforementioned reasonable fear of potential harm.

12. Plaintiff Lindsay Huffman is above the age of majority and lives in Elkview, West Virginia. Upon learning of the water contamination on January 9, 2014 she contacted Defendant West Virginia American Water to determine whether her home was affected by the contamination. After receiving assurances that her address was not affected by the water contamination, she invited family members from Charleston to stay at her house until the crisis was over. The next day after drinking, cooking and bathing with the water all eleven individuals staying with her suffered sentinel symptoms of exposure including skin irritation, nausea and vomiting. On January 11, 2014 she called Defendant West Virginia American Water again where she was again incorrectly and negligently informed that her home was not affected by the water contamination. She has incurred expense and suffered annoyance, aggravation, loss of use and inconvenience because of the disruption of her household caused by the contamination of the water. She lost the use and enjoyment of her leasehold. She represents Class Members who were not properly warned, and who were exposed and seek medical monitoring for themselves and minor children as well as those residents who incurred expenses and/or experienced annoyance, aggravation, loss of use and inconvenience.

13.  Plaintiff Aladdin Restaurant, Inc. (Aladdin) is a restaurant licensed and operating in Charleston, West Virginia. Plaintiff Aladdin has suffered and continues to suffer economic damages as a result of the conduct, acts and omissions of the Defendants. Not only did Plaintiff Aladdin lose several days of business during of the pendency of government "do not use" orders, but it also had to incur unexpected costs because of the disruption in the water supply. These factors have added to the labor and managerial costs as Plaintiff Aladdin tries to overcome the adverse effects of the water contamination.  Further, Plaintiff Aladdin asserts that it faces the potential for a long-term decrease in revenue because of the continuing effect on consumer confidence in the local water supply. Plaintiff Aladdin seeks to represent businesses who suffered economic loss, including lost profits, due to the contamination.

14. Plaintiff Georgia Hamra is a resident above the age of majority and lives in Charleston, West Virginia in proximity to the facility. Ms. Hamra was exposed to the Crude MCHM and experienced economic loss because she had to incur expenses for travel to relocate to a hotel outside of the affected area. She represents Class Members in need of medical monitoring and who incurred travel expenses because of the loss of use associated with the contamination of the water.

15. Plaintiff John Sarver is a resident above the age of majority who owns and operates a sole proprietorship, Mousie's Car Wash, in Charleston, West Virginia and a limited liability company and Plaintiff in this action, Nitro Car Care Center, LLC, in Nitro, West Virginia of which he is the sole owner and managing

member. Mr. Sarver was exposed to the contaminated public water and to the

fumes emanating from the facilities of Freedom Industries. Mr. Sarver has

suffered and continues to suffer economic damages as a result of the conduct, acts

and omissions of the Defendants. Plaintiff Sarver seeks to represent businesses

that suffered economic losses and individuals who require medical monitoring.

16. Plaintiff Carolyn Burdette is a resident above the age of majority and lives in

Cross Lanes, West Virginia. She is the sole owner and managing member of a

beauty shop and Plaintiff in this action, Colours Salon and Boutique, LLC.   Ms.

Burdette was exposed to the contaminated public water. Plaintiff Burdette has

suffered and continues to suffer economic damages as a result of the conduct, acts

and omissions of the Defendants.  Plaintiff Burdette seeks to represent businesses

that suffered economic losses and individuals who require medical monitoring.

## DEFENDANTS

17. Defendant American Water Works Company, Inc. ("American Water") is a

Delaware Corporation having its principal place of business in Voorhees, New

Jersey.  Defendant American Water bears legal responsibility for the damages

stemming from the contamination of the water supply. Its acts and omissions

include its failure to require, capitalize and fund the development of an alternate

water supply and to properly oversee and manage its wholly owned and controlled

subsidiaries, West Virginia American Water Company and American Water

Works Services Company, Inc. Defendant American Water exercises full

dominion and control over its subsidiaries Defendants Services and West

Virginia-American Water Company. Defendant American Water is jointly and

severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action.

18. Defendant American Water Works Service Company, Inc., ("Service") is a New Jersey corporation and wholly-owned subsidiary of Defendant American Water Works Company, Inc. having its principal place of business in Vorhees, New Jersey. Defendant Services negligently performed management, engineering and water quality services on behalf of American Water for Defendant West Virginia American Water Company and as such, Defendant Services bears legal responsibility for the damages stemming from the distribution of Crude 4-MCHM into the public water supply. As the service arm which actually performed all of the work required by its sister company, Defendant American Water Works Services Company, Inc., is liable for the failure to properly warn the class members of the nature of the contaminated water. Its acts and omissions include failure to properly assess, plan for and respond to an obvious environmental risk about which it knew or should have known. Defendant Services is jointly and severally liable to Plaintiffs for all damages and other relief awarded as a result of this action.

19. Defendant West Virginia-American Water Company ("WVAW"), is a West Virginia Corporation with its principal place of business in Charleston, West Virginia. Defendant WVAW bears legal responsibility for the damages stemming from the distribution of Crude 4-MCHM into public water supply. Its acts and omissions include its failure to properly assess, plan for and respond to an obvious environmental risk about which it knew or should have known and its failure to

maintain its facilities in sound, workable condition so to avoid releasing the hazardous chemicals it stored and distributed. Further, Defendant WVAW is liable for damages stemming from its failure to warn its customers. Defendant WVAW is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action.

20. Defendant Chemstream, Inc. ("Chemstream") is a West Virginia limited liability company with its principal office address as 166 Commerce Drive, Stoystown, Pennsylvania. Defendant Chemstream is owned and controlled by Defendant J. Clifford Forrest. Consistent with the allegations set forth herein, Defendant Chemstream is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action due to its own conduct, acts and omissions as well as its role in Defendant Forrest's operation as a single business entity Defendants Freedom and Chemstream along with WV Funding, LLC (WV funding) and Mountaineer Funding (Mountaineer Funding).

21. Defendant Eastman Chemical Company ("Eastman"), is a Delaware Corporation with its principal place of business in Kingsport, Tennessee. As the manufacturer and distributor of Crude 4-MCHM, Defendant Eastman had a duty to protect the public from and give adequate warning of the dangers stemming from the release of Crude 4-MCHM in the Elk River. Through its acts and omission Eastman negligently characterized the risk of Crude 4-MCHM, failed to properly warn of its potential environmental and health hazards and sold a hazardous chemical to a suspect facility upstream from a municipal water supply. Defendant Eastman is

jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action.

22. Defendant J. Clifford Forrest ("Forrest") is a Pennsylvania business man who lists his principal office address as 61 Fourteenth Street, Wheeling, West Virginia in filings with the West Virginia Secretary of State. Defendant Forrest owns, controls, dominates and operates as a single business entity Defendants Freedom Industries and Chemstream along with WV Funding and Mountaineer Funding. Consistent with the allegations set forth herein, Defendant Forrest is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action due to his own conduct, acts and omissions as well as his operation as a single business entity Defendants Freedom, Chemstream, WV Funding and Mountaineer Funding.

23. Defendant Freedom Industries, LLC ("Freedom Industries"), is a West Virginia company with its principal place of business in Kanawha County, West Virginia. Freedom Industries as the operator of the site bears legal responsibility for the leak of 4-MCHM on January 9, 2014. Freedom Industries is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action.

24. Defendant Gary Southern is a Charleston, West Virginia resident above the age of majority. He bears responsibility because of his personal role in directing operations at the facility of Defendant Freedom Industries and his ownership interest in the facility which he sold to Defendant Chemstream. Defendant

Southern is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action.

25. Defendant Mountaineer Funding, LLC ("Mountaineer Funding") is a West Virginia limited liability company with its principal office address as 61 Fourteenth Street, Wheeling, West Virginia. Defendant Mountaineer Funding is owned and controlled by Defendant J. Clifford Forrest. Defendant Mountaineer Funding was formed by Defendant J. Clifford Forrest on January 17, 2014. Consistent with the allegations set forth herein, Defendant Mountaineer Funding, LLC is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action due to its own conduct, acts and omissions as well as its role in Defendant Forrest's operation of Defendants Freedom, Chemstream, WV Funding and Mountaineer Funding as a single business enterprise.

26. Defendant WV Funding, LLC ("WV Funding") is a West Virginia limited liability company with its principal office address as 61 Fourteenth Street, Wheeling, West Virginia. Defendant WV Funding is owned and controlled by Defendant J. Clifford Forrest. Consistent with the allegations set forth herein, Defendant WV Funding is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action due to its own conduct, acts and omissions as well as its role in Defendant Forrest's operation of Defendants Freedom, Chemstream, WV Funding and Mountaineer Funding as a single business enterprise.

**JURISDICTION**

27. Original jurisdiction of this Court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1332(d)(2).  This Court is vested with jurisdiction by virtue of 28 U.S.C. §1332(d). Minimal diversity exists between named Plaintiffs of this putative class action, each of whom are citizens of the State of West Virginia, and Defendants Eastman Chemical Company, American Water Works Company, Inc. and American Water Works Service Company, Inc., each of whom are citizens of other states. The proposed class exceeds 100 persons. Further, the amount in controversy exceeds $5,000,000.00.

28. This action arises out of violations of the Resource Conservation and Recovery Act , 42 U.S.C. §§ 6901, *et seq. ("RCRA")*; the Emergency Planning Community Right To Know Act, 42 U.S.C. §§ 11001, *et seq.;* the Clean Water Act,  33 U.S.C.S. §§ 1251, *et seq. (*"CWA"*); T*he Safe Drinking Water Act, 42 U.S.C.A. §§ 300f to 300j ("SDWA"); Toxic Substances Control Act, 15 U.S.C. §§ 2601-2692 ("TSCA"); Rivers and Harbors Act of 1899, 33 U.S.C.A. §§ 401 *et seq.*; and the Clean Air Act, 42 U.S.C.A. §§ 7401 *et seq*. ("CAA").

29. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

**ALLEGATIONS**

30. At its facilities in Charleston along the Elk River Defendant Freedom Industries used, controlled, distributed, transported and disposed of Crude 4-methylcyclohexane methanol ("Crude 4-MCHM"), a known toxic chemical that

replaced diesel fuel in the froth flotation phase of coal processing, in a reckless and negligent manner.

31. The tank storing the Crude 4-MCHM on the premises of Defendant Freedom Industries was built using rivet construction in the 1930s.

32. Defendant Eastman sold Crude 4-MCHM to Defendant Freedom Industries and either knew or should have known of the obvious poor conditions and environmental practices at the site and knew or with the exercise of reasonable diligence should have known of the threat of chemical release into the Elk River. Given the known toxicity of Crude 4-MCHM and Eastman's own research, Eastman knew or should have known that its MSDS and other disclosures and warnings accompanying its sale of the product were insufficient under the circumstances.

33. On or about January 9, 2014, government officials discovered a licorice smell originating from the facilities of Defendant Freedom Industries. The licorice smell is associated with Crude 4-MCHM at concentrations exceeding the chemical's odor threshold although the MSDS sheet issued by Defendant Eastman for 4-MCHM lists the odor associated with the chemical as that of alcohol rather than licorice.

34. Airborne release of Crude 4-MCHM from the facility of Defendant Freedom Industries caused chemical air pollution resulting in ambient concentrations well above the odor threshold for the chemical over an area of several square miles and over a time period of several days after the January 9, 2014 release.

35. Citizens in the Charleston area detected the licorice smell for several days before the January 9, 2014 release, which had been noted and reported to Defendant WVAW and government authorities in the past by residents.

36. Defendant WVAW initially reported that only 2,000 to 5,000 gallons of Crude 4-MCHM leaked into the Elk River. That number is as yet unknown with recent estimates of the release's volume above 10,000 gallons.

37. Crude 4-MCHM migrated from the facility of Defendant Freedom Industries into the Elk River and thence downstream into the public water intake of Defendant WVAW.

38. A sheen could be still be seen emanating from the facility of Defendant Freedom Industries on the afternoon of January 10, 2014 and tests show that the concentration of 4-MCHM in the Elk River at the water intake point was in excess of 500 parts per billion approximately thirty-six hours after the spill was first discovered.

39. The temporal and geographic extent of the contamination, the reports of earlier detection of Crude 4-MCHM above the odor threshold and the age of the Crude 4-MCHM tanks indicate that Crude 4-MCHM had in all likelihood been leaking from the storage tank for a period of time pre-dating January 9, 2014.

40. Defendant WVAW operates a water treatment plant just downstream from the facility of Defendant Freedom Industries. As such WVAW has a responsibility to perform full risk assessment of any potential sources of pollution upstream from its water intake on the Elk River. Such a risk assessment should have

encompassed the known risk presented by the Defendant Freedom Industries facilities and its storage of toxic chemicals including Crude 4-MCHM.

41. In April 2002, the West Virginia Department of Health and Human Resources (WVDHHR) in a Source Water Assessment Report advised Defendant WVAW that its water supply was highly susceptible to contamination. Further, WVDHHR in that same report specifically advised Defendant WVAW that the "Pennzoil Manufacturing site" was a potential point source of contamination; Defendant Freedom Industries now sits on the former Pennzoil Manufacturing site.

42. The WVDHHR report recommended that WVAW develop an alternate water source in the event that the water supply at the current intake became contaminated and suggested that Defendant WVAW create and implement a Source Water Assessment Plan that would provide for an alternate water supply in the event of contamination.

43. Despite the foreseeable risk of contamination from the nearby Freedom Industries facility, Defendant WVAW did not develop an alternate source of water for its 300,000 users in West Virginia or create and implement a Source Water Assessment Plan.

44. WVAW failed to comply with the standards and requirements set forth under the SDWA, other state and federal statutes and the common law of West Virginia.

45. When the plume of Crude 4-MCHM reached Cincinnati, Ohio those responsible for the municipal water there shut the Ohio River intake and relied on an alternate water supply they had developed as a contingency in the event of emergency.

46. Defendant WVAW, despite having been warned of the foreseeable risk by the WVDHHR in the April 2002 Source Water Assessment Report, failed to implement any means to shut off the water intake in the event of contamination of the Elk River.

47. Defendant WVAW, despite having been warned of the foreseeable risk by the WVDHHR in the April 2002 Source Water Assessment Report, failed to implement any means to store and/or divert contaminated river water from entering the treatment plants' filters.

48. Defendant WVAW, despite having been warned of the foreseeable risk by the WVDHHR in the April 2002 Source Water Assessment Report, failed to implement a full activated carbon treatment system, instead it negligently relied on a three-foot activated carbon cap on its sand filters.

49. Defendant WVAW, without fully assessing the risk, dosed the raw water coming into the plant with potassium permanganate, a chemical oxidizing agent "incompatible" with Crude 4-MCHM as stated on Eastman's MSDS.

50. Defendant WVAW filled tankers with contaminated water from the treatment plant in Charleston and then distributed that water to individuals seeking emergency replacement water supplies.

51. Defendant Eastman is the exclusive United States manufacturer of Crude 4-MCHM. Defendant Eastman produced and sold the Crude 4-MCHM at issue in this matter.

52. The combination chemical pure 4-MCHM is not found in nature and consists of a methyl group combined with a hexane ring and methanol. Crude 4-MCHM, which is at issue here, contains various other chemicals, including free methanol.

53. Defendant Eastman has a duty to properly characterize the toxicity of the chemicals it sells and to warn the public of the dangers associated with any known toxicity.

54. Defendant Eastman had a duty to characterize the environmental and health risks of Crude 4-MCHM, did so negligently and with conscious disregard of the chemical's toxicity and caused the damages complained of herein. That Crude 4-MCHM may break down in the environment is well known and foreseeable. The likely breakdown and metabolite chemicals of pure 4-MCHM are known to be dangerous and toxic, including but not limited to carcinogens and neurotoxins, like formaldehyde.

55. Defendant Eastman failed to properly characterize and therefore failed to warn properly of the risk to public health and the environment of the toxicity of Crude 4-MCHM in that internal reports about the product's toxicity reached conclusions of low toxicity when the data in those internal reports implicated higher toxicity.

56. Defendant Eastman failed to characterize and therefore failed to learn properly of the risk to health and the environment when it assumed the Crude 4-MCHM would be confined to the controlled industrial setting of a coal processing plant instead of released into the environment where residential contact would be foreseeable. Given the coal industry's abysmal record of unpermitted discharges of coal slurry into both surface and groundwater and the open and obvious perils

given the manner in which Freedom stored chemicals on and operated its facility, Defendant Eastman reasonably should have foreseen that even when used in a controlled coal processing plant Crude 4-MCHM may be introduced into the environment.

57. Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when it ignored the objective data collected in its study "Determination of Ready Biodegradability (Biotic Degradation) Using the CO2 Evolution Test (Modified Sturm)," concluding that "it is unlikely the test substance would persist in an aquatic environment as evidenced by the significant carbon dioxide evolution," despite the fact that the "crude material contained significant impurities including water."

58. Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment by requesting, as the study sponsor, that stability of the Crude 4-MCHM not be determined prior to commencing testing and requesting that the uniformity/concentration of the Crude 4-MCHM not be confirmed in a test entitled, "An Acute Aquatic Effects Test with the Fathead Minnow."

59. Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when the cause of death of twenty rats "was not determined" in an Eastman study entitled "Acute Toxicity of 4-Methylcyclohexane Methanol."

60. Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when it again did not determine the cause

of death of two rats who died during a test of "Acute Dermal Toxicity in the Rat for Crude MCHM."

61. Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when it ignored deaths, erythema, desquamation, moderate to severe transient weakness, prostration, stumbling, red urine and splenic lesions noted during the test of "Acute Dermal Toxicity in the Rat for Crude MCHM" in which Defendant Eastman concluded that despite these results the substance was only "slightly toxic."

62. Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment and the toxic genetic risk of pure 4-MCHM, crude 4-MCHM or the potential breakdown chemicals if either were to be released in the environment where humans could be exposed.

63. Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment posed by Pure 4-MCHM or Crude 4-MCHM by failing to consider the breakdown chemicals that would result from reactivity between Pure 4-MCHM and Crude 4-MCHM and chemicals used in the treatment of municipal water supplies, as well as found in the environment.

64. The known risks of exposure to Crude 4-MCHM breakdown chemicals were not disclosed by Eastman.  Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment of Crude 4-MCHM or its known toxic constituent and/or breakdown chemicals.

65. The foreseeable risks of the Crude 4-MCHM could have been reduced or avoided by reasonable instructions or warnings; their omission renders the Crude 4-MCHM unsafe and unreasonably dangerous.

66. Defendant Eastman in its MSDS sheet for Crude 4-MCHM described as unknown the chemical's reactivity. Defendant Eastman had a duty to investigate the chemical's reactivity but failed to undertake the necessary research.

67. Defendant Eastman owes a duty under applicable statutory and common law to make full disclosure of threats to human health in Material Safety Data Sheets for Crude 4-MCHM under the Emergency Planning Community Right To Know Act, 42 U.S.C. §§ 11001, et seq. and  Toxic Substances Control Act, 15 U.S.C. §§ 2601-2692 ("TSCA") and to reflect accurately the state of knowledge of the medical and scientific communities about the toxicity of 4-MCHM.

68. Defendant Eastman placed Crude 4-MCHM into interstate commerce. The foreseeable risks of harm posed by Crude 4-MCHM could have been reduced or avoided by reasonable instructions or warnings; their omission renders the product not reasonably safe. Crude 4-MCHM is unreasonably dangerous.

69. Defendant Eastman issued MSDS sheets and other warning data that were insufficient, inadequate and not protective of human health and the environment.

70. Because Defendant Eastman's MSDS sheets did not accurately characterize the toxicity of the Crude 4-MCHM and thus the foreseeable risks posed by its release, it was reasonably foreseeable for businesses in the affected area to refrain from operating and/or to incur additional costs associated with operating with bottled water regardless of assurances of water safety by government officials.

71. Defendant Eastman improperly disclosed in its MSDS sheets numerous items for which Defendant Eastman alleged that data was not available when Defendant Eastman shoule have relied on myriad sources of available data including its own testing of Crude 4-MCHM and scientific literature disclosing known health effects of its component, constituent, breakdown and/or metabolite chemicals.

72. Defendant Eastman failed to comply with the standards and requirements as set forth in the Emergency Planning Community Right To Know Act, 42 U.S.C. §§ 11001, et seq.; the Safe Drinking Water Act, 42 U.S.C.A. §§ 300f to 300j ("SDWA"); the Toxic Substances Control Act, 15 U.S.C. §§ 2601-2692 ("TSCA"); and  the West Virginia Hazardous Waste Management Act §22-18-1 et . seq., as well as the common law of West Virginia.

73. Defendant Eastman failed to comport or comply with the Good Laboratory Practices set forth and required by the United States Environmental Protection Agency.

74. Defendant Gary Southern recently sold his interest in the current facility operated by Defendant Freedom Industries for several million dollars.  Mr. Southern still works as a consultant for Defendant Freedom Industries.

75. Mr. Southern knew or should have known about the conditions at the facility. His acts and omissions in ignoring the obvious threats to the environment and failure to take appropriate steps to mitigate them directly contributed to Plaintiffs' damages.

76. Plaintiffs have transmitted via the United States Mail on January 13, 2014 to the Defendants WVAW, Freedom Industries, Eastman and Gary Southern; the West

Virginia Department of Environmental Protection; and the United States

Environmental Protection Agency pre-suit notice letters as required by statute and

regulation which provide notice to the Defendants named therein that the

Plaintiffs intend to seek leave of the Honorable Court after the requisite 60-day

pre-suit notice period has lapsed to amend this complaint to include causes of

action asserted under the provisions allowing for Citizens' Suits and/or private

actions under the following statutes: The Resource Conservation and Recovery

Act , 42 U.S.C. §§ 6901, et seq. ("RCRA"); The Comprehensive Environmental

Response Compensation and Liability Act, 42 U.S.C. §§ 9601, et seq.

("CERCLA"); Superfund Amendment and Reauthorization Act of 1986. Pub. L.

No. 99-499 (codified as amended in scattered sections of the United States Code)

("SARA"); The Emergency Planning Community Right To Know Act, 42 U.S.C.

§§ 11001, et seq.; The Clean Water Act, 33 U.S.C.S.  1251, et seq. ("CWA"); The

Safe Drinking Water Act, 42 U.S.C.A. §§ 300f to 300j ("SDWA"); Toxic

Substances Control Act, 15 U.S.C. §§ 2601-2692 ("TSCA"); Rivers and Harbors

Act of 1899, 33 U.S.C.A. §§ 401 et seq.; The Clean Air Act, 42 U.S.C.A. §§ 7401

et seq. ("CAA"); West Virginia Air Pollution Control Act W.Va. Code §22-5-1 et.

seq.; West Virginia Water Pollution Control Act W.Va. Code §22-11-1 et. seq.;

West Virginia Groundwater Protection Act §22-12-1 et. seq.; and West Virginia

Hazardous Waste Management Act §22-18-1 et . seq.

77. On or about December 31, 2013, Defendant J. Clifford Forrest, through his

wholly-owned Delaware limited liability company, Defendant Chemstream,

effectuated a merger of four companies selling specialty chemicals to the coal

industry, a line of business in which Defendant Chemstream participates from its Wheeling, West Virginia headquarters.

78. Defendants Forrest and Chemstream knew or should have known of the risk presented by the condition of the facilities of Defendant Freedom Industries, but Defendants Forrest and Chemstream purchased the property and began to operate the four recently merged companies without first repairing the obvious problems at Defendant Freedom Industries.

79. Defendants Forrest and Chemstream knew of the potential and foreseeable risk in part because the merger agreement set aside $1 million reportedly placed in "escrow" for repairs or upgrades at the facilities of Defendant Freedom Industries.

80. Despite that the smell of Crude 4-MCHM was emanating from the facility in the days prior to the spill, no emergency action was taken by Defendant Forrest or Defendant Chemstream to remedy the situation or begin emergency repairs or to remove the chemicals from the facility.

81. On or about January 17, 2013 Defendant Forrest formed Defendant Mountaineer Funding as its sole listed member. The articles of incorporation list 61 Fourteenth Street, Wheeling, West Virginia as the address of both Defendants Forrest and Mountaineer.

82. On or about January 17, 2013, Defendant Mountaineer Funding formed Defendant WV Funding. Defendant Mountaineer Funding is the sole listed member of Defendant WV Funding. The articles of incorporation list 61 Fourteenth Street, Wheeling, West Virginia as the address of Defendant WV

Funding as well as serving as the address for Defendant Mountaineer Funding and Defendant Forrest.

83. On or about January 17, 2013, Defendant Freedom Industries declared bankruptcy.

84. On or about January 17, 2013, Defendant WV Funding, an entity controlled, financed and dominated by Defendant J. Clifford Forrest proposed a $5 million loan as debtor-in-possession.

85. During a bankruptcy hearing on January 20, 2014 Defendant Gary Southern, current president of Defendant Freedom Industries, gave differing accounts of his relationship with Defendant Forrest at one point denying knowing him and later admitting that he had a conversation with him the day before the hearing.

86. Defendant Gary Southern, current president of Defendant Freedom Industries, had no knowledge as to the location of a $1 million escrow reportedly provided by Defendant Forrest through Defendant Chemstream as a condition of merger and earmarked for repairs, including of the secondary containment area which precipitated the events at issue here when it failed.

87. The lack of knowledge regarding the location of a $1 million escrow for repairs indicates that Defendant Chemstream and Forrest truly dominate and control the operations of Defendant Freedom and indicate that this $1 million escrow is still in the control of Defendants Chemstream and Forrest.

88. The fact a $1 million escrow for repairs was even a part of the Freedom Industries merger shows that Defendants Forrest and Chemstream had actual knowledge of the site's condition which not only imputes duty but also qualifies Defendants

24

Forrest and Chemstream as "operators" under applicable Federal and State statutes.

89. Defendant WV Funding ultimately received approval from bankruptcy court to loan millions of dollars to Defendant Freedom Industries.

## CLASS ACTION ALLEGATIONS

90. Plaintiffs seek to represent the following class of individuals and businesses: *All persons and businesses supplied with, using or exposed to water contaminated with Crude 4-MCHM and provided by West Virginia-American Water Company in Logan, Clay, Lincoln, Roane, Jackson, Boone, Putnam and Kanawha Counties and the Culloden area of Cabell County, West Virginia as of January 9, 2014, and any subclasses appropriate to effectuate complete relief to all affected parties.*

91. Excluded from the Class are the Defendants and their officers, directors and employees, the Court and its personnel.

92. Plaintiffs and all others similarly situated are entitled to have this case maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3) and (b)(4), for the following reasons.

93. The class is so numerous that joinder of all persons is impracticable. As many as 300,000 people are adversely affected by Defendants' releases of 4-methylcyclohexane methanol. The exact number of class members can be readily determined from the records of Defendant WVAW and the United States Census Bureau.

94. There are common issues of law and fact, including (1) whether Defendants are liable to individuals and businesses in the class for negligently allowing the release of Crude 4-methylcyclohexane methanol and/or failure to warn of its toxicity; (2) the scope of damages caused by the Defendants' negligence; (3) whether Defendants are strictly liable for conducting an ultra-hazardous activity injurious to members of the class; (4) whether Defendants are liable for nuisance and trespass; and, (5) whether a medical monitoring protocol is warranted. These and other common issues of law and fact relate to and affect the rights of Plaintiffs and class members.

95. Plaintiffs' claims are typical of the class. Plaintiffs reside and were present within the affected area. All were directed on January 9, 2014 not to drink, cook, wash with or otherwise come into contact with the water supplied by Defendant WVAW as a result of the unpermitted and negligent release from Defendant Freedom Industries' facility, as compounded by the negligence of the other Defendants.

96. Class members have suffered personal injuries and/or injury to their real and personal property and/or have been subjected to health risks necessitating medical monitoring. Plaintiffs' interests are identical to and aligned with those of other class members.

97. Plaintiffs will fairly and adequately represent and protect the interests of the class because:

a. Plaintiffs have retained counsel experienced in the prosecution of class action litigation who will adequately represent the interests of the class;

26

b. Plaintiffs and their counsel are aware of no conflicts of interest between plaintiffs and absent class members or otherwise that cannot be managed through the implementation of available procedures;

c. Plaintiffs have, or can acquire, adequate financial resources to assure that the interests of the class will be protected; and

d. Plaintiffs are knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this litigation.

98. Requiring the institution of separate lawsuits would pose a serious risk of inconsistent adjudications and earlier separate determinations with a prejudicial effect on subsequent litigants.

99. Prosecution of separate actions would pose a serious threat of substantially impeding the ability of class members to protect their interests in a timely and expedient fashion and potentially could overwhelm the court system.

100. Any denial of liability and defenses raised by the Defendants would be applicable to all claims presented by all members of the class or can otherwise by managed through available procedures.

101. Common issues of law and fact predominate over those issues that might pertain to individual cases.  Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate the entry of equitable or injunctive relief, including a medical monitoring protocol and injunctive relief to prevent recurrence of the conduct in the future.

102. A class action is superior to other available procedures for the fair and efficient adjudication of this controversy.

103. The vast majority of the class members have no interest in controlling the litigation.

104. A class action allows the Court to process all rightful claims in one proceeding. It is desirable to concentrate all the litigation in one forum.  Class litigation is manageable considering the opportunity to afford reasonable notice of significant phases of the litigation to class members and permit distribution of any recovery. The prosecution of separate actions by individual class members, or the individual joinder of all class members in this action, is impracticable and would create a massive and unnecessary burden on the resources of the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of each member of the class or subclasses, as appropriate. Because of the disparity of resources available to Defendants versus those available to individual class members, prosecution of separate actions would work a financial hardship on many class members. The conduct of this action as a class action conserves the resources of the parties and the court system, protects the rights of each member of the class and meets all due process requirements. A class action is also superior to maintenance of these claims on a claim by claim basis when all actions arise of the same circumstances and course of conduct.

**CAUSES OF ACTION**

**Count One- Negligence**

105.  Plaintiffs hereby incorporate all previous paragraphs.

106.  The conduct, acts and omissions of the Defendants violated duties owed to Plaintiffs and the Class. Defendants' negligence proximately caused damage to Plaintiffs and the Class.

107.  Defendants American Water, Services and WVAW owed a duty of reasonable care to the Class Members which duty was breached by a variety of acts and omissions including but not limited to failure to address the foreseeable risk warned of by the WVDHHR, failure to adequately warn the Class Members and failure to insure that water tankers were not filled with contaminated water. Those breaches proximately caused the damages complained of herein. Further, Defendants American Water, Services and WVAW committed a series of independent breaches by failed to budget for, fund and implement an alternate water supply to avoid the foreseeable risk warned of by the WVDHHR.

108.  Defendants American Water, Services and WVAW had a special relationship with their customers creating a duty to business Plaintiffs, as evidenced by the foreseeability of the nature of the harm to Plaintiffs' businesses that is lost profits due to the inability of their businesses to function without water. Furthermore, Plaintiffs are in contractual privity with Defendants American Water, Services and WVAW, further evidencing a special relationship. Additionally, the breach of duty by Defendants American Water, Services and WVAW caused physical harm to Plaintiffs property. Thus Defendants American Water, Services and WVAW are liable for lost profits.

109.  Defendant Eastman owed a duty of reasonable care to the Class Members which duty was breached by Eastman's failure maintain proper stewardship of their

product by delivering to a facility without the capacity to safely store the delivered product.  Further, Defendant Eastman further breached its duty by failing to properly warn of foreseeable risks, including in its MSDS sheets. Additionally, Defendant Eastman committed two independent acts of negligence when in 2005 and again in 2011, Defendant Eastman failed to properly characterize and warn the Class Members of the adverse health effects of the 4-Crude MCHM. Finally, Defendant Eastman breached its duty to the Class Members by failing to properly warn of foreseeable risks after it became clear that the Class Members were being exposed outside of a controlled industrial environment. In short, Eastman took shortcuts in its toxicology.

110. Defendants Forrest, Southern, Chemstream and Freedom Industries owed a duty of reasonable care to the Class Members which duty was breached by the failure to conduct due diligence and to control the chemicals stored on the facilities of Defendant Freedom Industries from release into the environment.

**Count Two- Gross Negligence**

111. Plaintiffs hereby incorporate all previous paragraphs.

112. The conduct of Defendants as set forth herein was reckless and wanton, constituting the tort of gross negligence, which resulted in damages to plaintiffs.

113. Defendants American Water, Service and WVAW are liable for their gross negligence because of the reckless manner in which they ignored threats to the health of Class Members both in the design and maintenance of their operations, their warnings and their attempts at delivering water.

114.  Defendant Eastman is liable for its gross negligence because it knowingly failed to properly characterize the risk and thus provide proper warnings necessary to protect the public. Further, Defendant Eastman was reckless in its sale of such a toxic product to a suspect facility located on a river bank in the middle of highly populated metropolitan area.

115.  Defendants Forrest, Southern, Chemstream and Freedom Industries are liable for their gross negligence because all of the Defendants clearly understood at least as early as December 31, 2013 of the threat posed by the facility but no actions were taken to avert the water contamination.

**Count Three - Prima Facie Negligence**

116.  Plaintiffs hereby incorporate all previous paragraphs.

117.  The actions of all Defendants constitute violations of laws intended to protect Plaintiffs from the effects of exposure to Crude 4-methylcyclohexane methanol, including, without limitation, the following laws: the Resource Conservation and Recovery Act , 42 U.S.C. §§ 6901, et seq. ("RCRA"); the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§ 9601, et seq. ("CERCLA"); Superfund Amendment and Reauthorization Act of 1986. Pub. L. No. 99-499 (codified as amended in scattered sections of the United States Code) ("SARA"); the Emergency Planning Community Right To Know Act, 42 U.S.C. §§ 11001, et seq.; the Clean Water Act,  33 U.S.C.S. §§ 1251, et seq. ("CWA"); the Safe Drinking Water Act, 42 U.S.C.A. §§ 300f to 300j ("SDWA"); the Toxic Substances Control Act, 15 U.S.C. §§ 2601-2692 ("TSCA"); the Rivers and Harbors Act of 1899, 33 U.S.C.A. §§ 401 et seq.; the

Clean Air Act, 42 U.S.C.A. §§ 7401 et seq. ("CAA"); the West Virginia Air

Pollution Control Act W.Va. Code §22-5-1 et. seq.; the West Virginia Water

Pollution Control Act, W.Va. Code §22-11-1 et. seq.; the West Virginia

Groundwater Protection Act §22-12-1 et. seq.; and, the West Virginia

Hazardous Waste Management Act, W. Va. Code §22-18-1 et . seq.

118.   The violation of these laws constitutes prima facie negligence and/or negligence

per se which proximately caused damage to Plaintiffs and the Class.

### Count Four - Strict Liability

119.   Plaintiffs hereby incorporate all previous paragraphs.

120.   Defendants' manufacturing, distribution, storage, control, use, transport and

disposal of the Crude 4-MCHM in close proximity to the Elk River and

WVAW's intake for the water supply of several counties is an ultra-hazardous

or abnormally dangerous activity.

121.   Defendants' conduct, acts and omissions have damaged Plaintiffs' property by

necessitating the flushing or replacement of pipes, water heaters and other

appliances, have caused lost profits, and have created the need for a medical

monitoring protocol to assess the health effects of exposure to Crude 4-MCHM

and protect the health of Plaintiffs and the Class Members through early

diagnosis of dread disease, including cancer.

122.   Defendants are prima facie answerable for all damage to Plaintiffs' person and

property which is the natural consequence of their ultra-hazardous and

abnormally dangerous activities.

123. Plaintiffs' injuries were proximately caused by Defendants' ultra-hazardous and abnormally dangerous activities.

124. Defendants are strictly liable for any and all personal injuries and damages caused by exposure to toxic substances escaping from their operations.

**Count Five - Negligent Infliction of Emotional Distress**

125. Plaintiffs hereby incorporate all previous paragraphs.

126. The failure to establish an alternative water supply by Defendants WVAW, American Water and Services constitutes negligence that foreseeably resulted in emotional distress to Plaintiff Melissa Johnson and those similarly situated which caused them to reasonably fear harmful effects from the contaminated water to the extent that they sought medical attention for sentinel symptoms such as skin and digestive symptoms.

127. The failure to establish and alternative water supply by Defendants WVAW, American Water and Services constitutes negligence that foreseeably resulted in emotional distress to Plaintiff Melissa Johnson and those similarly situated pregnant women which caused them to reasonably fear harmful effects from the contaminated water.

128. The failure to establish and alternative water supply by Defendants WVAW, American Water and Services constitutes negligence that foreseeably resulted in emotional distress to Plaintiff Crystal Good and those similarly situated parents which caused them to reasonably fear harmful effects from the contaminated water to both themselves and their children.

129. Defendant American Water, failed to adequately capitalize its wholly-owned subsidiary, Defendant WVAW, despite being warned in April 2002 by the West Virginia Department of Health and Human Services of the susceptibility of its water supply to contamination; such failure constituted, in each successive budget year, a series of independent negligent acts that foreseeably resulted in emotional distress to the Class Members which caused them to reasonably fear harmful effects from the contaminated water to both themselves and their children.

130. Defendant American Water, failed to adequately capitalize its wholly-owned subsidiary, Defendant WVAW, despite being warned by the West Virginia Department of Health and Human Services of the susceptibility of its water supply to contamination; such failure constituted, in each successive budget year, a series of independent negligent acts that foreseeably resulted in emotional distress to the Class Members which caused them to reasonably fear harmful effects from the contaminated water to both themselves and their children.

131. Defendant Eastman, negligently failed to warn the Class Members of the health risks presented by Crude 4-MCHM despite the fact that it could be foreseeably be released into the environment and come into contact with human receptors. That negligence foreseeably resulted in emotional distress to Class Members which cause them to reasonably fear harmful effects from the contaminated water to both themselves and their children.

132. Plaintiffs now reasonably distrust their water supply, thus this emotional distress is ongoing.

133. The conduct of the Defendants named herein constitutes the tort of intentional infliction of emotional distress.

**Count Six - Strict Products Liability for Failure to Warn**

134. Plaintiffs hereby incorporate all previous paragraphs.

135. Eastman Chemical Company ("Eastman") marketed, packaged, sold and distributed Crude 4-MCHM (4-methylcyclohexane methanol) to Defendant Freedom Industries.

136. At all relevant times, Eastman knew or should have known of the adverse health effects and risk of harm from exposure to the Crude MCHM it distributed.

137. Eastman failed to adequately warn about the adverse health effects, the risks of harm and the need for proper practices in the storage and handling of the Crude MCHM it marketed, sold, distributed and shipped.

138. Eastman failed to provide an adequate Material Safety Data Sheet regarding the adverse health effects and risk of harm arising from exposure to the 4-MCHM it marketed, sold, distributed and shipped.

139. Eastman, therefore, marketed, sold, distributed and shipped its product in an unsafe and unreasonable manner because the foreseeable risks of harm posed by the product could have been reduced or avoided by reasonable instructions or warnings, and their omission renders the product not reasonably safe.

140. The Crude MCHM that Eastman sold was unreasonably dangerous and defective due to Eastman's failure to provide adequate warnings and MSDS for safe use of the product.

141. Furthermore, Eastman had a duty to fully warn and disclose potential health hazards to the public immediately upon learning that its chemical had been released into a public water supply. Eastman's duty to warn under these circumstances extended to the potential health effects associated with pathways like drinking, cooking and bathing which would never be specifically factored in or warned against when determining toxicity in the controlled industrial environment of a coal processing plant. In short, no one in a prep plant would ever be expected to take a drink of or take a shower in the slurry water where Crude MCHM is used.

142. As a direct and proximate cause of Eastman's failure to warn, Plaintiffs suffered injuries.

143. Defendant WVAW, Services and American Water are liable for failure to warn once they became aware that the Elk River was contaminated and those contaminants were being distributed to the customers.

144. At the point that it became known that the water intake was contaminated the distribution of water for sanitation and firefighting purposes became an ultra-hazardous activity.

145. Defendants WVAW, Services and American Water should have immediately upon understanding that a contaminant had entered their distribution system issued warnings by all means possible to its customers not to contact the water.

Instead, the warnings came hours after hundreds of thousands of customers, including pregnant women, had continued to use the water without warnings.

146. Further, Defendants WVAW, Services and American Water should have not advised that the water was safe to drink at 1 ppm when other respected sources were warning against exposure at far lower levels especially for pregnant women.

### Count Seven - Public Nuisance

147. Plaintiffs hereby incorporate all previous paragraphs.

148. Defendants' pollution constitutes an unreasonable interference with the exercise of rights common to the general public in that it significantly interferes with public health and safety.

149. Defendants knew or had reason to know that their activities have a significant effect on public rights.

150. Defendants have acted intentionally or it was reasonably foreseeable to Defendants that their activities would cause harm to Plaintiffs and their property.

151. Defendants' activities proximately caused Plaintiffs' injuries.

152. The conduct, acts and omissions of Defendants as set forth herein created a public nuisance from which the Plaintiffs have derived special injuries which cannot be fully compensated in an action at law.

### Count Eight - Private Nuisance

153. Plaintiffs hereby incorporate all previous paragraphs.

154.   Defendants have invaded and interfered with, and are invading and interfering with the Plaintiffs' interest in the private use and enjoyment of their properties through their release of Crude 4-MCHM into Plaintiffs' water supply and into Plaintiffs' persons and properties, thereby resulting in private nuisance for which Defendants are responsible.

155.   Defendants' activities have created a private nuisance by way of the release of 4-MCHM into the water supply thereby naturally and proximately causing Plaintiffs to suffer personal injuries, lost profits, property damage, and loss of use and enjoyment of their properties.

### Count Nine - Trespass

156.   Plaintiffs hereby incorporate all previous paragraphs.

157.   Defendants recklessly, knowingly, and willfully caused and allowed hazardous toxic chemicals to be released and discharged into the water supply and into Plaintiffs' properties. This release resulted in an actual physical invasion onto and into Plaintiffs' properties. This physical invasion is continuing until the pipes of Plaintiffs' property are flushed clear and/or replaced.

158.   The entry and presence of  Crude 4-methylcyclohexane methanol in Plaintiffs' properties is unauthorized. Defendants have not sought or obtained Plaintiffs' consent to deposit and/or store 4-methylcyclohexane methanol on Plaintiffs' properties.

159.   Defendants American Water, WVAW and Services trespassed in that unwanted material, namely Crude 4-MCHM without permission entered the homes and businesses of the Class Members and the members are entitled to recover for

testing, to determine not whether Crude 4-MCHM was ever deposited, but rather to determine if the property is still contaminated.

160.  The damages caused by Defendants' unlawful trespass were foreseeable.

161.  Plaintiffs have suffered personal injury, injury to personal and real property, lost profits, and emotional distress as a direct and proximate result of Defendants' unlawful trespass.


### Count Ten – Equitable Remedy of Medical Monitoring

162.  Plaintiffs hereby incorporate all previous paragraphs.

163.  Plaintiffs have been exposed to a known toxic substance at a greater concentration than the general public is typically exposed such that the Plaintiffs have an increased risk of contracting latent dread disease for which testing exists different than medical tests required by the general public.

164.  Plaintiffs request the establishment of a court administered and supervised medical monitoring program to oversee and direct medical surveillance and provide for medical examinations and testing of class members for dread diseases, including but not limited to kidney, liver and neurological disease because members of the class have been exposed to Crude 4-MCHM, a known toxin, in greater concentrations than the public at large.  Further, the Class Members have likely been exposed to formaldehyde, a carcinogenic breakdown product of methanol which was listed as an ingredient of Crude 4-MCHM. Early detection of cancer and other diseases and maladies improve the

prospects for cure, treatment, prolongation of life and minimization of pain and disability.

165. Given the significance and extent of the exposure to chemicals, the toxicity of the chemicals, the seriousness of the diseases for which Plaintiffs are at risk, the relative increase in the chance of onset of disease in those exposed, and the value of early diagnosis, such surveillance to monitor the effect of exposure to toxic chemicals is reasonable and necessary. A medical monitoring protocol may include tests that are available and would provide a medical benefit.  For example, a protocol combining CBC tests with trigger levels could then prompt further cytometrics for those indicating an increased risk in the initial screening level set of tests.

166. It would be inequitable for Plaintiffs who have been wrongfully exposed to dangerous toxins, but unable to prove that cancer or disease is likely to have to pay the expense of medical monitoring when such intervention is clearly reasonable and necessary.

**Count Eleven - Punitive Damages**

167. Plaintiffs hereby incorporate all previous paragraphs.

168. The conduct of Defendants as set forth herein is wanton, reckless and reprehensible. Plaintiffs and the Class are thus entitled to recover punitive damages against Defendants.

169. Defendants were grossly negligent, willful, wanton and malicious in their activities and in failing to warn Plaintiffs of dangers well known to Defendants, which acts exhibited a deliberate disregard for the rights and safety of Plaintiffs.

170.   Defendants realized the imminence of danger to Plaintiffs and other members of the public, but continued their ultra-hazardous activities with deliberate disregard and complete indifference and lack of concern for the probable consequences of their acts.

171.   As a direct result of Defendants' deliberate disregard for the rights and safety of others, gross negligence, willful, wanton and malicious acts, and other wrongful acts, Plaintiffs suffered the injuries and dangers stated above.

172.   Defendants' acts as described herein exhibited deliberate disregard for the rights and safety of others and were grossly negligent, malicious, oppressive, willful and wanton. An award of punitive and exemplary damages is therefore necessary to punish Defendants, and each of them, and to deter any reoccurrence of this intolerable conduct. Consequently, Plaintiffs are entitled to an award of punitive damages.

173.   The conduct of Defendants as set forth herein is wanton, reckless and reprehensible. Plaintiffs and the Class are thus entitled to recover punitive damages against Defendants in an amount sufficient to punish Defendants for their wrongful conduct and to deter Defendants and others from similar wrongful conduct in the future.

**Count Twelve- Equitable Remedy of Piercing the Corporate Veil**

174.   The Plaintiffs hereby incorporate all previous paragraphs.

175.   Plaintiffs seek the equitable remedy of veil piercing as allowed under W.Va. Code §31B-3-303 against Defendants Forrest, Chemstream, Mountaineer Funding, WV Funding and Freedom Industries.

176. Plaintiffs also seek the equitable remedy of veil piercing as allowed under W.Va. Code §31B-3-303 against Defendants American Water, WVAW and Services.

177. Plaintiffs seek such equitable remedy on the basis That there exists such a unity of interest and ownership that the separate personalities of the businesses and individual members no longer exist and that injustice and an inequitable result will occur if the veil is not pierced.

178. The following factors support piercing the corporate veil in this case against Defendants Forrest, Chemstream, WV Funding, Mountaineer Funding and Freedom Industries:

    a. Assets of Defendant Forrest have been co-mingled extensively since December 31, 2013 up to and including forming companies with the explicit intent as to funnel money to Defendant Freedom.

    b. The funds transfer effectuated by Defendant Forrest through Defendants WV Funding and Mountaineer Funding is a clear diversion of corporate assets of Defendant WV Funding and Mountaineer Funding to the personal use of bailing out Defendant Freedom Industries for the benefit of Defendant Forrest, who is the sole shareholder of Defendant Chemstream, which in turn is the sole shareholder of Defendant Freedom Industries.

    c. Identical equitable ownership in and amongst these companies exists in that Defendant Forrest is the sole shareholder of various LLCs which are the sole shareholders of other LLCs. Defendant Forrest is the sole

shareholder of Defendant Chemstream which is the sole shareholder of
Defendant Freedom Industries. Defendant Freedom Industries was offered
a loan by newly formed Defendant WV Funding which in turn was solely
owned by Defendant Mountaineer Funding which in turn was solely
owned by Defendant Forrest.

d.  There was a clear failure on the part of Defendants Chemstream and
Forrest to adequately capitalize the Defendant Freedom Industries for the
risks that any reasonable person would have recognized in owning and
operating a poorly maintained hazardous materials storage area just
upstream from the sole water source of 300,000 people.

e.  Defendant Forrest used the corporate vehicle as a mere conduit to operate
Defendants Chemstream and Freedom, at first as a means to capture
market share in the coal processing chemical industry and then with the
addition of Defendants WV Funding and Mountaineer Funding as a means
to funnel his own funds into Defendant Freedom, to exercise dominion
and control over Defendant Freedom.

f.  Defendant J. Clifford Forrest ultimately owns all of the stock of the
companies that own all of the stock in the Defendants Freedom Industries
and WV Funding.

g.  Defendant Forrest shares the same address in Wheeling, West Virginia
with his captive funding vehicles Defendants WV Funding and
Mountaineer Funding.

h.  Defendant Forrest shares the same attorney with Defendants WV Funding and Mountaineer Funding.

i.  Defendant Southern, the President of Defendant Freedom initially denied knowing Defendant Forrest and then was forced to recant. He also testified that he did not have knowledge of the location of a supposed $1 million held in escrow for repairs to the containment wall which failed.

j.  Defendant Freedom Industries used and created the corporate shell entities of Defendants WV Funding and Mountaineer Funding for the sole reason to procure financial services in the form of a loan from Defendant Forrest in thinly veiled method to divert potential liability away from Defendant Forrest.

179.  The following factors support piercing the corporate veil in this case against Defendants American Water, WVAW and Services:

a.  There was a clear failure on the part of Defendant American Water to adequately capitalize the Defendant WVAW for the risks that any reasonable person would have recognized after being warned of the high susceptibility of contamination by the WVDHHR in April 2002.

b.  Defendant American Water used the corporate vehicle as a mere conduit to operate Defendants WVAW and Services.

c.  Defendant American Water ultimately owns all of the stock of Defendants WVAW and Services.

d.  Defendant American Water shares the same address in Vorhees, New
    Jersey with its wholly owned subsidiaries Defendants WVAW and
    Services.

e.  Defendant American Water shares the same law firm with Defendants
    WVAW and Services.

f.  Defendant American Water reports consolidated financials that include the
    financial results of Defendants WVAW and Services.

g.  Defendant American Water failed to adequately mandate and capitalize
    the alternate water supply which Defendant WVAW should have created
    which would have mitigated or averted the current crisis.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully pray for a Jury Trial and for the following relief:

1.  An Order certifying this action to proceed as a class action, authorizing Plaintiffs
    to represent the interests of the Class or subclasses as appropriate and appointing
    undersigned counsel to represent the Class;

2.  An injunction ordering Defendants Forrest, Chemstream and Freedom Industries
    to remove all sources of contamination from the facility of Defendant Freedom
    Industries including but not limited to the removal from the site of all
    contaminated soil;

3.  An injunction ordering Defendant WVAW to complete a Source Water
    Assessment Plan providing for an alternate, emergency water supply in the event
    of pollution upstream from its water intake on the Elk River and take appropriate

steps to ameliorate and reduce those risks to an acceptable level to ensure public safety in the future;

4. An injunction ordering Defendant Eastman to complete a competent and thorough toxicological analysis of the risks to acute and chronic effects to human health from exposures to low-levels of Crude 4-MCHM and to make changes to its published MSDS sheets accordingly. Such study must include medical surveillance of the currently affected population sufficient to provide usable epidemiological evidence;

5. An award of damages for Class Members who suffered business or economic losses as a result of Defendants' conduct, acts or omissions;

6. An award of damages or mechanism for recovery for Class Members who incurred costs for water replacement, travel, water heater, appliance or plumbing repair or replacement and any other out-of-pocket expenses as a result of the Defendants' conduct, acts or omissions;

7. An award of damages or mechanism for recovery to compensate those who sought medical attention or advice after exposure to the contaminated water.

8. An award of damages or mechanism for recovery to compensate for personal injury;

9. An award of damages or mechanism for recovery to compensate for loss of use and enjoyment of property, annoyance, nuisance, aggravation and inconvenience;

10. An award of punitive damages for all Class Members who were exposed to Crude 4-MCHM;

11. An Order establishing a Medical Monitoring Program designed to surveil as appropriate and to protect the Class Members from latent, dread disease, funded by the Defendants;

12. An Order establishing such administrative procedures as are reasonable to effectuate the relief granted Plaintiffs and the Class Members; and,

13. Such other relief as the Court or Jury may deem appropriate.

Respectfully Submitted:
By Counsel,

_____
Kevin W. Thompson, Esquire (W.Va. Bar No. 5062)
David R. Barney, Jr., Esquire (W.Va. Bar No. 7958)
Thompson Barney
2030 Kanawha Boulevard, East
Charleston, West Virginia  25311
Telephone: (304) 343-4401
Facsimile: (304) 343-4405
kwthompsonwv@gmail.com
drbarneywv@gmail.com

Van Bunch, Esquire (W.Va. Bar No. 10608)
Bonnett Fairbourn Friedman & Balint PC
2325 E. Camelback Road, Suite 300
Phoenix, Arizona 85016
Telephone: (602) 274-1100
Facsimile: (602) 274-1199
vbunch@bffb.com

P. Rodney Jackson (W.Va. Bar No. 1861)
Law Offices of Rod Jackson
401 Fifth-Third Center
700 Virginia Street, East
Charleston, West Virginia 25301
Telephone: (843) 780-6879
Facsimile: (304) 345-7258
prodjackson27@yahoo.com