UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT WEST VIRGINIA

| | |
|---|---|
| **CRYSTAL GOOD,**<br>**West Virginia residents;**<br>**MELISSA JOHNSON, individually and as**<br>**next-friend and parent of T.A.J.,**<br>**a West Virginia resident;**<br>**JOAN GREEN,**<br>**a West Virginia resident;**<br>**SUMMER JOHNSON,**<br>**a West Virginia resident;**<br>**MARY LACY,**<br>**a West Virginia resident;**<br>**WENDY RENEE RUIZ,**<br>**a West Virginia resident;**<br>**KIMBERLY OGIER,**<br>**a West Virginia resident;**<br>**ROY J. McNEAL,**<br>**a West Virginia resident;**<br>**GEORGIA HAMRA,**<br>**a West Virginia resident;**<br>**MADDIE FIELDS,**<br>**a West Virginia resident;**<br>**BRENDA BAISDEN, d/b/a FRIENDLY**<br>**FACES DAYCARE,**<br>**a West Virginia resident;**<br>**ALADDIN RESTAURANT, INC.,**<br>**a West Virginia Limited Liability Company;**<br>**R. G. GUNNOE FARMS LLC,**<br>**a West Virginia Limited Liability Company;**<br>**DUNBAR PLAZA, INC., d/b/a DUNBAR**<br>**PLAZA HOTEL,**<br>**a West Virginia corporation;**<br>**on behalf of themselves and all others**<br>**similarly situated,**<br><br>          **Plaintiffs,**<br><br>          **v.** | **Case No.:  2:14-CV-01374**<br><br>**Consolidated with:**<br><br>**Case No. 2:14-11011**<br>**Case No. 2:14-13164**<br>**Case No. 2:14-13454**<br><br>**FIRST AMENDED**<br>**CONSOLIDATED CLASS**<br>**ACTION COMPLAINT** |

1

**AMERICAN WATER WORKS**
**COMPANY, INC.,**
**a Delaware corporation;**
**AMERICAN WATER WORKS SERVICE**
**COMPANY, INC.,**
**a New Jersey corporation;**
**EASTMAN CHEMICAL COMPANY,**
**a Delaware corporation;**
**WEST VIRGINIA-AMERICAN WATER**
**COMPANY, d/b/a WEST VIRGINIA**
**AMERICAN WATER,**
**a West Virginia corporation;**
**GARY SOUTHERN,**
**a Florida resident;**
**DENNIS P. FARRELL,**
**a West Virginia resident;**
**CENTRAL WEST VIRGINIA REGIONAL**
**AIRPORT AUTHORITY, INC.,**
**a West Virginia corporation;**
**TRIAD ENGINEERING, INC.,**
**a West Virginia corporation;**
**CAST & BAKER CORPORATION,**
**a Pennsylvania corporation;**

         **Defendants.**

## FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**PLAINTIFFS**, individually and on behalf of all others similarly situated, based on their personal knowledge, information and belief, for their Consolidated Class Action Complaint for damages, equitable, statutory, and injunctive relief allege as follows:

### NATURE OF THE ACTION

1.    On January 9, 2014, approximately 300,000 West Virginians lost their water supply as the result of a spill of a coal processing chemical mixture sold and distributed exclusively by Eastman Chemical Company from a facility owned and operated by Freedom

2

Industries, Inc. ("Freedom Industries")[1] upstream from West Virginia-American Water Company's water treatment plant in Charleston, West Virginia.

2.      The chemical, 4-methylcyclohexane methanol, along with other chemicals, commonly referred to as "Crude MCHM", spilled into the Elk River just above its confluence with the Kanawha River in downtown Charleston.

3.      Crude MCHM then began to enter the intake for the water treatment plant making essential adequate and fair warning about the true dangers of Crude MCHM and its breakdown chemicals.

4.      Defendants could have prevented or avoided this accident with better precautionary measures, compliance with applicable regulations, and the use of reasonable care. The foreseeable risks of harm posed by Crude MCHM could have been reduced or avoided by reasonable instructions or warnings accompanying the sale and delivery of Crude MCHM in the stream of commerce, through the MSDS process and when it became clear that Crude MCHM had been released into the environment.  Those omissions render the product not reasonably safe. Exposure to Crude MCHM in the environment through human pathways caused bodily injury and has created a need for a medical monitoring program to protect the public from the risk of exposure to Crude MCHM.

5.      West Virginia-American Water Company failed to recognize and appreciate the risk presented by the presence of Freedom Industries' facility just upstream from their intake, and should, at a minimum, have determined what chemicals were stored or processed at the site,

---

[1]      On January 17, 2014, Freedom Industries, Inc., previously named as a defendant in this action, filed a Chapter 11 petition in the United States Bankruptcy Court for the Southern District of West Virginia, Case No. 14-20017 (RGP).  This action is stayed by operation of law as to that entity.

assessed the risk they presented to the water supply and, at a minimum, secured an alternate water supply to use in the event of foreseeable emergency.

6.      Certain Plaintiffs and Class Members operate businesses that lost revenue because of the spill and resulting "Do Not Use" order.  The spill and "Do Not Use" order affected Class Member service businesses dependent upon water -- like restaurants, car washes and beauty shops -- across the service area.

7.       Certain other Plaintiffs and Class Members were exposed to the contaminated water and the polluted air and thus require medical monitoring.

8.      Plaintiffs and Class Members have incurred costs for water replacement, travel, and other expenses directly related to the contamination of their water supply.

9.      In addition to damages and the equitable remedy of medical monitoring, the Plaintiffs petition this Court for additional injunctive relief to protect Plaintiffs and Class Members from further danger.

## PLAINTIFFS

10.      Plaintiffs and Class Members are individuals and/or entities which have suffered economic losses, property losses, and non-economic losses or injuries as the result of the Elk River spill.  As set forth in the Court's Order Consolidating Cases and Appointing Interim Class Counsel, the Plaintiffs and Class Members have all suffered in common an array of damages from the spill, specifically and as explained in more detail herein, within four basic categories: Physical Personal Injury Tort Claims; Non-Physical Tort Claims; Property Related Claims; and Financial Claims.

11.      Plaintiff Crystal Good is above the age of majority and lives in Charleston, West Virginia in proximity to the facility. Ms. Good, an unmarried mother of three, was exposed to the

4

contaminated public water and to the fumes emanating from the facilities of Freedom Industries. She experienced eye irritation associated with the exposure including nausea, dermatitis, and vomiting.  She has incurred expense and suffered injury, annoyance, aggravation, loss of use, and inconvenience because of the disruption of her household caused by the contamination of the water. She lost the use and enjoyment of her leasehold.

12.     Plaintiff Melissa Johnson is above the age of majority and lived in Culloden, West Virginia on January 9, 2014.  Ms. Johnson is pregnant and was unknowingly exposed to the contaminated water on January 9, 2014.  She has incurred expense and suffered annoyance, aggravation, loss of use, and inconvenience because of the disruption of her household caused by the contamination of the water. She lost the use and enjoyment of her home. She seeks medical monitoring on behalf of her infant child, TAJ, and others similarly situated.

13.     Plaintiff Georgia Hamra is a resident above the age of majority and lives in Charleston, West Virginia in proximity to the facility. Ms. Hamra was exposed to the MCHM and experienced economic loss because she had to incur expenses for travel to relocate to a hotel outside of the affected area.

14.     Plaintiff Mary Lacy is above the age of majority and lives in Charleston, West Virginia. After taking a shower in the contaminated water she developed difficulty in breathing. She sought treatment at Thomas Memorial Hospital. She has incurred expense and suffered personal injury, nuisance, emotional distress, annoyance, aggravation, loss of use, and inconvenience because of the disruption of her household caused by the contamination of the water. She lost the use and enjoyment of her property interests.

15.     Plaintiff Joan Green is above the age of majority and lives in Charleston, West Virginia. After being exposed to the water she developed rashes and skin irritation. Her pre-

existing psoriasis was painfully exacerbated by exposure to the contaminated water.  She sought treatment and has incurred expense and suffered personal injury, nuisance, emotional distress, annoyance, aggravation, loss of use, and inconvenience because of the disruption of her household caused by the contamination of the water. She lost the use and enjoyment of her property interests.

16.     Plaintiff Summer Johnson is above the age of majority and lives in Charleston, Kanawha County, West Virginia.  She is a customer of West Virginia American Water.  She lost the economic value of her tap water and suffered annoyance, aggravation, loss of use, and inconvenience because of the disruption of her household caused by the contamination of her tap water.  She also suffered a loss in the use and enjoyment of her property.

17. Plaintiff Wendy Renee Ruiz is above the age of majority and lives in Charleston, West Virginia. After being exposed to the contaminated water she developed a rash, nausea, vomiting and diarrhea. She sought treatment at Thomas Memorial Hospital where doctors prescribed an array of pharmaceuticals to treat her condition. She has incurred expense and suffered personal injury, nuisance, emotional distress, annoyance, aggravation, loss of use, and inconvenience because of the disruption of her household caused by the contamination of the water. She lost the use and enjoyment of her property interests.

18.     Plaintiff Kimberly Ogier is above the age of majority and lives in Logan County, West Virginia. After taking a shower in the contaminated water she developed a rash, which later became infected. She sought treatment at Logan Regional Medical Center. She has incurred expense and suffered personal injury, nuisance, emotional distress, annoyance, aggravation, loss of use, and inconvenience because of the disruption of her household caused by the contamination of the water.  She lost the use and enjoyment of her property interests.

6

19.     Plaintiff Roy J. McNeal is above the age of majority and lives in Boone County, West Virginia. He is a customer of West Virginia American Water and was exposed to the contaminated water. He incurred expense and suffered injury, annoyance, aggravation, loss of use, and inconvenience because of the disruption of his household caused by the contamination of the water. He lost the use and enjoyment of his property.

20.     Plaintiff Maddie Fields is above the age of majority and a resident of St. Albans, Kanawha County, West Virginia. Plaintiff Maddie Fields is not a customer of West Virginia American Water and has no property interest affected by the contamination of the water supply complained of herein. At all times relevant herein, Plaintiff Maddie Fields was gainfully employed at the Arby's Restaurant in Cross Lanes, Kanawha County, West Virginia. Plaintiff Maddie Fields suffered economic loss from lost wages due to temporary closure of her place of employment because of the "Do Not Use" order.

21.     Plaintiff Aladdin Restaurant, Inc. (Aladdin) is a restaurant licensed and operating in Charleston, West Virginia. Plaintiff Aladdin has suffered and continues to suffer economic damages as a result of the conduct, acts and omissions of the Defendants.  Not only did Plaintiff Aladdin lose several days of business during of the pendency of government "Do Not Use" order, but it also had to incur unexpected costs because of the disruption in the water supply. These factors have added to the labor and managerial costs as Plaintiff Aladdin tries to overcome the adverse effects of the water contamination.  Further, Plaintiff Aladdin asserts that it faces the potential for a long-term decrease in revenue because of the continuing effect on consumer confidence in the local water supply.

22.     Plaintiff Brenda Baisden is a resident above the age of majority who owns and operates a sole proprietorship, Friendly Faces Daycare in Kanawha County, West Virginia. She

suffered economic damages because of the forced shutdown of her business during the "Do Not Use" period and because of increased operating costs afterward. She was exposed to contaminated public water. Mr. Baisden has suffered and continues to suffer economic damages as a result of the conduct, acts and omissions of the Defendants.

23.    Plaintiff R. G. Gunnoe Farms, LLC, ("Gunnoe Farms") is a limited liability corporation engaged in the food production business in Kanawha County. Plaintiff Gunnoe Farms suffered economic losses related to the forced shutdown stemming from the "Do Not Use" order and related to higher operating costs experienced after the "Do Not Use" order was lifted.

24.    Plaintiff Dunbar Plaza, Inc., d/b/a Dunbar Plaza Hotel ("Dunbar Plaza"), is a duly licensed business operating a hotel in Dunbar, West Virginia. Plaintiff Dunbar Plaza suffered economic losses related to water spill because of the "Do Not Use" order, decreased bookings and higher operating costs after the "Do Not Use" order was lifted.

## DEFENDANTS

25.    Defendant American Water Works Company, Inc. ("American Water") is a Delaware Corporation having its principal place of business in Voorhees, New Jersey. Defendant American Water bears legal responsibility for the damages stemming from the contamination of the water supply.  Its acts and omissions include its failure to require, capitalize, and fund the development of an alternate water supply and to properly oversee and manage its wholly owned and controlled subsidiaries, West Virginia-American Water Company and American Water Works Services Company, Inc. ("Services").  Defendant American Water exercises full dominion and control over its subsidiaries Defendants Services and West Virginia-American Water Company ("WVAW").  Defendant American Water is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action.

8

26.     Defendant American Water Works Service Company, Inc., is a New Jersey corporation and wholly-owned subsidiary of Defendant American Water Works Company, Inc. having its principal place of business in Vorhees, New Jersey. Defendant Services negligently performed management, engineering, and water quality services on behalf of American Water for Defendant West Virginia-American Water Company and as such, Defendant Services bears legal responsibility for the damages stemming from the distribution of Crude MCHM into the public water supply.  As the service arm which actually performed all of the work required by its sister company, Defendant American Water Works Services Company, Inc., is liable for the failure to properly warn the Class Members of the nature of the contaminated water.  Its acts and omissions include failure to properly assess, plan for, and respond to an obvious environmental risk about which it knew or should have known. Defendant Services is jointly and severally liable to Plaintiffs for all damages and other relief awarded as a result of this action.

27.     Defendant West Virginia-American Water Company ("WVAW"), is a West Virginia Corporation with its principal place of business in Charleston, West Virginia. Defendant WVAW bears legal responsibility for the damages stemming from the distribution of Crude MCHM into public water supply. Its acts and omissions include its failure to properly assess, plan for and respond to an obvious environmental risk about which it knew or should have known and its failure to maintain its facilities in sound, workable condition so to avoid releasing the hazardous chemicals it stored and distributed. Further, Defendant WVAW is liable for damages stemming from its failure to warn its customers. Defendant WVAW is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action.

28.     Defendant Eastman Chemical Company ("Eastman") is a Delaware Corporation with its principal place of business in Kingsport, Tennessee.  As the manufacturer and distributor

of Crude MCHM, Defendant Eastman had a duty to protect the public from and give adequate warning of the dangers stemming from the release of Crude MCHM in the Elk River. Through its acts and omission Eastman negligently characterized the risk of  Crude MCHM, failed to properly warn of its potential environmental and health hazards and sold a hazardous chemical to a suspect facility upstream from a municipal water supply.  Defendant Eastman is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action.

29.     Defendant Gary Southern is a Marco Island, Florida resident above the age of majority. He bears responsibility because of his personal role in directing operations at the facility of Freedom Industries for the two years prior to the spill of Crude MCHM into the Elk River and because he profited from the sale of his interest in a closely-held company as part of the set of mergers and acquisitions which resulted in the Freedom Industries corporate, ownership and management structure prior to the leak of Crude MCHM on January 9, 2014. Defendant Southern is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action.

30.     Defendant Dennis P. Farrell is a Kanawha County, West Virginia resident above the age of majority. He bears responsibility because of his personal role in directing operations at the facility of Freedom Industries and because he profited from his ownership interest in the facility which he ultimately sold.  Defendant Farrell is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action.

31.     Defendant Central West Virginia Regional Airport Authority, Inc. ("Airport") is a political subdivision of the State of West Virginia, governed by a board comprised of representatives of Kanawha, Putnam, Lincoln, Boone, and Nicholas Counties, and the City of

Charleston.  At all relevant times, Defendant Airport owned and operated Yeager Airport in Charleston, West Virginia.

32.    Defendant Triad Engineering, Inc. ("Triad") is a West Virginia corporation. Upon information and belief, its principal place of business is now in Pittsburgh, Pennsylvania. At all relevant times, Defendant Triad has been licensed to conduct and has been conducting business in the State of West Virginia.

33.    Defendant Cast & Baker Corporation ("Cast") is a Pennsylvania Corporation with its principal place of business in Cannonsburg, Pennsylvania.  At all relevant times, Defendant Cast & Baker Corporation has been licensed to conduct and has been conducting business in the State of West Virginia.

## JURISDICTION

34.    Original jurisdiction of this Court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1332(d)(2).  This Court is vested with jurisdiction by virtue of 28 U.S.C. §1332(d). Minimal diversity exists between named Plaintiffs of this putative class action, each of whom are citizens of the State of West Virginia, and Defendants Eastman Chemical Company, American Water Works Company, Inc. and American Water Works Service Company, Inc., each of whom are citizens of other states. The proposed class exceeds 100 persons. Further, the amount in controversy exceeds $5,000,000.00.

35.    This action arises out of violations of the the Clean Water Act, 33 U.S.C.S. §§ 1251, *et seq.* ("CWA"*)*; Toxic Substances Control Act, 15 U.S.C. §§ 2601-2692 ("TSCA"); Rivers and Harbors Act of 1899, 33 U.S.C.A. §§ 401 *et seq.*; and the Clean Air Act, 42 U.S.C.A. §§ 7401 *et seq.* ("CAA").

36.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

## ALLEGATIONS

### The Elk River Spill

37.     Freedom Industries used, controlled, distributed, transported, and disposed of Crude 4-methylcyclohexane methanol, a known toxic chemical used in the froth flotation phase of coal processing.

38.     The tank storing the Crude MCHM on the premises of Freedom Industries was built using rivet construction in the 1930's.

39.     Defendant Eastman sold Crude MCHM to Freedom Industries and either knew or should have known of the obvious poor conditions and environmental practices at the site and knew or with the exercise of reasonable diligence should have known of the threat of chemical release into the Elk River. Given the known toxicity of Crude MCHM and Eastman's own research, Eastman knew or should have known that its MSDS and other disclosures and warnings accompanying its sale of the product were insufficient under the circumstances.

40.     On or about January 9, 2014, government officials discovered a licorice smell originating from the facilities of Freedom Industries. The licorice smell is associated with Crude MCHM at concentrations exceeding the chemical's odor threshold although the MSDS sheet issued by Defendant Eastman for Crude MCHM lists the odor associated with the chemical as that of alcohol rather than licorice.

41.     Airborne release of Crude MCHM from the Freedom Industries facility caused chemical air pollution resulting in ambient concentrations well above the odor threshold for the

chemical over an area of several square miles and over a time period of several days after the January 9, 2014, release.

42.     For several days before the January 9, 2014 release, citizens in the Charleston area detected the licorice smell, which had been noted and reported to Defendant WVAW and government authorities in the past by residents.

43.     Defendant WVAW initially reported that only two thousand (2,000) to five thousand (5,000) gallons of Crude MCHM leaked into the Elk River. However,  recent estimates of the volume of the release are above ten thousand (10,000) gallons.

44.     Crude MCHM migrated from the facility of Freedom Industries into the Elk River and thence downstream into the public water intake of Defendant WVAW.

45.     A sheen could be still be seen emanating from the facility of Freedom Industries on the afternoon of January 10, 2014, and tests show that the concentration of Crude MCHM in the Elk River at the water intake point was in excess of 500 parts per billion (500 ppb) approximately thirty-six hours after the spill was first discovered.

46.     The temporal and geographic extent of the contamination, the reports of earlier detection of Crude MCHM above the odor threshold, and the age of the Crude MCHM tanks indicate that Crude MCHM had in all likelihood been leaking from the storage tank for a period of time pre-dating January 9, 2014.

**The Contamination at WVAW Water Treatment Plant**

47.     Defendant WVAW operates a water treatment plant just downstream from the facility of Freedom Industries. As such, WVAW has a responsibility to perform full risk assessment of any potential sources of pollution upstream from its water intake on the Elk River.

Such a risk assessment should have encompassed the known risk presented by the Freedom Industries facilities and storage of toxic chemicals including Crude MCHM.

48.     In April 2002, the West Virginia Department of Health and Human Resources (WVDHHR) in a Source Water Assessment Report advised Defendant WVAW that its water supply was highly susceptible to contamination. Further, WVDHHR in that same report specifically advised Defendant WVAW that the "Pennzoil Manufacturing site" was a potential point source of contamination.   Freedom Industries now sits on the former Pennzoil Manufacturing site.

49.     The WVDHHR report recommended that WVAW develop an alternate water source in the event that the water supply at the current intake became contaminated and suggested that Defendant WVAW create and implement a Source Water Assessment Plan that would provide for an alternate water supply in the event of contamination.

50.     Despite the foreseeable risk of contamination from the nearby Freedom Industries facility, Defendant WVAW did not develop an alternate source of water for its 300,000 users in West Virginia or create and implement a Source Water Assessment Plan.

51.     WVAW failed to comply with the standards and requirements set forth under the Safe Drinking Water Act, other state and federal statutes and the common law of West Virginia.

52.     Defendant WVAW, despite having been warned of the foreseeable risk by the WVDHHR in the April 2002 Source Water Assessment Report, failed to implement any means to shut off the water intake in the event of contamination of the Elk River.

53.     Defendant WVAW, despite having been warned of the foreseeable risk by the WVDHHR in the April 2002 Source Water Assessment Report, failed to establish any means to store and/or divert contaminated river water from entering the treatment plant's filters.

54.     Defendant WVAW, despite having been warned of the foreseeable risk by the WVDHHR in the April 2002 Source Water Assessment Report, failed to implement a full activated carbon treatment system.  Instead, it negligently relied on a three-foot activated carbon cap on its sand filters.

55.     Defendant WVAW, without fully assessing the risk, dosed the raw water coming into the plant with potassium permanganate, a chemical oxidizing agent "incompatible" with Crude MCHM as stated on Eastman's MSDS.

56.     Defendant WVAW filled tankers with contaminated water from the treatment plant in Charleston and then distributed that water to individuals seeking emergency replacement water supplies.

**Production and Sale of the Crude MCHM by Eastman**

57.     Defendant Eastman sold Crude MCHM, which is a waste by-product or co-product resulting from Eastman's manufacture of chemicals used to make high performance polyster copolymers. Defendant Eastman produced and sold the Crude MCHM at issue in this matter.

58.     The combination chemical pure Crude MCHM is not found in nature and consists of a methyl group combined with a hexane ring and methanol. Crude MCHM contains various other chemicals, including free methanol.

59.     Eastman produces Crude MCHM as a byproduct of the manufacture of the more valuable chemical commodity, 1,4-cyclohexanedimethanol (referred to hereafter as "CHDM" and marketed by Eastman as Eastman CHDM-D and Eastman CHDM-D90), a chemical used to make polyethylene terephthalate (PET) products, polyesters used in food packaging applications.

60.    Upon information and belief, Eastman's Crude MCHM "product" has many waste-like characteristics, including, but not limited to, the following:

(1)    Crude MCHM–is not specifically marketed by Eastman as a product and Eastman has not bothered even to create a Crude MCHM "Product Data Sheet," a sheet that Eastman uses to highlight its commercial products' uses and attributes for marketing purposes;

(2)    Crude MCHM is never made to order or to satisfy the demands of purchasers of Crude MCHM, but, rather, is only ever produced as a byproduct when Eastman produces CHDM to satisfy the demands of purchasers of its CHDM;

(3)    Eastman sells its Crude MCHM "as is" as it comes out of the waste line of the CHDM process stream;

(4)    Eastman does not further refine or distill Crude MCHM to meet any specifications for the "active" ingredient, which ostensibly is MCHM (hence the designation "Crude" MCHM);

(5)    Crude MCHM is not commercially viable as a stand-alone product, while CHDM would be a commercially viable product to Eastman even without the contribution from sales of the byproduct Crude MCHM; and

(6)    Crude MCHM is barely marketable as a retail chemical for its use as a coal flotation frother, such that the only mention of this use that can be found online (apart from reports on the instant chemical spill) is contained in a 1990 patent that the patent holder allowed to lapse in 1998 rather than pay the miniscule patent maintenance fee.

61.     Defendant Eastman has a duty to properly characterize the toxicity of the chemicals it sells, to warn the public of the dangers associated with any known toxicity and to take appropriate measures to ensure safe handling by its customers given Eastman's knowledge of the dangers posed by the product should it be released into the environment.

62.     Defendant Eastman had a duty to characterize the environmental and health risks of Crude MCHM, did so negligently and with conscious disregard of the chemical's toxicity/corrosivity and caused the damages complained of herein. That fact that Crude MCHM may break down in the environment is well known and foreseeable. The likely breakdown and metabolite chemicals of Crude MCHM are known to be dangerous and toxic, including, but not limited to, carcinogens and neurotoxins, like formaldehyde.

63.     Defendant Eastman failed to properly characterize and therefore failed to warn properly of the risk to public health and the environment of the toxicity of Crude MCHM in that internal reports about the product's toxicity reached conclusions of low toxicity when the data in those internal reports implicated higher toxicity.

64.     Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when it assumed the Crude MCHM would be confined to the controlled industrial setting of a coal processing plant instead of released into the environment where residential contact would be foreseeable.  Given the coal industry's abysmal record of unpermitted discharges of coal slurry into both surface and groundwater and the open and obvious perils given the manner in which Freedom Industries stored chemicals at and operated its facility, Defendant Eastman reasonably should have foreseen that even when used in a controlled coal processing plant, Crude MCHM may be introduced into the environment.

17

65.     Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when it ignored the objective data collected in its study "Determination of Ready Biodegradability (Biotic Degradation) Using the CO2 Evolution Test (Modified Sturm)," concluding that "it is unlikely the test substance would persist in an aquatic environment as evidenced by the significant carbon dioxide evolution," despite the fact that the "crude material contained significant impurities including water."

66.     Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment by requesting, as the study sponsor, that stability of Crude MCHM not be determined prior to commencing testing and requesting that the uniformity/concentration of Crude MCHM not be confirmed in a test entitled, "An Acute Aquatic Effects Test with the Fathead Minnow."

67.     Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when the cause of death of twenty rats "was not determined" in an Eastman study entitled "Acute Toxicity of 4-Methylcyclohexane Methanol."

68.     Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when it again did not determine the cause of death of two rats who died during a test of "Acute Dermal Toxicity in the Rat for Crude MCHM."

69.     Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when it ignored deaths, erythema, desquamation, moderate to severe transient weakness, prostration, stumbling, red urine, and splenic lesions noted during the test of "Acute Dermal Toxicity in the Rat for Crude MCHM" in which Defendant Eastman concluded that despite these results the substance was only "slightly toxic."

18

70.     Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment and the toxic genetic risk of pure Crude MCHM, Crude MCHM or the potential breakdown chemicals, if either were to be released in the environment where humans could be exposed.

71.     Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment posed by pure MCHM or Crude MCHM by failing to consider the breakdown chemicals that would result from reactivity between pure MCHM and Crude MCHM and chemicals used in the treatment of municipal water supplies, as well those as found in the environment.

72.     The known risks of exposure to Crude  MCHM breakdown chemicals were not disclosed by Eastman.  Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment of Crude MCHM or its known toxic constituent and/or breakdown chemicals.

73.     The foreseeable risks of Crude MCHM could have been reduced or avoided by reasonable instructions or warnings.  Their omission renders the Crude MCHM unsafe and unreasonably dangerous.

74.     Defendant Eastman in its MSDS sheet for Crude MCHM described as unknown the chemical's reactivity. Defendant Eastman had a duty to investigate the chemical's reactivity but failed to undertake the necessary research.

75.     Defendant Eastman owes a duty under applicable statutory and common law to make full disclosure of threats to human health in MSDS sheets for Crude MCHM and to reflect accurately the state of knowledge of the medical and scientific communities about the toxicity of Crude MCHM.

76.     Defendant Eastman placed Crude MCHM into interstate commerce. The foreseeable risks of harm posed by Crude MCHM could have been reduced or avoided by reasonable instructions or warnings.  Their omission renders the product not reasonably safe. Crude MCHM is unreasonably dangerous.

77.     Defendant Eastman issued MSDS sheets and other warning data that were insufficient, inadequate, and not protective of human health and the environment.

78.     Because Defendant Eastman's MSDS sheets did not accurately characterize the toxicity of Crude MCHM and thus the foreseeable risks posed by its release, it was reasonably foreseeable for businesses in the affected area to refrain from operating and/or to incur additional costs associated with operating with bottled water regardless of assurances of water safety by government officials.

79.     Defendant Eastman improperly disclosed in its MSDS sheets numerous items for which Defendant Eastman alleged that data was not available when Defendant Eastman should have relied on myriad sources of available data including its own testing of Crude MCHM and scientific literature disclosing known health effects of its component, constituent, breakdown, and/or metabolite chemicals.

80.     Defendant Eastman improperly disclosed it its MSDS sheets information relating to the corrosive nature of Crude MCHM which significantly contributed to the leak at Freedom Industries.

81.     Defendant Eastman failed to disclose the full extent of its knowledge of the potential adverse health impacts of Crude MCHM.

82.     Defendant Eastman failed to provide proper chemical analysis of Crude MCHM to customers.

83.     Defendant Eastman failed to disclose to customers, regulators or the public, either via statutory notice, MSDS sheet or public announcement the fact that aldehydes were expected to be part of the chemical composition on MCHM.

84.     Defendant Eastman failed to comply with the standards and requirements as set forth in the Toxic Substances Control Act, 15 U.S.C. §§ 2601-2692 ("TSCA as well as the common law of West Virginia.

85.     Defendant Eastman failed to comport or comply with the Good Laboratory Practices set forth and required by the United States Environmental Protection Agency.

**Airport Factual Allegations**

86.     Defendant Airport owns and operates the Yeager Airport in Charleston, West Virginia.

87.     Yeager Airport is situated at the top of a ridge directly above the Etowah River Terminal facility.  The southernmost end of Yeager Airport's runway and its runway arrestor system is situated east of the Etowah River Terminal facility.

88.     Yeager Airport sits on a man-made plateau that was constructed in the 1940s by removing portions of the ridge and hilltops.  In the original grading process, more than 9 million cubic yards of earth and rock were moved with the aid of more than 2 million pounds of explosives.

89.     In the early 2000s, the Airport learned that Yeager Airport would become obsolete unless it extended its runway or at least constructed a runway safety area, such as an engineered material arresting system, at the end of its runway.  However, because of Yeager Airport's location on top of a ridge, extending the runway was not possible without dramatically altering the natural grade of the land.

90.     In order to avoid becoming obsolete, the Airport decided to undertake an elaborate runway extension project that involved disturbing at least 170 acres of vegetated and forested land on the hillside directly above and to the northeast of the Etowah River Terminal, including at least 55 acres of clear-cutting.  The actual runway extension of approximately 500 feet was planned for the southernmost end of the runway, directly above and to the east of the Etowah River Terminal, where fill and other materials would have to be brought in to construct an artificial slope so the extension could be built at the same elevation as the existing runway. The disturbance to the north and northeast of the Etowah River Terminal, running roughly parallel to the existing runway, was planned for the purpose of obtaining the fill or "borrow" by excavation of earth from that side of the mountain to build up the slope at the southern end of the runway.  The plan called for the movement of approximately 1.7 million cubic yards of earth.

91.     The Airport contracted with Defendant Triad for the design and engineering work for the runway extension project.  The Airport contracted with Defendant Cast to serve as the contractor for the construction work.  The Airport separately contracted with various logging companies to complete the pre-construction clear-cutting and timbering of the land.

92.     Upon information and belief, prior to the commencement of the construction phase, the Airport did an extensive pre-blasting survey of the Etowah River Terminal tank site. Upon information and belief, as a result of this extensive pre-blast survey, the Airport was aware that multiple carbon steel tanks holding industrial chemicals -- tanks with the potential for rapid corrosion when subjected to repeated surface flooding events -- were situated directly downstream of the planned runway extension.

93.     Upon information and belief, the Airport, in part because of its connection with county, city, and emergency planning officials, knew that the tanks situated downstream of its

22

planned runway extension were perched on the edge of a bank that sloped straight into the Elk River, and that any leaks from those tanks would discharge into the Elk River a short distance upstream of the main or only water intake from which tap water was distributed to the entire region.

94.     The Airport's runway extension project was riddled with problems of erosion, sediment, and stormwater control from the start.  Upon information and belief, the clear-cutting of the forest and vegetation above the Etowah River Terminal began in 2004 or early 2005, and was completed or almost completed by March 31, 2005.  The logging companies that contracted with the Airport received multiple citations from the West Virginia Division of Forestry during this clear-cutting phase for their failure to comply with "best management practices" intended to prevent erosion and sedimentation through various devices, including devices intended to reduce stormwater runoff from timbering sites and haul and skid roads.

95.     The erosion, sediment, and stormwater problems continued during the active construction and grading phase, which was originally planned to occur between April 2005 to September 2007.  The Airport was cited multiple times during this construction phase for violations of its construction permit, including multiple violations for failure to install sediment traps and other sediment control devices.  The primary purpose of sediment traps and sediment basins is to reduce sediment in receiving streams from construction sites.  However, because sediment traps work through the trapping or collecting of stormwater runoff in an impoundment, followed by the controlled release of the impounded stormwater, such traps and basins necessarily reduce peak flows from construction sites and reduce the frequency of downstream flooding events associated with construction and land disturbing events.

96.     The State of West Virginia's stormwater regulations focus on the control of erosion and sediment (water quality) more than the control of stormwater runoff (water quantity) itself.  However, these regulations nonetheless have the intended effect of reducing stormwater runoff and peak flows, because the main factors affecting erosion and sedimentation from construction sites and erosion downstream of construction sites are the amount and speed of stormwater that flows across the site and the amount and speed of the stormwater that is discharged downstream of the site.

97.     In addition, industry standards for large construction activities and land disturbances require the management of stormwater itself to prevent any increases in downstream flooding or peak surface flows.  Industry standards require the installation of temporary and -- where the terrain has been permanently altered in such a way that the alteration would otherwise increase peak stormwater flows -- permanent stormwater detention and retention structures, such as stormwater basins, such that neither active-phase nor post-construction peak flows exceed pre-construction peak flows from the site.

98.     Upon information and belief, despite planning and constructing a runway extension that required the permanent disturbance, de-vegetation, and compaction of a large area of land directly above the Etowah River Terminal, the Airport and Triad did not design or plan for any permanent stormwater detention or retention structures following completion of the runway extension project.

99.     Upon information and belief, most of the temporary stormwater detention structures that were included in the construction design and plans, such as multiple sediment traps and basins, were not installed by Defendant Cast or were only belatedly installed, in some cases years after construction had commenced.

24

100.    Upon information and belief, the stormwater controls that were installed during the active construction phase were inadequate to control the excess stormwater from the construction.

101.    Upon information and belief, no permanent stormwater detention or retention structures were installed during or upon completion of the runway extension project.

102.    Upon information and belief, the amount of stormwater that was discharged from the Airport's grounds and flowed onto the Etowah River Terminal was significantly increased during the pre-construction (i.e., timbering and clear-cutting) and active construction phases of the runway extension project.

103.    Upon information and belief, the amount of stormwater that was and is discharged from the Airport's grounds onto the Etowah River Terminal was and remains significantly increased following completion of the runway extension project.

104.    Upon information and belief, the primary southern drainage and outlet for the stormwater from the Airport's runway extension discharges into, around, and out of an old clay pipe across Barlow Drive from, and northeast of, the Etowah River Terminal site.  Stormwater from this pipe has no working culvert in which to cross under Barlow Drive.  Small flows head south along a ditch on the other side of the road from Etowah River site.

105.    Upon information and belief, beginning in late 2004 or 2005 and continuing to the present, as a result of the runway extension project and the lack of associated or adequate stormwater controls, any significant storm or rain event at Yeager Airport's grounds results in increased stormwater runoff that flows into the southern drainage below the airport runway, and, when discharged from Yeager's property, cannot be contained by the roadside ditch along

Barlow Drive.  Runoff from routine storm events therefore sheet flows across Barlow Drive and onto the Etowah River Terminal site.

106.    Upon information and belief, the increased stormwater that sheet flows across Barlow Drive as a result of the runway extension project, and the lack of associated or adequate stormwater controls, collects at a low point on the Etowah River Terminal site that is just to the east of the so-called secondary containment wall surrounding the chemical storage tanks.  Prior to the chemical spill and associated remediation, there existed a culvert pipe that was designed to handle the pre-runway extension stormwater flows onto the Etowah River Terminal site and safely discharge those at an outlet on the Elk River bank on the other side of the secondary containment structure.

107.    Upon information and belief, beginning in 2004 or 2005 and continuing until the site was altered for remediation following the spill, the increased stormwater that sheet flows across Barlow Drive as a result of the runway extension project and the lack of associated or adequate stormwater controls, overwhelmed the culvert pipe that was designed to handle the pre-runway extension stormwater.

108.    Upon information and belief, the increased stormwater from the Airport's grounds caused the culvert pipe to corrode and fail, resulting in erosion of soil and sediment from the area inside the containment structure on the Etowah River Terminal, which in turn produced a slip in the land that is visible on Google Earth photos beginning in or about September 2005, and runs directly underneath the tank that failed.

109.    Upon information and belief, the increased stormwater from the Airport's grounds resulted in too much water for the culvert pipe to convey, which resulted in water permeating and penetrating the secondary containment wall and frequently flooding and saturating the

26

surface and subsurface of  the containment area at the Etowah River Terminal and coming into contact with the bottom of the tank that eventually failed.

110.    Upon information and belief, the erosion of the tank's foundation and the increased water on the tank site and the associated process of repeated wetting and drying of the tank bottom, which resulted from the Airport's runway extension project and the lack of associated or adequate stormwater controls, significantly caused or contributed to the MCHM tank's failure in January 2014.

<b><u>Allegations Concerning Other Defendants</u></b>

111.    Defendant Dennis Ferrell was an owner and executive at Freedom Industries with the power and authority to effectuate the necessary repairs which would have avoided the spill into the Elk River, but he chose to do nothing instead.

112.    Defendant Gary Southern recently sold his interest in Enviromine, LLC  to Chemstream, LLC  for several million dollars. By completing the acquisition and agreeing not to compete with Freedom Industries, Mr. Southern made $9 million for his part in acquisitions by Chemstream, LLC that sealed its control of Freedom Industries and its key personnel. Mr. Southern, due to his position of authority and supervision over the operation of the Freedom Industries facilities, was in a position to know and correct the environmental problems which led to the toxic release complained of herein. He testified during bankruptcy proceedings that he had substantial involvement with the facility for a period of years preceding the spill.

113.    Mr. Southern knew or should have known about the conditions at the facility. His acts and omissions in ignoring the obvious threats to the environment and failure to take appropriate steps to mitigate them directly contributed to Plaintiffs' damages.

114.    Despite the smell of Crude MCHM emanating from the facility in the days prior to the spill, no emergency action was taken by Defendant Southern to remedy the situation or begin emergency repairs or to remove the chemicals from the facility.

115.    On or about January 17, 2013, Freedom Industries declared bankruptcy.

116.    During a bankruptcy hearing on January 20, 2014, Defendant Gary Southern, former president of Freedom Industries, gave differing accounts of his relationship with investor J. Clifford Forrest, at one point denying knowing him and later admitting that he had a conversation with him the day before the hearing.

117.    Defendant Gary Southern, former president of Freedom Industries, claimed to have no knowledge as to the location of a one million dollar ($1,000,000) escrow reportedly provided by Forrest through Chemstream Holdings as a condition of merger and earmarked for repairs, including of the secondary containment area which precipitated the events at issue here when it failed.

118.    The fact a one million dollar ($1,000,000) escrow for repairs was even a part of the Freedom Industries merger shows that Defendant Southern  had actual knowledge of the site's condition. which not only imputes duty but also qualifies Southern and Farrell as "operators" under applicable Federal and State statutes.

### Health Effects of the Elk River Spill and Contamination

119.    Dr. Rahul Gupta, executive director of the Kanawha-Charleston Health Department, released calculations on or about April 23, 2014, putting the number of people who experienced negative health effects related to the water contamination complained of herein at nearly ninety-three thousand (93,000).

120.    Dr. Gupta also released results of community-wide survey by the Kanawha-Charleston Health Department on the impact of the January 9, 2014, chemical spill and water contamination, which showed that thirty-two percent (32%) of the respondents reported a member of their household had an illness related to the chemical spill.

121.    Dr. Gupta's research revealed that over twenty percent (20%) of the residents sought medical advice or attention related to the water contamination complained of herein.

122.    Dr. Gupta's research indicated that the Class Members suffered from rashes, diarrhea, abdominal pain, cramps, nausea, vomiting, eye irritation, headaches, dizziness, and respiratory symptoms.   All of these reactions are consistent with the testing conducted by Eastman and as it reported in its MSDS sheets for MCHM.

## CLASS ACTION ALLEGATIONS

123.    Plaintiffs seek to represent the following class of individuals and businesses: *All persons and businesses supplied with, using, or exposed to water contaminated with Crude MCHM and provided by West Virginia-American Water Company in Logan, Clay, Lincoln, Roane, Jackson, Boone, Putnam, and Kanawha Counties and the Culloden area of Cabell County, West Virginia as of January 9, 2014.*

124.    Excluded from the Class are the Defendants and their officers, directors, and employees, as well as the Court and its personnel.

125.    Plaintiffs and all others similarly situated are entitled to have this case maintained as a class action pursuant to Federal Rules of Civil Procedure  for the following reasons:

(1)  The prerequisites for a class action under Federal Rule of Civil Procedure 23(a) are met.   The class is so numerous that joinder of all persons is impracticable. As many as thirty thousand (300,000) people are adversely

affected by Defendants' release of Crude MCHM. The exact number of Class Members can be readily determined from the records of Defendant WVAW and the United States Census Bureau.

(2)  There are common issues of law and fact, including: (a) whether Defendants are liable to individuals and businesses in the class for negligently allowing the release of Crude MCHM and/or failure to warn of its toxicity; (b) the scope of damages caused by the Defendants' conduct; (c) whether Defendants are strictly liable for conducting an ultra-hazardous activity injurious to members of the class; (d) whether Defendants are liable for nuisance and trespass; and, (e) whether a medical monitoring protocol is warranted.  These and other common issues of law and fact relate to and affect the rights of Plaintiffs and Class Members.

126.  Plaintiffs' claims are typical of the class. Plaintiffs reside and were present within the affected area. All were directed on January 9, 2014, not to drink, cook, wash with, or otherwise come into contact with the water supplied by Defendant WVAW as a result of the unpermitted and negligent release from Freedom Industries' facility, to which the negligence of the other Defendants significantly contributed in cause and effect.

127.  Plaintiffs and the Class Members have suffered an array of damages all stemming from the common trunk of facts and issues related to the spill.

128.  Plaintiffs who reside in households supplied by WVAW water ("Residential Plaintiffs") have all suffered common damages from the loss of the use of tap water over the period of contamination.  This loss of use is common to all such Residential Plaintiffs and affected them similarly.

129.    Plaintiffs who are hourly wage-earners and who work in industries particularly affected by the water contamination and therefore lost wages as a result of the contamination ("Wage Loss Plaintiffs") were affected similarly.

130.    Plaintiffs who are businesses that lost profits ("Business Plaintiffs") because they had to shut down during the duration of the water contamination period were affected similarly.

131.    Plaintiffs have suffered annoyance, aggravation, personal and bodily injuries, as well as economic loss and injury to their real and personal property and/or have been subjected to health risks necessitating medical monitoring claims, that are typical of the experience of the Class Members. Plaintiffs' interests are identical to and aligned with those of other Class Members, particularly with respect to proving the liability of Defendants for the harm they suffered.

132.    Plaintiffs will fairly and adequately represent and protect the interests of the class because:

(1)   Plaintiffs have retained counsel experienced in the prosecution of class action litigation who will adequately represent the interests of the class;

(2)   Plaintiffs and their counsel are aware of no conflicts of interest between Plaintiffs and absent Class Members or otherwise that cannot be managed through the implementation of available procedures;

(3)   Plaintiffs have, or can acquire, adequate financial resources to assure that the interests of the class will be protected; and

(4)   Plaintiffs are knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this litigation.

133.    Further, any denial of liability and defenses raised by the Defendants would be applicable to all claims presented by all members of the class or can otherwise be managed through available procedures.

134.    Defendants' conduct presents predominant common factual questions. Fundamentally, all of the Plaintiffs' claims arise out of a single course of conduct by Defendants that caused the Elk River chemical spill.  Although this was an incident that affected a sizeable geographic area and many individuals and businesses, it can be traced back to actions made jointly and severally by the small group of Defendants named here.  Whether Plaintiffs and the Class Members are presenting one or more of the four relevant categories of Physical Personal Injury Tort Claims, Non-Physical Tort Claims, Property Claims, or Financial Claims, they will present common liability proof that is the same for each member of the Class.  Across claim categories, Plaintiffs' common proof of Defendants' liability will involve the same cast of characters, events, discovery, documents, fact witnesses, and experts.

135.    The need for proof of Plaintiffs' and Class Members' damages will not cause individual issues to predominate over common questions.  The amounts of economic and non-economic losses, consistent with each of the four categories of claims, can be efficiently demonstrated either at trial or as part of routine claims administration through accepted and court-approved methodologies with the assistance of court-appointed personnel, including Special Masters.  Certain types or elements of damage are subject to proof using aggregate damage methodologies or simply rote calculation and summation.

136.    A class action is superior to maintenance of these claims on a claim-by-claim basis when all actions arise out of the same circumstances and course of conduct.  A class action allows the Court to process all rightful claims in one proceeding.  Class litigation is manageable

considering the opportunity to afford reasonable notice of significant phases of the litigation to Class Members and permit distribution of any recovery. The prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members in this action, is impracticable and would create a massive and unnecessary burden on the resources of the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of each member of the class or subclasses, should that be determined to be appropriate.

137. The conduct of this action as a class action conserves the resources of the parties and the court system, protects the rights of each member of the class, and meets all due process requirements.

138. Certification of the Class with respect to particular common factual and legal issues concerning liability and comparative fault, as well as the necessary and appropriate quantum of punitive damages, or ratio of punitive damages to actual harm, is appropriate under Federal Rule of Civil Procedure 23(c)(4).

139. The particular common issues of liability, comparative fault, and the quantum of punitive damages or ratio of punitive damages to actual harm, are common to all Class Members no matter what type of harm or injury was suffered by each Class Member.

## CAUSES OF ACTION

### Count One - Negligence

140. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

141.    The conduct, acts and omissions of the Defendants violated duties owed to Plaintiffs and the Class.  Defendants' negligence proximately caused damage to Plaintiffs and the Class.

<strong>Count Two - Negligence against American Water Defendants</strong>

142.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

143.    American Water Defendants (Defendants American Water, Services, and WVAW) owed a duty of reasonable care to the Class Members which duty was breached by a variety of acts and omissions including, but not limited to, failure to address the foreseeable risk posed by the Freedom Industries facility and as warned of by the WVDHHR, failure to adequately warn the Class Members, failure to design, maintain, and operate its water treatment plant according to industry standards so as to protect public health and safety, negligently and unreasonably delivering and placing on Plaintiffs' property a toxic and noxious substance, Crude MCHM, and failure to ensure that water tankers were not filled with contaminated water. Those breaches proximately caused the damages complained of herein.

144.    American Water was negligent in at least the following respects:

(1)    Failing to address the foreseeable risk warned of by the WVDHHR;

(2)    Failing to ascertain the nature and extent of potential threats to the Elk River water supply, such as the Etowah River Terminal storage facility, and to take appropriate steps to prepare for the possibility of a chemical leak;

(3)    Failing to monitor and maintain adequate water reserves in the event of a necessary disruption of the water intake and purification process;

34

(4)     Failing to maintain and monitor appropriate carbon filtration reserves;

(5)     Negligently and unreasonably delivering and placing on Plaintiffs' property a toxic and noxious substance, Crude MCHM;

(6)     Failing to take appropriate steps after learning of the upstream chemical leak from the Etowah River Terminal, such as contacting CHEMTREC or the manufacturer of the chemical, to obtain information necessary for the prompt protection, remediation, and restoration of its water treatment facilities and water supply;

(7)     Failing to adequately warn the Class Members;

(8)     Failing to ensure that water tankers were not filled with contaminated water during the emergency response; and

(9)     Failing to take appropriate and prompt steps to flush its water treatment facility and water supply system.

145.    Further, Defendants American Water, Services, and WVAW committed a series of independent breaches by failure to budget for, fund, and implement an alternate water supply to avoid the foreseeable risk warned of by the WVDHHR.

146.    Defendants' negligence was the proximate cause of Crude MCHM, a noxious and/or toxic substance, invading the real and personal property of property-owning Class Members and causing substantial harm to real property from the loss of use and enjoyment and from the contamination of real property fixtures such as pipes, which required cleaning by flushing.  Defendants' negligence was also the proximate cause of substantial harm to personal property such as appliances from the temporary loss of use of personal property and from the contamination of personal property.

35

147.    As a proximate result of American Water's negligence, Plaintiffs and all similarly situated residential customers of American Water were instructed not to use their tap water for any purpose other than toilet flushing and firefighting for five-to-eight days.   The water continued to be impure, with an unpleasant odor and irritating quality, for weeks or even months thereafter.

148.    As a proximate result of Defendant American Water's negligence, thousands of West Virginia residents were unable to work and earn regular wages.   Many of these residents, including Plaintiff Maddie P. Fields, have no property interest affected by the Elk River chemical spill, but were nevertheless unable to work and earn regular wages. Thus, Defendants American Water, Services, and WVAW are liable for lost wages.

149.    Defendant American negligently failed to adequately capitalize its wholly-owned subsidiary, Defendant WVAW, despite being warned in April 2002 by the West Virginia Department of Health and Human Services of the susceptibility of its water supply to contamination; such failure constituted, in each successive budget year, a series of independent negligent acts that foreseeably resulted in damages to the Class Members.

**Count Three - Negligence against Eastman**

150.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

151.    Defendant Eastman owed a duty of reasonable care to the Class Members which was breached by Eastman's failure to prepare for and maintain proper stewardship of their product by knowingly or negligently delivering to a facility without the capacity to safely store the delivered product.   Further, Defendant Eastman breached its duty by failing to properly warn of foreseeable risks, including in its MSDS sheets. Additionally, Defendant Eastman committed

two independent acts of negligence when in 2005 and again in 2011, Defendant Eastman failed to properly characterize and warn the Class Members of the adverse health effects of Crude MCHM. Finally, Defendant Eastman breached its duty to the Class Members by failing to properly warn of foreseeable risks after it became clear that the Class Members were being exposed outside of a controlled industrial environment.

152.    Upon information and belief, Crude MCHM is a corrosive chemical (unlike pure MCHM, an organic, and unlike the gasoline and diesel products originally stored at the Etowah River Terminal site) because of the high percentage of water (4% to 10%) contained within it and its tendency to separate during storage into an organic layer and a corrosive water layer.

153.    Upon information and belief, the end-use, retail market for Crude MCHM is so limited, depressed, and sporadic that Crude MCHM could not be stored by a distributor in a manner that complied with industry standards for the storage of such chemicals (*i.e.*, in properly constructed, maintained, and regularly inspected tanks) and still be sold by the distributor at a profit.  In other words, in order for the Etowah River Terminal or any other distributor to make a profit selling Eastman's Crude MCHM, the distributor has to store the chemical in a cut-rate (dilapidated or outdated) tank and ignore costly industry standards for the maintenance and inspection of tanks containing corrosive  chemicals (or even non-corrosive chemicals).

154.    Upon information and belief, Eastman knew or should have known that the end-use, retail market for Crude MCHM is so limited, depressed, and sporadic that Crude MCHM cannot be stored by a distributor in a manner that complies with industry standards for the storage of such chemicals (*i.e.*, in properly constructed, maintained, and regularly inspected tanks) and still be sold by the distributor at a profit.

155.   Upon information and belief, Eastman knew or should have known that the Etowah River Terminal and Freedom Industries were not storing Crude MCHM in a manner that complied with industry standards for the storage of chemicals (*i.e.*, in properly constructed, maintained, and regularly inspected tanks).

156.   Eastman could have disposed of its Crude MCHM – the waste-like byproduct of Eastman's process for making CHDM – as a solid waste product pursuant to the rules and regulations promulgated by the State of Tennessee for the disposal of industrial solid waste products.  Had Eastman done so, the recipient of Eastman's Crude MCHM (or Eastman itself, had it elected to incinerate it) would have been subjected to periodic inspections to ensure compliance with Tennessee's statutes and regulations governing the disposal of industrial wastes, one of the most obvious and fundamental purposes of which is to prevent industrial byproducts and waste from ending up in public rivers and contaminating public water supplies.  However, Eastman would have had to pay to dispose of its waste-like Crude MCHM as an actual waste, and would also have lost whatever small sums it received from selling Crude MCHM as a "product."

157.   Upon information and belief, Eastman knew or should have known that the only business that would pay even a small sum for the receipt of Crude MCHM as a "product" to be distributed was the kind of business that Freedom Industries and the Etowah River Terminal have been demonstrated to have been: cut-rate businesses operating with short-term profit horizons, on the margins of legality, and with little regard for chemical industry standards and public safety.

158.   Eastman knew or should have known that there was a real and substantial danger that the Crude MCHM it was "selling" as a "product" would be stored improperly or otherwise

mishandled and end up involved in an environmentally catastrophic release and contamination like the one that occurred.

159.    A reasonably prudent person or company, knowing what Eastman knew or should have known about the retail market for its waste-like Crude MCHM, and knowing what Eastman knew or should have known about operations at the Etowah River Terminal, would have disposed of its crude byproduct as a waste, pursuant to Tennessee's regulations, and thereby avoided the unnecessary risk of an environmentally catastrophic release like the one that occurred.

160.    Eastman's negligence was a proximate cause of the chemical spill, as a result of which Plaintiffs and all similarly situated customers of American Water were instructed not to use their tap water for any purpose other than toilet flushing and firefighting for five-to-eight days.  The water continued to be impure, with an unpleasant odor and irritating quality, for weeks or even months thereafter.

161.    Defendant Eastman's negligence was a proximate cause of the chemical spill and the damages of the Class Members.

### Count Four - Negligence Against Gary Southern

162.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

163.    Defendant Gary Southern owed a duty of reasonable care to the Class Members which duty was breached by a variety of acts and omissions including, but not limited to, failure to immediately address the foreseeable risk apparent upon assuming control. Those breaches proximately caused the damages complained of herein.

164.    Defendant Southern knew or should have known of the inherent dangers with the condition of the Freedom Industries' site prior to the spill and should have taken steps to prevent the spill.

165.    Defendant Southern had a duty to obey the laws and regulations of the United States and the State of West Virginia of which his breach proximately caused the damages complained of herein.

166.    Defendant Southern's conduct, acts, and omissions constitute the tort of negligence.

## Count Five - Negligence Against Dennis Farrell

167.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

168.    Defendant Dennis Farrell owed a duty of reasonable care to the Class Members which duty was breached by a variety of acts and omissions including, but not limited to, failure to immediately address the foreseeable risk apparent upon assuming control. Those breaches proximately caused the damages complained of herein.

169.    Defendant Dennis Farrell knew or should have known of the inherent dangers with the condition of the Freedom Industries' site prior to the spill and should have taken steps to prevent the spill.

170.    Defendant Farrell had a duty to obey the laws and regulations of the United States and the State of West Virginia of which his breach proximately caused the damages complained of herein.

171.    Defendant Farrell's conduct, acts and omissions constitute the tort of negligence.

**Count Six - Negligence against Airport, Triad, and Cast & Baker**

172.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

173.    Plaintiffs hereby incorporate all previous paragraphs.

174.    The Airport violated industry standards and its duty of reasonable care as a landowner by failing to monitor the activities of its timbering and logging contractors during the runway extension project's pre-construction phase to ensure that the logging activities complied with best management practices for the control of stormwater runoff and otherwise did not result in increased stormwater runoff downstream of the Airport's grounds.

175.    Upon information and belief, the Airport and Triad violated industry standards for landowners/permittees and project engineers and their duties of reasonable care by failing to design and ensure the construction of appropriate stormwater detention and retention structures, such as stormwater basins and ponds, to prevent increased stormwater runoff downstream of the Airport's grounds during the active construction phase of the  runway extension project.

176.    Defendant Cast failed to exercise reasonable care by failing to comply with the design plans, stormwater management permit, and relevant regulations requiring the construction of sediment traps for the impoundment of stormwater at the construction site during the active phase of construction on the runway extension project.

177.    The Airport and Triad violated industry standards and their duties of reasonable care as landowner/permittee and project engineer in failing to monitor the activities of Defendant Cast to ensure compliance with the design plans, stormwater management permit, and relevant regulations requiring the construction of sediment traps for the impoundment of stormwater at the construction site during the active phase of construction on the runway extension project.

178.   Upon information and belief, the Airport and Triad violated industry standards and their duties of reasonable care as landowner/permittee and project engineer by failing to design and ensure the construction of appropriate permanent stormwater detention and retention structures, such as stormwater basins and ponds, to prevent increased stormwater runoff downstream of the Airport's grounds after the completion of the runway extension project.

179.   Upon information and belief, as a proximate result of the Airport's, Triad's, and Cast's acts of negligence, the Etowah River Terminal was inundated with stormwater runoff from the Airport's runway extension project during the pre-construction, active construction, and post-construction phases.

180.   Upon information and belief, the increase in stormwater runoff from the Airport's grounds that resulted from the Airport's, Triad's, and Cast's acts of negligence significantly increased the frequency, severity, and duration of surface flooding and stormwater saturation events at the Etowah River Terminal tank site from late 2004 or early 2005 to the present.

181.   Upon information and belief, the increase in stormwater runoff from the Airport's grounds that resulted from the Airport's, Triad's, and Cast's acts of negligence was a proximate and significant cause of soil erosion at the Etowah River Terminal site and of the failure and corrosion of the culvert pipe intended to safely convey stormwater underneath the Etowah River Terminal's secondary containment area.

182.   Upon information and belief, the significant increase in the frequency, severity, and duration of flooding and surface saturation events and the soil erosion that were proximately caused by the Airport's, Triad's, and Cast's acts of negligence were a significant contributing cause of the January 2014 failure of the tank containing Crude MCHM at the Etowah River Terminal and consequent contamination of the tap water of the entire region.

183.   Upon information and belief, the Airport's acts of negligence resulting in increased stormwater runoff from its grounds and the downstream flooding of the Etowah River Terminal constitute a failure to keep its public grounds "open, in repair, or free from nuisance" under W. Va. Code section 29-12A-4(c)(3).   Moreover, upon information and belief, the Airport's acts of negligence are each attributable to acts of negligence of the Airport's employees, including, but not limited to, the Airport's director, while acting within the scope of their employment with the Airport.

### Count Seven - Gross Negligence

184.   Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

185.   The conduct of Defendants as set forth herein was reckless and wanton, constituting the tort of gross negligence, which resulted in damages to plaintiffs.

186.   Defendants American Water, Services, and WVAW are liable for their gross negligence because of the reckless manner in which they ignored threats to the health of Class Members both in the design and maintenance of their operations, their warnings and their attempts at delivering water.

187.   Defendant Eastman is liable for its gross negligence because it knowingly failed to properly characterize the risk and thus provide proper warnings necessary to protect the public. Defendant Eastman was reckless and wanton in its decision to sell its waste as a product. Further, Defendant Eastman was reckless in its sale of such a toxic product to a suspect facility located on a river bank in the middle of highly populated metropolitan area.

188.    Defendant Southern is liable for his gross negligence because all of he clearly understood of the threat posed by the facility but took no actions to avert the water contamination.

**Count Eight -** ***Prima Facie*** **Negligence Against the American Water Defendants for Violations of Drinking Water Treatment State Revolving Fund Act, the Safe Drinking Water Act, and Primary Statutory Duty of Safety and Convenience to the Public**

189.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

190.    The failure by Defendants American Water, Services, and WVAW to establish and maintain adequate and suitable facilities and perform its service in a way that is reasonable, safe, and sufficient for the security and convenience of the public, violated its primary statutory duty to the Plaintiffs and the Class pursuant to W. Va. Code § 24-3-1.

191.    The failure by Defendants American Water, Services, and WVAW to adopt a source water protection plan, pursuant to W. Va. Code R. § 64-77-5.2, constitutes *prima facie* negligence.  W. Va. Code R. § 64-77-5.2 requires that "a source water protection plan shall be adopted by the public water system for the continued protection of the watershed from potential sources of contamination."

192.    The failure by Defendants American Water, Services, and WVAW  to adopt a source water protection plan is in contravention to the Safe Drinking Water Act. The Safe Drinking Water Act establishes operational standards for all public water systems.  43 USCA § 300j-13 of the Safe Drinking Water Act requires a source water quality assessment program be established for the protection and benefit of public water systems. This provision was adopted into the West Virginia State Code under §16-13C-1 through 6 of the Drinking Water Treatment State Revolving Fund Act and was implemented by the Secretary of HHR through W. Va. Code

R. § 64-77-5.2, which requires a source water protection plan be adopted by public water systems, including WVAW. This regulation was adopted pursuant to W. Va. Code §§ 16-1-4 (a) and (b)(3-4), which grant the Secretary of the Department of Health and Human Resources the authority to propagate regulations addressing sources of sources of water supply and safe drinking water.

193.     Pursuant to § 64-77-11, violators of W. Va. Code R. § 64-77-5.2 are subject to the civil, administrative, and criminal penalties of the Public and Community Water Systems and Administrative Penalties Act, W. Va. Code §§ 16-1-9a(d)(2) and (3) and § 16-1-9a(d)(1), as well as 16-1-9 and 16-1-18.

194.     "The State of West Virginia provides for the regulation of public water supplies to promote and protect the public health by having the public served safe and potable water. The West Virginia Department of Health and Human Resources, Bureau for Public Health is empowered to adopt rules to implement the intent of the law." W. Va. Code R. § 64-77-1. The administrative rule requiring all public water systems to adopt a source water protection plan was designed to prevent contamination of the public water supply and to protect the users of that water supply from injuries caused by contaminated water. As consumers of a public water supply, Plaintiffs and Class Members are within the class that said rule was designed to protect.

195.     Therefore, Defendants American Water, Services, and WVAW are liable for *prima facie* negligence.

### Count Nine - *Prima Facie* Negligence Against Defendant, Eastman
### For Violations of the Toxic Substances Control Act

196.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

45

197.    Eastman manufactured and released into stream of commerce Crude MCHM knowing that it was a harmful, toxic substance that would be used in coal processing plants which are designed to release process water, which would by design include Crude MCHM, into the environment through the National Pollutant Discharge Elimination System ("NPDES") outlets associated with coal processing plants and coal slurry impoundments.

198.    West Virginia Department of Environmental Protection testing has revealed detectable levels at NPDES outlet as high as 1.4 parts per million and as high as 50 parts per billion downstream in nearby creeks.

199.    In 1998, Eastman began to conduct toxicology studies on MCHM with the intention of developing data which would allow the company to remove the warning about the potential for blood disorders from its MSDS sheets. Eastman went so far as to change the breed of rat used in experiments and to abandon on several occasions Good Laboratory Practices in order to sanitize the available safety information about Crude MCHM.

200.    Eastman ignored the alarming data revealed in its studies so that it could draw and then report to the EPA false and/or misleading conclusions regarding the toxicity of Crude MCHM.

201.    Under the Toxic Substances Control Act, Eastman has a duty to perform tests, note adverse health impacts and truthfully report the test results and negative health impacts to the Administrator of the EPA.

202.    As alleged herein and below such conduct, acts and omissions constitute tortious violations of the Toxic Substances Control Act, 15 U.S.C. § 2603 and 15 USC §2614(3)(B), a law intended to protect Class Members from the harm complained of herein.

46

## Count Ten – Breach of Express and Implied Warranties
## and Statutory Violations against American Water

203.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

204.    Beginning on or about January 13, 2014, American Water began issuing instructions to customers for the "flushing" of their individual water delivery systems.  American Water divided customers into geographical zones and instructed them to perform the flushing steps at different times over the course of several days, from approximately January 13, 2014 to January 17, 2014.

205.    American Water told customers that they could use its water for all purposes, including drinking, after the flushing steps were complete.

206.    However, the water that American Water delivered in the many days immediately following the flushing continued to be contaminated with MCHM.  The water was neither pure nor potable.  The water continued to have an unpleasant odor and an irritating quality for many days after the systems were flushed.

207.    American Water nonetheless charged customers its regular rate for the use of this impure and non-potable water following the system flushing.

208.    American Water's actions in selling and charging its customers for the use of impure and non-potable water in the days immediately following the flushing was in violation of its express warranty that the water was suitable for all purposes, including drinking.

209.    American Water's actions in selling and charging its customers for the use of impure and non-potable water in the days immediately following the flushing was in violation of its implied warranties under W. Va. Code § 46-2-314, including, but not limited to, its implied

warranties that the water pass without objection in the water utility trade and that the water be suitable for the ordinary purposes for which tap water is commonly used, including drinking.

210.    American Water's actions in telling its customers that the water it was delivering to customers' homes in the days following the flushing was suitable for all purposes including drinking were unfair or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-6-104, in the following particular respects:  (a) 46A-6-102(7)(E) (by representing that the water it was selling was suitable for the use of drinking when it was not and by representing that it did not have any deleterious characteristics when it continued to be irritating to the eyes and skin); (b) 46A-6-102(7)(G) (by representing that the water it was selling was pure and potable, the standard for utility tap water, and that it was of acceptable quality when it was not); (c) 46A-6-102(7)(L) (by making public statements with respect to the quality, characteristics, purity, and potability of its water that were likely to be confusing and misunderstood); (d) 46A-6-102(7)(M) (by concealing from customers that the water it was selling was still contaminated above the odor- and irritant-thresholds for Crude MCHM and likely to have an unpleasant taste and odor and an irritating quality for many days after the flushing); (e) and 46A-6-102(7)(N) (by making deceptive and misleading public statements concerning the quality, purity, and potability of the water after flushing and causing those statements to be published and broadcast).

211.    The exclusion in West Virginia Code § 46A-1-105(3) does not apply to the allegations in the preceding paragraph for at least two reasons: (1) No agency of the United States or the State of West Virginia regulates discounts allowed for early payment by customers of American Water, and, thus, American Water fails to meet the third of the three requirements for exclusion under section 46A-1-105(3); and (2) The "exclusions" in section 46A-1-105 must

48

be read in connection with the "application" in section 46A-1-104, which applies only to consumer credit sales, consumer loans, and consumer leases, and is intended only to exclude utility fees, late fees, and early payment discounts, to the extent regulated elsewhere, from being characterized and regulated as credit sale transactions under section 46A-1-104. Section 46A-6-101, *et seq*., the "General Consumer Protection" provision regulates all transactions, without regard to whether those transactions are credit sales, loans, or leases, and prohibits the use of misleading or deceptive statements in connection with the sale of goods, and therefore neither the application in 46A-1-104 nor the exclusions in 46A-1-105 apply to actions for the deceptive or misleading sale of goods under 46A-6-104. Section 46A-6-104 has its own separate set of clear exemptions set forth in section 46A-6-105, which protects publishers and broadcasters from liability for innocently running deceptive advertisements.

212. Plaintiffs are entitled to actual damages and/or statutory damages under West Virginia Code § 46A-6-106 for American Water's violations of its express and implied warranties and West Virginia Code §§ 46-2-314 and 46A-6-104.

### Count Eleven - Negligent Infliction of Emotional Distress Against the American Water Defendants and Eastman Chemical Company

213. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

214. The failure to establish an alternative water supply by Defendants WVAW, American Water, and Services constitutes negligence that foreseeably resulted in emotional distress to Class Representatives and those similarly situated which caused them to reasonably fear harmful effects from the contaminated water to the extent that they sought medical attention for sentinel symptoms such as skin and digestive symptoms.

215.    The failure to establish an alternative water supply by Defendants WVAW, American Water and Services constitutes negligence that foreseeably resulted in emotional distress to Plaintiff Melissa Johnson and those similarly situated pregnant women which caused them to reasonably fear harmful effects from the contaminated water.

216.    The failure to establish and alternative water supply by Defendants WVAW, American Water and Services constitutes negligence that foreseeably resulted in emotional distress to Plaintiff Crystal Good and those similarly situated parents which caused them to reasonably fear harmful effects from the contaminated water to both themselves and their children.

217.    Defendant American Water, failed to adequately capitalize its wholly-owned subsidiary, Defendant WVAW, despite being warned in April 2002 by the West Virginia Department of Health and Human Services of the susceptibility of its water supply to contamination; such failure constituted, in each successive budget year, a series of independent negligent acts that foreseeably resulted in emotional distress to the Class Members which caused them to reasonably fear harmful effects from the contaminated water to both themselves and their children.

218.    Defendant American Water, failed to adequately capitalize its wholly-owned subsidiary, Defendant WVAW, despite being warned by the West Virginia Department of Health and Human Services of the susceptibility of its water supply to contamination; such failure constituted, in each successive budget year, a series of independent negligent acts that foreseeably resulted in emotional distress to the Class Members which caused them to reasonably fear harmful effects from the contaminated water to both themselves and their children.

50

219.    Defendant Eastman, negligently failed to warn the Class Members of the health risks presented by Crude MCHM despite the fact that it could be foreseeably be released into the environment and come into contact with human receptors. That negligence foreseeably resulted in emotional distress to Class Members which cause them to reasonably fear harmful effects from the contaminated water to both themselves and their children.

220.    Plaintiffs now reasonably distrust their water supply, thus this emotional distress is ongoing.

221.    The conduct of the Defendants named herein constitutes the tort of negligent infliction of emotional distress.

### Count Twelve - Strict Products Liability for Failure to Warn Against American Water Defendants

222.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

223.    Defendant American Water, Services, and WVAW are liable for failure to warn once they became aware that the Elk River was contaminated and those contaminants were being distributed to the customers.

224.    American Water Defendants are sellers and distributors of a product, namely water, and were the suppliers of water to the Plaintiffs at all times relevant herein.

225.    At the point that it became known that the water intake was contaminated the distribution of water for sanitation and firefighting purposes became an ultra-hazardous activity.

226.    Defendants American Water, Services, and WVAW should have immediately upon understanding that a contaminant had entered their distribution system issued warnings by all means possible to its customers not to contact the water. Instead, the warnings came hours

after hundreds of thousands of customers, including pregnant women, had continued to use the water without warnings.

227.    The water supplied to the Plaintiffs preceding the "Do Not Use" warning, as well as thereafter, was unreasonably dangerous and entirely defective as it was contaminated with one or more dangerous and/or hazardous chemicals as a result of the water contamination alleged herein.

228.    Further, Defendants American Water, Services, and WVAW should have not advised that the water was safe to drink at one part per million (1 ppm) when other respected sources were warning against exposure at far lower levels especially for pregnant women.

**Count Thirteen- Strict Products Liability for Failure to Warn Against Eastman**

229.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

230.    Eastman marketed, packaged, sold and distributed Crude MCHM to Freedom Industries.

231.    At all relevant times, Eastman knew or should have known of the adverse health effects and risk of harm from exposure to the Crude MCHM it distributed.

232.    Eastman failed to adequately warn about the adverse health effects, the risks of harm and the need for proper practices in the storage and handling of the Crude MCHM it marketed, sold, distributed, and shipped.

233.    Eastman failed to provide an adequate Material Safety Data Sheet regarding the adverse health effects and risk of harm arising from exposure to the Crude MCHM it marketed, sold, distributed, and shipped.

234.    Eastman, therefore, marketed, sold, distributed and shipped its product in an unsafe and unreasonable manner because the foreseeable risks of harm posed by the product could have been reduced or avoided by reasonable instructions or warnings, and their omission renders the product not reasonably safe.

235.    The Crude MCHM that Eastman sold was unreasonably dangerous and defective due to Eastman's failure to provide adequate warnings and MSDS for safe use of the product.

236.    Furthermore, Eastman had a duty to fully warn and disclose potential health hazards to the public immediately upon learning that its chemical had been released into a public water supply. Eastman's duty to warn under these circumstances extended to the potential health effects associated with pathways like drinking, cooking, and bathing which would never be specifically factored in or warned against when determining toxicity in the controlled industrial environment of a coal processing plant. In short, no one in a prep plant would ever be expected to take a drink of or take a shower in the slurry water where Crude MCHM is used.

237.    Defendant Eastman Chemical Company, as the manufacturer of Crude MCHM, a waste byproduct that it was selling as a "product," had at least the following duties:  to subject its product to appropriate toxicity testing in order to determine its toxicological profile; and to adequately warn all potential users of the product of all known and knowable toxicological hazards associated with the product.

238.    Eastman subjected analytically pure MCHM to a battery of toxicological tests, including eye irritation testing in rabbits, in 1990.  The results of this eye irritation testing on rabbits showed that pure MCHM is only a "moderate" eye irritant.

239.    Eastman has never subjected Crude MCHM, the actual "product" that it sells, to eye irritation testing, despite the fact that Eastman knows that Crude MCHM may consist of as

much as twenty-eight percent (28%) of chemicals other than water and pure MCHM, and that Crude MCHM contains at least one significant constituent, CHDM, that is a dangerous and strong eye irritant that causes eye burns and that caused "severe" eye irritation in a similar rabbit study.

240.    Eastman's material safety data sheets for its CHDM products identify CHDM as a product that is a "Danger!" because it "Causes eye burns."  However, Eastman's MSDS for Crude MCHM identifies it as only causing "skin and eye irritation," even though Eastman has never performed the rabbit eye irritation test on the crude product itself, which contains CHDM, but only on the pure product, which does not contain CHDM.

241.    Upon information and belief, the Crude MCHM that leaked into the Elk River and contaminated the water is a much more potent eye irritant than the pure MCHM that Eastman tested and upon which Eastman based its eye irritation warning for the Crude MCHM Material Safety Data Sheet.

242.    Upon information and belief, Crude MCHM should have been identified as a dangerous eye irritant that causes severe eye irritation.

243.    Upon information and belief, the Etowah River Terminal and Freedom Industries, while knowingly storing chemicals in substandard tanks on the banks of a river near a major water utility intake, at least thought, based on the material safety data sheets provided by the manufacturers of those chemicals, that the chemicals they were storing so carelessly were relatively non-toxic and non-irritating in dilute concentrations.

244.    Freedom Industries relied on Eastman's negligent testing, negligent failure to test, failure to warn, and inadequate warnings concerning toxicity, in storing Crude MCHM in a manner so likely to result in contamination of the water supply.

245.    Eastman failed to test and to provide necessary solubility data or warnings relating to the likelihood of separation of Crude MCHM into a water layer and an organics layer during storage and the formation of a corrosive water layer on the bottom of any storage tank in which the chemical was stored.

246.    Upon information and belief, Freedom Industries and Etowah River Terminal relied on Eastman's lack of warnings and testing in storing Crude MCHM in poorly-maintained and outdated tanks intended to hold non-corrosive petrochemicals.

247.    Eastman's negligence in testing, failing to test, warning, and failing to warn purchasers about the true toxic and corrosive nature of the product was a proximate cause of the chemical spill, and, as a result, Plaintiffs and all similarly situated residential customers of American Water were instructed not to use their tap water for any purpose other than toilet flushing and firefighting for five-to-eight days.  The water continued to be impure, with an unpleasant odor and irritating quality, for weeks or even months thereafter.

248.    Eastman's Crude MCHM was defective, as sold, because it contained inadequate instructions and warnings concerning the true toxic and corrosive nature of the product.

249.    The defective instructions and warnings were a proximate cause of the chemical spill, and, as a result, Plaintiffs and all similarly situated residential customers of American Water were instructed not to use their tap water for any purpose other than toilet flushing and firefighting for five-to-eight days.  The water continued to be impure, with an unpleasant odor and irritating quality, for weeks or even months thereafter.  Eastman is strictly liable under the law of the State of West Virginia.

250.    As a direct and proximate cause of Eastman's failure to warn, Plaintiffs suffered injuries.

**Count Fourteen - Strict Liability for Ultra Hazardous Activities against
Gary Southern, Dennis Farrell and Eastman Chemical Company**

251.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

252.    Defendants Southern, Farrell, and Eastman, inclusive, or one or more of them, were engaged in manufacturing, distribution, storage, control, use, transport and disposal of the Crude MCHM in close proximity to the Elk River and WVAW's intake for the water supply of several counties is an ultra-hazardous or abnormally dangerous activity. The storage of harmful chemicals in tanks in bulk quantities on one's property is also an abnormally dangerous activity as is distributing to facilities ill-equipped to handle such toxic materials. Therefore, Defendants Southern, Farrell and Eastman Chemical are strictly liable for all damages that are caused by that activity.

253.    Defendants' conduct, acts, and omissions have: damaged Plaintiffs' property by necessitating the flushing or replacement of pipes, water heaters and other appliances; caused lost profits; and, created the need for a medical monitoring protocol to assess the health effects of exposure to Crude MCHM and protect the health of Plaintiffs and the Class Members through early diagnosis of dread disease, including cancer.

254.    Defendants are *prima facie* answerable for all damage to Plaintiffs' person and property which is the natural consequence of their ultra-hazardous and abnormally dangerous activities.

255.    Defendants are strictly liable for any and all damages caused by the escape of any materials impounded.

256.    Plaintiffs' injuries were proximately caused by Defendants' ultra-hazardous and abnormally dangerous activities.

56

257.    Defendants are strictly liable for any and all personal injuries and damages caused by exposure to toxic substances escaping from their operations.

## Count Fifteen - Public Nuisance Against All Defendants

258.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

259.    Defendants' acts and omissions constitute an unreasonable interference with the exercise of rights common to the general public in that it significantly interferes with public health and safety.

260.    Defendants knew or had reason to know that their activities have a significant effect on public rights.

261.    Defendants have acted intentionally or it was reasonably foreseeable to Defendants that their activities would cause harm to Plaintiffs and their property.

262.    Defendants' activities proximately caused Plaintiffs' injuries.

263.    The conduct, acts, and omissions of Defendants as set forth herein created a public nuisance from which the Plaintiffs have derived special injuries which cannot be fully compensated in an action at law.

## Count Sixteen - Private Nuisance Against All Defendants

264.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

265.    Defendants have invaded and interfered with, and are invading and interfering with, the Plaintiffs' interest in the private use and enjoyment of their properties through their release of Crude MCHM into Plaintiffs' water supply and into Plaintiffs' persons and properties, thereby resulting in private nuisance for which Defendants are responsible. Plaintiffs were

instructed not to use their tap water for any purpose other than toilet flushing and firefighting for five-to-eight days.  The water continued to be impure, with an unpleasant odor and irritating quality, for weeks or even months thereafter.

266.    Defendants' activities have created a private nuisance by way of the release of Crude MCHM into the water supply, thereby naturally and proximately causing Plaintiffs to suffer personal injuries, lost profits, property damage, and loss of use and enjoyment of their properties.

267.    The damages of the Plaintiffs caused by the private nuisance are substantial including, but not limited to, interference with the enjoyment of the Plaintiffs' residences and businesses, annoyance, aggravation and inconvenience, mental and emotional distress, and other damages not specified herein.

268.    The actions of the Defendants in this regard were willful, wanton, reckless and/or careless.

### Count Seventeen - Trespass Against All Defendants

269.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

270.    Defendants recklessly, knowingly, and willfully caused and allowed hazardous toxic chemicals to be released and discharged into the water supply and into Plaintiffs' properties. This release resulted in an actual physical invasion onto and into Plaintiffs' properties. This physical invasion is continuing until the pipes of Plaintiffs' property are flushed clear and/or replaced.

271.    The entry and presence of Crude MCHM in Plaintiffs' properties is unauthorized. Defendants have not sought or obtained Plaintiffs' consent to deposit and/or store 4-methylcyclohexane methanol on Plaintiffs' properties.

272.    Defendants American Water, Services, and WVAW trespassed in that unwanted material, namely Crude MCHM, without permission entered the homes and businesses of the Class Members.  The Class Members are entitled to recover for testing, to determine not whether Crude MCHM was ever deposited, but rather to determine if the property is still contaminated.

273.    The damages caused by Defendants' unlawful trespass were foreseeable.

274.    Plaintiffs have suffered personal injury, injury to personal and real property, lost profits, and emotional distress as a direct and proximate result of Defendants' unlawful trespass.

275.    The actions of the Defendants in this regard were willful, wanton, reckless, and/or careless.

**Count Eighteen- Breach of Contract Against American Water Defendants**

276.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

277.    A contract existed between the Plaintiffs and American Water Defendants whereby the Defendants would provide safe and adequate drinking water and water for other uses.

278.    American Water Defendants breached their contract with the Plaintiffs, entitling the Plaintiffs to all contract damages, including, but not limited to, damages associated with the breach and consequential damages.

**Count Nineteen – Equitable Remedy of Medical Monitoring**

279.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

280.    Crude MCHM is a proven hazardous substance.

281.    Plaintiffs have been significantly exposed to them relative to the general population.

282.    Plaintiffs' exposure to the Crude MCHM was due to the tortious conduct of the Defendants.

283.    As a direct and proximate result of the exposure, Plaintiffs have suffered an increased risk of contracting serious latent disease.

284.    The increased risk of disease makes it reasonably necessary for the Plaintiffs to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of exposure.

285.    Monitoring procedures exist that make the early detection of a disease possible.

286.    Plaintiffs who are, or who represent the interests of, the exposed population in utero, infants, and children have been exposed to a known toxic substance, Crude MCHM, at a greater concentration than the general public is typically exposed such that the Plaintiffs have an increased risk of contracting latent dread disease for which testing exists different than medical tests required by the general public.

287.    The population of in utero, infants, and children up to the age of five were exposed to levels at or exceeding two parts per million (2 ppm) Crude MCHM in the first twenty-four to thirty-six hours, which is a greater concentration than the general public is typically exposed.

60

288.    The exposed population in utero, infants, and children up to the age of five, have an increased risk of developing neurological damage, resulting in ADD or ADHD from the toxic insult to the developing brain caused exposure to methanol contained in Crude MCHM.

289.    Cognitive tests for ADD or ADHD, once the exposed population in utero, infants, and children up to the age of five reach an appropriate age, are readily available, generally accepted, and advantageous medically.

290.    A medical monitoring protocol may include follow-up structural tests or other neurological examinations if initial screenings and/or cognitive tests so indicate. Such follow-up structural, and neurological examinations are readily available, generally accepted, and advantageous medically.

291.    A medical monitoring protocol may include data collection incorporating epidemiological data generated by generally accepted medical surveillance techniques as a means of quantifying and identifying ongoing risk factors which may necessitate a change in the medical monitoring protocol for the exposed population in utero, infants, and children up to the age of five

292.    Plaintiffs, on behalf of the exposed population in utero, infants, and children up to the age of five they represent, request the establishment of a court administered and supervised medical monitoring program to oversee and direct medical surveillance and provide for medical examinations and testing of Class Members for latent dread diseases, including, but not limited to, neurological disease because members of the class have been exposed to Crude MCHM, a known toxin, in greater concentrations than the public at large.

293.    Given that the exposed population in utero, infants, children up to the age of five were exposed to a chemical: 1) similar in structure to chemicals which are known or likely

61

carcinogens; 2) on which no cancer studies have been performed; and 3) that early animal studies suggest cause blood disorders, tests and surveillance aimed at uncovering cancer risks are readily available, generally accepted, and advantageous medically.

294.   Given the toxicity of the chemicals, the seriousness of the diseases for which Plaintiffs are at risk, the relative increase in the chance of onset of disease in those exposed, and the value of early diagnosis, such surveillance to monitor the effect of exposure to toxic chemicals is reasonable and necessary.

295.   It would be inequitable for Plaintiffs who have been wrongfully exposed to dangerous toxins, but unable to prove that is likely to have to pay the expense of medical monitoring when such intervention is clearly reasonable and necessary.

## Count Twenty - Punitive Damages

296.   Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

297.   The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs.  Plaintiffs and the Class are thus entitled to recover punitive damages against Defendants.

298.   Defendants were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs, in their activities and in failing to warn Plaintiffs of dangers well known to Defendants, which acts exhibited a deliberate disregard for the rights and safety of Plaintiffs.

299.    Defendants realized the imminence of danger to Plaintiffs and other members of the public, but continued their ultra-hazardous activities with deliberate disregard and complete indifference and lack of concern for the probable consequences of their acts.

300.    As a direct result of Defendants' deliberate disregard for the rights and safety of others, gross negligence, malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs, Plaintiffs suffered the injuries and dangers stated above.

301.    Defendants' acts as described herein exhibited deliberate disregard for the rights and safety of others and were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. An award of punitive and exemplary damages is therefore necessary to punish Defendants, and each of them, and to deter any reoccurrence of this intolerable conduct. Consequently, Plaintiffs are entitled to an award of punitive damages.

302.    The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. Plaintiffs and the Class are thus entitled to recover punitive damages against Defendants in an amount sufficient to punish Defendants for their wrongful conduct and to deter Defendants and others from similar wrongful conduct in the future.

### Count Twenty-One- Equitable Remedy of Piercing the Corporate Veil Against the American Water Defendants

303.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

304.    The following factors support piercing the corporate veil in this case against Defendants American Water, Services, and WVAW:

(1) There was a clear failure on the part of Defendant American Water to adequately capitalize the Defendant WVAW for the risks that any reasonable person would have recognized after being warned of the high susceptibility of contamination by the WVDHHR in April 2002;

(2) Defendant American Water used the corporate vehicle as a mere conduit to operate Defendants WVAW and Services;

(3) Defendant American Water ultimately owns all of the stock of Defendants WVAW and Services;

(4) Defendant American Water shares the same address in Vorhees, New Jersey with its wholly-owned subsidiaries, Defendants WVAW and Services;

(5) Defendant American Water shares the same law firm with Defendants WVAW and Services;

(6) Defendant American Water reports consolidated financials that include the financial results of Defendants WVAW and Services; and

(7) Defendant American Water failed to adequately mandate and capitalize the alternate water supply which Defendant WVAW should have created which would have mitigated or averted the current crisis.

**Count Twenty-One- Defendant, Eastman Chemical Company, Violations Of The Toxic Substance Control Act- 15 USC §2607(E) and 15 USC §2614(3)(b)**

305.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

306.    Pursuant to 15 USC §2619(A)(1), Plaintiffs bring this action to restrain on-going violations of 15 USC §2607(E) and 15 USC §2614(3)(b) and to require compliance with TSCA.

307.    Pursuant to 15 U.S.C. § 2619(B)(1), Plaintiffs served Defendant, Eastman Chemical Company, through its registered agent for service of process, Corporation Service Company on September 2, 2014 with the statutorily required notice setting forth with specificity the violations of TSCA, 15 USC §2607(E) and 15 USC §2614(3)(b), alleged by Plaintiffs.

308.    The locations of the violations are believed to be Eastman Chemical's factory in Kingsport, Tennessee.

309.    The Plaintiffs reside in the Southern District of West Virginia.

310.    The beginning date for the violation related to the failure to report the potential for blood disorders is April 16, 1998 and continuing every day until the present.

311.    The beginning date for the violation related to the failure to report to the EPA the effect on health and environment is January 9, 2014 and continuing every day until formally reported.

312.    At the time of the spill and immediately thereafter, Eastman Chemical knew that MCHM presented a substantial risk of injury to health or the environment because of the widespread acute illnesses reported throughout the affected region. Under 15 USC §2607(E), TSCA required Eastman to immediately notify the EPA Administrator that MCHM presented a risk of injury to health.

313.    Pursuant to 15 USC §2607(E), Eastman should have reported to the EPA Administrator that thousands of residents sought medical advice and/or treatment after being exposed to MCHM and presenting with the exact symptoms predicted in the Eastman MCHM MSDS.

314.    Further, Eastman Chemical knew that its product was intended for use in coal processing plants designed to discharge slurry containing MCHM into refuse impoundments

65

which then discharge into the waters of the United States.  Thus, Eastman knew or should have known that MCHM would come into direct contact with the environment. Not only does MCHM enter the environment when used as intended in coal processing facilities, but Eastman should also have known that this harmful toxin would enter the waters of the United States given the frequency of permitted and unpermitted releases of coal processing wastes. Thus, Eastman under 15 USC §2607(E) should have disclosed the risk of harm to the environment presented by the obvious pathway from the coal processing plant to the waters of the United States.

315.    In the aftermath of the spill, testing by the West Virginia Department of Environmental Protection identified MCHM in NPDES outlets and in creeks downstream from slurry impoundments at six different locations across the state. Given the acute health impacts experienced by the population, when Eastman learned the WVDEP had confirmed the exposure pathway to the streams of West Virginia its duty to report under 15 USC §2607(E) was once again triggered.

316.    Independent scientific testing by WVTAP replicating key components of Eastman's aquatic toxicology studies indicate that MCHM is significantly more toxic than previously represented by Eastman. These results call into question the veracity of Eastman's studies determining that the potential for harm to aquatic life was small and once again independently triggered Eastman's duty under 15 USC §2607(E) to disclose to the EPA information indicating that MCHM presents a risk to the environment.

317.    The spill of MCHM into the Elk River negatively impacted the odor and taste of Plaintiffs' municipal water supply. Such impact on the odor and taste of the water triggers a duty for Eastman to report the spill to the EPA Administrator under 15 USC §2607(E).

318.    In 1998, Eastman began to conduct toxicology studies on MCHM with the intention of developing data which would allow the company to remove the warning about the potential for blood disorders from its MSDS sheets. Eastman went so far as to change the breed of rat used in experiments and to abandon on several occasions Good Laboratory Practices in order to sanitize the available safety information about Crude MCHM.

319.    Eastman ignored the alarming data revealed in its studies so that it could draw and then report to the EPA false and/or misleading conclusions regarding the toxicity of Crude MCHM.

320.    Every public health official from the CDC to the Kanawha County Board of Health cited the lack of toxicological data as the largest impediment to adequately assessing the risk of MCHM exposure. Eastman's on-going violation of 15 USC §2607(E) for the past seventeen years is not a minor paperwork infraction without real-world harm to residents. Eastman's seventeen years of failure to report under 15 USC §2607(E) denied medical, science and government professionals information desperately needed on the evening of January 9th. Had Eastman carried out its duty under 15 USC §2607(E) to faithfully report the risks of MCHM over the past seventeen years, those public health officials would not only immediately have  had access to the questionable final reports Eastman grudgingly made available days after the spill but also the raw data and scientific analysis gathered in those early Eastman studies so scientists and doctors from CDC, Kanawha County Board of Health and EPA could draw their own conclusions.

321.    Had Eastman properly characterized and disclosed the risk of MCHM as required by TSCA, West Virginia American Water would have had a more accurate MSDS upon which to rely when making the decision to leave its sole intake open.

322.    Each failure to submit reports, notices or other information as required by TSCA is a separate violation of 15 USC §2614(3)(B).

## PRAYER FOR RELIEF

1.    **WHEREFORE**, the Plaintiffs respectfully pray for a Jury Trial and for the following relief:

(1)  An Order certifying this action to proceed as a Class Action, authorizing Plaintiffs to represent the interests of the Class or subclasses as appropriate and appointing undersigned counsel to represent the Class;

(2)  An injunction ordering Defendant WVAW to complete a Source Water Assessment Protection Plan and to provide for an alternate, emergency water supply in the event of pollution upstream from its water intake on the Elk River and take appropriate steps to ameliorate and reduce those risks to an acceptable level to ensure public safety in the future;

(3)  An injunction ordering Defendant Eastman to complete a competent and thorough toxicological analysis of the risks to acute and chronic effects to human health from exposures to low levels of Crude MCHM and to make changes to its published MSDS sheets accordingly. Such study must include medical surveillance of the currently affected population sufficient to provide usable epidemiological evidence;

(4)  An injunction ordering Defendant Eastman to provide to the Administrator of the EPA immediately any and all reporting required pursuant to 15 USC §2607(E) and 15 USC §2614.

(5)  An award of damages for Class Members who suffered business or economic losses as a result of Defendants' conduct, acts, or omissions;

(6)  An award of damages or mechanism for recovery for Class Members who incurred costs for water replacement, travel, water heater, appliance or plumbing repair or replacement and any other out-of-pocket expenses as a result of the Defendants' conduct, acts, or omissions;

(7)  An award of damages or mechanism for recovery to compensate those who sought medical attention or advice after exposure to the contaminated water.

(8)  An award of damages or mechanism for recovery to compensate for personal injury;

(9)  An award of damages or mechanism for recovery to compensate for loss of use and enjoyment of property, annoyance, nuisance, aggravation, and inconvenience;

(10) An award of punitive damages for all Class Members who were exposed to Crude MCHM;

(11) Prejudgment and post-judgment interest;

(12) Statutory damages for attorney fees and litigation costs pursuant to TSCA;

(13) Damages for lost wages;

(14) An Order establishing a Medical Monitoring Program designed to survey as appropriate and to protect the Class Members from latent, dread disease, funded by the Defendants;

(15) An Order establishing such administrative procedures as are reasonable to effectuate the relief granted Plaintiffs and the Class Members;

(16) That the Court order the Defendants to pay for the costs of this proceeding,

including reasonable attorneys' fees and costs, including, but not limited to,

costs of class notice and administration; and

(17) Such other relief as the Court or Jury may deem appropriate.

Respectfully Submitted:

By Counsel,

/s/ Kevin W. Thompson
Kevin W. Thompson, Esquire (WVSB# 5062)
David R. Barney, Jr., Esquire (WVSB# 7958)
Thompson Barney
2030 Kanawha Boulevard, East
Charleston, West Virginia  25311
Telephone: (304) 343-4401
Facsimile: (304) 343-4405
kwthompsonwv@gmail.com
drbarneywv@gmail.com

Van Bunch, Esquire (WVSB# 10608)
Bonnett Fairbourn Friedman & Balint PC
2325 E. Camelback Road, Suite 300
Phoenix, Arizona 85016
Telephone: (602) 274-1100
Facsimile: (602) 274-1199
vbunch@bffb.com

/s/ Stuart Calwell
Stuart Calwell, Esquire (WVSB# 0595)
Alex McLaughlin, Esquire (WVSB# 9696)
D. Christopher Hedges, Esquire (WVSB# 7894)
THE CALWELL PRACTICE, LC
Law and Arts Center West
500 Randolph Street
Charleston, WV 25302
(304) 343-4323
(304) 344-3684 (facsimile)
scalwell@calwelllaw.com
amclaughlin@calwelllaw.com
chedges@calwelllaw.com

Interim Class Counsel for Plaintiffs and the Class

70

/s/ Mark F. Underwood
Mark F. Underwood, Esquire (WVSB# 7023)
UNDERWOOD LAW OFFICE
923 Third Avenue
Huntington, West Virginia 25701
Telephone: 304-522-0508
Facsimile: 304-399-5449
markunderwood@underwoodlawoffice.com

Counsel for Plaintiffs


P. Rodney Jackson, Esquire (WVSB# 1861)
Law Offices of Rod Jackson
401 Fifth-Third Center
700 Virginia Street, East
Charleston, West Virginia 25301
Telephone: (843) 780-6879
Facsimile: (304) 345-7258
prodjackson27@yahoo.com


Stephen H. Wussow, Esquire (visiting attorney)
Michael G. Stag, Esquire (visiting attorney)
Stuart H. Smith, Esquire (visiting attorney)
Sean S. Cassidy, Esquire (visiting attorney)
Smith Stag, LLC
One Canal Place
365 Canal Street, Suite 2850
New Orleans, Louisiana 70130
Telephone: (504) 593-9600
Facsimile: (504) 593-9601
swussow@smithstag.com
mstag@smithstag.com
ssmith@smithstag.com
scassidy@smithstag.com


/s/Michael J. Del Giudice
Michael J. Del Giudice, Esquire (WVSB# 0982)
Timothy J. LaFon, Esquire (WVSB# 2123)
Cicarello, Del Giudice and LaFon
1219 Virginia Street, East, Suite 100
Charleston, West Virginia  25301
Telephone:  (304) 343-4400

71

Facsimile:  (304) 343-4464
mikedel@cdlwv.com
tlafon@cdlwv.com