```
            UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF WEST VIRGINIA
                    AT CHARLESTON
```

CRYSTAL GOOD, individually and as
parent and next friend of minor children
M.T.S., N.T.K. and A.M.S. and
MELISSA JOHNSON,
individually and as parent of her unborn child,
MARY LACY and JOAN GREEN and JAMILA AISHA OLIVER,
WENDY RENEE RUIZ and KIMBERLY OGIER and ROY J. McNEAL and
GEORGIA HAMRA and MADDIE FIELDS and BRENDA BAISDEN, d/b/a
FRIENDLY FACES DAYCARE, and ALADDIN RESTAURANT, INC., and
R. G. GUNNOE FARMS LLC, and DUNBAR PLAZA, INC.,
d/b/a DUNBAR PLAZA HOTEL,
on behalf of themselves and all others
similarly situated,

       Plaintiffs,

v.                                    Civil Action No.: 2:14-01374

AMERICAN WATER WORKS COMPANY, INC., and
AMERICAN WATER WORKS SERVICE COMPANY, INC., and
EASTMAN CHEMICAL COMPANY and
WEST VIRGINIA-AMERICAN WATER COMPANY,
d/b/a WEST VIRGINIA AMERICAN WATER, and
GARY SOUTHERN and DENNIS P. FARRELL,

       Defendants.


### MEMORANDUM OPINION AND ORDER

Pending is the motion by American Water Works Company, Inc. ("American"), to dismiss, filed January 7, 2015.

American is the parent company of defendants American Water Works Service Company, Inc. ("Service Company") and West Virginia-American Water Company ("WV American"). The three defendants are referred to collectively as the water company defendants.

I.

A.   The Incident

On January 9, 2014, approximately 300,000 residents in the Charleston and surrounding area suffered an interruption in their water supply.  The interruption was caused by a spill into the Elk River of a coal processing chemical mixture sold and distributed exclusively by Eastman Chemical Company.  The mixture was at the time owned by and being stored in a facility owned and operated by Freedom Industries, Inc. ("Freedom Industries").  The chemical, 4-methylcyclohexane methanol, along with other chemicals, is commonly referred to as "Crude MCHM."  Crude MCHM infiltrated the WV American water treatment plant in Charleston.

Plaintiffs assert that the water company defendants could have prevented the incident with better precautions, regulatory compliance, and use of reasonable care.  Some putative class members operate businesses that lost revenue due to the interruption.  Others claim physical injuries, asserting that exposure to Crude MCHM in the environment through human pathways caused bodily injury and necessitated that they be medically monitored.  Still others are alleged to have incurred

costs for water replacement, travel, and other associated expenses.

B.   The First Amended Consolidated Class Action Complaint

      On December 9, 2014, the First Amended Consolidated Class Action Complaint became the operative pleading in the case.  It alleges the following claims against the water company defendants:

    Count One: Negligence;

    Count Two: Negligence for, <u>inter alia</u>, the water company defendants' failure to address the foreseeable risk posed by the Freedom Industries facility, as warned by the West Virginia Department of Health and Human Resources, failure to adequately warn the class members, failure to design, maintain, and operate the water treatment plant according to industry standards, negligently and unreasonably delivering and placing on plaintiffs' property the Crude MCHM, and failure to ensure that water tankers were not filled with contaminated water;

    Count Seven: Gross negligence as to the water company defendants inasmuch as they recklessly ignored threats to class members both in design and maintenance of their operations, their warnings and attempts to deliver water;

    Count Eight: Prima facie negligence as to the water company defendants for failing to adopt a source water protection plan as required by the federal Safe Water Drinking Act, the state Drinking Water Treatment Revolving Fund Act, and accompanying regulations;

    Count Ten:  Breach of warranties as to the water company defendants inasmuch as they informed customers their water would be safe following flushing and charged their customers the regular rate for the impure water, in violation of the warranties that the water pass without

>objection in the water utility trade and that the water be suitable for the ordinary purposes for which tap water is commonly used, which acts were also unfair or deceptive acts and practices in violation of the West Virginia Consumer Credit and Protection Act ("WVCCPA");
>
>Count Eleven:  Negligent infliction of emotional distress against the water company defendants arising out of, <u>inter alia</u>, their failure to establish an alternative water supply that caused affected individuals to reasonably fear harmful effects from the contaminated water;
>
>Count Twelve: Strict products liability against the water company defendants for failure to warn concerning the contamination until hours after it occurred and for providing incorrect information that it was safe to drink the water when Crude MCHM was at one part per million;
>
>Count Fifteen: Public nuisance against all defendants;
>
>Count Sixteen: Private nuisance against all defendants;
>
>Count Seventeen: Trespass against all defendants;
>
>Count Eighteen:  Breach of contract against the water company defendants;
>
>Count Nineteen: Medical monitoring against all defendants.

## II.

A.   Governing Standard

Rule 12(b)(2) provides that "a party may assert the lack of personal jurisdiction" by motion.  Fed. R. Civ. P. 12(b)(2).  Our court of appeals has observed as follows respecting the Rule 12(b)(2) standard:

> When a district court considers a question of personal jurisdiction based on the contents of a complaint and supporting affidavits, the plaintiff has the burden of making a prima facie showing in support of its assertion of jurisdiction.  In considering whether the plaintiff has met this burden, the district court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction."

Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558 (4th Cir. 2014) (some citations omitted)(quoting Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)).  The exercise of personal jurisdiction over a foreign corporation is proper only if: (1) jurisdiction is authorized by the long-arm statute of the state in which the district court sits, and (2) application of the relevant long-arm statute is consistent with the due process clause.  ESAB Grp., Inc. v. Zurich Ins. PLC, 685 F.3d 376, 391 (4th Cir. 2012).

Where, as here, the forum state has drawn a long-arm statute that is coextensive with the reach of the Due Process Clause, the two-step inquiry merges into one, and the court assesses whether the exercise of personal jurisdiction comports with the due process clause.  In re Celotex Corp., 124 F.3d 619, 627-28 (4th Cir. 1997) ("Because the West Virginia long-arm statute is coextensive with the full reach of due process, it is unnecessary in this case to go through the normal two-step formula for determining the existence of personal

5

jurisdiction.") (citing <u>Pittsburgh Terminal Corp. v. Mid Allegheny Corp.</u>, 831 F.2d 522, 525 (4th Cir. 1987)); <u>Tire Eng'g v. Shandong Linglong Rubber Co.</u>, 682 F.3d 292, 301 (4th Cir. 2012) (observing that the two-prong test "collapses into a single inquiry" when a state's long-arm statute "extends personal jurisdiction to the outer bounds of due process").

In <u>Universal Leather</u>, the court of appeals succinctly set forth the due process analysis that is applicable here:

> Under the Fourteenth Amendment's Due Process Clause, there are two paths permitting a court to assert personal jurisdiction over a nonresident defendant. The first path is "specific jurisdiction," which may be established if the defendant's qualifying contacts with the forum state also constitute the basis for the suit. The second path is "general jurisdiction," which requires a "more demanding showing of continuous and systematic activities in the forum state." . . .
>
> We recognize that "[f]airness is the touchstone of the jurisdictional inquiry," and we employ a three-part test to determine whether the exercise of specific personal jurisdiction over a nonresident defendant comports with the requirements of due process. Under this test, we analyze: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims [arose] out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable."

<u>Universal Leather</u>, 773 F.3d at 559 (citations omitted).

A nonresident corporation has purposefully availed itself of the privilege of conducting business in a forum state

6

when its "conduct and connection with the forum [s]tate are such that . . . [it] should reasonably anticipate being haled into court there." Fed. Ins. Co. v. Lake Shore Inc., 886 F.2d 654, 658 (4th Cir. 1989) (quoting World-Wide Volkswagen v. Woodson, 444 U.S. 286, 297 (1980)) (internal quotations omitted). Our court of appeals has generally ruled "that a foreign defendant has purposefully availed itself of the privilege of conducting business in the forum state when the defendant 'substantially collaborated with a forum resident and that joint enterprise constituted an integral element of the dispute.'" Universal Leather, 773 F.3d at 560 (citation omitted).

B.  Analysis

Plaintiffs allege in the first amended consolidated class action complaint as follows respecting American:

> Defendant . . . [American] bears legal responsibility for the damages stemming from the contamination of the water supply. Its acts and omissions include its failure to require, capitalize, and fund the development of an alternate water supply and to properly oversee and manage its wholly owned and controlled subsidiaries, . . . [WV American and the Service Company]. Defendant . . . [American] exercises full dominion and control over its subsidiaries . . . [WV American and the Service Company].

(First Am. Consol. Class Act. Compl. ¶ 25).

American challenges the exercise of personal jurisdiction. It asserts there is no basis for general jurisdiction. Respecting specific jurisdiction, it contends that it has no contacts with West Virginia. It attaches the affidavit of William D. Rogers, the Vice President and Treasurer of American, which provides pertinently as follows:

> American is a citizen of Delaware and New Jersey.
>
> It is a holding company that holds the stock of its direct and indirect subsidiaries.
>
> It does not provide services or conduct operations in any state.
>
> It has only four employees.
>
> It is the parent corporation of the Service Company and WV American.
>
> It does not exercise full dominion and control over the Service Company or WV American, which have their own employees, officers, and directors.
>
> None of the officers of American are also officers of WV American, and none of the officers of WV American are also officers of American.
>
> One of the five board members of WV American is an officer of American.
>
> None of the board members of American are officers or directors of WV American.

American also asserts that plaintiffs cannot impute the West Virginia contacts of WV American to American unless they first allege facts sufficient to support piercing of the corporate veil.

Plaintiffs challenge the Rogers affidavit, in part, on the following grounds:

> Mr. Rogers' account does not adequately reflect the current relationship between . . . [American] and the . . . [WV American] water treatment facility and intake at issue in this case. In . . . [American's] latest Form 10-K, for the year ended December 31, 2013, . . . [American] identified Mr. Nick Rowe as a Senior Vice President holding that title since November 2011. Mr. Rowe was also noted as having "responsibility for the day to day operations" while employed by . . . [American] of the "American Water facilities . . . in West Virginia" between 1987 and 1998. While it is unclear exactly what management positions Mr. Rowe held during this time, it is apparent from the 10-K that . . . [American] refers to itself as running water facility operations in West Virginia, and its wholly-owned subsidiaries as mere divisions or business units to this day.

(Pls.' Resp. at 8).

Plaintiffs also attach to their response brief certain historical information respecting American and its predecessor West Virginia subsidiary, West Virginia Water Company.[1] First, plaintiffs reference the July 16, 1969 order entered by the West Virginia Public Service Commission ("PSC"). The order addressed the issuance of a certificate to construct, operate and maintain a new, integrated water treatment plant and facilities. The order led to the takeover of the water supply by WV American for

---

[1] The subsidiary name change to WV American appears to have been accomplished in 1986. For ease of reference, the court uses WV American _infra_ to refer to the predecessor subsidiary and the present day successor entity.

the Charleston and surrounding areas and construction of the water treatment plant at the center of this controversy. In discussing options related to the takeover, the PSC order provides materially as follows:

> It was the judgment of the management of . . . [American], the parent firm of . . . [WV American], that the proposed plan was needed in order for the operating company to meet its public obligations to provide a safe potable supply of water, adequate for the present and future needs through 1990. Management declares its existing facilities are inadequate to meet its projected demands. . . . The management of . . . [American] also indicated that, based on its experience, any delay in the proposed plan would only increase the cost.

(PSC Ord. at 235). The order additionally reflects that American would, with respect to WV American, "maintain a capital structure of 60-65 percent debt, 10 to 15 percent preferred stock and the balance common equity." (**Id.**)

Second, plaintiffs attach the testimony of Marshall A. Anderson before the PSC, coming just months prior to the July 16, 1969, order.[2] On April 1, 1969, Mr. Anderson, then vice-president for American, appeared before the PSC. He had served as a director for American since 1953, along with serving as a director of WV American. His testimony discussed the historical

---

[2] Mr. Anderson was sworn prior to his testimony. The court treats the testimony as the equivalent of a sworn affidavit for purposes of the Rule 12(b)(2) analysis.

corporate structure of American and what came to be known as WV American, along with the then-proposed construction of the facility at issue here. Mr. Anderson testified as follows:

> He participated in the 1965 American acquisition of the distant predecessor to WV American, namely, Southern Gas & Water Company;
>
> A new board of directors that included multiple American officials was elected at that time, for the new entity that ultimately became WV American, with members who had training in design, construction, and operation of public water supply facilities;
>
> Prior to the acquisition, American officials visited the Charleston water treatment facilities and certain other plants, during which a serious water quality problem was noticed in Nitro that required prompt action;
>
> The American-dominated board of WV American requested that a consulting firm "prepare a report for us which we could use in conjunction with opinions of our own engineers and other employees in determining the best course to follow" for upgrading the Charleston water system. (Testim. at 77);
>
> In lieu of temporary fixes at existing water treatment facilities, the board of directors elected to propose "a new treatment plant which could take water from both the Elk and Kanawha Rivers." (Id. at 79);
>
> At the time the proposal and its related components were developed, "officers of the company[, which the favorable inference rule would equate with American,] were authorized to investigate site locations and to make their recommendations." (Id. at 80). Those recommendations were agreed to "by our consulting engineers . . . and the officers were authorized to proceed with acquisition of the site in the Triangle District." (Id. at 80-81).
>
> Mr. Anderson stated that "we felt that we should provide an abundant supply of the highest quality

11

water possible within the limits of economic feasibility." (Id. at 81).

Mr. Anderson also noted as follows when asked about actions taken by the new board of directors of American in 1965:

> Having taken over management of the company, we wanted an evaluation of the Charleston system in order to determine what improvements were necessary to put the Charleston water facilities in a condition to furnish an ample quantity of high quality water for a reasonable period in the future.

(Id. at 79).

As noted, the court is required to take both the allegations in the first amended consolidated class action complaint, the PSC order, and Mr. Anderson's testimony as true.[3]

---

[3] In Universal Leather, our court of appeals observed as follows:

> Because the district court did not conduct an evidentiary hearing, the court was required to assume the credibility of Universal's version of the facts, and to construe any conflicting facts in the parties' affidavits and declarations in the light most favorable to Universal. See, e.g., Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 396 (4th Cir. 2003) (stating that absent an evidentiary hearing, the district court "must take all disputed facts and reasonable inferences in favor of the plaintiff" in determining whether the plaintiff has met its initial burden of proof with regard to personal jurisdiction) (citing Combs, 886 F.2d at 676); O'Hare Int'l Bank v. Hampton, 437 F.2d 1173, 1176–77 (7th Cir.1971) (accepting as true, for purposes of appeal, facts related in the plaintiff's affidavits and complaint when the parties' affidavits contained contradictory factual allegations with respect to personal jurisdiction); cf. Dowless v. Warren-Rupp Houdailles, Inc., 800 F.2d 1305, 1307–08

Additionally, in assessing whether plaintiffs have made out a prima facie case, "the most favorable inferences" are drawn in plaintiffs' favor. Plaintiffs specifically allege in Count Two that American negligently designed the water treatment plant, leading to the contamination that is central to this litigation. While the water treatment plant has doubtless been upgraded over the decades that have followed, the court must accept as true that one or more of the breaches alleged would have occurred in the design phase, namely, at the time that the PSC was considering, and then approved, the certificate discussed <u>supra</u>.

Viewed from that perspective, plaintiffs have offered a prima facie case respecting the three factors set forth in <u>Universal Leather</u> that would support the exercise of specific jurisdiction. American is accused both of improperly overseeing

---

(4th Cir. 1986) (noting that the plaintiff "need not present evidence in making a prima facie case to oppose a motion to dismiss," and that "[m]ere allegations are sufficient" to satisfy the pleading requirements for personal jurisdiction).

<u>Universal Leather</u>, 773 F.3d at 560-61 (emphasis added); <u>see also</u> 4 Charles A. Wright <u>et al.</u>, Fed. Prac. & Proc § 1067.6 (3rd ed elec. 2015) ("In challenging specific jurisdiction, a defendant may raise factual issues relevant to personal jurisdiction. If a defendant makes such a challenge, the plaintiff must respond by establishing a basis for personal jurisdiction by presenting at least comparable levels of proof (when comparable levels of proof are put forth the plaintiff receives the benefit of the doubt).").

and managing WV American and of direct negligence from a design perspective arising out of direct contact with this forum.[4] Plaintiffs support these assertions not only with bare allegations, but with inferences favorable to them arising from language found in the PSC order and Mr. Anderson's testimony. Viewed in a plaintiff-centric way, the allegations, PSC order, and Mr. Anderson's testimony may be understood to mean that American controlled its new subsidiary from the beginning, as a business unit or division, with the American-dominated board of directors and officers of WV American making detailed assessments and evaluations concerning the design, construction, and future expansion of the water system for Charleston and surrounding areas.

These considerations are sufficient for the court to conclude, at this stage of the case, that American Water purposefully availed itself of the privilege of conducting activities in this forum and that the negligent design claim, at a minimum, arises out of those purposefully directed activities. Additionally, it is constitutionally reasonable to exercise

---

[4] For this reason, the court does not now pass on whether the allegations found in the operative pleading are sufficient to state a plausible claim for piercing the corporate veil of the subsidiaries for purposes of reaching American Water. The ultimate determination of that issue may well be fact-bound in any event.

personal jurisdiction presently.  American Water has not shown that this "'litigation [is] 'so gravely difficult and inconvenient' that . . . [it would be] unfairly . . . [placed] at a "severe disadvantage" in comparison to [its] opponent[s].'" ESAB Group, Inc. v. Zurich Ins. PLC, 685 F.3d 376, 392 (4th Cir. 2012) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478 (1985) (quoting The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 18 (1972); McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957)).

At this point, the proof and allegations suffice for purposes of the Due Process Clause.[5]

---

[5] Citing nonbinding circuit authority, defendants assert "Where, as here, Plaintiffs bring multiple claims, they must establish specific jurisdiction for each claim." (Reply at 3 (emphasis in original)).  That is not the case.  The leading commentators on federal jurisdiction observe as follows:

> In conclusion, the pendent personal jurisdiction doctrine in both the diversity and federal question contexts is best articulated as follows: a district court has discretion to exercise personal jurisdiction over a claim that it ordinarily lacks personal jurisdiction over only when that claim arises out of the same common nucleus of operative fact as does a claim that is within the in personam jurisdiction power of the court.

4A Charles A. Wright et al., Fed. Prac. & Proc. Civ. § 1069.7 (3d ed. 2014).  Our court of appeals would appear to subscribe to the general rule set forth by the commentators.  See ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 628 (4th Cir. 1997) ("Once a court has a constitutional case, in the Article III sense, properly before it, service by a court sufficient to assert personal jurisdiction over a defendant by any authorized

**The Clerk is directed to forward copies of this written opinion and order to counsel of record and any unrepresented parties.**

DATED: April 9, 2015

_____
John T. Copenhaver, Jr.
United States District Judge

---

mechanism consistent with due process may be held to apply to the entire constitutional case.").