UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CRYSTAL GOOD, individually and as
parent and next friend of minor children
M.T.S., N.T.K. and A.M.S. and
MELISSA JOHNSON,
individually and as parent of her unborn child,
MARY LACY and JOAN GREEN and JAMILA AISHA OLIVER,
WENDY RENEE RUIZ and KIMBERLY OGIER and ROY J. McNEAL and
GEORGIA HAMRA and MADDIE FIELDS and BRENDA BAISDEN, d/b/a
FRIENDLY FACES DAYCARE, and ALADDIN RESTAURANT, INC., and
R. G. GUNNOE FARMS LLC, and DUNBAR PLAZA, INC.,
d/b/a DUNBAR PLAZA HOTEL,
on behalf of themselves and all others
similarly situated,

        Plaintiffs,

v.                                    Civil Action No.: 2:14-01374

AMERICAN WATER WORKS COMPANY, INC., and
AMERICAN WATER WORKS SERVICE COMPANY, INC., and
EASTMAN CHEMICAL COMPANY and
WEST VIRGINIA-AMERICAN WATER COMPANY,
d/b/a WEST VIRGINIA AMERICAN WATER, and
GARY SOUTHERN and DENNIS P. FARRELL,

        Defendants.


MEMORANDUM OPINION AND ORDER


        Pending is the motion to dismiss by American Water

Works Service Company, Inc. ("Service Company"), and West

Virginia-American Water Company ("WV American"), filed January

7, 2015.[1]

_____

        [1]  American Water Works Company, Inc. is referred to herein
as "American."  Defendants American, Service Company and WV
American are referred to herein collectively as the "water
company defendants."

On May 20, 2015, the court granted plaintiffs' motion to file a surreply. Having considered the surreply and the response thereto filed May 28, 2015, the matter is ripe for adjudication.

I.

A.   The Incident

On January 9, 2014, approximately 300,000 residents in the Charleston and surrounding area suffered an interruption in their water supply. The interruption was caused by a spill into the Elk River of a coal processing chemical mixture sold and distributed exclusively by Eastman Chemical Company. The mixture was at the time being stored in a facility owned and operated by Freedom Industries, Inc. ("Freedom Industries").

The chemical, 4-methylcyclohexane methanol, along with other chemicals, is commonly referred to as "Crude MCHM." Crude MCHM infiltrated WV American's water treatment plant in Charleston. Plaintiffs assert that the water company defendants could have prevented or avoided the incident by taking better precautionary measures, complying with applicable regulations, and using reasonable care.

2

Some plaintiffs and putative class members operate
businesses that lost revenue due to the interruption.  Others
claim physical injuries, asserting that exposure to Crude MCHM
in the environment through human pathways caused bodily injury
and necessitated they be medically monitored.  All are alleged
to have incurred costs for water replacement, travel, and other
associated expenses.

B.   The First Amended Consolidated Class Action Complaint

On December 9, 2014, the First Amended Consolidated
Class Action Complaint ("operative pleading") became the
operative pleading in the case.  It alleges the following claims
against the water company defendants:

Count One: Negligence;

Count Two: Negligence specifically arising out of their
failure to address the foreseeable risk posed by the
Freedom Industries facility, the failure to adequately warn
the class members, the failure to design, maintain, and
operate the water treatment plant according to industry
standards, negligently and unreasonably delivering and
placing on plaintiffs' property the Crude MCHM, and failing
to ensure that water tankers were not filled with
contaminated water;

Count Seven: Gross negligence for recklessly ignoring
threats to class members both in design and maintenance of
their operations, their warnings and attempts to deliver
water;

Count Eight: Prima facie negligence for failing to adopt a
source water protection plan as required by the federal

Safe Water Drinking Act, the state Drinking Water Treatment Revolving Fund Act, and accompanying regulations;

Count Ten:  Breach of warranties inasmuch as they informed customers their water would be safe following flushing and charged their customers the regular rate for the impure water, in violation of the warranties that the water pass without objection in the water utility trade and that the water be suitable for the ordinary purposes for which tap water is commonly used, which acts were also unfair or deceptive acts and practices in violation of the West Virginia Consumer Credit and Protection Act ("WVCCPA");

Count Eleven:  Negligent infliction of emotional distress arising out of, <u>inter</u> <u>alia</u>, their failure to establish an alternative water supply, which failure caused affected individuals to reasonably fear harmful effects from the contaminated water;

Count Twelve: Strict products liability for failure to warn concerning the contamination until hours after it occurred and for providing incorrect information that it was safe to drink the water when Crude MCHM was at one part per million ("1 ppm");

Count Fifteen: Public nuisance;

Count Sixteen: Private nuisance;

Count Seventeen: Trespass;

Count Eighteen:  Breach of contract;

Count Nineteen: Medical monitoring.[2]

---

[2] Plaintiffs also allege a "claim" in Count Twenty for punitive damages.  The item is best understood as an element of damage and not a stand-alone claim for relief.

4

II.

A.   Governing Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleader provide "a short and plain statement of the claim showing . . . entitle[ment] to relief."  Fed. R. Civ. P. 8(a)(2); <u>Erickson v. Pardus</u>, 127 S. Ct. 2197, 2200 (2007).  Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted . . . ."  Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 545 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957), <u>overruled on other grounds</u>, <u>Twombly</u>, 550 U.S. at 563); <u>see also</u> <u>Anderson v. Sara Lee Corp.</u>, 508 F.3d 181, 188 (4th Cir. 2007). In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (quoting <u>Twombly</u>, 550 U.S. at 570); <u>see also Monroe v. City of Charlottesville</u>, 579 F.3d 380, 386 (4th Cir. 2009).

5

Application of the Rule 12(b)(6) standard requires that the court "'accept as true all of the factual allegations contained in the complaint . . . .'" Erickson, 127 S. Ct. at 2200 (quoting Twombly, 127 S. Ct. at 1965); see also South Carolina Dept. Of Health And Environmental Control v. Commerce and Industry Ins. Co., 372 F.3d 245, 255 (4th Cir. 2004) (quoting Franks v. Ross, 313 F.3d 184, 192 (4th Cir. 2002)). The court must also "draw[] all reasonable . . . inferences from th[e] facts in the plaintiff's favor . . . ." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).

B.   The Motion to Dismiss

The water company defendants first seek dismissal of Counts One, Two, Seven, Eight, and Twelve (generally, negligence and strict liability counts) on the grounds that the claims are barred by the gist of the action doctrine and the rule against recovery of solely economic loss in tort.  Second, they request dismissal of Count Eighteen, asserting that a service interruption does not constitute a breach of contract.  They next seek dismissal of Count Eight on the alternative ground that plaintiffs' statutory and regulatory allegations cannot be used to support a prima facie negligence claim.  Count Ten is challenged on the grounds that the WVCCPA does not extend to transactions covered under a public utility tariff.

6

Count Eleven is asserted to be deficient based upon a failure to plead that plaintiffs were exposed to a disease medically proven to cause death or substantial injury as required for negligent infliction of emotional distress. Count Twelve is also alleged to be deficient inasmuch as the asserted inadequate warnings were issued pursuant to government recommendations. Dismissal is sought for Count Fifteen based upon plaintiffs' failure to suffer the "special injury" required for a public nuisance claim. Count Sixteen is challenged based upon its assertion of a common public right to support a private nuisance claim.

Count Seventeen is challenged as generally failing to state a claim for trespass. Count Nineteen is targeted for dismissal due to plaintiffs' putative failure to sufficiently allege a medical monitoring claim.

### 1. Counts One, Two, Seven, Eight, and Twelve: "Gist of the Action" Doctrine

The water company defendants assert these five counts run contrary to the gist of the action doctrine. That doctrine is designed "to prevent the recasting of a contract claim as a tort claim . . . ." Gaddy Engineering Co. v. Bowles Rice McDavid Graff & Love, LLP, 231 W. Va. 577, 586, 746 S.E.2d 568, 577 (2013).

7

Under the gist of the action doctrine, a tort claim "will not arise for breach of contract unless the action in tort would arise independent of the existence of the contract."  Syl. pt. 9, Lockhart v. Airco Heating & Cooling, Inc., 211 W. Va. 609, 611, 567 S.E.2d 619, 620 (2002).  The Supreme Court of Appeals of West Virginia recently observed that a tort recovery is barred where any of the following four factors is present:

> (1) where liability arises solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.

Gaddy, 231 W. Va. at 586, 746 S.E.2d at 577 (quoted authority omitted) ("Succinctly stated, whether a tort claim can coexist with a contract claim is determined by examining whether the parties' obligations are defined by the terms of the contract."); Covol Fuels No. 4, LLC v. Pinnacle Min. Co., LLC, No. 14-1395, --- F.3d ----, 2015 WL 877427, at *8 (4th Cir. Mar. 3, 2015)(noting the doctrine applies "if any one of [the] four [Gaddy] factors is present."); Dan Ryan Builders, Inc. v. Crystal Ridge Development, Inc., No. 13-2234, --- F.3d ----, 2015 WL 1771537, at *1 (4th Cir. Apr. 20, 2015).

The water company defendants contend that there is no legal duty to provide water to anyone unless a customer contract

8

is first formed.   They contend the gateway contract requirement
is fatal to plaintiffs' tort claims.

Plaintiffs admit that WV American "clearly does have a
contractual duty to supply water to its customers" but they
offer a number of contentions to avoid the gist-of-the-action
bar.  (Resp. at 14).  First, they assert that WV American is a
public water utility and "the only provider of tap water to the
affected communities by legislative and regulatory design."
(Resp. at 12).  They then observe that the tort and contract
claims can coexist under West Virginia law if the tort claims
would arise independent of the existence of the contract.   They
contend that both common law, and statutory and regulatory
principles, supply the independent duty in tort.

It appears undisputed that WV American has a duty to
supply water to its customers.  The question of whether, or to
what extent, that contractual obligation subsumes the duty to
avoid carrying a potential toxin into a customer's home is a bit
more difficult.  In discussing common law duties, plaintiffs
assert that while WV American has a contractual duty to provide
water, it has an entirely separate duty in tort not to "invade
and contaminate the real and personal property of others" in the
process of doing so.  (Resp. at 14).  They appear correct at
this juncture for at least two related reasons.

9

First, in <u>Chamberlaine & Flowers, Inc. v. Smith Contracting, Inc.</u>, 176 W. Va. 39, 341 S.E.2d 414 (1986), the plaintiff alleged against an insurer both a contract and a negligence claim, asserting as to the latter that the insurer negligently failed to pay a certain coverage amount.  The Supreme Court of Appeals of West Virginia concluded that plaintiff was "dressing a contract claim in a tort's clothing." <u>Id.</u> at 41, 341 S.E.2d at 417.  The West Virginia court additionally analyzed the matter as follows:

> The distinction between tort and contract liability, as between parties to a contract, can be difficult to define. <u>The key distinction is whether the act complained of was one of misfeasance or nonfeasance.</u> Misfeasance, or negligent affirmative conduct, in performing a contract generally subjects the actor to tort liability in addition to contract liability for physical harm to persons and tangible things.  On the other hand, there is generally no tort liability for failing to do what one has contracted to do, unless there is some duty to act apart from the contract. USF & G's refusal to pay on the insurance policy was not a negligent act, but an affirmative refusal to act. Such a refusal to act constitutes nonfeasance. Because there is no tort liability for USF & G's nonfeasance . . . , the trial court was correct in dismissing the negligence count of the appellant's complaint.

<u>Id.</u> at 41-42, 341 S.E.2d at 417 (citations and footnotes omitted).

In this case, it appears that plaintiffs are alleging misfeasance as opposed to nonfeasance.  They allege negligent affirmative conduct by the water company defendants in

10

performing their water supply duties, in essence delivering tainted water to their homes and businesses as a result of active misfeasance.  There is thus a claim stated for both tort and contract.

Second, plaintiffs cite in their response brief <u>City of Greenville v. W.R. Grace & Co.</u>, 827 F.2d 975, 977 (4th Cir. 1987), a case that the water company defendants fail to mention in their reply brief.  The case touches on drawing the line between contract and tort claims.

In <u>City of Greenville</u>, Grace manufactured fireproofing products, one of which contained asbestos.  Greenville installed some of the material in its city hall after Grace supplied it, apparently under a contract.  See <u>City of Greenville v. W.R. Grace & Co.</u>, 640 F. Supp. 559, 563 (D.S.C. 1986) (district court opinion noting that "substantial evidence showed that at the time <u>Grace sold Greenville</u> the asbestos-containing Monokote, Grace was actually aware of the hazard to building occupants from asbestos-containing fireproofing") (emphasis added).

The court of appeals, applying South Carolina law, observed as follows:

> We think that the South Carolina courts would be
> willing to extend tort liability to the manufacturer
> whose product threatens a substantial and unreasonable
> risk of harm by releasing toxic substances into the

11

> environment, thereby causing damage to the property
> owner who has installed the harmful product in his
> building.

Id. at 977.  In other words, despite a clear-cut contract for the sale of goods, the fact that the goods included a toxic substance that could damage the owner's property gave rise to an independent tort claim.

The same principle may apply here.  While South Carolina law is inapplicable, it is informative on the difficult question posed.  The parties appear to agree that the water company defendants have no duty to supply water until an application has been made and accepted, as has occurred here.  Whether delivery of a potentially toxic substance is a breach of that duty, or instead a breach of an entirely separate tort duty similar to that at issue in Chamberlaine and City of Greenville, remains to be determined.

The contours of the source of the duty may depend upon the drawing of the finest of distinctions.  That analysis is best accomplished with a complete evidentiary record, including specific citations to the lengthy tariff applicable to the parties' dispute where appropriate.  Additionally, little discussion or briefing is devoted to the question of the extent to which the gist of the action doctrine applies to a public utility such as this one, where anyone desiring the most basic

of services is required, in essence, to sign-up on the provider's terms.[3]

It is ORDERED that this ground of the motion to dismiss be, and hereby is, denied.

### 2. Counts One, Two, Seven, Eight, and Twelve: The Economic Loss Rule

The water company defendants next assert that plaintiffs' tort claims seeking damages for lost profits, business opportunities and unnamed other expenses are barred by the so-called economic loss rule.[4]  The general parameters of the rule are reasonably well-settled.  In <u>Aikens v. Debow</u>, 208 W. Va. 486, 541 S.E.2d 576 (2000), the supreme court of appeals observed as follows:

> We conclude that an individual who sustains purely economic loss from an interruption in commerce caused by another's negligence may not recover damages in the

---

[3] The water company defendants additionally contend that the Count Seven claim for gross negligence must fail inasmuch as a viable negligence claim is not alleged.  The contention lacks merit.

[4] Commentators have observed similarities between the gist of the action doctrine and economic loss rule.  <u>See</u>, <u>e.g.</u>, 7 Hon. Michael M. Baylson <u>et al.</u>, <u>Business and Commercial Litigation in Federal Courts</u> § 78:8 (3d ed. elec. 2014) (footnotes omitted); <u>see also</u>, <u>e.g.</u>, Dan B. Dobbs, <u>et al.</u>, <u>The Law of Torts</u> § 613 (2d ed. elec. 2014); 1A Louis Altman & Malla Pollack, <u>Callmann on Unfair Competition, Trademarks and Monopolies</u> § 9:1 (4th Ed. elec. 2015).

absence of physical harm to that individual's person or
property, a contractual relationship with the alleged
tortfeasor, or some other special relationship between
the alleged tortfeasor and the individual who sustains
purely economic damages sufficient to compel the
conclusion that the tortfeasor had a duty to the
particular plaintiff and that the injury complained of
was clearly foreseeable to the tortfeasor.

Id. at 499, 541 S.E.2d at 589.  The decision in Aikens stands

for the principle that an individual who sustains purely

economic loss due to another's negligence can only recover, when

there is neither a contract or physical harm to person or

property, when some special relationship exists between the

parties.

        The existence of a special relationship is a question

for the court using the following parameters:

        The existence of a special relationship will be
        determined largely by the extent to which the
        particular plaintiff is affected differently from
        society in general. It may be evident from the
        defendant's knowledge or specific reason to know of
        the potential consequences of the wrongdoing, the
        persons likely to be injured, and the damages likely
        to be suffered. Such special relationship may be
        proven through evidence of foreseeability of the
        nature of the harm to be suffered by the particular
        plaintiff or an identifiable class and can arise from
        contractual privity or other close nexus.

Eastern Steel Constructors v. Salem, 209 W. Va. 392, 398, 549

S.E.2d 266, 272 (2001); (quoting Aikens, 208 W. Va. at 499, 541

S.E.2d at 589).  The supreme court of appeals has emphasized

that "the existence of a special relationship between two

14

parties 'will differ depending upon the facts of each relationship[.]'" <u>White v. AAMG Const. Lending Center</u>, 226 W. Va. 339, 700 S.E.2d 791 (2010) (quoting <u>Aikens</u>, 208 W. Va. at 500, 541 S.E.2d at 590).

The West Virginia court has found a special relationship under circumstances different from those present here.  In <u>Eastern Steel</u>, it narrowly cast one such relationship as follows:

> [A] design professional (<u>e.g.</u> an architect or engineer) owes a duty of care to a contractor, who has been employed by the same project owner as the design professional and who has relied upon the design professional's work product in carrying out his or her obligations to the owner, notwithstanding the absence of privity of contract between the contractor and the design professional, due to the special relationship that exists between the two).

209 W. Va. at 401, 549 S.E.2d at 275.  The contractor in <u>Eastern Steel</u> was required to rely on the design professional's work product in carrying out its business obligations.

In <u>Glascock v. City National Bank</u>, 213 W. Va. 61, 576 S.E.2d 540 (2002), it was concluded a special relationship arose in the context of a construction loan agreement where a lender maintained oversight of, or intervened in, the quality of the construction process, but then failed to disclose information to the borrower about the quality of the construction project when it was foreseeable that the borrower would be injured.

15

There is arguably, however, an indicia of a special
relationship in this action absent in both <u>Eastern Steel</u> and
<u>Glascock</u>.  It may arise by statute, namely, West Virginia Code
sections 24-3-1 and 24-4-7.  The first section provides, in
pertinent part, as follows:

> Every public utility subject to this chapter shall
> establish and maintain adequate and suitable
> facilities, safety appliances or other suitable
> devices, and shall perform such service in respect
> thereto as shall be reasonable, safe and sufficient
> for the security and convenience of the public . . . .

W. Va. Code § 24-3-1.  Plaintiffs allege that the water company
defendants violated this provision in the period leading up to
the chemical leak and their response thereto.  Section 24-4-7
provides as follows:

> <u>Any person, firm or corporation</u> claiming to be damaged
> by any violation of this chapter by any public utility
> subject to the provisions of this chapter, may make
> complaint to the commission, as provided herein, and
> bring suit in his own behalf for the recovery of the
> damages for which such public utility may be liable
> under this chapter in any circuit court having
> jurisdiction. . . .

W. Va. Code § 24-4-7 (emphasis added).

In the usual case, the plaintiff may elect between the
administrative and judicial fora.  <u>Carter v. Willis</u>, 145 W. Va.
779, 783, 117 S.E.2d 594, 596 (1960); <u>State ex rel. Chesapeake</u>
<u>and Potomac Telephone Co. of W. Va. v. Ashworth</u>, 190 W. Va. 547,
550, 438 S.E.2d 890, 893 (1993) ("In <u>Carter</u> . . . , we

16

recognized that a user of a public utility is not restricted to the PSC for relief, but can, under W. Va. Code 24-4-7 . . . 'bring suit in his own behalf for the recovery of the damages . . . in any circuit court having jurisdiction.'").[5]  Resort to a judicial forum here is thus appropriate.

The water company defendants nevertheless suggest that section 24-4-7 permits an action only by customers of the relevant utility.  There are grounds for disagreement with that reading.  See, e.g., Community Antenna Service, Inc. v. Charter Communications VI, LLC, 227 W. Va. 595, 603, 712 S.E.2d 504, 512 (2011) ("Chapter 24 permits any 'person, firm or corporation,' damaged by a public utility's violation of the duties created by Chapter 24, to bring a suit for the recovery of the damages in

---

[5]  In Ashworth, the supreme court of appeals observed as follows:

> Although the general rule is that one must exhaust administrative remedies before going into court to enforce a right, W. Va. Code 24-4-7 [1923] confers concurrent jurisdiction on the PSC and the circuit court in a limited number of cases—namely, those cases seeking a refund based on rules and practices of the PSC that are clear and unambiguous. In these limited cases, a plaintiff can proceed either before the PSC or the circuit court.

Ashworth, 190 W. Va. at 551, 438 S.E.2d at 894.  Inasmuch as section 24-4-7 refers to "any violation of this chapter," it seems unlikely that the West Virginia court was limiting concurrent jurisdiction to refund actions generally.  It was simply addressing a case where a refund was the chosen remedy of the user before it.

any circuit court."); <u>Hedrick v. Grant County Public Service Dist.</u>, 209 W. Va. 591, 595, 550 S.E.2d 381, 385 (2001) (noting section 24-4-7 "suggests that the Legislature intended to allow <u>aggrieved parties</u> the right to pursue specified forms of relief in either" the circuit court or the PSC); <u>Ashworth</u>, 190 W. Va. at 550, 438 S.E.2d at 893 ("In <u>Carter</u> . . . , we recognized that a <u>user</u> of a public utility is not restricted to the PSC for relief, but can, under W. Va. Code 24-4-7 . . . 'bring suit in his own behalf for the recovery of the damages . . . in any circuit court having jurisdiction.'") (emphasis added).

The text and history of the provisions found in Chapter 24 support a broader reading of section 24-4-7.  The substance of sections 24-1-2 and 24-4-7 first appeared in the state code in 1913.  The definition of "customer," however, was added to section 24-1-2, a definitions section for the chapter, long after, in 1978, and now reads as follows:

> Whenever used in this chapter, "customer" shall mean and include any person, firm, corporation, municipality, public service district or any other entity who purchases a product or services of any utility and shall include any such person, firm, corporation, municipality, public service district or any other entity who purchases such services or product for resale.

W. Va. Code § 24-1-2.

Since 1978, the Legislature's use of the term "customer" in Chapter 24 has proliferated dramatically.  Indeed, it was added to a provision in Chapter 24 in 2006, which appears just seven sections prior to section 24-4-7.  And yet "customer" has not been added to section 24-4-7 so as to cabin its reach.  The claim-creating provision of section 24-4-7 has been left untouched by the Legislature for over a century.  Plaintiffs' reading of section 24-4-7, which would allow actions against a public utility even absent a customer relationship, is lent support by this analysis.

The water company defendants seek to avoid that result.  First, they assert that Aikens stands for the proposition that the economic loss rule limits customers to a recovery under their contract alone.  But Aikens did not reach so far.  See Aikens, 208 W. Va. at 493, 541 S.E.2d at 583 ("The sole issue presented for our resolution is whether economic loss from an interruption in commerce in the absence of damage to a plaintiff's person or property is recoverable in a tort action.").  Indeed, a recent decision from the supreme court of appeals includes language suggesting that a special relationship in addition to a contractual relationship would permit the party suffering the breach to pursue an action in tort.  See White v. AAMG Const. Lending Center, 226 W. Va. 339, 346, 700 S.E.2d 791,

19

798 (2010) ("In West Virginia, the general rule holds that when a lender breaches its contract with a borrower causing economic loss (but no property damage or personal injuries), the borrower's primary remedy is to pursue a breach of contract action against the lender.  However, where the lender and borrower have a "special relationship" that extends beyond the contract, the borrower may recover tort-type damages.") (emphasis added).

This "contract-plus" analysis finds support elsewhere in West Virginia law and is certainly not inconsistent with the water company defendants' position concerning the general rule that an action in tort does not lie for the breach of a purely contractual duty.  See, again, Gaddy, 231 W. Va. at 586, 746 S.E.2d at 577 ("Succinctly stated, whether a tort claim can coexist with a contract claim is determined by examining whether the parties' obligations are defined by the terms of the contract.").  The necessary, separate duty in tort may be supplied by a special relationship engendered by the statutes just discussed.

The water company defendants next assert that a statute so generally phrased as West Virginia Code section 24-3-1 cannot create a special relationship unless the Legislature so intended.  They cite various published cases, not from this

jurisdiction, to that effect.  The contention fails inasmuch as
it does not account for the synergistic effect of both West
Virginia Code sections 24-3-1 and 24-4-7.  See <u>Community</u>
<u>Antenna</u>, 227 W. Va. 595, 604, 712 S.E.2d 504, 513 (2011)
("Community Antenna asserts that by reading W. Va. Code, 24D-1-
22(c), -23(e), and W. Va. Code, 24-4-7 together, it is clear
that the Legislature intended for any person, firm or
corporation damaged by a violation of the Cable Television
Systems Act to be permitted to institute a private suit for
damages caused by the violation. After examining the precise
words chose by the Legislature in adopting these statutes, we
agree.").

        The first section creates an ascertainable standard
for liability.  See <u>Reed v. Smith Lumber Co.</u>, 165 W. Va. 415,
420, 268 S.E.2d 70, 72-73 (1980) ("We also recognize that a gas
company is a public utility subject to W. Va. Code, 24-3-1, and
as such, is required to "'perform such service in respect
thereto as shall be reasonable, safe and sufficient for the
security and convenience of the public.'"").  The second, with
its individually focused terminology, provides a tort-based
statutory claim for private enforcement of the liability
standard.  Those two provisions may be deemed to create the

21

requisite special relationship or the necessary separate duty in tort.[6]

The court does not now definitively resolve the matter.  It suffices to conclude that the targeted counts in the operative pleading allege claims for relief.  It is ORDERED that this ground of the motion to dismiss be, and hereby is, denied.


3. Count Eighteen: Service Interruption is Not a Breach


The water company defendants next request dismissal of Count Eighteen, asserting that a service interruption does not constitute a breach of contract.  They contend as follows:

> Plaintiffs allege . . . [WV American] had a contract
> to "provide safe and adequate drinking water and water
> for other uses" and that . . . [WV American] breached

---

[6] The water company defendants cite published decisions they assert stand for the proposition that the economic loss rule is applied even more vigorously in the context of public utilities. None of those decisions involved state statutes like those under consideration.  For example, the decision in H.R. Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 159 N.E. 896 (1928), noted that the general statutory duty to furnish water at reasonable rates through suitable connections was insufficient to impose liability.  It found that broad duty would not support a claim by a stranger to a water supply contract whose warehouse was destroyed by a fire.  A statute like West Virginia Code section 24-4-7, which provides that statutory vehicle to enforce the general duty imposed, was absent.  It is true, as the water company defendants note, that Nichol v. Huntington Water Co., 53 W. Va. 348, 44 S.E. 290 (1903), concluded no contract or tort duty was owed by a water supplier to a hotel owner whose building burned for lack of sufficient water to extinguish the blaze.  That decision, however, predates by a decade the enactment of West Virginia Code section 24-4-7.

> this contract.  In essence, Plaintiffs claim . . . [WV
> American] was contractually obligated to provide an
> uninterrupted supply of water and they seek damages
> related to the lack of water usable for drinking,
> cooking, and bathing. To the contrary, an interruption
> in service for these reasons is not a breach of
> contract. A public utility such as . . . [WV American]
> does not and cannot ensure there will never be a
> service interruption -- particularly where the
> chemical contamination was caused by parties and
> circumstances outside of . . . [WV American] control.

(Mem. in Supp. at 12-13).  They note that the Public Service

Commission ("PSC") regulations to which they are bound permit

the discontinuation of water service for a variety of reasons.

See, e.g., W. Va. Code R. § 150-7-7.4.8.a.2 (permitting water

utilities to discontinue service without notice "[w]here

conditions hazardous to life or property are found to exist on

the customer's premises, or where the utility's regulating,

measuring or distribution equipment or facilities have been

tampered with"); id. § 150-7-7.4.12.d–f (outlining notice

required for unscheduled interruptions in service); id. § 150-7-

7.4.12.i (discussing alternative water supplies); id. § 150-7-

7.4.14.a–g (explaining rationing plans and discussing water

utilities' ability to restrict use of water).[7]

---

[7] The water company defendants assert that PSC rules and
regulations are incorporated into the tariff.  Plaintiffs do not
address the matter.  The court assumes, at this point, the
assertion is accurate.

Plaintiffs offer a number of arguments in response. They appear to assert that the aforementioned regulatory provisions do not excuse every single conceivable service interruption and that, consequently, it is incumbent upon the water company defendants under the allegedly extreme circumstances in this action to prove an affirmative defense of impracticability.

As noted, the parties appear to agree that the water company defendants provide service to their customers under a binding contract.  While the terms of the contract might be stated in greater detail, its essence is that water will be supplied so long as the customer pays for the service.  Service interruptions occur to segments of a water utility's customers for a variety of reasons, foremost being the rupture of water lines.  In those types of situations, a water utility might understandably avail itself of the kinds of arguments the water company defendants make here.

The scale of the alleged service failure here, however, which essentially shut down the entire system for days, for reasons that plaintiffs assert were entirely avoidable, would seem to require affirmative, defensive proof by the water company defendants in order to be absolved of their contractual bargain.  The better course at this stage is to take the

parties' water-supply bargain at face value, with the water
company defendants obliged to prove their affirmative defense at
the appropriate juncture.  Count Eighteen is deemed to state a
claim at this point in the case.

It is ORDERED that the motion to dismiss as to this
ground be, and hereby is, denied.


### 4. Count Eight: Statutes and Regulations Cannot Support a Prima Facie Negligence Claim


The water company defendants next seek dismissal of
Count Eight, the prima facie negligence claim, on yet another
ground.  First, they contend plaintiffs have failed to supply
sufficient factual allegations to support a claim under West
Virginia Code section 24-3-1.  Plaintiffs assert in response
that the 122 paragraphs of factual allegations in the operative
pleading suffice to adequately place the opposing parties on
notice respecting the nature of the claim.  That contention
withstands scrutiny.

Second, the water company defendants assert that they
cannot be subject to prima facie negligence arising out of their
failure to adopt a source water protection plan inasmuch as no
such requirement applied to them at the time of the chemical

leak.  The operative pleading alleges in Count Eight that the predicate for the prima facie negligence claim is the water company defendants' putative failures to adopt a source water protection plan pursuant to (1) West Virginia Code of State Regulations section 64-77-5.2, (2) the federal Safe Water Drinking Act provision found at 43 U.S.C. § 300j-13, and (3) West Virginia's adoption of the federal measure at West Virginia Code section 16-13C-1 through 6 of the Drinking Water Treatment Revolving Fund Act.

The water company defendants assert that section 64-77-5.2 is not applicable inasmuch as it was not promulgated until many years following the design and construction of the treatment plant at the center of this action.  That contention is accurate, and it is also the position taken by the regulator.[8]

_____

[8]  A petition for a writ of mandamus was filed asserting that the West Virginia Department of Health and Human Resources failed to require source water protection plans for the treatment plant.  In its response, the agency stated "[the Series 77 rules] were enacted in 1998 as part of the effort to comply with the federal amendments to the . . . . [Safe Water Drinking Act].  At that point, however, . . . [WV American's] Kanawha District facility was an existing facility, not a new facility. Thus, these legislative rules concerning the design of new water plants would not have applied."  State of W. Va. ex rel. Covenant House v. Huffman, No. 14-0112, at *2 (W. Va. Mar. 12, 2014), available at http://www.courtswv.gov/supreme-court/clerk/pdf/cases-of-interest/covenant-v-huffman/DHHRResponse.pdf.

It is also the case that the body of regulations within which section 64-77-5.2 is found appear to relate only to public water systems designed and going on line following the federal and state statutory and regulatory provisions cited in the operative pleading.  The regulations are entitled Public Water Systems Design Standards and, in context, were intended to cover water systems contemplated and approved long after the subject treatment facility.  <u>See</u>, <u>e.g.</u>, W. Va. C.S.R. § 64-77-1.1.b ("The West Virginia DHHR . . . requires that the applicant or the applicant's engineer submit reliable engineering data and a report if new or innovative technology is proposed."); W. Va. C.S.R. § 64-77-3.1.a ("The applicant shall submit four (4) complete sets of documents for a formal review . . . ."); W. Va. C.S.R. § 64-77-4.2 ("The system including the water source, treatment facilities, operation and distribution system shall be designed for maximum day demand at the design year."); W. Va. C.S.R. § 64-77-4.2 ("In selecting the source of water to be developed, the public water system's engineer shall prove to the satisfaction of the . . . [Bureau for Public Health] that an adequate quantity of water will be available, and that the water that is to be delivered to the consumers will meet the current requirements of the rule").

27

Plaintiffs attempt to avoid this result by pointing
out certain provisions in the regulations that could be
construed to cover existing facilities.  The primary section to
which they point as an exemplar, however, has a forward-looking
connotation.  See, e.g., W. Va. C.S.R. § 64-77-5.1 ("In
selecting the source of water to be developed . . . .")
(emphasis added).  They then pivot to an entirely different
series of the regulations, noting the provision in West Virginia
Code of State Regulations 64-3-4.5 stating as follows:

> The public water system shall be constructed, altered
> or renovated in accordance with the plans and
> specifications approved by the Commissioner in
> accordance with the Bureau for Public Health rule,
> Public Water System Design Standards, 64CSR77.

W. Va. C.S.R. § 64-3-4.5.  Plaintiffs appear to envision that
the slightest proposed "alteration" of the existing facility
would require full plant retrofitting to comply with the many
prerequisites found in Series 77.  (See Pls.' Resp. at 25
("Defendants should have come into full § 64-77 compliance upon
making any post-1998 alterations or upgrades to the water
system.")).  That reading of the regulation is obviously, and
impermissibly, overbroad.

Inasmuch as the treatment facility under consideration
was designed, constructed and approved prior to the
aforementioned regulations, the amendments to the federal Safe

Water Drinking Act, and West Virginia's adoption thereof, it is
ORDERED that the motion to dismiss be, and hereby is, granted to
the extent these three provisions serve as predicates for a
prima facie negligence claim.  The residue of the motion to
dismiss as to Count Eight is denied.

### 5. Count Ten: The WVCCPA Does Not Reach Transactions Pursuant to a Public Utility Tariff

In Count Ten, plaintiffs allege claims for breach of
express and implied warranties and statutory violations.  They
claim that on January 13, 2014, WV American told customers to
flush their water systems.[9]  The flushing schedule continued
until January 17, 2014.  Following flushing, WV American told
customers the water was safe for all uses, including drinking.
Plaintiffs allege, however, that the water delivered in the days
immediately following the flushing continued to harbor Crude
MCHM.  Despite this, WV American charged its customers the
regular usage rate.

---

[9] Plaintiffs actually refer throughout this count to
"American Water," their shorthand phrase for WV American's
parent, American Water Works Company, Inc.  The court infers
their intention to instead reference WV American.  In seeking
dismissal of Count Ten, the moving defendants, namely, the
Service Company and WV American, appear to have arrived at the
same inference.

Plaintiffs claim this was "in violation of . . . [WV American's] express warranty that the water was suitable for all purposes, including drinking," and "its implied warranties under W. Va. Code § 46-2-314, including, but not limited to, its implied warranties that the water pass without objection in the water utility trade and that the water be suitable for the ordinary purposes for which tap water is commonly used, including drinking."  (Op. Pleading ¶ 209).

They further allege that WV American's actions constituted unfair or deceptive acts or practices in violation of the WVCCPA, West Virginia Code section 46A-6-104, in the following respects:

 (a) 46A-6-102(7)(E) (by representing that the water it was selling was suitable for the use of drinking when it was not and by representing that it did not have any deleterious characteristics when it continued to be irritating to the eyes and skin);

 (b) 46A-6-102(7)(G) (by representing that the water it was selling was pure and potable, the standard for utility tap water, and that it was of acceptable quality when it was not);

 (c) 46A-6-102(7)(L) (by making public statements with respect to the quality, characteristics, purity, and potability of its water that were likely to be confusing and misunderstood);

 (d) 46A-6-102(7)(M) (by concealing from customers that the water it was selling was still contaminated above the odor- and irritant-thresholds for Crude MCHM and likely to have an unpleasant taste and odor and an irritating quality for many days after the flushing);

       (e) and 46A-6-102(7)(N) (by making deceptive and
       misleading public statements concerning the quality,
       purity, and potability of the water after flushing and
       causing those statements to be published and
       broadcast).

**Id.** ¶ 210.

       The water company defendants assert that the WVCCPA claims are foreclosed by West Virginia Code section 46A-1-105(a)(3):

       (a) This chapter does not apply to:

         (3) Transactions under public utility or common
         carrier tariffs if a subdivision or agency of
         this state or of the United States regulates the
         charges for the services involved, the charges
         for delayed payment, and any discount allowed
         for early payment . . . .

**Id.** They rely in particular upon a very recent decision of the supreme court of appeals discussing the reach of the statute.

       In **Holt v. West Virginia-American Water Co.**, 233 W. Va. 688, 760 S.E.2d 502 (2014), Mr. Holt received a $5,136.96 water bill.  His customary monthly bill never exceeded $30.00. He contacted the water company and the PSC.  An inspection of his water supply facilities concluded his meter was leaking. The water company repaired the device but did not tell Mr. Holt. It also continued to seek the full amount of the erroneous bill. Mr. Holt instituted a complaint with the PSC, which granted him interim relief prohibiting the water company from terminating

31

his service.  The water company ultimately credited his account $5,110.64.

Later, the water company told Mr. Holt another leak was occurring but that it was on his side of the supply line. Mr. Holt repaired the line but the water company declined to supply him a credit for the amount owing on the second leak.  A third leak was discovered by Mr. Holt but there was a delay in repairing it due to the unavailability of an excavator.  He was billed for his regular usage rate and the leaking water for 11 months.  He refused to pay for the leaking water and suffered arrearages and penalties.

In October 2010, Mr. Holt's service was terminated for nonpayment of the disputed charges.  It was restored the following day.  At the request of PSC staff, the water company credited Mr. Holt's account for the second leak in the amount of $1,643.12.  An ALJ and the PSC later concluded that the water company had arbitrarily adopted a leak adjustment policy which was contrary to law.  It was ordered that Mr. Holt be given an additional refund, although he also sought an additional $1,885.48 he expended for labor and materials to replace his water line.  That request was dismissed by the PSC for lack of jurisdiction, after which Mr. Holt instituted a WVCCPA action in the circuit court.

32

The supreme court of appeals concluded that the action was barred by West Virginia Code section 46A-1-105(a)(3):

> Having determined that W. Va. Code § 46A-1-105(a)(3) is not ambiguous, we now proceed to apply the statute to this case. First, we note that in this appeal, the parties do not dispute that WVAW is a public utility. Further, the parties do not dispute that WVAW is regulated by the PSC, which is a state agency. The PSC regulates water utilities, including WVAW, through implementation and application of Rules for Government of Water Utilities ("Water Rules"), W. Va. Code R. § 150-7-1 et seq. <u>Through these rules, the PSC regulates, as described in W. Va. Code § 46A-1-150(a)(3), charges for services, charges for delayed payment, and any discount allowed for early payment.</u> Thus, whether W. Va. Code § 46A-1-105(a)(3) applies to the claims in this case turns on whether Mr. Holt's claims arise from transactions under WVAW's tariff.

<u>Holt</u>, 233 W. Va. at 692-93, 760 S.E.2d at 506-07 (emphasis added).  Concerning that extant question of whether the WVCCPA claims arose under the tariff, the supreme court of appeals stated as follows:

> Tariffs must contain a schedule of all of a water utility's rates, charges, tolls, and all of the utility's rules and regulations. W. Va. Code R. § 150-2-2.1 (2002). WVAW's tariff, titled "Rates, Rules and Regulations for Furnishing Water at Cities, Towns, Communities, Etc." ("Tariff") was issued under the authority of the PSC. First and foremost, the Tariff provides the rates for water usage and states that "[b]ills and notices of the company will be mailed or delivered to the consumer's last address as shown by the records of the company."
>
> We conclude that Mr. Holt's claims all arise from transactions described in the Tariff. Accordingly, W. Va. Code § 46A-1-105(a)(3) applies to exclude Mr. Holt's WVCCPA claims.

<u>Holt</u>, 233 W. Va. at 693, 760 S.E.2d at 507 (citations and

footnote omitted).  While plaintiffs attempt to challenge the express language in <u>Holt</u>, the decision's effect is unmistakeable.[10]  Their WVCCPA claims are barred by West Virginia Code section 46A-1-105(a)(3).

Plaintiffs assert in the alternative that they have pled common law breach of express and implied warranty claims in Count Ten.  While the water company defendants do not believe those claims to have been pled, the court concludes that paragraphs 208 and 209 of the operative pleading encompass those warranty claims.  It is thus ORDERED that the motion to dismiss Count Ten as to the WVCCPA claims alleged be, and hereby is, granted, and that the residue of the motion to dismiss Count Ten be, and hereby is, denied.

6.  Count Eleven: Failure to Plead Exposure to a Disease
     Medically Proven to Cause Death or Substantial Injury

The water company defendants next contend that plaintiffs have failed to plead a viable claim for negligent

---

[10] Plaintiffs, in essence, assert the supreme court of appeals was mistaken concerning the statute's reach: "Plaintiffs canvassed the regulations of the West Virginia Public Service Commission pertaining to water utilities . . . and relevant statutes, and did not find a single regulation that arguably supported the contention that the PSC regulates "'any discount allowed for early payment.'"  (Pls.' Resp. at 29-30).  The supreme court of appeals having spoken authoritatively on the issue, the matter is closed.

infliction of emotional distress inasmuch as they have not alleged they were exposed to a disease medically proven to cause death or substantial injury.  They rely upon the following four syllabus points in <u>Marlin v. Bill Rich Const., Inc.</u>, 198 W. Va. 635, 482 S.E.2d 620 (1996):

> 10. "An individual may recover for the negligent infliction of emotional distress absent accompanying physical injury upon a showing of facts sufficient to guarantee that the emotional damages claim is not spurious."
>
> 11. A claim for emotional distress without an accompanying physical injury can only be successfully maintained upon a showing by the plaintiffs in such an action of facts sufficient to guarantee that the claim is not spurious and upon a showing that the emotional distress is undoubtedly real and serious.
>
> 12. In order to recover for negligent infliction of emotional distress based upon the fear of contracting a disease, a plaintiff must prove that he or she was actually exposed to the disease by the negligent conduct of the defendant, that his or her serious emotional distress was reasonably foreseeable, and that he or she actually suffered serious emotional distress as a direct result of the exposure.
>
> 13. In addition to other factors which may be adduced in evidence to prove that serious emotional distress arising from the fear of contracting a disease is reasonably foreseeable, the evidence must show first, that the exposure upon which the claim is based raises a medically established possibility of contracting a disease, and second, that the disease will produce death or substantial disability requiring prolonged treatment to mitigate and manage or promising imminent death.

<u>Marlin</u>, 198 W. Va. at 639, 482 S.E.2d at 624 (citation omitted).

The material allegations in the operative pleading are as follows:

> 215. The failure to establish an alternative water supply . . . constitutes negligence that foreseeably resulted in emotional distress to Plaintiff Melissa Johnson and those similarly situated pregnant women which caused them to reasonably fear harmful effects from the contaminated water.
>
> 216. The failure to establish an alternative water supply constitutes negligence that foreseeably resulted in emotional distress to Plaintiff Crystal Good and those similarly situated parents which caused them to reasonably fear harmful effects from the contaminated water to both themselves and their children.

(Op. Pleading ¶¶ 215-16).  Plaintiffs note in their response brief that the toxicology profile of crude MCHM is virtually unknown.  They also note that in Marlin the plaintiffs suffered an exposure but no physical injury.  Here, plaintiffs point out, there were physical injuries:

> After taking a hot shower in water that she had not been told was contaminated, Plaintiff Mary Lacy developed trouble breathing. She became alarmed and sought treatment at Thomas Memorial Hospital. Plaintiff Kimberly Ogier also took a shower in the water without knowing that it was contaminated.  Ms. Ogier immediately developed a rash that worsened to the point that it became infected. She sought treatment at Logan Regional Medical Center for the infected rash. ACAC ¶¶215-221.
>
> Plaintiff Crystal Good is a mother of three sons living in Charleston who were exposed to the contaminated water. She alleges that the failure to establish an alternative water supply foreseeably and reasonably caused her to fear harmful effects from the water to both her and her children.  Of course, the fact that she and her family were actually

experiencing the harmful effects warned of in the
Eastman MSDS sheets amplifies the reasonable basis for
her emotional distress.

(Pls.' Resp. at 31-32). The operative pleading further alleges

as follows:

287. The population of in utero, infants, and children
up to the age of five were exposed to levels at or
exceeding two parts per million (2 ppm) Crude MCHM in
the first twenty-four to thirty-six hours, which is a
greater concentration than the general public is
typically exposed.

288. The exposed population in utero, infants, and
children up to the age of five, have an increased risk
of developing neurological damage, resulting in ADD or
ADHD from the toxic insult to the developing brain
caused [by] exposure to methanol contained in Crude
MCHM.

289. Cognitive tests for ADD or ADHD, once the exposed
population in utero, infants, and children up to the
age of five reach an appropriate age, are readily
available, generally accepted, and advantageous
medically.

(Op. Pleading ¶¶ 287-89)

In view of the physical injuries alleged, the

uncertainty occasioned by the effects of crude MCHM, the age of

the affected putative class members, and the fact that the case

is at the Rule 12(b)(6) stage, the court concludes plaintiffs

have alleged "facts sufficient to guarantee that the claim is

not spurious and . . . that the emotional distress is

undoubtedly real and serious" and have raised a medically established

possibility of contracting a disease that will produce

substantial disability requiring prolonged treatment to mitigate and manage.  A claim for negligent infliction of emotional distress has thus been alleged.  Syl. pt. 11, <u>Marlin</u>, 198 W. Va. at 639, 482 S.E.2d at 624 (citation omitted).  It is ORDERED that this ground of the motion to dismiss be, and hereby is, denied.

> 7.   Count Twelve: The Strict Liability Claim for Failure
>       to Warn is Deficient Inasmuch as the Alleged
>              Inadequate Warnings Were Pursuant
>                 to Government Recommendations.

Count Twelve alleges a strict liability claim arising out of the water company defendants' failure to provide certain warnings.  The material allegations in the operative pleading are as follows:

> 223. [The water company defendants] . . . are liable for failure to warn once they became aware that the Elk River was contaminated and those contaminants were being distributed to the customers.
>
> . . . .
>
> 225. At the point that it became known that the water intake was contaminated the distribution of water for sanitation and firefighting purposes became an ultra-hazardous activity.
>
> 226. Defendants . . . should have immediately upon understanding that a contaminant had entered their distribution system issued warnings by all means possible to its customers not to contact the water. Instead, the warnings came hours after hundreds of thousands of customers, including pregnant women, had continued to use the water without warnings.

227. The water supplied to the Plaintiffs preceding the "Do Not Use" warning, as well as thereafter, was unreasonably dangerous and entirely defective as it was contaminated with one or more dangerous and/or hazardous chemicals as a result of the water contamination alleged herein.

228. Further, . . . [the water company defendants] should have not advised that the water was safe to drink at one part per million (1 ppm) when other respected sources were warning against exposure at far lower levels especially for pregnant women.

(Op. Pleading ¶¶ 223, 225-28).

The water company defendants focus on the safe drinking threshold alleged in paragraph 228.  They contend that the Centers for Disease Control ("CDC") and other government agencies, not the water company defendants, determined the level of concentration at which the water was deemed safe.  The water company defendants quote the following language from a CDC report:

Since CDC/ATSDR [the Agency for Toxic Substance Disease Registry] recommended the emergency short-term screening level, state and federal officials have acquired several additional proprietary studies on the toxicology of MCHM. When these studies became available, the U.S. Department of Health & Human Services convened a Federal expert workgroup including scientists from the National Institute of Environmental Health Sciences and National Toxicology Program, the National Library of Medicine, the Environmental Protection Agency, and CDC/ATSDR to review the available animal studies and the methodology for the short-term screening level calculation. This workgroup concurred that the 1 ppm short-term screening level was appropriate.

Centers for Disease Control, Summary Report of Short-term

Screening Level Calculation and Analysis of Available Animal Studies for MCHM 1 (2014), <u>available at</u> http://www.bt.cdc.gov/chemical/MCHM/westvirginia2014/pdf/MCHM-Summary-Report.pdf.

The claim alleged by plaintiffs appears to be one of use defectiveness.  As noted in syllabus point 2 of <u>Ilosky v. Michelin Tire Corp.</u>, 172 W. Va. 435, 437, 307 S.E.2d 603, 605 (1983), "Use defectiveness covers situations when a product may be safe as designed and manufactured, but which becomes defective because of the failure to warn of dangers which may be present when the product is used in a particular manner."  <u>Id.</u>  Plaintiffs do not assert the water was manufactured defectively.  They contend that once the Crude MCHM was used in combination with the water, it became dangerous, and, consequently, the water company defendants were obliged to warn of the danger and its potential consequences.

The water company defendants offer substantial evidence that the applicable warnings were fashioned by the CDC and other government agencies charged with protecting the public in a rapidly unfolding crisis.  A finder of fact may accord significant weight to that proof.  But it is a matter of weight.  As the supreme court of appeals in <u>Ilosky</u> held in syllabus point 4, "The determination of whether a defendant's efforts to warn of a product's dangers are adequate is a jury question."

<u>Ilosky</u>, 172 W. Va. at 437, 307 S.E.2d at 605.  The claim is thus not susceptible to disposition at the Rule 12(b)(6) stage.[11]

It is ORDERED that this ground of the motion to dismiss be, and hereby is, denied.


8.  Counts Fifteen and Sixteen: The Nuisance Claims
Lack Necessary Allegations and
Are Implausible as Pled


Dismissal is sought for Count Fifteen based upon plaintiffs' failure to allege the "special injury" required for a public nuisance claim.  Count Sixteen is challenged based upon its allegation of a common public right to support a private nuisance claim.  The private nuisance claim is first addressed.

---

[11] The water company defendants offer two additional arguments under this heading.  First, they assert this claim is barred by the gist of the action doctrine.  The court has addressed the doctrine <u>supra</u>.  That analysis is fully applicable here.  The argument is not meritorious at this early stage of the case.  Second, the water company defendants contend the allegation in paragraph 225 is inadequate to assert a strict liability claim.  They cite authorities standing for the unremarkable position that the provision of water by a utility is not an abnormally dangerous activity.  The theory here, of course, is a bit more novel, namely, that once the intake became contaminated with Crude MCHM, which then was distributed to customers, the water supply process was transformed into one with inherent, unavoidable hazards for which a warning was essential.  The allegation suffices at this stage of the case.

In <u>Rhodes v. E.I. du Pont de Nemours and Co.</u>, 636 F.3d 88 (4th Cir. 2011), plaintiffs alleged the contamination of a public water supply in their town.  For a number of years, a DuPont plant in the area deposited perfluorooctanoic acid (PFOA) into the environment around the facility.  PFOA was found in the water transported by Parkersburg City Water Department to its customers.  The substance had accumulated in plaintiffs' bloodstream and was found in the residences of other customers.  Plaintiffs alleged, <u>inter alia</u>, a private nuisance claim against Dupont individually and on behalf of a class of water customers in the area.

The analysis found in the <u>Rhodes</u> decision is worth quoting at length:

> Under West Virginia law, a private nuisance arises when a person or entity has created a "substantial and unreasonable interference with the private use and enjoyment of another's land."  In contrast, when a defendant's conduct "unlawfully operates to hurt or inconvenience an indefinite number of persons," a public nuisance is created.

> The distinction between these two types of nuisance, however, is not simply a matter of tallying the number of people affected by a defendant's allegedly tortious conduct. As the district court recognized, the proper characterization of a nuisance as either private or public <u>depends on the nature of the interest affected by the defendant's conduct</u>.

> <u>If the only interest that is invaded is an interest shared equally by members of the public, then the alleged nuisance is public in nature</u>.  Such a circumstance is precisely the situation presented

42

here, <u>because DuPont's allegedly tortious conduct</u>
<u>interfered with the general public's access to clean</u>
<u>drinking water</u>. The fact that the water eventually was
pumped into private homes did not transform the right
interfered with from a public right to a private
right. We therefore conclude, as the district court
did, that when a release of pollutants directly
affects a municipal water supply and does not
interfere with any private water source, such as a
well drilled on private property, the presence of the
pollutants in the public water supply will not support
a private nuisance claim.

<u>Rhodes</u>, 636 F.3d at 96-97 (emphasis added).

The decision in <u>Rhodes</u> is fatal to plaintiffs' private
nuisance claim: "[T]he presence of the pollutants in the public
water supply will not support a private nuisance claim." <u>Id.</u> at
97.

Respecting the public nuisance claim alleged in Count
Fifteen, the water company defendants assert that plaintiffs do
not, and cannot, allege they suffered a special injury as
required by West Virginia law.

In <u>Hark v. Mountain Fork Lumber Co.</u>, 127 W. Va. 586,
595-96, 34 S.E.2d 348, 354 (1945), the supreme court of appeals
distinguished a public from a private nuisance in this way:

A public nuisance is an act or condition that
unlawfully operates to hurt or inconvenience an
indefinite number of persons. The distinction between
a public nuisance and a private nuisance is that the
former affects the general public, and the latter
injures one person or a limited number of persons
only. Ordinarily, a suit to abate a public nuisance
cannot be maintained by an individual in his private

> capacity, as it is the duty of the proper public
> officials to vindicate the rights of the public.

Id. (footnotes omitted) (quoted in Duff v. Morgantown Energy

Associates (M.E.A.), 187 W. Va. 712, 716, 421 S.E.2d 253, 257

(1992)).  The decision in Hark also offers the briefest of

descriptions concerning the special injury requirement: "But if

the act or condition causes special injury to one or a limited

number of persons and substantial permanent damages result which

cannot be fully compensated in an action at law, a suit to abate

a nuisance so existing may be maintained by a private

individual."  Id. at 596, 34 S.E.2d at 354; see also

International Shoe Co. v. Heatwole, 126 W. Va. 888, 30 S.E.2d

537 (1944)(discussing special injury requirement).  One must

comb back through another nearly two decades of precedent to

find further explication of the requirement.  An excerpt from

one decision during that time frame is illustrative:

> The proof shows that defendant kept large piles of
> sand, gravel, logs, etc., stored in the streets of
> Bellepoint for months at a time. Even the witnesses
> for defendant so admit. This storage was in front of a
> lot owned by Smith's wife. Smith had built a house on
> this lot, and resided there. He testified that the
> material piled in the street stopped up the ditch and
> caused water to overflow his garden. This storage
> therefore caused Smith special injury, not suffered by
> the public at large, and thus gave him the right to
> seek injunctive relief.

Briers v. Alderson, 101 W.Va. 662, 133 S.E. 373, 375 (1926).

44

Plaintiffs respond by pointing to their allegations relating to certain representatives.  First, Georgia Hamra is said, unlike perhaps many other area residents, to have incurred expenses for leaving her home and relocating to a hotel outside the affected communities.  Representatives Crystal Good, Mary Lacy, Joan Green, Wendy Renee Ruiz, and Kimberly Ogier, are also offered as having experienced special injuries inasmuch as they suffered different combinations of the sentinel symptoms alleged in the affected area, including nausea, vomiting, headaches, and rashes.  Plaintiffs offer additional allegations relating to other plaintiffs as well.

In view of the difficulty of ascertaining and applying the special injury requirement, the better course is to await development of the evidentiary record following discovery. Those suffering what may now be seen as special injuries may simply be part of much larger subgroups of individuals with the same injuries, thus cutting against plaintiffs' ability to make the necessary special injury showing.

45

It is thus ORDERED that the motion to dismiss be, and hereby is, granted as to the Count Sixteen private nuisance claim and denied as to Count Fifteen.[12]


                                III.


        Based upon the foregoing discussion, it is ORDERED that the motion to dismiss be, and hereby is, granted, in part, as to Count Eight insofar as the regulations discussed herein, the federal Safe Water Drinking Act, and West Virginia's adoption thereof, are used as predicates for a prima facie negligence claim; granted, in part, as to Count Ten insofar as claims are alleged under the WVCCPA; granted as to the entirety of Count Sixteen; and otherwise denied.


        The Clerk is directed to forward copies of this written opinion and order to counsel of record and any unrepresented parties.

                        DATED:  June 3, 2015

                        _____
                        John T. Copenhaver, Jr.
                        United States District Judge

---

        [12]  The water company defendants request for dismissal of Count Seventeen and Count Nineteen may be addressed summarily. The claims satisfy the Twombly standard and are not subject to dismissal at this juncture.