UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CRYSTAL GOOD, individually and as
parent and next friend of minor children
M.T.S., N.T.K. and A.M.S. and
MELISSA JOHNSON,
individually and as parent of her unborn child,
MARY LACY and JOAN GREEN and JAMILA AISHA OLIVER,
WENDY RENEE RUIZ and KIMBERLY OGIER and ROY J. McNEAL and
GEORGIA HAMRA and MADDIE FIELDS and BRENDA BAISDEN, d/b/a
FRIENDLY FACES DAYCARE, and ALADDIN RESTAURANT, INC., and
R. G. GUNNOE FARMS LLC, and DUNBAR PLAZA, INC.,
d/b/a DUNBAR PLAZA HOTEL,
on behalf of themselves and all others similarly situated,

       Plaintiffs,

v.                                   Civil Action No.: 2:14-01374

AMERICAN WATER WORKS COMPANY, INC., and
AMERICAN WATER WORKS SERVICE COMPANY, INC., and
EASTMAN CHEMICAL COMPANY and
WEST VIRGINIA-AMERICAN WATER COMPANY,
d/b/a WEST VIRGINIA AMERICAN WATER, and
GARY SOUTHERN and DENNIS P. FARRELL,

       Defendants.

MEMORANDUM OPINION AND ORDER

      Pending is the partial motion to dismiss by Eastman

Chemical Company ("Eastman"), filed January 7, 2015.


I.


A.   The Incident


      On January 9, 2014, approximately 300,000 residents in

the Charleston and surrounding area suffered an interruption in

their water supply.  The interruption was caused by a spill into the Elk River of a coal processing chemical mixture sold and distributed exclusively by Eastman.  The mixture was at the time being stored in a facility owned and operated by Freedom Industries, Inc. ("Freedom Industries").

The chemical, 4-methylcyclohexane methanol, and other substances, is referred to as "Crude MCHM."  It infiltrated the water supply at the water treatment plant operated by West Virginia-American Water Company ("WV American").  Plaintiffs also assert that American Water Works Service Company, Inc. ("Service Company") and American Water Works Company, Inc. ("American"), bear responsibility for the infiltration and ensuing events.  American is the parent of both WV American and Service Company.  The three entities are referred to herein collectively as the "water company defendants."

Plaintiffs assert that the water company defendants could have prevented or avoided the incident by taking better precautionary measures, complying with applicable regulations, and using reasonable care.  They assert a host of other failures on Eastman's part in its manufacturing, testing, and distribution of Crude MCHM.  They generally contend Eastman failed to warn of the dangers stemming from the chemical release, negligently characterized the risk of Crude MCHM and

its potential environmental and health hazards, and negligently sold that alleged hazardous chemical to a suspect facility situated upstream from a municipal water supply.

Some putative class members are businesses that lost revenue from the interruption.  Others claim physical injuries, asserting that exposure to Crude MCHM in the environment through human pathways caused bodily injury and necessitated medical monitoring.  All are alleged to have incurred costs for water replacement, travel, and other associated expenses.

B.   The First Amended Consolidated Class Action Complaint

On December 9, 2014, the First Amended Consolidated Class Action Complaint ("operative pleading") became the operative pleading in the case.  Plaintiffs allege the following claims against Eastman:

Count One: Negligence;

Count Three: Negligence for knowingly or negligently delivering its product to a facility without the capacity to safely store it, failing to properly warn of foreseeable risks, including in its MSDS sheets, failing to warn the putative class members of the adverse health effects of Crude MCHM, and failing to properly warn when putative class members were being exposed to Crude MCHM;

Count Seven: Gross negligence for failing to properly characterize the risk and provide proper warnings about Crude MCHM and recklessly and wantonly selling that waste product to a suspect facility located on a river bank in the middle of a highly populated area;

3

Count Nine: Prima facie negligence against Eastman for violation of the federal Toxic Substances Control Act inasmuch as it knew Crude MCHM was toxic and yet it continued to sell it and to manipulate laboratory tests to affect available safety information about the substance;

Count Eleven: Negligent infliction of emotional distress for failing to warn the putative class members of the health risks presented by Crude MCHM despite the fact that Eastman knew the substance could foreseeably come in contact with human receptors;

Count Thirteen: Strict products liability for, <u>inter alia</u>, marketing, packaging, selling and distributing unreasonably dangerous and defective Crude MCHM to Freedom Industries, when Eastman knew or should have known of its adverse health effects and risk of harm and failing to adequately warn about the substance, such as using proper practices in its storage and handling and providing adequate Material Safety Data Sheet ("MSDS") information concerning it;

Count Fourteen: Strict liability for conducting an ultrahazardous activity by, <u>inter alia</u>, manufacturing and then distributing Crude MCHM to an ill-equipped facility in close proximity to the Elk River and WV American's intake;

Count Fifteen: Public nuisance;

Count Sixteen: Private nuisance;

Count Seventeen: Trespass;

Count Nineteen: Medical monitoring;

Count Twenty-one: Violation of the Toxic Substance Control Act for failing to disclose to government agencies certain information concerning Crude MCHM.[1]

---

[1] Plaintiffs also allege a "claim" in Count Twenty for punitive damages.  The item is best understood as an element of damage and not a stand-alone claim for relief.

II.

A.  Governing Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleader provide "a short and plain statement of the claim showing . . . entitle[ment] to relief."  Fed. R. Civ. P. 8(a)(2); Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007).  Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted . . . ."  Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 545 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957), overruled on other grounds, Twombly, 550 U.S. at 563); see also Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007). In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570); see also Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009).

5

Application of the Rule 12(b)(6) standard requires that the court "'accept as true all of the factual allegations contained in the complaint . . . .'" <u>Erickson</u>, 127 S. Ct. at 2200 (quoting <u>Twombly</u>, 127 S. Ct. at 1965); <u>see also</u> <u>South Carolina Dept. Of Health And Environmental Control v. Commerce and Industry Ins. Co.</u>, 372 F.3d 245, 255 (4th Cir. 2004) (quoting <u>Franks v. Ross</u>, 313 F.3d 184, 192 (4th Cir. 2002)). The court must also "draw[] all reasonable . . . inferences from th[e] facts in the plaintiff's favor . . . ." <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 244 (4th Cir. 1999).

B.   The Partial Motion to Dismiss

Eastman offers a host of reasons for dismissal. First, it seeks dismissal of Counts One, Three, Seven, Eleven, Thirteen, and Fourteen (generally, negligence and strict liability counts) on the grounds that the claims are barred by the rule against recovery in tort of solely economic loss when physical injury to person or property is absent. Second, it requests dismissal of Counts Nine and Twenty-One, asserting the lack of a private right of action, the absence of standing, and conclusory pleading as to liability and causation. It next seeks dismissal of Count Eleven on the alternative ground that plaintiffs fail to plead they were exposed to a disease

6

medically proven to cause death or substantial injury as
required for negligent infliction of emotional distress.

Dismissal is sought for Count Fifteen based upon
plaintiffs' asserted failure to suffer the "special injury"
required for a public nuisance claim.  Count Sixteen is
challenged based upon its assertion of a common public right to
support a private nuisance claim.

Count Seventeen is challenged as generally failing to
state a claim for trespass.  Count Nineteen is targeted for
dismissal due to plaintiffs' putative failure to sufficiently
allege a medical monitoring claim.

> 1. Counts One, Three, Seven, Eleven,
>    Thirteen and Fourteen:
>    The Economic Loss Rule

Eastman first asserts that plaintiffs' tort claims
seeking damages for lost profits, business opportunities and
unnamed other expenses are barred by the so-called economic loss
rule.  The general parameters of the rule are reasonably well-
settled.  In Aikens v. Debow, 208 W. Va. 486, 541 S.E.2d 576
(2000), the supreme court of appeals observed as follows:

We conclude that an individual who sustains purely

> economic loss from an interruption in commerce caused by
> another's negligence may not recover damages in the
> absence of physical harm to that individual's person or
> property, a contractual relationship with the alleged
> tortfeasor, or some other special relationship between
> the alleged tortfeasor and the individual who sustains
> purely economic damages sufficient to compel the
> conclusion that the tortfeasor had a duty to the
> particular plaintiff and that the injury complained of
> was clearly foreseeable to the tortfeasor.

Id. at 499, 541 S.E.2d at 589. The decision in Aikens stands

for the principle that an individual who sustains

purely economic loss due to another's negligence can only

recover, when there is neither a contract or physical harm to

person or property, when some special relationship exists

between the parties.

        The primary difficulty with Eastman's contention at

this early stage of the litigation is that it is unclear that

purely economic losses are at issue. Plaintiffs respond to

Eastman's contention as follows:

> Aikens does not apply because of the physical invasion
> of Plaintiffs and their property resulting from the
> contamination by Crude MCHM. . . . [A]ny invasion by a
> physically-perceptible substance may constitute
> physical damage warranting recovery of economic loss.
> Plaintiffs' pipes and the tap water that enters
> Plaintiffs' homes are Plaintiffs' real and personal
> property. Eastman, through its conduct, caused
> Plaintiffs' real and personal property to suffer a
> physical harm and Eastman is liable for the damages
> resulting from the loss of the use of that property.

(Resp. at 7-8). Additionally, while plaintiffs do not mention

it in their response, the operative pleading alleges as follows

at paragraph 253:

>    Defendants' conduct, acts, and omissions have: damaged
>    Plaintiffs' property by necessitating the flushing or
>    replacement of pipes, water heaters and other
>    appliances . . . .

(Op. Pldg. ¶ 253).

The truth of the foregoing allegation must be accepted at this point, along with the reasonable and favorable inferences that flow from it.  Accordingly, the court is unable to conclude as a matter of law that Counts One, Three, Seven, Eleven, Thirteen and Fourteen are flawed as a matter of law as running contrary to the economic loss rule.  The targeted counts in the operative pleading allege plausible claims for relief. It is ORDERED that this ground of the motion to dismiss be, and hereby is, denied.

### 2. Counts Nine and Twenty-One: Proximate Cause, Implied Right of Action, Conclusory Pleading and Lack of Standing

Eastman next asserts that plaintiffs have not demonstrated that the federal Toxic Substances Control Act creates a private right of action and, in any event, have failed to adequately allege standing, fault or causation for these Counts.  Plaintiffs do not appear to advance a private right of action, at least under Count Nine.  They instead seek to use the

Toxic Substances Control Act as a predicate for a prima facie

negligence claim.  Eastman, however, relies upon West Virginia

precedent illustrating that approach will not suffice:

> "Whenever a violation of a statute is the centerpiece
> of a theory of liability, the question arises whether
> the statute creates an implied private cause of
> action."  Whether a private cause of action exists
> based on a violation of a statute is determined by
> applying the four-part test set forth in Hurley v.
> Allied Chemical Corporation, 164 W.Va. 268, 262 S.E.2d
> 757 (1980). . . .
>
>> The following is the appropriate test to
>> determine when a State statute gives rise by
>> implication to a private cause of action: (1)
>> the plaintiff must be a member of the class for
>> whose benefit the statute was enacted; (2)
>> consideration must be given to legislative
>> intent, express or implied, to determine whether
>> a private cause of action was intended; (3) an
>> analysis must be made of whether a private cause
>> of action is consistent with the underlying
>> purposes of the legislative scheme; and (4) such
>> private cause of action must not intrude into an
>> area delegated exclusively to the federal
>> government.

Arbaugh v. Board of Educ., County of Pendleton, 214 W. Va. 677,

681, 591 S.E.2d 235, 239 (2003) (emphasis added) (citations

omitted); see also Fucillo v. Kerner ex rel. J.B., 231 W. Va.

195, 201, 744 S.E.2d 305, 311 (2013).

        Plaintiffs have not undertaken in their response, much

less discharged, their obligation under Arbaugh and Hurley.

Additionally, the weight of authority, limited as it is, is

against them on the point.  See, e.g., Cudjoe ex rel. Cudjoe v.

<u>Department of Veterans Affairs</u>, 426 F.3d 241, 248 (3rd Cir.
2005) ("The only citizens' suits allowed under 15 U.S.C. §
2619[, which is the citizens' civil actions provision of the
statute,] are to enjoin violations of the Toxic Substances
Control Act, not for money damages.  Courts have held that the
Toxic Substances Control Act does not permit private citizens to
pursue either civil penalties available under the statute (which
may only be imposed by the EPA) . . . or compensation for
personal injuries . . . ."); <u>Sipes ex rel. Slaughter v. Russell</u>,
89 F. Supp.2d 1199, 1204 (D. Kan. 2000) ("On its face, [the
Toxic Substances Control Act] permits only the United States
(through the EPA) to impose fines and penalties on TSCA
violators. It does not allow private citizens to enforce the
penalty provisions as a method for recovering compensatory
damages.").  Count Nine is thus subject to dismissal.

        Count Twenty-One is another matter.  Plaintiffs desire
in that claim only what Congress has specifically permitted,
namely, to pursue a private action to enjoin violations of the
Toxic Substances Control Act:

    [A]ny person may commence a civil action--

        against any person . . . who is alleged to be in
        violation of this chapter or any rule
        promulgated under section 2603, 2604, or 2605 of
        this title, or subchapter II or IV of this
        chapter, or order issued under section 2604 of
        this title or subchapter II or IV of this

11

chapter to restrain such violation . . . .

15 U.S.C.A. § 2619(a)(1).  Plaintiffs have alleged that Eastman

has violated 15 U.S.C. § 2607(e), which provides as follows:

> Any person who manufactures, processes, or distributes
> in commerce a chemical substance or mixture and who
> obtains information which reasonably supports the
> conclusion that such substance or mixture presents a
> substantial risk of injury to health or the
> environment shall immediately inform the Administrator
> of such information unless such person has actual
> knowledge that the Administrator has been adequately
> informed of such information.

15 U.S.C. § 2607(e).  The basis for section 2607(e) violations

are the following summarized allegations supported by the

information found in paragraphs 312 to 19 of the operative

pleading:

> Thousands of residents sought medical advice or
> treatment after exposure to Crude MCHM;
>
> Eastman knew that its product would end up in the
> environment inasmuch as contaminated Crude MCHM slurry
> from coal processing plants inevitably migrated to
> waters of the United States;
>
> In the aftermath of the spill, testing by the West
> Virginia Department of Environmental Protection
> identified Crude MCHM in outlets and creeks downstream
> from slurry impoundments at six different locations
> across the state;
>
> Independent scientific testing replicating key
> components of Eastman's aquatic toxicology studies
> indicates that Crude MCHM is significantly more toxic
> than previously represented by Eastman;
>
> In 1998, Eastman began to conduct toxicology studies
> on Crude MCHM hoping to justify removal from its MSDS
> sheets a warning about the potential for blood
> disorders;

During that time, Eastman went so far as to change the breed of rat used in experiments and otherwise abandon Good Laboratory Practices; and

Eastman ignored data in those studies and reported false or misleading conclusions to the Environmental Protection Agency regarding the toxicity of Crude MCHM.

These allegations, if taken as true, support the view that (1) in manufacturing and distributing Crude MCHM, Eastman obtained information reasonably supporting the view that it could cause a substantial risk of injury to the health or the environment, (2) but that it concomitantly failed to inform the relevant agency.  Plaintiffs thus have both standing and a plausible claim for relief under section 2619(a)(1).  Eastman's request for dismissal of Count Twenty-One is thus not meritorious.

Accordingly, the court ORDERS that Eastman's motion to dismiss as to Count Nine be, and hereby is, granted, and as to Count Twenty-One, denied.

### 3.  Count Eleven: Failure to Plead Exposure to a Disease Medically Proven to Cause Death or Substantial Injury

Eastman next contends that plaintiffs have failed to plead a viable claim for negligent infliction of emotional distress inasmuch as they have not alleged they were exposed to

13

a disease medically proven to cause death or substantial injury. The court notes the following four syllabus points from <u>Marlin v. Bill Rich Const., Inc.</u>, 198 W. Va. 635, 482 S.E.2d 620 (1996):

> 10. "An individual may recover for the negligent infliction of emotional distress absent accompanying physical injury upon a showing of facts sufficient to guarantee that the emotional damages claim is not spurious."
>
> 11. A claim for emotional distress without an accompanying physical injury can only be successfully maintained upon a showing by the plaintiffs in such an action of facts sufficient to guarantee that the claim is not spurious and upon a showing that the emotional distress is undoubtedly real and serious.
>
> 12. In order to recover for negligent infliction of emotional distress based upon the fear of contracting a disease, a plaintiff must prove that he or she was actually exposed to the disease by the negligent conduct of the defendant, that his or her serious emotional distress was reasonably foreseeable, and that he or she actually suffered serious emotional distress as a direct result of the exposure.
>
> 13. In addition to other factors which may be adduced in evidence to prove that serious emotional distress arising from the fear of contracting a disease is reasonably foreseeable, the evidence must show first, that the exposure upon which the claim is based raises a medically established possibility of contracting a disease, and second, that the disease will produce death or substantial disability requiring prolonged treatment to mitigate and manage or promising imminent death.

<u>Marlin</u>, 198 W. Va. at 639, 482 S.E.2d at 624 (citation omitted).

      The material allegations in the operative pleading are as follows:

14

58. The combination [of] chemical[ly] pure Crude MCHM
is not found in nature and consists of a methyl group
combined with a hexane ring and methanol. Crude MCHM
contains various other chemicals, including free
methanol.

. . . .

60. Upon information and belief, Eastman's Crude MCHM
"product" has many waste-like characteristics,
including, but not limited to, the following: (1)
Crude MCHM is not specifically marketed by Eastman as
a product and Eastman has not bothered even to create
a Crude MCHM "Product Data Sheet," a sheet that
Eastman uses to highlight its commercial products'
uses and attributes for marketing purposes; (2) Crude
MCHM is never made to order or to satisfy the demands
of purchasers of Crude MCHM, but, rather, is only . .
. produced as a byproduct when Eastman produces CHDM
to satisfy the demands of purchasers of its CHDM[2]; (3)
Eastman sells its Crude MCHM "as is" as it comes out
of the waste line of the CHDM process stream; (4)
Eastman does not further refine or distill Crude MCHM
to meet any specifications for the "active"
ingredient, which ostensibly is MCHM (hence the
designation "Crude" MCHM); (5) Crude MCHM is not
commercially viable as a stand-alone product, while
CHDM would be a commercially viable product to Eastman
even without the contribution from sales of the
byproduct Crude MCHM; and (6) Crude MCHM is barely
marketable as a retail chemical for its use as a coal
flotation frother, such that the only mention of this
use that can be found online (apart from reports on
the instant chemical spill) is contained in a 1990
patent that the patent holder allowed to lapse in 1998
rather than pay the miniscule patent maintenance fee.

. . . .

62. Defendant Eastman had a duty to characterize the
environmental and health risks of Crude MCHM, did so

_____

[2] Crude MCHM is a byproduct occurring during the
manufacture of 1,4-cyclohexanedimethanol, referred to in the
text as "CHDM."  The compound is marketed by Eastman for use in
making polyesters used in food packaging applications.

negligently and with conscious disregard of the
chemical's toxicity/corrosivity and caused the damages
complained of herein. Th[e] fact that Crude MCHM may
break down in the environment is well known and
foreseeable. The likely breakdown and metabolite
chemicals of Crude MCHM are known to be dangerous and
toxic, including, but not limited to, carcinogens and
neurotoxins, like formaldehyde.

63. Defendant Eastman failed to properly characterize
and therefore failed to warn properly of the risk to
public health and the environment of the toxicity of
Crude MCHM in that internal reports about the
product's toxicity reached conclusions of low toxicity
when the data in those internal reports implicated
higher toxicity.

       .  .  .  .

67. Defendant Eastman failed to characterize and
therefore failed to warn properly of the risk to
health and the environment when the cause of death of
twenty rats "was not determined" in an Eastman study
entitled "Acute Toxicity of 4-Methylcyclohexane
Methanol."

68. Defendant Eastman failed to characterize and
therefore failed to warn properly of the risk to
health and the environment when it again did not
determine the cause of death of two rats who died
during a test of "Acute Dermal Toxicity in the Rat for
Crude MCHM."

69. Defendant Eastman failed to characterize and
therefore failed to warn properly of the risk to
health and the environment when it ignored deaths,
erythema, desquamation, moderate to severe transient
weakness, prostration, stumbling, red urine, and
splenic lesions noted during the test of "Acute Dermal
Toxicity in the Rat for Crude MCHM" in which Defendant
Eastman concluded that despite these results the
substance was only "slightly toxic."

(Op. Pleading ¶¶ 58, 60, 62-63, 67-69).

16

Plaintiffs note in their response brief that the toxicology profile of crude MCHM is virtually unknown.  They also note that in <u>Marlin</u> the plaintiffs suffered an exposure but no physical injury.  Here, plaintiffs point out, there were physical injuries:

> After taking a hot shower in water that she had not been told was contaminated, Plaintiff Mary Lacy developed trouble breathing. She became alarmed and sought treatment at Thomas Memorial Hospital. Plaintiff Kimberly Ogier also took a shower in the water without knowing that it was contaminated.  Ms. Ogier immediately developed a rash that worsened to the point that it became infected. She sought treatment at Logan Regional Medical Center for the infected rash. ACAC ¶¶215-221.

> Plaintiff Crystal Good is a mother of three sons living in Charleston who were exposed to the contaminated water. She alleges that the failure to establish an alternative water supply foreseeably and reasonably caused her to fear harmful effects from the water to both her and her children.  Of course, the fact that she and her family were actually experiencing the harmful effects warned of in the Eastman MSDS sheets amplifies the reasonable basis for her emotional distress.

(Pls.' Resp. at 31-32).  The operative pleading further alleges as follows:

> 287. The population of <u>in utero</u>, infants, and children up to the age of five were exposed to levels at or exceeding two parts per million (2 ppm) Crude MCHM in the first twenty-four to thirty-six hours, which is a greater concentration than the general public is typically exposed.

> 288. The exposed population <u>in utero</u>, infants, and children up to the age of five, have an increased risk of developing neurological damage, resulting in ADD or ADHD from the toxic insult to the developing brain

17

     caused [by] exposure to methanol contained in Crude
     MCHM.

     289. Cognitive tests for ADD or ADHD, once the exposed
     population <u>in utero</u>, infants, and children up to the
     age of five reach an appropriate age, are readily
     available, generally accepted, and advantageous
     medically.

(Op. Pleading ¶¶ 287-89)

     In view of the physical injuries alleged, the
uncertainty occasioned by the effects of Crude MCHM, the age of
the affected putative class members, and the fact that the case
is at the Rule 12(b)(6) stage, the court concludes plaintiffs
have alleged "facts sufficient to guarantee that the claim is
not spurious and . . . that the emotional distress is
undoubtedly real and serious" and they have raised a medically
established possibility of contracting a disease that will
produce substantial disability requiring prolonged treatment to
mitigate and manage.  A claim for negligent infliction of
emotional distress has thus been alleged.  Syl. pt. 11, <u>Marlin</u>,
198 W. Va. at 639, 482 S.E.2d at 624 (citation omitted).  It is
ORDERED that this ground of the motion to dismiss be, and hereby
is, denied.

### 4. Counts Fifteen and Sixteen: The Nuisance Claims
### Lack Necessary Allegations and
### Are Implausible as Pled

Dismissal is sought for Count Fifteen based upon plaintiffs' failure to allege the "special injury" required for a public nuisance claim.  Count Sixteen is challenged based upon its allegation of a common public right to support a private nuisance claim.  The private nuisance claim is first addressed.

In <u>Rhodes v. E.I. du Pont de Nemours and Co.</u>, 636 F.3d 88 (4th Cir. 2011), plaintiffs alleged the contamination of a public water supply in their town.  For a number of years, a DuPont plant in the area deposited perfluorooctanoic acid (PFOA) into the environment around the facility.  PFOA was found in the water transported by Parkersburg City Water Department to its customers.  The substance had accumulated in plaintiffs' bloodstream and was found in the residences of other customers.  Plaintiffs alleged, <u>inter alia</u>, a private nuisance claim against Dupont individually and on behalf of a class of water customers in the area.

The analysis found in the <u>Rhodes</u> decision is worth quoting at length:

> Under West Virginia law, a private nuisance arises when a person or entity has created a "substantial and unreasonable interference with the private use and enjoyment of another's land."  In contrast, when a

19

defendant's conduct "unlawfully operates to hurt or inconvenience an indefinite number of persons," a public nuisance is created.

The distinction between these two types of nuisance, however, is not simply a matter of tallying the number of people affected by a defendant's allegedly tortious conduct. As the district court recognized, the proper characterization of a nuisance as either private or public depends on the nature of the interest affected by the defendant's conduct.

If the only interest that is invaded is an interest shared equally by members of the public, then the alleged nuisance is public in nature. Such a circumstance is precisely the situation presented here, because DuPont's allegedly tortious conduct interfered with the general public's access to clean drinking water. The fact that the water eventually was pumped into private homes did not transform the right interfered with from a public right to a private right. We therefore conclude, as the district court did, that when a release of pollutants directly affects a municipal water supply and does not interfere with any private water source, such as a well drilled on private property, the presence of the pollutants in the public water supply will not support a private nuisance claim.

Rhodes, 636 F.3d at 96-97 (emphasis added).

The decision in Rhodes is fatal to plaintiffs' private nuisance claim: "[T]he presence of the pollutants in the public water supply will not support a private nuisance claim." Id. at 97.

Respecting the public nuisance claim alleged in Count Fifteen, Eastman asserts that plaintiffs do not, and cannot,

allege they suffered a special injury as required by West
Virginia law.

        In Hark v. Mountain Fork Lumber Co., 127 W. Va. 586,
595–96, 34 S.E.2d 348, 354 (1945), the supreme court of appeals
distinguished a public from a private nuisance in this way:

> A public nuisance is an act or condition that
> unlawfully operates to hurt or inconvenience an
> indefinite number of persons. The distinction between
> a public nuisance and a private nuisance is that the
> former affects the general public, and the latter
> injures one person or a limited number of persons
> only. Ordinarily, a suit to abate a public nuisance
> cannot be maintained by an individual in his private
> capacity, as it is the duty of the proper public
> officials to vindicate the rights of the public.

Id. (footnotes omitted) (quoted in Duff v. Morgantown Energy
Associates (M.E.A.), 187 W. Va. 712, 716, 421 S.E.2d 253, 257
(1992)).  The decision in Hark also offers the briefest of
descriptions concerning the special injury requirement: "But if
the act or condition causes special injury to one or a limited
number of persons and substantial permanent damages result which
cannot be fully compensated in an action at law, a suit to abate
a nuisance so existing may be maintained by a private
individual."  Id. at 596, 34 S.E.2d at 354; see also
International Shoe Co. v. Heatwole, 126 W. Va. 888, 30 S.E.2d
537 (1944) (discussing special injury requirement).  One must
comb back through another nearly two decades of precedent to
find further explication of the requirement.  An excerpt from

21

one decision during that time frame is illustrative:

> The proof shows that defendant kept large piles of
> sand, gravel, logs, etc., stored in the streets of
> Bellepoint for months at a time. Even the witnesses
> for defendant so admit. This storage was in front of a
> lot owned by Smith's wife. Smith had built a house on
> this lot, and resided there. He testified that the
> material piled in the street stopped up the ditch and
> caused water to overflow his garden. This storage
> therefore caused Smith special injury, not suffered by
> the public at large, and thus gave him the right to
> seek injunctive relief.

Briers v. Alderson, 101 W.Va. 662, 133 S.E. 373, 375 (W.Va.
1926).

Plaintiffs respond by pointing to their allegations
relating to certain representatives.  First, Georgia Hamra is
said, unlike perhaps many other area residents, to have incurred
expenses for leaving her home and relocating to a hotel outside
the affected communities.  Representatives Crystal Good, Mary
Lacy, Joan Green, Wendy Renee Ruiz, and Kimberly Ogier, are also
offered as having experienced special injuries inasmuch as they
suffered different combinations of the sentinel symptoms alleged
in the affected area, including nausea, vomiting, headaches, and
rashes.  Plaintiffs offer additional allegations relating to
other plaintiffs as well.

In view of the difficulty of ascertaining and applying
the special injury requirement, the better course is to await
development of the evidentiary record following discovery.

Those suffering what may now be seen as special injuries may simply be part of much larger subgroups of individuals with the same injuries, thus cutting against plaintiffs' ability to make the necessary special injury showing.

It is thus ORDERED that the motion to dismiss be, and hereby is, granted as to the Count Sixteen private nuisance claim and denied as to Count Fifteen.[3]


III.


Based upon the foregoing discussion, it is ORDERED that the motion to dismiss be, and hereby is, granted as to Count Nine and Count Sixteen, and otherwise denied.

The Clerk is directed to forward copies of this written opinion and order to counsel of record and any unrepresented parties.

DATED:  June 4, 2015

John T. Copenhaver, Jr.
United States District Judge

---

[3] Eastman also requests dismissal of Count Seventeen and Count Nineteen.  Those two counts may be addressed summarily inasmuch as they satisfy the Twombly standard and are not subject to dismissal at this juncture.

23