UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CRYSTAL GOOD, individually and as
parent and next friend of minor children
M.T.S., N.T.K. and A.M.S. and
MELISSA JOHNSON,
individually and as parent of her unborn child,
MARY LACY and JOAN GREEN and JAMILA AISHA OLIVER,
WENDY RENEE RUIZ and KIMBERLY OGIER and ROY J. McNEAL and
GEORGIA HAMRA and MADDIE FIELDS and BRENDA BAISDEN, d/b/a
FRIENDLY FACES DAYCARE, and ALADDIN RESTAURANT, INC., and
R. G. GUNNOE FARMS LLC, and DUNBAR PLAZA, INC.,
d/b/a DUNBAR PLAZA HOTEL,
on behalf of themselves and all others
similarly situated,

        Plaintiffs,


v.                                    Civil Action No.: 2:14-01374


AMERICAN WATER WORKS COMPANY, INC., and
AMERICAN WATER WORKS SERVICE COMPANY, INC., and
EASTMAN CHEMICAL COMPANY and
WEST VIRGINIA-AMERICAN WATER COMPANY,
d/b/a WEST VIRGINIA AMERICAN WATER, and
GARY SOUTHERN and DENNIS P. FARRELL,

        Defendants.


MEMORANDUM OPINION AND ORDER


        Pending are plaintiffs' motion for class

certification, the joint motions by defendants American Water

Works Company, Inc., American Water Works Service Company, Inc.,

West Virginia-American Water Company, and Eastman Chemical

Company to exclude the expert testimony of Seward G. Gilbert,

Harvey Rosen, Ph.D., and David Scott Simonton, Ph.D., and the

motion by defendant Eastman Chemical Company to exclude the expert testimony of Lawrence M. Stanton, each of which were filed July 6, 2015, and plaintiffs' motion to exceed page limitation, filed August 25, 2015.[1]

The court ORDERS that the motion to exceed be, and hereby is, granted, with plaintiffs given leave to submit a 33-page reply memorandum respecting class certification.

Additionally, plaintiffs assert as follows in response to the motion to exclude Dr. Simonton: "Plaintiffs did not cite to Dr. Simonton's opinion in support of their motion for class certification.  For that reason alone, Defendants' attack is premature and should be summarily rejected without further analysis."  (Resp. at 1).  Inasmuch as plaintiffs have chosen not to rely upon Dr. Simonton, the court assesses the class certification request in the absence of his proposed opinions.  There is thus no need to pass on the admissibility of his methodology and opinions.  It is ORDERED that the motion to exclude Dr. Simonton be, and hereby is, denied without prejudice.

---

[1]  American Water Works Company, Inc., is referred to herein as "American."  Defendants American, Service Company and WV American are referred to herein collectively as the "water company defendants."  Eastman Chemical Company is referred to herein as "Eastman."

I.

A.    The Incident


        On January 9, 2014, approximately 300,000 residents in
the Charleston and surrounding area are alleged to have suffered
an interruption in their water supply.  The interruption was
caused by a spill into the Elk River of a coal processing
chemical mixture sold and distributed exclusively by Eastman.
The mixture was being stored in a facility owned and operated by
Freedom Industries, Inc. ("Freedom Industries").

        The chemical, 4-methylcyclohexane methanol, along with
other chemicals, is commonly referred to as "Crude MCHM."  Crude
MCHM infiltrated WV American's water treatment plant in
Charleston.  Plaintiffs assert that both Eastman and the water
company defendants could have prevented or avoided the incident
by taking better precautionary measures, complying with
applicable regulations, and using reasonable care.

        The vast majority of the plaintiffs and putative class
members are residents of dwellings whose water supply was
interrupted, employees who lost wages during the Do Not Use
order or businesses that lost revenue due to the interruption.

All are alleged to have incurred costs for water replacement, travel, and other associated expenses.

B.    The First Amended Consolidated Class Action Complaint

On December 9, 2014, the First Amended Consolidated Class Action Complaint ("operative pleading") became the operative pleading in the case.  Omitting claims alleged against individual co-defendants and other claims previously dismissed, the operative pleading alleges the following:

Count One: Negligence against the defendants;

Count Two: Negligence as to the water company defendants specifically arising out of their failure to address the foreseeable risk posed by the Freedom Industries facility, the failure to adequately warn the class members, the failure to design, maintain, and operate the water treatment plant according to industry standards, negligently and unreasonably delivering and placing on plaintiffs' property the Crude MCHM, and failing to ensure that certain water tankers used to supply residents with replacement water were not filled with contaminated water;

Count Three: Negligence against Eastman for knowingly or negligently delivering its product to a facility without the capacity to safely store it, failing to properly warn of foreseeable risks, including in its MSDS sheets, failing to warn the putative class members of the adverse health effects of Crude MCHM, and failing to properly warn when putative class members were being exposed to Crude MCHM;

Count Seven: Gross negligence against the water company defendants for recklessly ignoring threats to class members both in design and maintenance of their operations, their warnings and attempts to deliver water.  They also allege gross negligence against Eastman for failing to properly

4

characterize the risk and provide proper warnings about
Crude MCHM and recklessly and wantonly selling that waste
product to a suspect facility located on a river bank in
the middle of a highly populated area;

Count Eight: Prima facie negligence against the water
company defendants for failing to adopt a source water
protection plan;

Count Ten:  Breach of warranties against the water company
defendants inasmuch as they informed customers their water
would be safe following flushing and charged their
customers the regular rate for the impure water, in
violation of the warranties that the water pass without
objection in the water utility trade and that the water be
suitable for the ordinary purposes for which tap water is
commonly used;

Count Eleven:  Negligent infliction of emotional distress
against the water company defendants arising out of, inter
alia, their failure to establish an alternative water
supply, which failure caused affected individuals to
reasonably fear harmful effects from the contaminated
water.  They also allege negligent infliction of emotional
distress against Eastman for failing to warn the putative
class members of the health risks presented by Crude MCHM
despite the fact that Eastman knew the substance could
foreseeably come in contact with human receptors;

Count Twelve: Strict products liability against the water
company defendants for failure to warn concerning the
contamination until hours after it occurred and for
providing incorrect information that it was safe to drink
the water when Crude MCHM was at one part per million;

Count Thirteen: Strict products liability against
Eastman for, inter alia, marketing, packaging, selling
and distributing unreasonably dangerous and defective
Crude MCHM to Freedom Industries, when Eastman knew or
should have known of its adverse health effects and
risk of harm and failing to adequately warn about the
substance, such as using proper practices in its
storage and handling and providing adequate Material
Safety Data Sheet ("MSDS") information concerning it;

Count Fourteen: Strict liability against Eastman for
conducting an ultrahazardous activity by, inter alia,

manufacturing and then distributing Crude MCHM to an
ill-equipped facility in close proximity to the Elk
River and WV American's intake;

Count Fifteen: Public nuisance as to the water company
defendants and Eastman;

Count Seventeen: Trespass as to the water company
defendants and Eastman;

Count Eighteen:  Breach of contract as to the water company
defendants and Eastman;

Count Nineteen: Medical monitoring as to the water company
defendants and Eastman.

Count Twenty-one: Violation by Eastman of the Toxic
Substance Control Act for failing to disclose to government
agencies certain information concerning Crude MCHM.


C.   The Certification Requests

        In their July 6, 2015, motion to certify, plaintiffs

identify the following issues for collective determination:


    (1) certifying this action to be maintained as a class
    action with respect to particular issues pursuant to
    Federal Rule of Civil Procedure 23(c)(4), with respect
    to the overarching common issues of whether Defendants
    are liable and whether exemplary damages should be
    awarded as a multiplier of compensatory damages; and

    (2) certifying a single Class of affected businesses
    and West Virginia American Water customers pursuant to
    Federal Rule of Civil Procedure 23(b)(3), to
    adjudicate the issue of damages suffered by the Class
    resulting from the loss of use of tap water during the
    period of the "Do Not Use" ("DNU") order.

(Mot. to Certify at 1-2).

II.

A.  Governing Standards

1. Daubert Standard

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony.  As a threshold matter, an expert must be "qualified . . . by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  In assessing a proffered expert's qualifications, the district court must "'consider the proposed expert's full range of experience and training,' not just his professional qualifications."  Belk, Inc. v. Meyer Corp., U.S., 679 F.3d 146, 162 (4th Cir. 2012) (quoting United States v. Pansier, 576 F.3d 726, 737 (7th Cir. 2009).  While relevant qualifications are crucial, an expert "need not be precisely informed about all details of the issues raised in order to offer an opinion."  Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791 (4th Cir. 1989).

Once qualified, an expert's testimony is admissible if it will assist the trier of fact and is (1) "based on sufficient facts or data," (2) "the product of reliable principles and methods," and (3) "the principles and methods [have been

7

applied] reliably to the facts of the case." Fed. R. Evid. 702;
see United States v. McLean, 715 F.3d 129, 144 (4th Cir. 2013).
Admissibility of such testimony is governed by a two-part test:
the evidence is admitted if "it rests on a reliable foundation
and is relevant." Daubert v. Merrell Dow Pharm., 509 U.S. 579,
597 (1993). Relevance and reliability is guided by, among other
things:

> (1) whether the particular scientific theory "can be
> (and has been) tested"; (2) whether the theory "has
> been subjected to peer review and publication"; (3)
> the "known or potential rate of error"; (4) the
> "existence and maintenance of standards controlling
> the technique's operation"; and (5) whether the
> technique has achieved "general acceptance" in the
> relevant scientific or expert community.

United States v. Crisp, 324 F.3d 261, 266 (4th Cir. 2003)
(quoting Daubert, 509 U.S. at 593–94)).

        The court need not, however, consider all of the
factors in lockstep fashion. Neither Rule 702 nor case law
establish a mechanistic test for determining the reliability of
an expert's proffered testimony. Rather, "'the test of
reliability is flexible' and 'the law grants a district court
the same broad latitude when it decides how to determine
reliability as it enjoys in respect to its ultimate reliability
determination.'" United States v. Wilson, 484 F.3d 267, 274
(4th Cir. 2007) (quoting Kumho Tire Co. v. Carmichael, 526 U.S.
137, 141-42 (1999)).

The gatekeeping role exercised by the district court is a critical one.  Inasmuch as "expert witnesses have the potential to be both powerful and quite misleading[,]" the court must "ensure that any and all scientific testimony . . . is not only relevant, but reliable."  PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 123 (4th Cir. 2011); Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) (citing Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) and Daubert, 509 U.S. at 588, 595).  As observed in Westberry, "The inquiry to be undertaken by the district court is 'a flexible one' focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached."  Westberry, 178 F.3d at 261 (quoting Daubert, 509 U.S. at 594–95).

The court is not obliged to "determine that the proffered expert testimony is irrefutable or certainly correct" -- "[a]s with all other admissible evidence, expert testimony is subject to testing by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'"  United States v. Moreland, 437 F.3d 424, 431 (4th Cir. 2006) (quoting Daubert, 509 U.S. at 596) (alteration in original); see also Maryland Cas. Co. v. Therm-O-Disc., Inc., 137 F.3d 780, 783 (4th Cir. 1998) (noting that

"[a]ll <u>Daubert</u> demands is that the trial judge make a 'preliminary assessment' of whether the proffered testimony is both reliable ... and helpful").


## 2. Class Action Standards


A party seeking class certification must satisfy the requirements found in Federal Rule of Civil Procedure 23(a) and also demonstrate satisfaction of at least one of the subdivisions found in Rule 23(b).  <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 614 (1997); <u>Deiter v. Microsoft Corp.</u>, 436 F.3d 461, 466 (4th Cir. 2006).  There are three material portions of Rule 23, in sequence below, that are relevant here:

<u>RULE 23(a)</u>

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly
and adequately protect the interests of the
class.

RULE 23(b)(3)

(b) Types of Class Actions. A class action may be
maintained if Rule 23(a) is satisfied and if:

. . . .

(3) the court finds that the questions of
law or fact common to class members
predominate over any questions affecting
only individual members, and that a class
action is superior to other available
methods for fairly and efficiently
adjudicating the controversy. The matters
pertinent to these findings include:

(A) the class members' interests in
individually controlling the
prosecution or defense of separate
actions;

(B) the extent and nature of any
litigation concerning the controversy
already begun by or against class
members;

(C) the desirability or undesirability
of concentrating the litigation of the
claims in the particular forum; and

(D) the likely difficulties in
managing a class action.

RULE 23(c)(4)

(c)  Certification Order; Notice to Class Members;
Judgment; Issues Classes; Subclasses

. . . .

(4) Particular Issues. When appropriate, an
action may be brought or maintained as a

11

> class action with respect to particular
> issues.

Fed. R. Civ. P. 23(a), (b)(3), (c)(4); see generally Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311 (4th Cir. 2006).

As noted by our court of appeals, "A plaintiff bears the burden of proving these requirements." Monroe v. City of Charlottesville, 579 F.3d 380, 384 (4th Cir. 2009). The district court is entrusted with exhaustively examining the certification request, as set forth more fully infra, and, as a result, is given the concomitant latitude to do so:

> [A] district court's "wide discretion" in deciding
> whether to certify . . . class . . . . [is based on] a
> district court['s] . . . greater familiarity and
> expertise than a court of appeals in managing the
> practical problems of a class action . . . . [I]ts
> certification decision is entitled to "substantial
> deference," especially when the court makes "well-
> supported factual findings supporting its decision."

Ward v. Dixie Nat'l Life Ins. Co., 595 F.3d 164, 179 (4th Cir. 2010) (citations omitted).

The plaintiffs seek class certification for issues of liability and exemplary damages under Rule 23(c)(4) and for damages to affected residents and businesses under Rule 23(b)(3). In addition to satisfying the foregoing standards under Rule 23, the class must be ascertainable. Our court of appeals observed long ago that "[i]n order to determine whether a class action is proper, the district court must determine

12

whether a class exists and if so what it includes.  Although not specifically mentioned in the rule, the definition of the class is an essential prerequisite to maintaining a class action." Roman v. ESB, Inc., 550 F.2d 1343, 1348 (4th Cir. 1976).  That settled principle of case law, in a nutshell, defines the concept of ascertainability.  In 2003, the long-implicit concept of ascertainability was added to Rule 23(c)(1)(B), providing that "[a]n order that certifies a class action must define the class . . . ."  Fed. R. Civ. P. 23(c)(1)(B).

Apart from these standards, it is important to note that "[t]he likelihood of the plaintiffs' success on the merits . . . is not relevant to the issue of whether certification is proper."  See, e.g., Thorn, 445 F.3d at 319 (4th Cir. 2006).  As a corollary, however, it is also observed as follows:

> [T]he district court must take a "close look" at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification. Such findings can be necessary even if the issues tend to overlap into the merits of the underlying case.

Id.  The court is thus not prohibited from addressing the defendants' Daubert challenges at the class certification stage. To the extent any doubt remained on that point following Thorn, it was laid to rest in Behrend.

In <u>Behrend</u>, the Supreme Court addressed a class certification request that succeeded in the district court and the Third Circuit, essentially due to the unwillingness of the lower courts to heavily scrutinize a particular expert opinion inasmuch as it would require reaching the merits of the plaintiffs' claims at the class certification stage.

After noting the "rigorous analysis" required under Rule 23, the Supreme Court concluded that the class was improperly certified:

> [A] party must not only "be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact," typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a). . . . The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b). . . .
>
> Repeatedly, we have emphasized that it "'may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,' and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" Such an analysis will frequently entail "overlap with the merits of the plaintiff's underlying claim."  That is so because the "'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"
>
> The same analytical principles govern Rule 23(b). . . .
>
> By refusing to entertain arguments against respondents' damages model that bore on the propriety of class certification, simply because those arguments would also be pertinent to the merits determination,

>the Court of Appeals ran afoul of our precedents
>requiring precisely that inquiry. And it is clear
>that, under the proper standard for evaluating
>certification, respondents' model falls far short of
>establishing that damages are capable of measurement
>on a classwide basis.

<u>Behrend</u>, 133 S. Ct. at 1432-33 (citations omitted).  The Supreme

Court elaborated further on the error below as follows:

>The District Court and the Court of Appeals saw no
>need for respondents to "tie each theory of antitrust
>impact" to a calculation of damages.  That, they said,
>would involve consideration of the "merits" having "no
>place in the class certification inquiry."  <u>That
>reasoning flatly contradicts our cases requiring a
>determination that Rule 23 is satisfied, even when
>that requires inquiry into the merits of the claim</u>.
>The Court of Appeals simply concluded that respondents
>"provided a method to measure and quantify damages on
>a classwide basis," finding it unnecessary to decide
>"whether the methodology [was] a just and reasonable
>inference or speculative."  <u>Under that logic, at the
>class-certification stage any method of measurement is
>acceptable so long as it can be applied classwide, no
>matter how arbitrary the measurements may be. Such a
>proposition would reduce Rule 23(b)(3)'s predominance
>requirement to a nullity</u>.

<u>Id.</u> at 1433 (citation omitted) (emphasis added); <u>Amgen Inc. v.

Connecticut Retirement Plans and Trust Funds</u>, 133 S. Ct. 1184,

1194-95 (2013) ("Rule 23 grants courts no license to engage in

free-ranging merits inquiries at the certification stage. Merits

questions may be considered to the extent -- but only to the

extent -- that they are relevant to determining whether the Rule

23 prerequisites for class certification are satisfied.").

Throughout the inquiry, it is important to bear in mind that Rule 23 should receive "a liberal, rather than a restrictive, construction . . . [with] a standard of flexibility that will 'best serve the ends of justice for the affected parties and ... promote judicial efficiency.'" <u>Gunnells v. Healthplan Services, Inc.</u>, 348 F.3d 417, 424 (4th Cir. 2003).

With these governing standards in mind, the court first turns to the <u>Daubert</u> inquiry, followed immediately thereafter by the Rule 23 analysis.

III.

A.   <u>Daubert</u> Challenges

As stated above, the following discussion focuses on the relevance and reliability of the experts' opinions to the extent they bear on the issue of class certification.   <u>See</u> <u>Amgen Inc.</u>, 133 S. Ct. at 1194-95.

The court concludes it is only necessary to consider the opinions offered by Mr. Stanton, Dr. Rosen and Mr. Gilbert. The opinions of Dr. Rosen and Mr. Gilbert are central to the request for class certification concerning economic damages resulting from class-wide loss of water while the Do Not Use

16

order was in effect.  Mr. Stanton's testimony relates to the standard of care Eastman should have exercised in selling Crude MCHM, and is relevant to the request to certify the question of defendants' liability.

In particular, a rigorous analysis of Dr. Rosen's and Mr. Gilbert's damage models is necessary in order to determine if damages can be addressed on a class-wide basis.  The defendants' motions to exclude these opinions consist of a full-frontal assault on the experts' qualifications, methodology, and the factual basis for their opinions.  The attack on Mr. Stanton is of a lesser quantum.

### 1. Mr. Stanton

Mr. Stanton is the plaintiffs' witness on Eastman's compliance with the standards of care in the chemical industry. Plaintiffs rely on Mr. Stanton to show a predominance of common questions in class members' claims against Eastman.  In his declaration, Mr. Stanton asserts that Eastman's conduct fell short of industry standards when it failed to properly assess, disclose, and mitigate risks caused by its sale of Crude MCHM. In response, Eastman argues that Mr. Stanton is unqualified to opine on these matters, that the Responsible Care standards he discusses are not industry standards, and that much of Mr.

Stanton's declaration constitutes improper legal conclusions rather than expert opinion.  The court evaluates Mr. Stanton's opinions at this stage only to the extent they are germane to the issue of class certification.

First, the court finds that Mr. Stanton is amply qualified to offer his expert opinion.  He has extensive experience in chemical risk management, having worked both for industry and relevant government agencies.  Eastman repeatedly attempts to minimize his experience by focusing on small segments of his resume and narrowly defining the expertise at issue.  For example, Eastman suggests that because he is not a toxicologist, he cannot render an opinion on how Eastman's product safety sheets should have discussed the toxicity of MCHM.  Our circuit has provided guidance particularly relevant to this line of argument:

> Certainly, an expert must have specialized knowledge to assist jurors in deciding particular issues in the case, but [the party] reads this requirement far too narrowly. In undertaking its role as gatekeeper to ensure that proffered evidence is reliable pursuant to Fed. R. Evid. 702, the district court must decide whether the expert has "sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case."

Belk, Inc. v. Meyer Corp., U.S., 679 F.3d 146, 162 (4th Cir. 2012) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 156 (1999).

Mr. Stanton's declaration and accompanying curriculum vitae lay out his relevant experience.  In part, plaintiffs describe his experience as follows:

> Stanton has represented the United States in countless meetings and discussions with the chemical industry on their standard of care and what regulation is needed to augment or reinforce those standards.  Serving as Director of the EPA's Office of Emergency Management (OEM), the nation's foremost chemical emergency response agency, he was the most senior civil servant involved in chemical emergency response measures.  In this capacity, he had primary agency-level management authority over major events involving contamination to the environment, including Superstorm Sandy, the West Fertilizer explosion, and the OEM's support for the state response to the Elk River chemical spill, among the more than 300 emergency response actions per year conducted by his office.

Pls' Resp. Stanton 11-12.

Given this wealth of experience, Eastman's contention that Mr. Stanton is unqualified to render his expert opinion is without merit.  Eastman reads the requirement of Rule 702 that an expert show specialized knowledge too narrowly, ignoring the relevant industry and public sector experience he cites as the basis of his opinion.

Next, Eastman argues that Mr. Stanton relies on Responsible Care standards that have not been adopted as industry standards and that he reaches conclusions regarding Eastman's conduct based on incomplete or selective evidence. These objections go to the weight and credibility of Mr.

19

Stanton's opinions rather than their admissibility.  If anything, Eastman's motion to exclude confirms that there are common issues to be resolved in these areas, while falling short of presenting any grounds on which to exclude his contribution here.  The factual issues raised in Eastman's motion would be more properly settled through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." <u>Daubert</u>, 509 U.S. at 596.[2]

For the foregoing reasons, Eastman's motion to exclude the expert testimony of Mr. Stanton for purposes of class certification is denied.

## 2. Dr. Rosen

Plaintiffs offer Dr. Rosen as an expert in economics. Dr. Rosen received a Bachelor's degree, Master's degree, and Ph.D. in economics from Case Western University.  He has taught economics for over 46 years, first as an associate professor at Cleveland State University and currently as an adjunct professor at John Carroll University.  Dr. Rosen teaches classes in banking, finance, and macroeconomics, with coursework including

---

[2] **Eastman also argues that Mr. Stanton's opinions will confuse the jury and should be excluded under Fed. R. Evid. 403. This argument is not relevant to the court's consideration of plaintiffs' certification motion.**

"generally accepted methods used by other economists and financial analysts for valuing all types of economic losses." Rosen Decl. 2, ¶ 9.  Dr. Rosen has published extensively and frequently serves as an expert in proceedings involving the valuation of economic damages.

Dr. Rosen's declaration presents models measuring the economic impact of the water interruption on residential and business putative class members.  Plaintiffs rely on Dr. Rosen's models to establish both 1) a class-wide method to estimate aggregate damages due to lost profits, wages, and residential water service and 2) a "mechanical" method of determining individual class members' damages following the determination of class-wide damages.  See Pls.' Mem. in Opp. to Mot. to Exclude Rosen and Gilbert ("Pls.' Resp. Rosen/Gilbert")3-5.  Dr. Rosen describes the models he utilizes as follows:

> These models have been used by economists, regional planners and disaster agencies such as FEMA to quantify the economic impact on a region so that policies and programs can be developed to deal with natural disasters and other occurrences that might disrupt the provision of vital services to a community.

(Rosen Decl. at 6, ¶ 11).

The models Dr. Rosen offers to determine damages for businesses (including wage earners) and residential customers differ significantly and are discussed in turn.

a.      Estimate of Business and Wage-Earner Losses

        Dr. Rosen's estimate of class-wide damages for businesses and hourly wage earners involves a two-step calculation.  First, Dr. Rosen uses economic data for the region to estimate the Gross Regional Product ("GRP") or "value added" in the affected area.[3]  Next, he estimates the incremental decline in value added resulting from the interruption in water service.  In Dr. Rosen's opinion, this decline in value added is a reasonable measure of the damages incurred by businesses and hourly employees while the Do Not Use order was in effect.

        Dr. Rosen's declaration includes two paragraphs describing his choice of methodology for the business damages estimate.  Dr. Rosen states:

> 14.  The measurement of aggregate damages for business customers is measured by the direct economic impact of the loss of water on the ability of the business or business sector to continue to operate.  The economic models developed to measure aggregate economic impact or damages on businesses or business sectors take into account the severity of the shortage measured as the proportion of the normal water supply affected and the resilience of the business or industrial sector to operate or not as measured by the percentage of normal output reduction due to a shortage of water.  Many of the models developed to calculate aggregate economic

_____

[3] Dr. Rosen's data is drawn from the Implan database, which combines data published by the Census Bureau, the Bureau of Labor Statistics, and the Bureau of Economic Analysis.  Dr. Rosen describes the data as "widely used by regional economists as well as government planning agencies."  Rosen Decl. 9 n. 16.

> impact losses estimate diminished revenue (output) to
> measure the economic impact of a water interruption.
> In order to convert lost revenue to business damage it
> is necessary to deduct any variable expenses avoided
> if the business was not able to operate normally and
> add any incremental expenses associated with the
> supply restriction.
>
> 15.  FEMA and others measure the aggregate economic
> impact by calculating the incremental decline in value
> added (Gross Regional Product).  The value added
> approach eliminates some double counting of
> intermediate product sales from business to business.
> Both measures conservatively estimate the true cost of
> water interruptions as neither takes into account the
> costs incurred by government for transportation and
> distribution to the public of alternative water
> sources for basic water needs. . . .

Rosen Decl. 8-9, ¶ 14-15 (footnotes omitted).

In other words, Dr. Rosen defines business damage
(which includes both businesses and hourly-worker class members)
as the incremental decline in value added due to the water
interruption, adjusted downward to account for any cost savings
due to the interruption and upward to include additional costs
incurred.  For example, payroll savings due to business closures
should be subtracted, while expenses to acquire bottled water
could be added.  However, Dr. Rosen believes the decline in
value added is itself "a reasonable proxy" for economic damages
because most expenses in the short run tend to be fixed.  Id. at
9 n. 14.

23

To evaluate Dr. Rosen's model, it is important to understand both the definition of value added and the formula Dr. Rosen uses to estimate a reduction in value added caused by the water interruption.  As discussed below, the parties differ and are somewhat inconsistent in their description of the value added concept.  It appears to the court that at the very least, value added can be said to include business revenues and labor payments, as well as government revenues (including both taxes and revenues directly generated by government activities). Plaintiffs describe value added as "essentially a measure of revenues minus payments to other businesses."  Pls.' Resp. Rosen/Gilbert 3.[4]

Dr. Rosen estimates that the annual value added in the five affected counties is $13.6 billion.  Rosen Decl. 10, ¶ 18. To estimate a decline in value added due to the water interruption, he divides the economy into 36 business sectors. Dr. Rosen applies a sector-specific "resilience" factor to each such sector, "recognizing that the different sectors were impacted differently by the lack of water."  Id.  The resilience

---

[4] By contrast, Defendants define value added as "a measure of overall economic output in an area, including the value of the output, less the costs of non-labor inputs, generated by private businesses, non-profit agencies, and government offices, among others."  Def. Mem. Excl. Rosen 8.

factor to which he refers is essentially a percentage representing the proportion of value added lost due to the interruption.[5]  The resilience factors used were drawn from a study by the Applied Technology Council ("ATC") published in 1991.[6]  Dr. Rosen cites the use of these ATC resilience factors by FEMA in its studies on the potential economic impact of water shortages.  Using these resilience factors, he estimates that businesses in the area lost $77.6 million in revenue.  This conclusion is reached by calculating the daily diminished value added for each business sector (using each sector's resilience factor), then multiplying by 6.12 (the plaintiffs' estimate of the average number of days of water service interruption).  Id. at 10, ¶ 19.

Dr. Rosen also provides a method for individual businesses to claim their share of losses from the aggregate

---

[5] Dr. Rosen provides the following example:  "[M]ining had a resilience factor of .15. That is, for short-term interruptions mining could operate at .85 [sic, 85] percent of normal production experiencing a loss in value added of 15 percent." Rosen Decl. 10, ¶ 18.

[6] The ATC, a non-profit organization in California, aims "to develop and promote state-of-the-art, user-friendly engineering resources and applications for use in mitigating the effects of natural and other hazards on the built environment." Applied Technology Council, About ATC, https://www.atcouncil.org/about-atc (last visited October 7, 2015).  As discussed below, the use of the ATC resilience factors is a point of contention between the parties.

amount.  He suggests that a claim form relying on common business records, such as sales tax data from comparable periods, can be used to simplify these claims.  Adjustments would have to be made to account for reduced costs during the water interruption as well as incidental expenses such as bottled water.  Id. at 11, ¶ 20.  Hourly wage earners, whose lost earnings are also included in the decline in value added figure, could also submit claim forms based on payroll or accounting records showing the loss in earnings due to business closures.  Id. ¶ 21.

b.  Estimate of Residential Losses

Dr. Rosen's model for losses incurred by residential class members is based on their "'willingness to pay' to avoid the risk of being without water for a certain duration."  Id. at 7, ¶ 12.  The willingness to pay formula incorporates residents' sensitivity to price changes, the price elasticity of demand, regular water consumption and the duration of service interruption.  Price elasticity represents residents' sensitivity to changes in the price of water.  Dr. Rosen selected a price elasticity of -0.41, an average elasticity identified in a meta-study of other published estimates.[7]  Id. at

_____

[7] Defendants challenge Dr. Rosen's selection of a -0.41 elasticity as arbitrary.  See infra p. 37.

12, ¶ 23 (citing Dalhussen et al., <u>Price and Income Elasticities of Residential Water Demand: A Meta-analysis</u>, Land Economics, May 2003, volume 79 (2), 295).  The economic loss equals "the difference between the reduced quantity of water available (Qr) and normal demand."  <u>Id.</u>[8]  Dr. Rosen's model purportedly captures not just the price of the lost water but also the annoyance and inconvenience allegedly suffered by plaintiffs during the service interruption.

Using this model, Dr. Rosen and Mr. Gilbert estimate that the economic loss to residential class members is $51.9 million (or about 38 dollars per class member).  <u>Id.</u>, ¶ 26.  Dr. Rosen states that claim amounts for individual residential plaintiffs can be determined by mechanical application of this formula.  While Dr. Rosen explains the economic principles underlying the residential damages model, the calculation of damages was conducted by Mr. Gilbert in his report as discussed in the following section.

---

[8] Dr. Rosen's formula draws heavily on Brozovic <u>et al.</u>, <u>Estimating Business and Residential Water Supply Interruption Losses From Catastrophic Events</u>, Water Resources Research, <u>volume</u> 43, W 08423, doi: 10. 1029/2006 WR004782. The parties dispute the appropriateness of relying on the Brozovic method, as discussed further <u>infra</u>.

### 3.  Mr. Gilbert

Plaintiffs offer Mr. Gilbert as an expert in engineering.  Mr. Gilbert has over 40 years of engineering experience.  He is a former officer of the United States Public Health Service and employee of Union Carbide Corp.  In 2004, Mr. Gilbert founded Engineering Perfection, PLLC, a firm providing "engineering services for oil and gas development, government, private citizens and serving as an expert for law firms." Gilbert Rep. 1.  Mr. Gilbert also claims expertise in geographic information systems (GIS), a geographic data analysis tool.  In particular:

> Since 2008, Mr. Gilbert has been performing benefit cost analyses for the Federal Emergency Management Agency (FEMA).  The FEMA analyses are for potential projects that would lessen the damages from natural hazards.  Since 2009, FEMA contracted with Mr. Gilbert to provide training to state and local governments on methods for determining the economic impacts of natural disasters.  The training topics include the loss of potable water services to residents.

Id.

Mr. Gilbert is responsible for analysis producing several figures relied upon by plaintiffs, including the number of residents affected by the DNU order, the average time period residents were affected, and the average water consumption and cost paid by those residents.  Id. at 2.  Mr. Gilbert based these calculations on "meter readings of West Virginia American

28

Water Company and government records." **Pls.' Resp.
Rosen/Gilbert** 29.[9]  These figures are the inputs used in the
residential damages model endorsed by Dr. Rosen and discussed
above.

Plaintiffs repeatedly categorize Mr. Gilbert's
contribution as "number-crunching," distinguishing it from Dr.
Rosen's economic assessment of the model for residential
damages.  While defendants argue Mr. Gilbert's opinion should be
excluded in its entirety because of this reliance on Dr. Rosen's
economic expertise, Mr. Gilbert conducted independent
engineering work underlying the plaintiffs' evidence of class-
wide residential damages.  The analysis below addresses Dr.
Rosen's work with respect to business and hourly worker damages
and then discusses the residential estimates produced jointly by
Dr. Rosen and Mr. Gilbert.

B.    <u>Daubert</u> Inquiry Respecting Dr. Rosen's Analysis for
      Business and Hourly Worker Class Members

The court analyses Dr. Rosen's estimates of damages to
proposed class members for lost business profits and hourly

---

[9]    Mr. Gilbert's initial calculation based on these meter
readings contained a computational error resulting in a
significant misstatement of aggregate residential losses.  This
error was corrected in amended submissions by Mr. Gilbert and
Dr. Rosen.

wages together, as Dr. Rosen's aggregate "value added" formula
does not allow for the separation of these groups.  As a
starting point, it is far from clear that Dr. Rosen's estimate
of decline in value added in the region is a reliable or helpful
means of measuring actual damages to plaintiff businesses and
workers.  Defendants correctly note that plaintiffs have a
significant evidentiary burden to prove lost profits under West
Virginia law.  A party must prove lost profits "with reasonable
certainty; lost profits may not be granted if they are too
remote or speculative." Cell, Inc. v. Ransom Investors, 427
S.E.2d 447, 450 (W. Va. 1992); see also Given v. Field, 199 W.
Va. 394, 398 (W. Va. 1997) (reaffirming the reasonable certainty
rule).  Plaintiffs' reliance on Story Parchment Co. v. Paterson
Parchment Paper Co., 282 U.S. 555 (1931), for a more lenient
standard is misplaced, as that case does not address the West
Virginia-specific rule.

          Defendants contend that "value added includes
extraneous inputs . . . over and above the putative business
class members' lost profits." Def. Mem. Excl. Rosen 8.  The
inputs defendants identify as problematic are the economic
contributions of government and indirect taxes.  See Expert
Report of Jesse David, PhD., Class Certification Phase ¶ 49.  As
discussed above, Dr. Rosen's value added estimate captures

output on the regional level, including revenues from public entities.  Plaintiffs argue business profits and labor-related payments are both properly included in a calculation of class-wide damages because wage earners are part of the putative class.  To the extent business taxes and government revenue should be excluded, plaintiffs see this as a minor issue that can be corrected in updated estimates or brought out on cross-examination.[10]

Even if the estimates were corrected to account for the factors listed above, it is a leap at best to propose that a decline in value added in the affected area is a reasonable proxy for business losses.  Proof of lost profits is generally an individualized inquiry, and there is considerable danger that Dr. Rosen's formula would ignore important factors unique to individual class members while creating an illusion of precision.  The court is mindful that "[s]crutiny of expert testimony is especially proper where it consists of an array of figures conveying a delusive impression of exactness in an area

---

[10] Plaintiffs attempt to deflect criticism by referring to potential future improvements in Dr. Rosen's calculations. While plaintiffs focus on Dr. Rosen's opinion "that a method exists for reliably estimating [aggregate damages]," Pls.' Resp. Rosen/Gilbert 9, the court must satisfy itself that the evidence relied upon at this stage is reliable and relevant to a class-wide determination.

31

where a jury's common sense is less available than usual to protect it." <u>Tyger Const. Co. Inc. v. Pensacola Const. Co.</u>, 29 F.2d 137 (4th Cir. 1994) (quoting <u>Eastern Auto Distribs., Inc. v. Peugeot Motors of Am.</u>, 795 F.2d 329, 338 (4th Cir. 1986) (internal quotation omitted).[11]

The plaintiffs' attempts to bolster Dr. Rosen's choice of methodology by comparing it to studies carried out by FEMA in its disaster planning process are unpersuasive.  While defendants overreach by painting Dr. Rosen's approach as a completely novel, "hybrid" method of his own creation, they rightfully emphasize that an analytical approach appropriate to one context may not be appropriate to another.

Here, the fact that FEMA uses a similar formula to carry out a regulatory cost-benefit analysis is insufficient to show that the same method can provide a reliable estimate of damages to plaintiff businesses in a civil litigation setting.  Plaintiffs have cited no instance in which the FEMA method has been used to calculate actual damages resulting from an interruption of water service or similar incident.  While the

_____

[11] Defendants also criticize several other aspects of Dr. Rosen's model, including the alleged inclusion of certain geographic areas outside the scope of the DNU order and the adjustment made for the continued availability of water for toilet flushing during the interruption.  The court does not need to reach these disagreements at this time.

FEMA studies attempt to estimate economic losses, the regulatory context allows for simplifying assumptions not appropriate to a civil proceeding for monetary damages.

Finally, potential inaccuracies in the factual inputs used by Dr. Rosen create additional doubt regarding his opinion's reliability.  Defendants marshal two counter-experts, Dr. Jesse David, PhD and Dr. Tom S. Witt, PhD, both economists, to rebut Dr. Rosen's methodology and choice of data inputs. While many of the specific disagreements raised by the parties would be more appropriately addressed at trial, the cumulative number of factual questions and Dr. Rosen's inability to satisfactorily answer them are concerning.

For example, Dr. Rosen's model simply takes annual revenue figures and divides by 365 to calculate daily losses. Dr. Rosen and plaintiffs are dismissive of questions about whether, for example, weekend closures or seasonal variations in business patterns should be factored into this analysis.[12]

---

[12] Another significant factual dispute revolves around the resilience factors used to estimate the percentage reduction in value added to be applied for each industry.  The defendants' counter-expert concluded the resilience factors are overbroad, failing to differentiate between businesses in the same sector with dissimilar revenue streams.  Additionally, these factors were designed to measure the effects of water shortages of significantly greater duration than the Do Not Use order and plaintiffs have not indicated any setting in which they have been applied to short-term interruptions.  David Rep. ¶ 54-57.

Plaintiffs argue that Dr. Rosen's model uses the best available data and will provide a reasonable estimate based upon which individual class members can submit claims using individualized evidence such as bills and receipts.  However, this type of aggregate estimate based alone on a fictional "average" class member is not useful.

     In <u>Broussard v. Meineke Discount Muffler Shops, Inc.</u>, our court of appeals addressed a very similar dispute regarding an expert's reliance on average figures to compute lost profits in a class action:

> Plainly plaintiffs' claim for lost profits damages was not a natural candidate for class-wide resolution; the calculation of lost profits is too "dependent upon consideration of the unique circumstances pertinent to each class member."  . . . [P]laintiffs' expert based his lost profits testimony on abstract analysis of "averages": . . . The expert admitted that he had "not attempted to calculate the damages that any individual franchisee has suffered in this case," focusing instead on the fictional "typical franchisee operation."  Plaintiffs attempted to substitute this "hypothetical or speculative" evidence, divorced from any actual proof of damages, for the proof of individual damages necessary to meet North Carolina's "reasonable certainty" standard of proof for lost profits awards.  <u>That this shortcut was necessary in order for this suit to proceed as a class action should have been a caution signal to the district court that class-wide proof of damages was impermissible.</u>

155 F.3d 331 (4th Cir. 1998) (internal citations omitted) (emphasis added).

As in <u>Broussard</u>, plaintiffs wish to use "hypothetical or speculative" calculations based on a non-existent average class member to circumvent the need to meet their burden as to individual class members' damages.  The suggestion that a claims form or other procedure could be used at a later stage to determine individual damages provides no comfort that the methods Dr. Rosen has used to estimate aggregate business damages are reliable.

C.    <u>Daubert</u> Analysis for Residential Class Member Damages

First, defendants challenge the qualifications of Mr. Gilbert to carry out the residential damages analysis and accuse plaintiffs of pivoting to rely on Dr. Rosen's expertise to support the residential model once it became clear that Mr. Gilbert could not explain basic economic concepts underlying the formula.[13]  While the court is skeptical of Mr. Gilbert's fitness to offer expert testimony regarding the model itself, as opposed to the engineering calculations he conducted to reach his estimates, the ultimate issue of which expert is responsible for

_____

[13] Mr. Gilbert testified he selected the "Brozovic method" to calculate residential losses before initial consultations with Dr. Rosen.  <u>Gilbert Depo.</u> 74-75.  At several points in his deposition, Mr. Gilbert deferred to Dr. Rosen as the expert who could explain economic concepts undergirding the model.  Dr. Rosen later testified that the choice of economic variables used in the model "would also be my opinion."  <u>Rosen Depo.</u> 215.

the damages methodology need not be resolved at this juncture.
Even assuming that Dr. Rosen, who is clearly qualified from an
economic perspective, was responsible for selecting variables in
Mr. Gilbert's calculations, there are ample problems with the
approach that render it unreliable and unhelpful to a fact
finder.

Most significantly, the aggregate estimate of
residential damages proffered by Dr. Rosen and Mr. Gilbert
relies on the same type of speculative averages as Dr. Rosen's
business damages model.  Like the calculation of lost profits,
the determination of damages resulting from the residential loss
of water is necessarily tied up in individual factors unique to
each household.  Resort to an average "willingness to pay" to
avoid an interruption in water does not cure this defect,
especially where, as here, the commodity to be purchased is not
available on the open market.  Plaintiffs themselves define
willingness to pay as "a measure analogous to the fair market
value of a good or service for those goods and services that are
available on the market."  <u>Pls.' Resp. Rosen/Gilbert</u> 28-29.  No
showing has been made that the willingness to pay measure is
transferrable to the context of utility goods not subject to
market pricing.[14]

---

[14] The parties also dispute numerous other issues regarding

Similarly, the use of a -0.41 price elasticity for the residential damages estimate shows the danger of relying on averages in this context.  The parties agree that small changes in the selected price elasticity yield startlingly different estimates of damages.  Plaintiffs' response to this problem is to claim that national studies frequently use lower elasticities, rendering their experts' choice "conservative" from their perspective.  Further, they point to administrative problems in inquiring individually into the effects of the Do Not Use order on individual plaintiffs.  Neither of these responses addresses the core issue that expert evidence must be based on reliable inputs under <u>Daubert</u>.

Perhaps most extravagantly, plaintiffs contend that due to the "problematic" nature of individualized inquiry, the use of averages provides a more objective measure of damages:

> While adding up receipts or out-of-pocket expenses sounds objective and fair at first blush, when one considers the choices that people had and made, it quickly becomes clear that this method is highly subjective and problematic, especially when performed on an individual level.  Some class members, for example, may have decided, under the

the residential model, such as its applicability to an interruption as short as the Do Not Use order in the instant case and the decision to exclude water for toilet flushing from baseline water consumption.  These issues, while significant, implicate the relevance and reliability of the residential estimate less seriously than the overall use of speculative averages and shortcuts to simplify the calculation.

circumstances, that they might as well go on an
unplanned vacation . . .

**Pls.' Resp. Rosen/Gilbert** 34.

Of course, the fact that some plaintiffs may have
failed to mitigate damages does not render an individualized
inquiry into damages subjective or unreliable.  By contrast, the
plaintiffs' approach of obscuring all variation between
individual plaintiffs by relying on shaky economic averages
hardly provides a more objective measure.  Plaintiffs attempt to
save this method by casting it as the most objective means
available, arguing that "each class member lost the same service
regardless of their spending decisions, and their losses should
vary only based on the amount of the water service they
typically used."  **Id.** at 35.  However, the plaintiffs' own
attempt to characterize residential damages as including
annoyance and inconvenience undercuts this reasoning.[15]

As in **Behrend**, "a model purporting to serve as
evidence of damages in this class action must measure only those
damages attributed to [the Plaintiff's] theory."  133 S. Ct.

---

[15]  Defendants also initially argued that residential
damages cannot be estimated by expert opinion under the rule of
**Wilt v. Buracker**, 443 S.E.2d 196 (W. Va. 1993). **Wilt** involved
the valuation of human life, and defendants fail to adequately
explain why the interruption of access to a good like tap water
should be treated similarly.

1426, 1433.  The court is not convinced that Dr. Rosen and Mr.
Gilbert's model of consumer willingness to pay based on average
inputs fits closely enough to the facts of this case to be
helpful or relevant under <u>Daubert</u>.

Based upon the foregoing analysis, it is ORDERED that
the motions to exclude the expert testimony of Dr. Rosen and Mr.
Gilbert be, and hereby are, granted.  The disallowance relates
to their proposed methodologies for estimating class-wide
damages at this stage of the case.  The court reserves the
question of whether, at a later date, Dr. Rosen or Mr. Gilbert's
expertise could be helpful to a trier of fact in determining
damages suffered by individual class members.

B.   Class Certification

1. The Proposed Rule 23(b)(3) Damages Class

Inasmuch as the foundational opinions of Dr. Rosen and
Mr. Gilbert have been excluded, there is no basis for the
certification of a damages class.  It is, accordingly, ORDERED
that the motion for class certification of a damages class be,
and hereby is, denied.[16]

_____

[16] The disposition of the Rule 23(b)(3) damages

2. **The Proposed Rule 23(c)(4) Liability Issues Class Consisting of Fault, Comparative Fault, and Punitive Damages**

Plaintiffs crystallize the factual underpinnings for the fault portion of their Rule 23(c)(4) liability issue certification ("fault issue") as follows:

> Defendants could have prevented or avoided the crisis with better precautionary measures, compliance with applicable regulations, and the use of reasonable care. Specifically, among other things, Eastman failed to avoid the foreseeable harm posed by Crude MCHM by commercializing a waste product and selling it to Freedom Industries without appropriate oversight, reasonable instructions, or warnings, including that Crude MCHM should be stored in non-corrosive, stainless steel tanks. Moreover, both Eastman and WVAW failed to guard against the risk presented by Freedom Industries' facility just upstream from the Charleston area's sole water source. In flagrant violation of industry standards, WVAW was completely unprepared for a spill affecting its sole source of supply and lacked sufficient water reserves to withstand a shutdown of its sole intake for any length of time. WVAW should have determined what chemicals were stored or processed at the site, assessed and planned for the risk they presented to the water supply, maintained sufficient water reserves at all times, and secured an alternate water supply to use in the event of foreseeable emergency.

(Pls.' Mem. in Supp. at 3).

Plaintiffs also mention certification of the issue of comparative fault ("comparative fault issue"). It appears this proposed issue is more aptly characterized as apportionment of

---

certification appears to obviate a number of additional arguments made by defendants, such as application of the economic loss rule.

fault as to Freedom, as opposed to defendants, respecting liability for the events leading to the Do Not Use order. Plaintiffs also appear to seek certification to determine the issue of impracticability, which is an affirmative defense by the water company defendants to plaintiffs' claim for breach of contract.  These apparent requests are consolidated under the heading of "comparative fault issue."

     The third component of the proposed liability certification is as follows: "The request for certification as to liability issues under Rule 23(c)(4) includes determining whether exemplary damages [("punitive damages issue")] should be imposed."  (Id. at 5; see also id. at 7 (("Here, the particular common issues of liability, comparative fault, and the ratio of punitive damages to actual harm are common to all claimants in the litigation as a whole, no matter what type of injury was suffered."")).[17]

_____

     [17] Defendants aptly note that the phase one jury will not hear evidence or make any findings on compensatory damage categories before it is forced to assess punitive damages.  That appears to be an insurmountable difficulty with certification, especially given the lack of any compensatory damages class. See  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 426 (2003) ("[c]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."); Phillip Morris USA v. Williams, 549 U.S. 346, 353-54 (2007) (holding the Due Process Clause prevents punitive damage awards for harm inflicted on persons not party to the litigation, stating "the fundamental due process concerns to which our punitive damages

It is unnecessary to undertake the Rule 23 analysis respecting the proposed class punitive damages multiplier.  In response to the defendants' substantial, joint attack on the proposal, plaintiffs' two-page reply cites but two unpublished district court cases, presenting dissimilar circumstances. Plaintiffs have failed to explain with supporting legal authority, how they overcome the challenge that their proposal violates due process inasmuch as it would prevent the jury, and then the court, from determining whether compensatory and punitive damages bear a reasonable relationship to one another. The court accordingly declines the plaintiffs' request to include the punitive damages issue as a component of class certification.

The court examines satisfaction of the Rule 23(a) factors below, turning thereafter to the Rule 23(c)(4) and 23(b)(3) analysis surrounding the proposed issue certification.

a.  The Rule 23(a) Analysis

Turning first to the Rule 23(a) factors, plaintiffs estimate the class number to be 224,180 based upon water usage

---

cases refer —- risks of arbitrariness, uncertainty, and lack of notice —- will be magnified"); Garnes v. Fleming Landfill, Inc., 413 S.E.2d 2417 (1991) ("As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages").

and billing records.  The usage information and records were
obtained through discovery from the water company defendants and
data of the United States Census Bureau.  Joinder is thus
impracticable and the numerosity requirement is satisfied.[18]

        Next is the matter of common questions.  As noted by
our court of appeals recently, Supreme Court precedent
"instructs that plaintiffs must present a common contention
capable of being proven or disproven in 'one stroke' to satisfy
Rule 23(a)(2)'s commonality requirement.  Thus, a class-wide
proceeding must be able to generate common answers that drive
the litigation."  Brown v. Nucor Corp., 785 F.3d 895, 908-09
(4th Cir. 2015).  Multiple common factual, legal, or mixed
issues will "drive" the litigation toward resolution.  Among
these are the water company defendants' liability for their

_____

        [18]  Defendants assert that the class is not ascertainable.
They contend that the method of ascertaining class members does
not account for transient or periodic residents like college
students or travelers.  They also note the records cannot
identify the number of occupants at service addresses or whether
they were present during the Do Not Use order.  They forecast
similar concerns respecting identification of affected hourly
workers.
        Defendants demand a level of precision that is not required
by Rule 23.  Compare EQT Production Co. v. Adair, 764 F.3d 347,
358-59 (4th Cir. 2014) ("The plaintiffs need not be able to
identify every class member at the time of certification" and
"Lacking even a rough outline of the classes' size and
composition, we cannot conclude that they are sufficiently
ascertainable.").  The court is confident that it will be able
to "readily identify the class members in reference to objective
criteria."  Id. at 358.  That is all that is required.

alleged negligent failure to prepare for the spill or react

swiftly enough once alerted to the approaching Crude MCHM, the

impracticability defense of those same defendants to the breach

of contract, and defendant Eastman's liability for its alleged

inadequate product stewardship and negligent failure to warn.

These common questions, which are central to the case, plainly

suffice for Rule 23(a)(2) purposes.

Third, respecting typicality, our court of appeals has

observed that "To be given the trust responsibility imposed by

Rule 23, 'a class representative must be part of the class and

possess the same interest and suffer the same injury as the

class members.'" Deiter v. Microsoft Corp., 436 F.3d 461, 466

(4th Cir. 2006) (emphasis added)) (quoting General Tel. Co. of

Southwest v. Falcon, 457 U.S. 147, 156 (1982) (internal

quotation marks omitted).  The decision in Deiter elaborated

further:

> That is, "the named plaintiff's claim and the class
> claims [must be] so interrelated that the interests of
> the class members will be fairly and adequately
> protected in their absence." The essence of the
> typicality requirement is captured by the notion that
> "as goes the claim of the named plaintiff, so go the
> claims of the class."

Id. at 466.  The decision in Deiter stressed other points as

well, namely, that (1) typicality is central to a representative

parties' ability to represent a class, (2) the representative's

prosecutorial interest in her own case must simultaneously advance the cause for absent class members, and (3) the representative's claim cannot be so different from the claims of absent class members that their claims will not be advanced by the representative's proof of his own claim.  Id. at 467.  The case also noted, however, "That is not to say that typicality requires that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned."  Id.

Respecting the liability issues for which Rule 23(c)(4) certification is sought, there is little space or light perceptible between the interests of the putative representatives and the absent class members.  The elements of proof for everyone, and the evidence and argument they would all muster to overcome the affirmative defense, are closely aligned, if not identical.  The facts to be used by the representatives to establish the liability issues would also prove them up for the putative class.  Inasmuch as the two issues here span the spectrum of representative plaintiffs and putative class members alike, they clearly satisfy the typicality requirement of Rule 23(a)(3).[19]

_____

[19] Eastman asserts that the varying effects of the alleged "noxious" odor of Crude MCHM impairs both a commonality and typicality finding.  Plaintiffs assert the odor issue is "primarily a post-[Do Not Use order] nuisance damages issue, which does not affect the typicality of the class

Finally, there is no suggestion that the
representatives are anything other than adequate.  As noted in
Gunnells, a conflict of interest sufficient to defeat adequacy
requires that the "conflict . . . be fundamental."  Gunnells,
348 F.3d at 430 (citation and internal quotations omitted).
That fundamental conflict is lacking "when, as here, all class
members 'share common objectives and the same factual and legal
positions [and] have the same interest in establishing the
liability of [defendants].'"  Ward v. Dixie Nat. Life Ins. Co.,
595 F.3d 164, 180 (4th Cir. 2010) (quoting Gunnells, 348 F.3d at
431).

The court thus finds and concludes that plaintiffs
have satisfied their burden to demonstrate the Rule 23(a)
factors as to the issues of fault and comparative fault.

---

representatives . . . . (Reply at 31).  The court agrees.
     The water company defendants assert that comparative fault
on the class members' parts apply and cause the collapse of a
class-based approach.  Plaintiffs emphasize the time frame and
events for which issue certification is actually sought, noting
"It is inconceivable that a person or business could be
complicit in the events leading to the [Do Not Use] order and
their deprivation of the use of clean water, for which
Plaintiffs seek a class recovery."  (Reply at 7).  The
comparative fault argument is not meritorious.

b.   The Rule 23(c)(4) Analysis


Our court of appeals has noted that the Rule 23(a), (b) and (c) analysis need not be conducted sequentially.  See Gunnells, 348 F.3d at 440 ("In sum, in its two most recent class action decisions, Ortiz and Amchem, the Supreme Court eschewed the dissent's suggested approach of reading each of Rule 23's provisions sequentially.").  The court thus turns to analysis of the proposed liability issues of fault and comparative fault under Rule 23(c)(4).


Consistent with the text of Rule 23(c)(4), one commentator recently observed as follows: "Although traditional claims brought under Rule 23(b) involve 'an all-or-nothing decision to aggregate individual cases,' Federal Rule of Civil Procedure 23(c)(4) allows litigants to resolve specific issues in a case on a class-wide basis."  Joseph Seiner, The Issue Class, 56 B.C. L. Rev. 121, 132 (2015) (quoting Jon Romberg, Half A Loaf Is Predominant and Superior to None: Class Certification of Particular Issues Under Rule 23(c)(4)(A), 2002 Utah L. Rev. 249, 251 n.96) (emphasis added).


There is no impediment to certifying particular issues in a case as opposed to entire claims or defenses.  That is the very approach urged by the authoritative Manual for Complex

Litigation:

> Rule 23(c)(4)(A) permits a class to be certified for
> specific issues or elements of claims raised in the
> litigation.  [T]his provision may enable a court to
> achieve the economies . . . for a portion of a case,
> the rest of which may either not qualify under Rule
> 23(a) . . . . Certification of an issues class is
> appropriate only if it permits fair presentation of
> the claims and defenses and materially advances the
> disposition of the litigation as a whole.

> An issues-class approach contemplates a bifurcated
> trial where the common issues are tried first,
> followed by individual trials on questions such as
> proximate causation and damages. A bifurcated trial
> must adequately present to the jury applicable
> defenses and be solely a class trial on liability.

(Manual for Comp. Litig. § 21.24 (4th 2004).

        If otherwise compliant with Rule 23, the proposed

liability issue certifications provide an orderly means to

resolve some of the central issues in the case.  That is an

approach that is encouraged by our court of appeals.  See In re

A.H. Robins, 880 F.2d 709, 740 (4th Cir. 1989) (noting the need

to "take full advantage of the provision in [Rule 23(c)(4)]

permitting class treatment of separate issues . . . to reduce

the range of disputed issues" in complex litigation).

        The court thus concludes that the proposed liability

issue certification is appropriate under Rule 23(c)(4).

48

c.   The Rule 23(b)(3) Analysis


As noted by our court of appeals, "Rule 23(b)(3) has two components: predominance and superiority." <u>Thorn v. Jefferson-Pilot Life Ins. Co.</u>, 445 F.3d 311, 319 (4th Cir. 2006).  As earlier noted, the factors for consideration of these matters are as follows:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

At its heart, the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 623 (1997).  In other words, to satisfy Rule 23(b)(3), "[c]ommon questions must predominate over any questions affecting only individual members; . . . [such that] a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons

similarly situated." Id. at 615 (internal quotation marks omitted).

A principle often forgotten is that the balancing test of common and individual issues is qualitative, not quantitative. Gunnells, 348 F.3d at 429. Common liability issues may still predominate even when individualized inquiry is required in other areas. Id. At bottom, the inquiry requires a district court to balance common questions among class members with any dissimilarities between class members. See Gunnells, 348 F.3d at 427-30.

While courts have denied certification when individual damage issues are especially complex or burdensome, see, e.g., Pastor v. State Farm Mut. Auto. Ins. Co., 487 F.3d 1042, 1047 (7th Cir. 2007), where the qualitatively overarching issue by far is the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time, such as where a defendant violates a statute in the identical manner on every occasion, individual damages issues are insufficient to defeat class certification under Rule 23(b)(3). See Murray v. GMAC Mortg. Corp., 434 F.3d 948, 953 (7th Cir. 2006); Smilow v. Southwestern Bell Mobile Systems, Inc., 323 F.3d 32, 40 (1st Cir. 2003). The same principle would apply here to the alleged liability in negligence.

50

Turning to analysis of the first and second Rule 23(b)(3) factors, there is apparently little interest among the putative class of a quarter million members in controlling and pursuing litigation on their own.  There have been less than 100 cases filed to date respecting the chemical leak cases.  Additionally, all of the cases surrounding the chemical leak are presently centered in this forum.  It is obviously desirable to keep them in place to the extent feasible.

Finally, there will undoubtedly be management issues that arise in the event the two liability issues are certified.  It is difficult to imagine those management concerns approaching some that have been encountered in other certified mass tort contexts.[20]  The court is confident that those matters will be addressed in due course as they arise.  In making that observation, the court is cognizant of the inefficient, costly and time consuming alternative.  Absent the proposed liability

---

[20]  For example, in <u>Central Wesleyan College v. W.R. Grace & Co.</u>, 6 F.3d 177 (4th Cir. 1993), the district court conditionally certified a class of higher education institutions seeking damages against multiple manufacturers of asbestos.  The court of appeals affirmed, despite noting immense management challenges such as the possible need for individualized damage determinations, a "daunting number of individual issues" necessary to "establish liability," the determination of "comparative fault" against many defendants, "[d]ifferent time bar defenses" respecting differently positioned defendants, and the necessity of applying the laws of various jurisdictions. <u>Id.</u> at 188-89.

issues certification, the issue of fault, for one, would have to be tried seriatim in every case for which a jury is empanelled. That consideration alone tips the balance heavily toward the limited issue certification sought by plaintiffs.  See Gunnells, 348 F.3d at 426 ("Proving these issues in individual trials would require enormous redundancy of effort, including duplicative discovery, testimony by the same witnesses in potentially hundreds of actions, and relitigation of many similar, and even identical, legal issues.").

Additionally, absence of the class device would surely discourage potentially deserving plaintiffs from pursuing their rights under the circumstances here presented.  That is another factor influencing the outcome sought by plaintiffs.  See Gunnells, 348 F.3d at 426 (noting in that case that "class certification will provide access to the courts for those with claims that would be uneconomical if brought in an individual action. As the Supreme Court put the matter, '[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'" (quoting Amchem, 521 U.S. at 617)).

Surely, the plaintiffs thus receive a benefit from the proposed issues certification.  But so, too, do the defendants.

As our court of appeals has noted, the focus of Rule 23(b)(3) in the mass tort context is to "ensure that class certification in such cases 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'"  Gunnells, 348 F.3d at 424 (quoting Amchem Products, Inc. v. Windsor, 521 U.S. 591, 615 (1997)).  As in Gunnells, defendants benefit from procedural fairness by certification:

> Furthermore, class certification "provides a single proceeding in which to determine the merits of the plaintiffs' claims, and therefore protects the defendant from inconsistent adjudications." This protection from inconsistent adjudications derives from the fact that the class action is binding on all class members. By contrast, proceeding with individual claims makes the defendant vulnerable to the asymmetry of collateral estoppel: If TPCM lost on a claim to an individual plaintiff, subsequent plaintiffs could use offensive collateral estoppel to prevent TPCM from litigating the issue. A victory by TPCM in an action by an individual plaintiff, however, would have no binding effect on future plaintiffs because the plaintiffs would not have been party to the original suit. Class certification thus promotes consistency of results, giving defendants the benefit of finality and repose.

Gunnells, 348 F.3d at 427.

There are thus many considerations supporting plaintiffs' proposed issues certification.  Nevertheless, defendants offer a number of contentions designed to upend the certification request.

53

First, defendants assert that the law requires a cause of action <u>as a whole</u> be factored into analysis of the predominance requirement of Rule 23(b)(3), as opposed to simply considering that requirement after the court isolates a potentially class-worthy issue under Rule 23(c)(4).  The argument is based upon the decision of the United States Court of Appeals for the Fifth Circuit in <u>Castano v. American Tobacco Co.</u>, 84 F.3d 734 (5th Cir. 1996) and, assertedly, our court of appeals' decision in <u>Gunnells</u>.

The issue raised by defendants is one of the primary concerns surrounding the application of Rule 23(c)(4) in the mass tort setting, as noted by one of the leading commentators on the class action device:

> Rule 23(c)(4) is controversial because it could be seen as undermining the requirement of Rule 23(b)(3) that for a class to be certified, "the questions of law or fact common to class members [must] predominate over any questions affecting only individual members."

2 William B. Rubenstein, <u>Newberg on Class Actions</u> § 4:91 (5th ed. elec. 2015)).

The weight of authority, however, runs counter to the defendants and <u>Castano</u>.  <u>See</u>, <u>e.g.</u>, <u>In re Nassau Cnty. Strip Search Cases</u>, 461 F.3d 219, 231 (2d Cir.2006); <u>Valentino v. Carter-Wallace, Inc.</u>, 97 F.3d 1227, 1234 (9th Cir.1996).  One

54

commentator so observes:

>[A]lthough it is clear that plaintiffs seeking issue
>class certification must establish the four components
>of Rule 23(a), there is less certainty as to what they
>must establish under Rule 23(b).  Moreover, courts
>have issued varying opinions in this regard.
>
>For the most part, appellate courts have agreed that
>the issue class can proceed under Rule 23(c)(4) even
>where the predominance requirement of Rule 23(b) has
>not been satisfied.

Joseph Seiner, supra at 134.

Another leading Rule 23 commentator has noted likewise
that "[m]ost federal courts of appeal hold that a class action
may be maintained with respect to a particular issue regardless
of whether the claim as a whole satisfies the requirement that
common questions of law or fact predominate over questions
affecting only individual members."  6 Thomas Smith & Elizabeth
Williams, Cyclopedia of Federal Proc. § 23:32 (3d ed. elec.
2015).  The defendants' contention is thus not meritorious.

Second, defendants assert a contention running through
much of their briefing, namely, that the limited liability
issues certification is swamped by the individualized issues
left to be determined in the wake, such as causation, damages
and punitive damages to name a few.  The court is not required
under Rule 23, however, to sacrifice class adjudication of a

driving issue in the case simply because many individualized inquiries will remain thereafter.  That is the case here.

Third, defendants assert that the commonality and typicality elements cannot be satisfied inasmuch as there are multiple defendants against whom different theories of liability are alleged.  They principally cite <u>Ball v. Union Carbide Corp.</u>, 385 F.3d 713, 717 (6th Cir. 2004).  The circumstances in <u>Ball</u> are as follows:

> The Heiser Plaintiffs are individuals who live or have lived in or near Oak Ridge, Tennessee, and who allegedly have cancer or have an increased risk of acquiring cancer or other diseases. The Ball Plaintiffs are African-Americans who live or have lived in a community known as Scarboro in Oak Ridge. Plaintiffs claim that they have been harmed through exposure to radioactive and other toxic substances over the period when nuclear weapons were manufactured in Oak Ridge. Defendants are [13] private contractors of the United States government that operate or have operated nuclear weapons manufacturing and research facilities in the Oak Ridge Reservation ("Contractor-Defendants"), and Secretary Spencer Abraham of the United States Department of Energy and John A. Gordon of the National Nuclear Security Administration ("Government-Defendants").

<u>Id.</u> at 717.  The proposed class definitions were drawn as follows:

> [P]ersons who lived in Oak Ridge, Tennessee, or otherwise resided in a nearby geographic area under the influence of the Defendants from 1943 to the present who have not yet contracted thyroid cancer but who have been exposed and put at risk by Defendants' act.
>          . . . .

56

> [A]ll individuals of African American descent who
> currently live in and/or . . . own property in
> Scarboro and/or once lived in . . . Scarboro . . .
> and continue to frequently visit . . . [there].

Id. at 726.

While the inquiry takes on an enhanced level of
complexity in the multiple defendants setting, a leading
commentator observes that this is not deemed an "absolute bar to
class certification . . . ."  2 William B. Rubenstein, Newberg
on Class Actions § 3.33 (5th ed. elec. 2015)).  One method of
analysis is stated as follows:

> [C]ourts . . . focus on the relationship between the
> proposed representative's claims and the challenged
> conduct of the defendants with whom the plaintiff has
> not had earlier dealings: if a sufficient
> interrelationship between the representative's claims
> and the other defendants' conduct can be shown, then
> the proposed representative's claims may satisfy the
> typicality test, as outlined in the following section.

Id. § 3:48 (emphasis added); 1 Joseph M. McLaughlin, McLaughlin
on Class Actions: Law and Practice § 5:15 (11th ed. elec. 2014).

This action is unlike Ball in many respects.
Foremost, the links and contacts between the two defendants and
each of the plaintiffs is identical.  The singular factual
circumstances out of which the claims arose are common and
typical across the class.  No representative or putative class
member had more or less contact with either of the defendants
according to the theories of liability alleged.

Additionally, the series of events involving the defendants respecting the discharge of Crude MCHM gives rise to a unique juridical link, the synergistic effect of which was to produce, again in a singular event, the circumstances that are central to adjudication of liability in the entire controversy. This is one further guarantee that a single resolution of the discrete liability issues through the class device would be fair and appropriate.  The argument is not meritorious.

Next, the water company defendants alone assert that inasmuch as causation and damages are essential elements of liability for breach of contract and are individualized in nature, the issue of breach is not susceptible to issue certification.  As the water company defendants concede, the breach of contract claim they urge as pled by plaintiffs has in actuality been characterized by plaintiffs, with support in the court's memorandum opinion and order on the water company defendants' motion to dismiss, as an affirmative defense upon which the water company defendants have the burden of proof.  It thus raises no concerns respecting individualized determination.[21]

---

[21] For the same reason, the water company defendants' argument concerning the different types of damages recoverable in tort and contract must fail.  The related issues they raise under subdivision C. of their separate response brief are readily handled through the court's instructions to the jury.

III.

Having performed the entirety of the analyses required by <u>Daubert</u> and Rule 23, it is ORDERED as follows:

1.  That plaintiffs' motion for class certification be, and hereby is, granted respecting the fault and comparative fault issues set forth <u>supra</u> and denied in all further respects;

2.  That the classes certified are as proposed by plaintiffs as follows:

    All persons residing in dwellings supplied tap water by KVTP on January 9, 2014;

    All persons or entities who owned businesses operating in real property supplied tap water by KVTP on January 9, 2014; and

    All persons who were regularly employed as hourly wage-earners for businesses that operated in real property supplied tap water by KVTP on January 9, 2014.

3.  That the joint motions by the water company defendants and Eastman to exclude the expert testimony of Dr. Rosen and Mr. Gilbert be, and hereby are, granted to the extent set forth <u>supra</u>;

4.    That the motions to exclude Lawrence M. Stanton and David
      Scott Simonton, Ph.D. be, and hereby are, denied without
      prejudice; and

5.    That interim class counsel be, and hereby are, appointed
      as class counsel pending the further order of the court.

      The Clerk is directed to forward copies of this
written opinion and order to counsel of record and any
unrepresented parties.

                    DATED:  October 8, 2015


                    John T. Copenhaver, Jr.
                    United States District Judge

60