UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CRYSTAL GOOD, individually and as
parent and next friend of minor children
M.T.S., N.T.K. and A.M.S. and
MELISSA JOHNSON,
individually and as parent of her unborn child,
MARY LACY and JOAN GREEN and JAMILA AISHA OLIVER,
WENDY RENEE RUIZ and KIMBERLY OGIER and ROY J. McNEAL and
GEORGIA HAMRA and MADDIE FIELDS and BRENDA BAISDEN, d/b/a
FRIENDLY FACES DAYCARE, and ALADDIN RESTAURANT, INC., and
R. G. GUNNOE FARMS LLC, and DUNBAR PLAZA, INC.,
d/b/a DUNBAR PLAZA HOTEL,
on behalf of themselves and all others
similarly situated,

        Plaintiffs,

v.                              Civil Action No.: 2:14-01374

AMERICAN WATER WORKS COMPANY, INC., and
AMERICAN WATER WORKS SERVICE COMPANY, INC., and
EASTMAN CHEMICAL COMPANY and
WEST VIRGINIA-AMERICAN WATER COMPANY,
d/b/a WEST VIRGINIA AMERICAN WATER, and
GARY SOUTHERN and DENNIS P. FARRELL,

        Defendants.


MEMORANDUM OPINION AND ORDER


        Pending is the renewed motion by American Water Works

Company, Inc. ("American" or "Defendant"), to dismiss for lack

of personal jurisdiction, and motion for summary judgment as to

all of plaintiffs' claims against it, filed May 10, 2016.


        American is the parent company of defendants American

Water Works Service Company, Inc. ("the Service Company") and

West Virginia-American Water Company ("WV American").  The three defendants are referred to collectively as "the water company defendants."

## I.   Background

### A.   The Incident

On January 9, 2014, approximately 300,000 residents in the Charleston, West Virginia, and the surrounding area suffered an interruption in their water supply.  The interruption was caused by a spill into the Elk River of a mixture composed primarily of a chemical known as Crude MCHM, sold and distributed exclusively by Eastman Chemical Company.  Crude MCHM consists primarily of the chemical 4-methylcyclohexane methanol. The mixture was prepared and owned by and being stored in a facility owned and operated by Freedom Industries, Inc. ("Freedom Industries").  Freedom Industries called the mixture that spilled into the Elk River "Shurflot 944" and marketed it to coal companies for coal cleaning purposes.  Shurflot 944 mixed Crude MCHM with other elements, present in relatively small proportion.  The mixture containing Crude MCHM infiltrated and contaminated the WV American water treatment plant in Charleston, known as the Kanawha Valley Treatment Plant ("KVTP"), which draws its water from the Elk River.

2

Plaintiffs assert that the water company defendants could have prevented the incident with better precautions, regulatory compliance, and use of reasonable care.  Some class members operate businesses that lost revenue due to the interruption.  Others claim physical injuries, asserting that exposure to Crude MCHM in the environment through human pathways caused bodily injury and necessitated that they be medically monitored.  Still others allege that they have incurred costs for water replacement, travel, and other associated expenses.

B.   The First Amended Consolidated Class Action Complaint

On December 9, 2014, the First Amended Consolidated Class Action Complaint ("operative pleading") became the operative pleading in the case.  Excepting those counts or portions of counts dismissed by order entered June 3, 2015, the operative pleading alleges the remaining claims against the water company defendants as follows:

Count One: Negligence;

Count Two: Negligence for, inter alia, the water company defendants' failure to address the foreseeable risk posed by the Freedom Industries facility, as warned by the West Virginia Department of Health and Human Resources, failure to adequately warn the class members, failure to design, maintain, and operate the water treatment plant according to industry standards, negligently and unreasonably delivering and placing on plaintiffs' property the Crude MCHM, and failure to ensure that water tankers were not

3

filled with contaminated water;

Count Seven: Gross negligence as to the water company defendants inasmuch as they recklessly ignored threats to class members both in design and maintenance of their operations, their warnings and attempts to deliver water;

Count Eight: Prima facie negligence as to the water company defendants;

Count Ten: Breach of warranties as to the water company defendants inasmuch as they informed customers their water would be safe following flushing and charged their customers the regular rate for the impure water, in violation of the warranties that the water pass without objection in the water utility trade and that the water be suitable for the ordinary purposes for which tap water is commonly used;

Count Eleven: Negligent infliction of emotional distress against the water company defendants arising out of, inter alia, their failure to establish an alternative water supply that caused affected individuals to reasonably fear harmful effects from the contaminated water;

Count Twelve: Strict products liability against the water company defendants for failure to warn concerning the contamination until hours after it occurred and for providing incorrect information that it was safe to drink the water when Crude MCHM was at one part per million;

Count Fifteen: Public nuisance against all defendants;

Count Seventeen: Trespass against all defendants;

Count Eighteen: Breach of contract against the water company defendants;

Count Nineteen: Medical monitoring against all defendants.

C.   American's Previous Motion to Dismiss

          On January 7, 2015, American Water Works Company moved
to dismiss the counts against it based on a lack of personal
jurisdiction.  In an order entered April 9, 2015, the court
explained that American "asserts there is no basis for general
jurisdiction," and, "[r]especting specific jurisdiction,
[American] contends that it has no contacts with West Virginia."
Good v. Am. Water Works Co., No. 2:14-cv-01374, 2015 WL 1600761,
at *3 (S.D.W. Va. Apr. 9, 2015).  The court noted that, at that
stage in the proceedings, it was only necessary for plaintiffs
to "ma[k]e out a prima facie case" for personal jurisdiction.
Id. at *6.  In determining whether plaintiffs had made a prima
facie case, the court was required to "take both the allegations
in the first amended consolidated class action complaint," and
any supporting materials submitted by plaintiffs, "as true," and
to draw "'the most favorable inferences' . . . in plaintiffs'
favor."  Id.

          Plaintiffs relied on three sets of materials to make
out a prima facie case for personal jurisdiction over American:
the allegations in the complaint, which, as mentioned above,
suggested that American played a role in designing and under-
financing the Charleston water facilities; a 1969 order from the

5

Public Services Commission ("PSC") describing American's role in designing and financing the water facilities in Charleston; and testimony from one of American's executives, Marshall A. Anderson, given in 1969, suggesting that American exerted great influence over the design of the Charleston water facilities after it acquired Southern Gas & Water Company, a predecessor to the company that eventually became WV American.  Good, 2015 WL 1600761, at *4-6.

The court stated that, "[v]iewed in a plaintiff-centric way, the allegations, PSC order, and Mr. Anderson's testimony may be understood to mean that American controlled its new subsidiary from the beginning, as a business unit or division, with the American-dominated board of directors and officers of WV American making detailed assessments and evaluations concerning the design, construction, and future expansion of the water system for Charleston and surrounding areas."  Id. at *6.  The court concluded that "plaintiffs have offered a prima facie case . . . that would support the exercise of specific jurisdiction."  Id.

II.  Personal Jurisdiction

As the court's previous order simply concluded that plaintiffs had established a prima facie case for personal

jurisdiction, American has renewed its motion to dismiss under
Rule 12(b)(2).  American contends that, at this stage in the
proceedings, plaintiffs may no longer rely on a mere prima facie
showing.  American contends further that plaintiffs cannot
demonstrate by a preponderance of the evidence that this court
may exercise personal jurisdiction over American.

A.   Legal Standards

     a.   Procedure for Determining Personal Jurisdiction

          Rule 12(b)(2) provides that "a party may assert the
lack of personal jurisdiction" by motion.  Fed. R. Civ. P.
12(b)(2).  Our court of appeals has emphasized that the choice
of procedures for settling disputes over personal jurisdiction
is within the trial court's discretion. Grayson v. Anderson, 816
F.3d 262, 268 (4th Cir. 2016) ("As with many pretrial motions, a
court has broad discretion to determine the procedure that it
will follow in resolving a Rule 12(b)(2) motion.").

          "When," in the earlier stages of a case, "a district
court considers a question of personal jurisdiction based on the
contents of a complaint and supporting affidavits, the plaintiff
has the burden of making a prima facie showing in support of its
assertion of jurisdiction." Universal Leather, LLC v. Koro AR,
S.A., 773 F.3d 553, 558 (4th Cir. 2014) (citations omitted).

Importantly, however, "'[a] threshold prima facie finding . . . [of] personal jurisdiction . . . does not finally settle the issue; plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing.'"  New Wellington Fin. Corp. v. Flagship Resort Dev. Corp., 416 F.3d 290, 294 n.5 (4th Cir. 2005) (quoting Prod. Grp. Int'l v. Goldman, 337 F. Supp. 2d 788, 793 n. 2 (E.D. Va. 2004)).  The Fourth Circuit has clarified that a Rule 12(b)(2) challenge should generally be resolved before trial "as a preliminary matter."  Grayson, 816 F.3d at 267.  Nevertheless, "when a material jurisdictional fact is disputed and that fact overlaps with a fact that needs to be resolved on the merits by a jury," a court "might . . . defer its legal ruling on personal jurisdiction to let the jury find the overlapping fact."  Grayson, 816 F.3d at 267 (citing Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)).

   b. Legal Standard for Personal Jurisdiction

Plaintiffs seek to establish liability against American, the parent of WV American.  American asserts, and plaintiffs do not contest, that no attempt has been made to pierce the corporate veil separating American and WV American.

Compare Def.'s Mem. Supp. Renewed Mot. to Dismiss and Mot. for
Summ. J. 2, ECF No. 755 (hereinafter "Def. Mot.") with Pls.'
Mem. in Opp. to American's Renewed Mot. to Dismiss 13-14, ECF
No. 822 (hereinafter "Pl. Resp.").  Instead, plaintiffs seek to
establish a "direct" claim against American, rather than a claim
based on its subsidiary's actions.

     As will be explained below, where "'the alleged wrong
can seemingly be traced to the parent through the conduit of its
own personnel and management' and 'the parent is directly a
participant in the wrong complained of,'" "the parent is
directly liable for its own actions."  United States v.
Bestfoods, 524 U.S. 51, 64-65 (1998) (quoting Douglas & Shanks,
Insulation from Liability Through Subsidiary Corporations, 39
Yale L.J. 193 (1929)).  For jurisdictional purposes, the "use of
a subsidiary does not necessarily subject the parent corporation
to the jurisdiction" of the state where the subsidiary does
business.  Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333,
336 (1925).  Instead, jurisdiction over the parent depends on
the parent's own contacts with the forum state.

     The exercise of personal jurisdiction over a foreign
corporation, including a parent corporation, is proper only if:
(1) jurisdiction is authorized by the long-arm statute of the

state in which the district court sits, and (2) application of the relevant long-arm statute is consistent with the due process clause.  ESAB Grp., Inc. v. Zurich Ins. PLC, 685 F.3d 376, 391 (4th Cir. 2012).

Where, as here, the forum state has drawn a long-arm statute that is coextensive with the reach of the Due Process Clause, the two-step inquiry merges into one, and the court assesses whether the exercise of personal jurisdiction comports with the Due Process Clause.  In re Celotex Corp., 124 F.3d 619, 627-28 (4th Cir. 1997) ("Because the West Virginia long-arm statute is coextensive with the full reach of due process, it is unnecessary in this case to go through the normal two-step formula for determining the existence of personal jurisdiction.") (citing Pittsburgh Terminal Corp. v. Mid Allegheny Corp., 831 F.2d 522, 525 (4th Cir. 1987) (internal citations omitted)); Tire Eng'g v. Shandong Linglong Rubber Co., 682 F.3d 292, 301 (4th Cir. 2012) (observing that the two-prong test "collapses into a single inquiry" when a state's long-arm statute "extends personal jurisdiction to the outer bounds of due process").

In personam jurisdiction is justified by the fact that a person - whether corporate or natural - has availed itself of

10

the privileges of a particular jurisdiction.  As the Supreme

Court has stated, "to the extent that a corporation exercises

the privilege of conducting activities within a state, . . .

[t]he exercise of that privilege may give rise to obligations .

. . ."  Int'l Shoe Co. v. State of Wash., Office of Unemployment

Comp. & Placement, 326 U.S. 310, 319 (1945).  In Universal

Leather, the Fourth Circuit succinctly set forth the due process

analysis that is applicable here:

> Under the Fourteenth Amendment's Due Process
> Clause, there are two paths permitting a court to
> assert personal jurisdiction over a nonresident
> defendant. The first path is "specific jurisdiction,"
> which may be established if the defendant's qualifying
> contacts with the forum state also constitute the
> basis for the suit.  The second path is "general
> jurisdiction," which requires a "more demanding
> showing of continuous and systematic activities in the
> forum state." . . . .
>
> We recognize that "[f]airness is the touchstone
> of the jurisdictional inquiry," and we employ a three-
> part test to determine whether the exercise of
> specific personal jurisdiction over a nonresident
> defendant comports with the requirements of due
> process.  Under this test, we analyze: "(1) the extent
> to which the defendant purposefully availed itself of
> the privilege of conducting activities in the forum
> state; (2) whether the plaintiff's claims [arose] out
> of those activities; and (3) whether the exercise of
> personal jurisdiction is constitutionally reasonable."

Universal Leather, 773 F.3d at 559 (citations omitted).

A nonresident corporation has purposefully availed

itself of the privilege of conducting business in a forum state

11

when its "conduct and connection with the forum [s]tate are such
that . . . [it] should reasonably anticipate being haled into
court there." Fed. Ins. Co. v. Lake Shore Inc., 886 F.2d 654,
658 (4th Cir. 1989) (internal quotations omitted). Our court of
appeals has generally ruled "that a foreign defendant has
purposefully availed itself of the privilege of conducting
business in the forum state when the defendant 'substantially
collaborated with a forum resident and that joint enterprise
constituted an integral element of the dispute.'" Universal
Leather, 773 F.3d at 560 (citation omitted).

B.  Analysis

        As stated above, the court previously concluded that
plaintiffs had made a prima facie claim that American
purposefully availed itself of the privilege of conducting
activities in this forum, and that plaintiffs' claim for
negligent design of the water facilities, at a minimum, arises
out of those purposefully directed activities.  The court also
concluded, as a prima facie matter, that it was constitutionally
reasonable to exercise personal jurisdiction.

        At this stage of the litigation, Plaintiffs'
substantive legal claims are intertwined with the factual issues
involved in establishing jurisdiction.  In particular,

12

American's involvement in the planning and design of the water facilities, its level of control over the workings of WV American, and its degree of engagement, if any, after the spill are all questions highly relevant to both jurisdiction and liability.  The court thus believes that the better course is to defer consideration, for personal jurisdiction purposes, of these overlapping, complex factual matters until ruling on American's motion for summary judgment and, if necessary, await determination by a jury to the extent that plaintiffs' claims against American are approved for adjudication at trial.  As noted above, the Fourth Circuit has explicitly stated that this approach is appropriate in some situations.  See Grayson, 816 F.3d at 267.

### III.  American's Motion for Summary Judgment

American has moved for summary judgment as to all of plaintiffs' claims against American.[1]  A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

---

[1] American moved for summary judgment on plaintiffs' breach of contract claims against American.  Def. Mot. 18.  As American notes, plaintiffs do not respond to American's motion on plaintiffs' contract claims.  Def.'s Reply Mem. in Supp. of Renewed Mot. to Dismiss and Mot. for Summ. J. 15, ECF No. 908. There being no genuine issue of material fact, plaintiffs' contract claims against American are dismissed.

genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c).  Material facts are those necessary to establish the

elements of a party's cause of action.  <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A.   Prima facie Negligence Claim

        The operative pleading lays out plaintiffs' prima

facie negligence claim against the water company defendants:

> The failure by [the water company defendants] to
> establish and maintain adequate and suitable
> facilities and perform its service in a way that is
> reasonable, safe, and sufficient for the security and
> convenience of the public, violated its primary
> statutory duty to the Plaintiffs and the Class
> pursuant to W. Va. Code § 24-3-1.

Pls.' Compl. ¶ 190, ECF No. 170.  Plaintiffs' Proposed Trial

Plan filed April 15, 2016 describes the basis for this claim in

more detail:

> West Virginia Code § 24-3-1 provides, in relevant
> part: "Every public utility subject to this chapter
> shall establish and maintain adequate and suitable
> facilities, safety appliances or other suitable
> devices, and shall perform such service in respect
> thereto as shall be reasonable, safe and sufficient
> for the security and convenience of the public."  Any
> person damaged by a water utility's breach of that
> duty has a right of action for damages.  <u>See</u> W. Va.
> Code § 24-4-7.  This section (like Plaintiffs' common-
> law negligence claims) can be divided broken down

14

> [sic] into duties that fall along two lines: duties
> with respect to construction and maintenance of
> adequate facilities ("shall establish and maintain
> adequate and suitable facilities"), on the one hand,
> and reasonable care in the operation of the system
> ("shall perform such service . . . as shall be
> reasonable").

Pls.' Proposed Trial Plan 5, ECF No. 696.  In the Proposed Trial Plan, plaintiffs allege a number of ways in which they believe these two statutory duties were violated, including that WV American "allowed its facilities . . . to fall into disrepair and become hydraulically overtaxed"; that it "unreasonably and carelessly failed to maintain a second intake"; and that it is responsible for "numerous operational and planning failures," particularly related to its planning for emergency contamination events.  Id. at 5-6.  Plaintiffs direct their prima facie negligence allegations in the Proposed Trial Plan, however, at WV American rather than the parent.[2]  Id.

---

[2] Plaintiffs do contend, as part of their prima facie negligence argument, that "[American] failed to adopt a source water protection plan, in contravention to the Safe Drinking Water Act."  Pl. Resp. 10.  American's brief notes that any claim plaintiffs may have had against American for prima facie negligence based on the failure to adopt a source water protection plan was previously dismissed by this court.  Def. Mot. 14 n.5.  American is correct.  See June 3, 2015 Mem. Op. and Order at 25-29, ECF No. 378 ("[T]he water company defendants assert that they cannot be subject to prima facie negligence arising out of their failure to adopt a source water protection plan . . . .  Inasmuch as the treatment facility under consideration was designed, constructed and approved prior to the . . . [relevant] amendments to the federal Safe Water

American contends that W. Va. Code § 24-3-1 does not apply to it, because the statute only assigns duties to "public utilities" subject to regulation in West Virginia, and that American does not fall under the statutory definition of a "public utility." Def. Mot. 17-18. American states that the term "public utility" in § 24-3-1 receives definition in § 24-1-2, which instructs that "'public utility' . . . shall mean and include any person or persons, or association of persons . . . engaged in any business . . . which is, or shall hereafter be held to be, a public service." Although not explicitly stated, American suggests that it, unlike WV American, does not provide any service to the public or hold themselves out as doing so. Def. Mot. 18; see Jefferson Utils., Inc. v. Jefferson Cty. Bd. of Zoning Appeals, 218 W. Va. 436, 441 (2005)("[T]he key to determining whether a 'public utility' is involved is . . . whether that specific entity has dedicated or held out its services, such as . . . water, to the public in a manner that suggests that it is in the business of supplying the public . . . with a particular service." (citing Wilhite v. Public Serv. Comm'n, 150 W. Va. 747 (1966))); see also Preston Cty. Light & Power Co. v. Renick, 145 W. Va. 115, 126 (1960)("It implies a

_____

Drinking Act, and West Virginia's adoption thereof, it is [ordered] that the motion to dismiss be, and hereby is, granted to the extent these . . . provisions serve as predicates for a prima facie negligence claim.")

public use, carrying with it the duty to serve the public and to treat all persons alike . . . .").  In addition, American cites a decision by West Virginia's Supreme Court of Appeals upholding the Public Service Commission's determination that the parent of a public utility was not thereby a public utility over which the Commission had jurisdiction.  W. Va. Highlands Conservancy, Inc. v. Pub. Serv. Comm'n of W. Va., 206 W. Va. 633, 635 (1998).

Plaintiffs do not appear to disagree with American's contention that it is not a "public utility," and cite no authority suggesting otherwise.  Instead, plaintiffs state that:

> [American] cites authorities . . . governing whether or not a corporation is a public utility and therefore subject to PSC regulation, that are inapposite. [American] had direct involvement in activities that resulted in the violations of Section 24-3-1 by WVAW. . . .  Thus, the Court should deny the motion for summary judgment as to [American] with respect to Plaintiffs' statutory negligence claims.

Pl. Resp. 10-11.  Plaintiffs' contention, in other words, appears to be that American should be liable because of their "direct involvement in" a utility's violation of W. Va. Code § 24-3-1, even though American is not itself a public utility. See id.  Before undertaking to answer that proposition as a matter of law, the court will consider the evidence offered by plaintiffs to support their "direct involvement" contention in connection with their common law negligence claim, which

17

contention is similar to that of their prima facie negligence
claim.

B.    Common-law Negligence Claim

        In their Proposed Trial Plan, plaintiffs explain the
basis of their common-law negligence claim against the water
company defendants:

> The issues relating to Plaintiffs' common-law
> negligence claims are similar in most respects to the
> issues relating to Plaintiffs' statutory claim, above.
> . . .  In addition to being responsible for the design
> of the system and failure to include the Coonskin
> intake, the parent company is also alleged to have
> chronically, maliciously, and deliberately underfunded
> known necessary capital projects in order to extort
> better rates from the Public Service Commission for
> those known and necessary projects, and also to have
> demanded that WVAW focus on projects that increase the
> number of customers for increased revenues at the
> expense of system hydraulics (or the ability to
> maintain reliable service to existing customers).  The
> parent company also encouraged practices that reduced
> costs, such as using storage to meet high demand
> events and actively deferring needed maintenance until
> it could capitalize that expense, at the expense of
> reliability, continuously measuring operating expenses
> by the extent to which they beat the budgeted amounts
> and paying bonus compensation to its employees based
> on their budget-beating performance.

Pls.' Proposed Trial Plan 6-7.

        In brief, according to their Proposed Trial Plan,
plaintiffs' common-law negligence claim against American appears

at this stage in the litigation to focus on the following categories of actions: (1) negligent design of the water facilities at the time they were approved and built in the late 1960s; (2) failure to direct WV American to take certain actions necessary to maintain its system properly; (3) failure to take certain steps in mitigation after the MCHM contamination became known; and (4) a general failure to ensure that WV American held sufficient capital to maintain its system properly.  As neither American nor plaintiffs have raised issue (3) in connection with the motion for summary judgment, it is not under consideration. These categories encompass numerous factual allegations, but provide analytic utility in considering the facets of plaintiffs' lengthy negligence allegations.

Fundamental to all of plaintiffs' negligence allegations is the contention that American exercised "control in the areas precisely related to the allegations," and was therefore directly responsible for those wrongs.  Pl. Resp. 11. Plaintiffs concede that this theory of liability does not require a piercing of the corporate veil:

> [American's] authorities are inapposite . . . .
> [because they] deal with the circumstances under which
> a court may impose liability on a parent company
> simply for actions taken by the subsidiary. . . .
> Here, [American] would have the Court decide this
> motion on the basis that veil piercing does not apply,

> on the rationale that there is an insufficient basis
> to find that [American] was in "total control" of [WV
> American].  However, [American] is alleged to be
> directly liable, based on its own actions within areas
> in which it retains, if not total control, certainly
> the pertinent decision-making authority with respect
> to matters concerning [WV American].

Pl. Resp. 13-14.

Instead of relying on veil-piercing authority, plaintiffs cite cases such as United States v. Bestfoods, in which the United States Supreme Court wrote the following regarding the direct liability of parent corporations for conduct in which they directly participated:

> As Justice (then-Professor) Douglas noted almost 70
> years ago, derivative liability cases are to be
> distinguished from those in which "the alleged wrong
> can seemingly be traced to the parent through the
> conduit of its own personnel and management" and "the
> parent is directly a participant in the wrong
> complained of."  [Douglas & Shanks, Insulation from
> Liability Through Subsidiary Corporations, 39 Yale
> L.J. 193, 207-08 (1929)].  In such instances, the
> parent is directly liable for its own actions.  See H.
> Henn & J. Alexander, Laws of Corporations 347 (3d ed.
> 1983) ("Apart from corporation law principles, a
> shareholder, whether a natural person or a
> corporation, may be liable on the ground that such
> shareholder's activity resulted in the liability").
> The fact that a corporate subsidiary happens to own a
> polluting facility operated by its parent does
> nothing, then, to displace the rule that the parent
> "corporation is [itself] responsible for the wrongs
> committed by its agents in the course of its
> business," Mine Workers v. Coronado Coal Co., 259 U.S.
> 344, 395, 42 S.Ct. 570, 577, 66 L.Ed. 975 (1922) . . .
> .

524 U.S. at 64-65 (citations abridged).

The theory of "direct liability" or "direct participation liability" of parent corporations, though less widely applied than the doctrine of corporate veil-piercing, receives significant discussion and application in the context of tort law and statutory violations.  See, e.g., Northbound Grp., Inc. v. Norvax, Inc., 795 F.3d 647 (7th Cir. 2015); Pearson v. Component Tech. Corp., 247 F.3d 471, 487 (3d Cir. 2001); Kingston Dry Dock Co. v. Lake Champlain Transp. Co., 31 F.2d 265, 267 (2d Cir. 1929)(Judge Hand)("One corporation may, however, become an actor in a given transaction, or in part of a business, or in a whole business, and, when it has, will be legally responsible.  To become so it must take immediate direction of the transaction through its officers, by whom alone it can act at all."); Travelers Indem. Co. v. Cephalon, Inc., 32 F. Supp. 3d 538, 556 (E.D. Pa. 2014), aff'd, 620 F. App'x 82 (3d Cir. 2015); Todd v. Xoom Energy Maryland, LLC, No. GJH-15-154, 2016 WL 727108, at *7 (D. Md. Feb. 22, 2016); Liability of Parent Corporation for "Direct Participation" in Subsidiary's Actions, 111 Am. Jur. Trials 205 (May 2016); Joshua M. Siegel, Reconciling Shareholder Limited Liability with Vicarious Copyright Liability: Holding Parent Corporations Liable for the Copyright Infringement of Subsidiaries, 41 U. Rich. L. Rev. 535

21

(2007) ("[C]orporate law principles recognize the direct liability of shareholders when they actually commit the transgressions on behalf of the corporation.").

The "direct liability" doctrine, as best understood, teaches that a parent corporation is responsible for its own torts in the same way that any other business is.  See Mine Workers, 259 U.S. at 395.  In Bestfoods, which focused on a parent company's direct liability under a federal statute for operating a polluting chemical facility, the Supreme Court emphasized that "[t]he question is not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary."  524 U.S. at 68 (citation omitted).  While "[c]ontrol of the subsidiary, if extensive enough, gives rise to indirect liability under piercing doctrine," it does not allow for direct liability.  Id.

The Court in Bestfoods sharpened and applied the rule by noting that "[a]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give

22

rise to direct liability." Id. at 72. "The critical question"
in establishing direct liability is "whether, in degree and
detail, actions directed to the facility by an agent of the
parent alone are eccentric under accepted norms of parental
oversight of a subsidiary's facility." Id. The Court noted
that the parent company in Bestfoods might have been directly
liable because it "became directly involved in environmental and
regulatory matters" of the subsidiary through the work of a man
employed only by the parent. Id. The employee "became heavily
involved in environmental issues at" the subsidiary, "actively
participated in and exerted control over a variety of [the
subsidiary's] environmental matters," and "issued directives
regarding [the subsidiary's] responses to regulatory inquiries."
Id.

          Some courts have suggested that the "direct liability"
doctrine is instead more akin to veil-piercing, in that it makes
a parent responsible for a subsidiary's actions when the parent
forces the subsidiary to take those actions, the rationale being
that the subsidiary is the parent's agent for those purposes.
For example, in Pearson, the Third Circuit wrote as follows:

          [I]t has long been acknowledged that parents may be
          "directly" liable for their subsidiaries' actions when
          the "alleged wrong can seemingly be traced to the
          parent through the conduit of its own personnel and

23

management," and the parent has interfered with the subsidiary's operations in a way that surpasses the control exercised by a parent as an incident of ownership. [Bestfoods, 524 U.S. at 64.] In such situations, the parent has not acted on its own (in which case there would be no need even to consider the subsidiary's actions), nor has it acted in its capacity as owner of the subsidiary; rather, it has forced the subsidiary to take the complained-of action, in disregard of the subsidiary's distinct legal personality. Thus, in the labor context, "direct" liability may attach if the parent has overridden the subsidiary's ordinary decision-making process and ordered it to institute an unfair labor practice, or to create discriminatory hiring policies. In this way, direct liability functions essentially as a kind of "transaction-specific" alter ego theory.

247 F.3d at 487 (citations abridged and omitted). See also Esmark, Inc. v. N.L.R.B., 887 F.2d 739, 756 (7th Cir. 1989)("In these [direct liability] cases . . . the parent only acted against the third party's interests through the agency of the subsidiary. The owner's liability was based on its control of its subsidiaries' actions from 'behind the scenes.' Thus the parent was not held 'directly liable'; it was liable derivatively for transactions of its subsidiary in which the parent interposed a guiding hand."). The contention that direct liability is akin to a transaction-specific veil-piercing theory appears in conflict with the Supreme Court's statement, already noted, that "[t]he question is not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary." Bestfoods, 524 U.S. at 68

24

(citation omitted).

The court believes, however, that <u>Pearson</u> and <u>Esmark</u> are consistent with <u>Bestfoods</u>, and merely emphasize that a parent need not commit a tort completely independently of its subsidiary in order to be liable under the "direct" theory.  By "forcing" a subsidiary to take a particular action, which is the type of conduct discussed in <u>Pearson</u> and <u>Esmark</u>, a parent company is liable in the same way as any tortfeasor who causes harm by acting in concert with others.  Forcing a subsidiary to do a particular act is not equivalent to a parent's generally "extensive . . . [c]ontrol of [a] subsidiary," which the Court in <u>Bestfoods</u> explicitly stated could not support "direct" liability, 524 U.S. at 68.  Where a parent generally dominates and controls a subsidiary, a parent may be liable for the subsidiary's conduct under a veil-piercing theory regardless of the parental officers' involvement in a particular act.  Not so with "direct" liability, whose lifeblood is a clear line from a particular tort to the conduct of the parent's officers and employees.  To reiterate the example in <u>Bestfoods</u>, the Court there noted that direct liability may exist because the parent's employee "actively participated in and exerted control over a variety of [the subsidiary's] environmental matters," which is plainly an example of a parent forcing its subsidiary to take

25

actions.[3]  524 U.S. at 72.

        In accordance with the general weight of authority,
plaintiffs in the present case will succeed on a theory of
direct liability only if they can establish that American
"became directly involved" as a participant in particular
actions – either alone or in concert with the subsidiary – that
raise cognizable tort claims.  Bestfoods, 524 U.S. at 72.
Plaintiffs must show specific, tortious "actions directed . . .
by an agent of the parent" that "are eccentric under accepted
norms of parental oversight of a subsidiary's facility."  Id.
It will not suffice to show that American exercised general
supervision "consistent with [its] investor status, such as
monitoring of the subsidiary's performance, supervision of the
subsidiary's finance and capital budget decisions, and

---

[3] The precise operation of the doctrine of "direct" liability is
contingent upon the legal source of a plaintiff's claim.  In
Bestfoods, the claim was federal, and the Supreme Court
articulated the theory of "direct liability" in the way that it
evidently applies in connection with federal law.  Here, where
plaintiffs rely on state tort law, the basis of the doctrine
must ultimately be state law.  See Northbound, 795 F.3d at 651
(discussing, in case brought under Illinois state law, the
Illinois courts' application of the rule).  Inasmuch as the
court has understood the "direct" liability theory merely to
subject a parent company to the usual rules of tort law, and
inasmuch also as West Virginia courts have not suggested that
they limit the "direct" theory in some way so as to treat parent
companies differently from other tortfeasors, the court will
apply the well-settled rules articulated above.

articulation of general policies and procedures," that
indirectly resulted in tortious conduct.  Id.

      1.   American's Alleged Negligent Design of Water
           Facilities

      Plaintiffs' first theory of negligence is that
American was "responsible for the design of the [water] system"
and, as part of that design, that it "unreasonably and
carelessly failed to maintain a second intake at the Coonskin
Shoals location, above the Freedom spill."  Pls.' Proposed Trial
Plan 6.  In support of this contention, they cite hearings
before the Public Service Commission in 1969.  These hearings
state, in pertinent part, as follows:

> It was the judgment of the management of . . .
> [American], the parent firm of . . . [WV American],
> that the proposed plan was needed in order for the
> operating company to meet its public obligations to
> provide a safe potable supply of water, adequate for
> the present and future needs through 1990.  Management
> declares its existing facilities are inadequate to
> meet its projected demands. . . .  The management of .
> . . [American] also indicated that, based on its
> experience, any delay in the proposed plan would only
> increase the cost.

July 16, 1969 Order of the W. Va. Public Service Commission in
W. Va. Water Company, Application for a Certificate of
Convenience and Necessity to Construct New Water Treatment
Facilities and to Develop New Sources of Supply of Water to

27

Kanawha County 235 (hereinafter "PSC Order").  The PSC Order
commented as to American's plans to finance WV American, in
light of the project.  Id.  Plaintiffs also note that Marshall
A. Anderson, a Vice President of American, appeared before the
PSC to promote the project.  Pl. Resp. 6-7.  In plaintiffs'
view, Anderson's testimony suggests that American played a key
role in planning and financing the project.  Id.

        A claim for this conduct could constitute an
appropriate use of the "direct liability" doctrine.  If American
directly supervised, planned, and financed the construction of
new facilities, then these "actions directed . . . by an agent
of the parent," including the above-mentioned American
executive, would likely be "eccentric under accepted norms of
parental oversight of a subsidiary's facility."  The parent's
involvement in appearing at the PSC meeting and supervising the
design of facilities goes well beyond activities involved in
"investor status," and could ground direct tort liability for
American.

        As a threshold matter, it is noted that the defendant
contends that any claim based on the facilities' design is time-
barred by W. Va. Code § 55-2-6a, which reads in pertinent part
as follows:

No action . . . to recover damages for any deficiency
in the . . . design . . . of any construction . . . of
any improvement to real property . . . or, to recover
damages for an injury to a person . . . arising out of
the defective or unsafe condition of any improvement
to real property . . . may be brought more than ten
years after . . . construction . . . [and occupancy or
acceptance by the owner].

This case is one that seeks damages, not for a design deficiency or unsafe condition in the real property improvement itself that was erected at the Elk River site of the water treatment plant ("KVTP"), but for failure to add or utilize an alternate water intake at the Coonskin Shoals site four miles up-river from the plant.  This ten-year statute of repose does not purport to cover a design defect relating to the lack of an alternate intake site four miles away or elsewhere.  Consequently, it does not bar this action against American.

Plaintiffs' primary assault on American is founded upon their contention that American is responsible for an alleged failure in the design of the KVTP in that there was no alternate water intake.  That contention is coupled with the alleged failure by American to provide its subsidiary, WV American, with the capital needed to include an alternate intake.  As to the first, in 1969 American, upon acquisition of the company that became WV American, participated in the design of the system proposed for the KVTP when approval was sought for

that system by the application filed by WV American, the
subsidiary, from the West Virginia Public Service Commission.
See PSC Order at 235.  The proposal included an intake at the
Elk River site of the proposed KVTP and an alternative intake
twelve or more miles away on the Kanawha River, into which the
Elk River flows about a mile below the KVTP site.  Id. 230-32.
The alternate intake was to be located on the Kanawha River at a
point beyond the town of Chelyan so as to avoid the potential
pollution from the many industrial sites located on or near the
Kanawha River between Chelyan and Charleston.  Pl. Resp. Ex. 2
at 19-20.  At the PSC hearing it was made known that the West
Virginia Department of Health ("WVDH") opposed the proposed
alternate site.  PSC Order at 233-34.  The PSC, in its order
entered at the close of the hearing on July 16, 1969, adopted
the WVDH view and disapproved the alternate site, but approved
the single site location as otherwise proposed.  Id. at 241.
The KVTP facility was ultimately constructed by the applicant,
WV American, in 1969, with a single intake at or near the Elk
River site.  Mem. in Supp. of WV American's and the Service
Company's Mot. to Dismiss Consolidated Class Action Compl. 2,
ECF No. 195.

          Plaintiffs do not allege that American was involved in
redesigning what would become the final, single-intake KVTP

project.  See Pl. Resp. 14.  Plaintiffs' only response to
American's distinction between its involvement in the initial
design and its lack of involvement in the final design is to
claim that "[t]his argument misses the mark. . . .  AWWC's
direct involvement in the design and operation of the water
treatment plant and intake at issue in the litigation are well-
supported."  Id.  Plaintiffs, however, offer no support for this
assertion.

According to American, its design involvement
pertained only to the initial, unimplemented design of the KVTP.
See Def.'s Reply Mem. in Supp. of Renewed Mot. to Dismiss and
Mot. for Summ. J. 11, 19, ECF No. 908 (hereinafter "Def.
Reply").  Inasmuch as plaintiffs fail to rebut this contention,
American's involvement in a plant design that WV American
scrapped for the final, single-intake design cannot be the basis
for liability for negligent design.  Consequently, plaintiffs
fail to demonstrate that a genuine issue of material fact exists
with respect to allegations of negligent design on the part of
American.

2.   American's Alleged Failure to Direct WV American to
Take Safety-Related Actions, and Alleged Control
Over WV American through Inadequate Capitalization
and the Service Company

The theory of liability that the court has referred to as "failure to direct WV American to take certain actions," supra p. 19, embraces various particular failings that plaintiffs have pinpointed, including the following:

> (1) Failing to address the foreseeable risk warned of by the [West Virginia Department of Health in 2002];
>
> (2) Failing to ascertain the nature and extent of potential threats to the Elk River water supply, such as the Etowah River Terminal storage facility, and to take appropriate steps to prepare for the possibility of a chemical leak;
>
> (3) Failing to monitor and maintain adequate water reserves in the event of a necessary disruption of the water intake and purification process;
>
> (4) Failing to maintain and monitor appropriate carbon filtration reserves;
>
> 145. Further, [American, the Service Company, and WV American] committed a series of independent breaches by failure to budget for, fund, and implement an alternate water supply to avoid the foreseeable risk warned of by the [West Virginia Department of Health in 2002]. . . .

Pls.' Compl. ¶ 144-45.  Plaintiffs also claim, repeatedly, that American "negligently failed to adequately capitalize its wholly-owned subsidiary, Defendant WVAW."  Id. ¶ 146.

32

American contends that these two theories of liability – which allege a failure to "direct specific [safety-related] action or to invest in specific projects" for WV American – "are not based on any independent action by American Water in West Virginia," but instead on "an alleged failure by American Water to take some action to manage or oversee WVAW or a failure to invest additional capital in WVAW to fund specific projects." Def. Mot. 19.  American claims that it had no duty to take any such actions, and, more particularly, that assigning liability on the basis of these claims "would undermine the fundamental premise that parent companies are not liable for the debts of their subsidiaries absent exceptional circumstances."  Id. at 19-20.

As the Supreme Court has stated, a parent company's general supervision of its subsidiary, "consistent with [its] investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures," is insufficient for "direct liability."  Bestfoods, 524 U.S. at 72.  Plaintiffs must show specific, tortious "actions directed . . . by an agent of the parent" that "are eccentric under accepted norms of parental oversight of a subsidiary's facility."

33

In particular, plaintiffs rely on American's 2013 Form 10-K for the proposition that at least one American executive, Nick O. Rowe, had responsibility for the day-to-day operations of WV American.  Such responsibility could rise to the level of "direct[] involve[ment]" required to ground a theory of direct liability.  See Bestfoods, 524 U.S. at 72.  Plaintiffs, however, mistakenly interpret American's 2013 Form 10-K to mean that Rowe was simultaneously an American executive and a manager of WV American's facilities.  As American points out, "Mr. Rowe did not hold the position of Senior Vice President at [American] until 2009, more than ten years after the 1987 to 1998 period" during which Rowe managed at least some West Virginia water facilities according to Form 10-K.  Compare Def. Reply 8 with Def. Reply Ex. 1 ¶ 6 (declaration of Rowe stating that he was not an employee of American from 1987 to 1998).  Therefore, Rowe's noncomtemporaneous status as WV American facilities manager and later as American executive is not relevant to American's involvement in the KVTP spill.  Plaintiffs provide no reason to think that individuals other than Mr. Rowe had a dual role as officers or employees of both American and WV American.

The court considers whether certain other evidence identified by plaintiffs suffices to create a colorable claim for undercapitalization by American.  Plaintiffs' evidence

34

consists of general materials describing American's budgeting and financing process regarding its subsidiaries, as well as complaints from WV American that it desired greater capital resources. Plaintiffs rely, first, on two depositions, one from Kathy Pape, a senior Vice President of American, and another from Kendall Mitzner, an engineering manager at WV American. Pl. Resp. 11-12. Pape testified about the allocation of capital in quite general terms:

> As I recall, there was an allocation of business transformation costs from top side, and I want to say based on number of customers. But there might have been a multiformula approach.

>                * * *

> Capital was allocated among all of the states, first for compliance. So we never wanted to be out of compliance with anything that we needed to do for providing safe and adequate water service. Then the compliance was to serve as water quality, so if you had any pressure or water quality issues. Then the third level would be – I would call it more discretionary. And we were all in competition for those discretionary dollars. And I think that the discretionary dollars would come more likely to a state that had an infrastructure surcharge.

>                * * *

> I think at the top side, there's a determination made in terms of once they look at the capital budgets and they look at the categories the total amount of capital that will be invested by the shareholder in the businesses.

Pape Dep. at 90-91, 93, 104.  Plaintiffs also rely on Mitzner's
deposition, which similarly states that when WV American wished
to undertake "larger capital projects," they "went to the
finance group to determine," based on the costs and priorities
of projects, whether they should "be moved up the ladder, so to
speak, of approval."  Mitzner Dep. at 39-40.

Pape and Mitzner's comments describe a routine, if
perhaps complex, set of decisions that a parent company must
make as to how to allocate capital among its subsidiaries.
Plaintiffs appear to use their testimony only to establish that
American maintained some control over WV American's financing,
see Pl. Resp. 11-12, and that its funding determinations may
have been made, in some way, based on the number of customers
that the utility serviced, id., but it is difficult to imagine
how either of these two facts could be otherwise.  Certainly
neither is helpful in establishing liability.

Plaintiffs next cite an order of the PSC, dated
October 13, 2011, that discusses staff and capital expenditure
reductions that WV American wished to make at that time.  See
Pl. Resp. 12-13 (citing WV American Water Company, General
Investigation Regarding Recent Staffing Changes, PSC Order,
October 13, 2011 (hereinafter "2011 PSC Order")).  Plaintiffs

36

cite this order to show that (1) WV American "acted
consistent[ly] with the [capital budget] directives" from
American, and (2) that, at the time of the proceedings, WV
American had proposed a reduction in capital expenditures that
would "'scale back' its systematic and scheduled valve program
for the [Charleston and Huntington facilities] despite the
possibility for increased main and service line breaks and
leaks." Id. Plaintiffs state that this material shows that WV
American, unlike subsidiaries in certain other states, was
"starve[d] . . . for capital." Id. at 13.

The 2011 PSC Order discusses WV American's plans to
lay off thirty-one staff members and to reduce certain capital
expenditures, as a result of low customer demand and other
factors. Largely because of the staff reductions, the 2011 PSC
Order notes that WV American "plan[ned] to scale back its
systematic and scheduled valve program in the Huntington and
Kanawha Valley Districts," "[d]espite the possibility for
increased main and service line breaks and leaks." 2011 PSC
Order at 17. But the PSC went on to conclude that WV American's
plan "[t]o simultaneously reduce capital spending on
distribution system infrastructure without an effective valve
operation and maintenance program is an unreasonable practice
that the Commission will not allow." Id. at 17-18.

37

Consequently, the PSC stated that it would "require [WV
American] to maintain the existing scheduled and systematic
valve programs."  Id. at 18.

        Similarly, plaintiffs highlight in an exhibit – though
they do not discuss in their brief – language from the 2011 PSC
Order stating that WV American wished to "reduce the level of
capital spending on physical plant":

> In addition to the proposed layoffs, WVAWC announced
> that it intends to reduce the level of capital
> spending on physical plant, particularly the
> replacement of aged distribution system
> infrastructure. . . .
>
> . . .  The Commission concludes that [WV American's
> proposed] replacement cycle is impractical and
> unacceptable, contrary to good utility practice and
> will result in increased main breaks, increased
> customer outages in both numbers and duration,
> increased unaccounted for water and a degradation of
> service over time and is inconsistent with the
> essential obligation of a public utility to maintain
> its utility system.

2011 PSC Order at 20.  The PSC rejected both the proposed
reductions in staffing that would lead to reduction in the valve
program, id. at 28-29, and the proposed reduction in plant
capital expenditures, id.

        It is not clear what plaintiffs believe this order
shows.  The order suggests, in a very general way, that WV

American was responsive to the realities of capital budgeting
that were likely driven by funding limitations from its parent
company.  But both of the specific proposals that plaintiffs
highlight in the 2011 PSC Order as sources of harm were not
approved by the PSC for implementation.  The mere fact that
reductions were proposed to the PSC cannot establish that
American committed torts, inasmuch as the PSC did not permit the
contemplated actions to be taken.  Moreover, plaintiffs have not
explained, in any way, how the proposed reductions in the valve
program or the particular reductions of capital expenditure for
WV American's plant would have been responsible for the harm
alleged in this case, even had they been implemented.
Plaintiffs cannot establish tort liability absent proof of
causation.

    Additionally, plaintiffs cite several pages of
deposition testimony from Jeff McIntyre, as well as a memorandum
he wrote in 2013 regarding WV American's capital budget.  See
Pl. Resp. 13 (citing McIntyre Depo. and August 6, 2013 Mem. re
2014 CAPEX Plan – WVAW).  Plaintiffs, however, incorrectly
identify McIntyre as the president of American; rather, he is
the president of WV American.  Compare Pl. Resp. 13 with Def.
Reply Ex. 2 (Dep. of Jeffrey McIntyre).  Plaintiffs believe that
McIntyre's deposition establishes that American "continues to

invest in capital projects like pipeline repair and replacement, making the decision to invest its assets to make sure that it can perform its services." Pl. Resp. 13.  They also quote from his memorandum, which states that "the needs analysis conducted by corporate does not reflect the strategic needs of the state," and that funding for certain recurring projects is being cut by $5 million.  Id.

Plaintiffs do not explain how any of this relates to the incident that is the subject of this case, or how it establishes that American should be directly liable for it. Although McIntyre made a number of recommendations that sought additional capital funding for WV American, plaintiffs do not state that any of these recommendations demonstrate a duty of American to the customers of WV American or a breach of that duty.  Neither do they show that these recommendations would have prevented the contamination of the KVTP.  Indeed, plaintiffs do not even say whether any of McIntyre's proposals were ultimately adopted by WV American.  These documents are thus of no value in creating a genuine question of material fact that would allow plaintiffs' claims to succeed.

Finally, plaintiffs appear to allege that American controls WV American through the Service Company's contract with

40

WV American.  This contention is not sufficiently developed in plaintiff's response to American's motion for summary judgment. It is plain, however, that not unlike similar corporate arrangements, American established a subsidiary, the Service Company, to contract individually with American's public utility subsidiaries to render various services at cost.  Such a contract was entered into by WV American and the Service Company, first in 1971 and later in 1989, the latter of which remains in effect.  Pls.' Resp. in Opp. to American's Mem. in Supp. of Mot. to Dismiss, Ex. 3 at 4, ECF No. 226 (hereinafter "Service Agreement").  American itself was not a party to the Service Agreement, and did not undertake any obligations or make any representations in the Service Agreement.  See id. According to American Vice President and Treasurer Deb Degillio, "[the Service Company] has its own employees, officers and directors that carry out its day-to-day operating functions." Def. Mot. Ex. 2 ¶ 21; see also, Def. Mot. Ex. 3 ¶ 13 (hereinafter "Macey Decl.").  Even had there been directors who served on the boards of both American and the Service Company at various times, the Supreme Court has observed that "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary." Bestfoods, 524 U.S. at 69 (citations and quotation marks omitted).

41

The Service Agreement indicates the agreement of the two parties that the Service Company is to perform many services for WV American, including, <u>inter alia</u>, assisting with recordkeeping and budgets, other administrative tasks, consulting regarding construction and operation of facilities and other engineering needs, advising regarding market conditions, and assisting WV American with water quality compliance. <u>Id.</u> at 6-12.  The Service Company directs monthly bills for all services to WV American.  <u>Id.</u> at 14.  WV American represents in the Service Agreement that it understands that the Service Company has or may enter similar agreements with other affiliates of American.  <u>Id.</u> at 15.  The Service Company agrees not to enter into similar terms with other affiliates that are more favorable than those in the agreement with WV American. <u>Id.</u>

American's expert, Jonathan Macey, opined that parent companies often use a "shared" service company to provide a variety of support to multiple subsidiaries.[4]  Macey Decl. ¶¶ 58-

---

[4]  The support functions that a service subsidiary provides are often needed by each of the subsidiaries and can be obtained from the service company at a lower cost than the cost at which internal departments could perform equivalent services.  <u>See</u> Macey Decl. ¶¶ 58-62.  As in the Service Company's case, this type of arrangement is commonly offered at cost – meaning that the Service Company does not derive a profit from it.  <u>See</u> <u>id.</u>

62.   Indeed, a similar arrangement surfaced in another West
Virginia public utility case.  W. Va. Highlands Conservancy, 206
W. Va. at 637 n. 12.  The Supreme Court of Appeals noted in that
case that the parent company, Allegheny, had recently been
reorganized, and owned subsidiaries that acted as utilities in
multiple states, including a subsidiary serving West Virginia.
Id.  Allegheny owned another subsidiary, Allegheny Power Service
Corporation, that "[a]ccording to Allegheny . . . acts as a
mutual service company for Allegheny's subsidiaries, in
accordance with 12 U.S.C. § 79m (1994) and SEC regulations."
Id.  The court in West Virginia Highlands found that even were
veil-piercing an appropriate method of establishing subject
matter jurisdiction, "the facts of this case" "would still not
support veil-piercing . . . ."  Id. at 640.  Citing Bestfoods,
the court reasoned that the plaintiff "failed to demonstrate
that Allegheny's corporate reorganization was effectuated for,
or is being used for, an improper purpose that would justify the
use of veil piercing principles."  Id.  In the instant case,
plaintiffs similarly fail to show that American's subsidiaries –
whether the Service Company, WV American, or both – were being
used for an improper purpose.

        Plaintiffs' only specific complaint with respect to
the Service Company is that American "dictates investment

strategy" for WV American through the Service Company.  See Pl.
Resp. 12.  Nowhere, however, do plaintiffs offer evidence
showing the nature of the parent's involvement in the Service
Agreement or the services that the Service Company performed for
WV American.  Plaintiffs' evidence does show that WV American
employee Kendall Mitzner provided data to a Service Company
employee, Michael Miller, for the purpose of determining capital
funding priorities for WV American.  See Pl. Resp. Ex. D at 62-
63.  Providing data to a company acting in part as a financial
and operational consultant is not surprising.

Mitzner's deposition testimony also shows that Mitzner
reported to one individual, David Schulz, who was both an
employee of the Service Company and a Vice President of
Operations at WV American.  Id.  Plaintiffs do not explain how
the fact that Schulz was both a Service Company employee and a
WV American executive means that American dictated investment
strategy or controlled the decision-making process at WV
American.  Simply put, WV American's financial strategy seems to
be a process of collaboration with an external consultant, the
Service Company, that had at least one employee who was also a
manager at WV American.  There is no indication that American
was involved in this process.  Without more, the court finds no
reason to think that this process demonstrates control of WV

American such that American could be found at fault for actions
taken at or with respect to WV American's facilities – as is
required for direct liability.

    In short, plaintiffs have set forth a number of facts
that have little or no relevance to the theory of direct
liability they advance, and they have cited American's failure
to take actions that in hindsight they assert might have been
taken.  Nowhere do they show, through their documentation or
other evidence, that American's limited involvement in the
affairs of WV American at various times generated a duty to WV
American's customers or that American carried out a specific act
such that it was itself liable for tortious conduct.  Nor do
plaintiffs show that American should be liable because it
committed a tort in concert with WV American, or directly and
specifically "forced" WV American to commit a tort.
Furthermore, plaintiffs do not allege other specific actions or
direct involvement that could give rise to a colorable
negligence claim on the basis of safety-related actions or some
type of control of WV American.  Indeed, the materials
plaintiffs have submitted simply show that American was involved
as an investor, in making capital allocations across its many
subsidiaries, and in exercising supervision over its
subsidiaries' finance and capital budget decisions.

45

Plaintiffs' claims against American in general do not identify acts or omissions on the part of American that would fall under the jurisprudence of direct liability (as opposed to theories of veil-piercing) which requires that a parent's actions be directed at a subsidiary's "facility, not the subsidiary." Bestfoods, 524 U.S. at 68.  For all of the foregoing reasons, plaintiffs' common-law negligence claim must be dismissed.

## IV.    Final Considerations

The same analysis also demonstrates that plaintiffs' theory of prima facie negligence cannot stand.  Plaintiffs in their response argue only that American had "direct involvement" in activities violating W. Va. Code § 24-3-1, again without specifying the nature of this involvement beyond that with which the court has already dealt.  Pl. Resp. 10.  Plaintiffs' claim of prima facie negligence against American must therefore be dismissed.

In light of the foregoing discussion of American's activities in West Virginia, the court returns to the abridged discussion of personal jurisdiction above, supra pp. 6-13. Personal jurisdiction depends on considerations of fairness given a corporation's activities, or lack thereof, in a state.

46

<u>Universal Leather</u>, 773 F.3d at 559.  Specific – as opposed to
general – personal jurisdiction requires that "the defendant's
qualifying contacts with the forum state <u>also constitute the</u>
<u>basis for the suit</u>." <u>Id.</u> (emphasis added).  A plaintiff wishing
to demonstrate specific personal jurisdiction over a corporation
must show that the corporation "purposefully availed" itself of
the forum state.  <u>Id.</u>

      The evidence shows that American has little contact
with West Virginia.  Indeed, plaintiffs have waived a claim that
the court possesses "general" personal jurisdiction over
American.  Plaintiffs, for example, do not dispute the
Declaration of Deb Degillio, which explains, among other things,
that American is organized in Delaware, does not provide
services directly in West Virginia, does not possess property in
West Virginia, and allows WV American to have officers who are
not employees of American.  Pl. Resp. 4-5.  These facts support
American's contention that it has not purposefully availed
itself of the forum.  Nevertheless, plaintiffs maintain that
"the Degillio account does not adequately reflect the
relationship between [American] and the [WV American] treatment
facility and the intake at issue in this case." <u>Id.</u> at 5.  As
now explained, however, the evidence plaintiffs cite in support

of this assertion does not justify the exercise of specific personal jurisdiction.

Plaintiffs' allegations about American's direct activities in West Virginia amount to the following: (1) involvement of an American executive in the initial stages of planning the KVTP in 1969, (2) employment of Nick Rowe by American while contemporaneously employed by WV American in a management capacity, (3) American's financial and regulatory "support to its subsidiaries," and (4) control over the services contract between the Service Company and WV American.   See Pl. Resp. 3-8.

The initial stages of planning the KVTP, occurring nearly a half-century ago and repulsed by the Public Service Commission's 1969 rejection of the proposed second intake on the Kanawha River, are generally irrelevant to the negligence claims arising against the water company defendants in this litigation. And Rowe, of course, was not in fact an employee of American while managing WV American's daily operations.  The basis for this action against American purportedly arises from allegations regarding American's negligent design of the final KVTP intake and undercapitalization of WV American.  The evidence does not support American's involvement in the former, and with respect

48

to the latter, plaintiffs' evidence regarding
undercapitalization has turned out to be ephemeral.  Plaintiffs
have not provided any justification for their allegation that
American's general corporate "support" of its subsidiary WV
American contributes to the basis for the claims arising in this
case.  Indeed, they have not explained how such general support
is anything other than the norm in corporate governance.

Finally, plaintiffs seem to argue that the Service
Agreement between WV American and the Service Company justifies
the exercise of personal jurisdiction over American.  Pl. Resp.
8.  While American acknowledges that the Service Company offers
its services to WV American's customers, plaintiffs do not
adequately explain how this conventional relationship justifies
the exercise of specific personal jurisdiction over American
itself.  Likewise, plaintiffs observe that American and the
Service Company maintain the same principal place of business in
New Jersey, but note nothing more in that respect.  Id.

Plaintiffs having failed to demonstrate that American
has overridden the ordinary decision-making process of its
subsidiary, WV American, and having failed to show that American
has purposefully availed itself of West Virginia's privileges, a

49

rationale for exercising specific personal jurisdiction over American is lacking.

## V.   Conclusion

Accordingly, the court ORDERS that American's motion for summary judgment be, and it hereby is, granted.  As plaintiffs have failed to show that direct liability can be a basis for this suit against American, the court further ORDERS that American's motion to dismiss for want of personal jurisdiction be, and it hereby is, granted.[5]

The Clerk is directed to forward copies of this written opinion and order to counsel of record and any unrepresented parties.

DATED:  September 26, 2016

John T. Copenhaver, Jr.
United States District Judge

---

[5] Plaintiffs moved on May 10, 2016 to exclude the testimony of Jonathan R. Macey, whom American has proffered as an expert. The water company defendants moved on May 11, 2016 to exclude the testimony of Steven Amter, whom plaintiffs have proffered as an expert.  The court has addressed the motions to exclude Macey and Amter in a separate order, this same day entered.