```
           UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF WEST VIRGINIA
                   AT CHARLESTON
```

CRYSTAL GOOD, individually and as
parent and next friend of minor children
M.T.S., N.T.K., and A.M.S.,
and MELISSA JOHNSON, individually and as parent of
her unborn child,
MARY LACY and JOAN GREEN and JAMILA AISHA OLIVER,
WENDY RENEE RUIZ and KIMBERLY OGIER and ROY J. McNEAL and
GEORGIA HAMRA and MADDIE FIELDS and BRENDA BAISDEN, d/b/a
FRIENDLY FACES DAYCARE, and ALADDIN RESTAURANT, INC., and
R. G. GUNNOE FARMS LLC, and DUNBAR PLAZA, INC.,
d/b/a DUNBAR PLAZA HOTEL, on behalf of themselves and all others
similarly situated,

      Plaintiffs,

v.                        Civil Action No. 14-1374

AMERICAN WATER WORKS COMPANY, INC., and
AMERICAN WATER WORKS SERVICE COMPANY, INC., and
EASTMAN CHEMICAL COMPANY and
WEST VIRGINIA-AMERICAN WATER COMPANY,
d/b/a WEST VIRGINIA AMERICAN WATER, and
GARY SOUTHERN and DENNIS P. FARRELL,

      Defendants.

## MEMORANDUM OPINION AND ORDER

Pending is the motion for summary judgment filed by defendant Eastman Chemical Company ("Eastman") on May 10, 2016.

### I.  Relevant factual and procedural background

#### A.

On January 9, 2014, approximately 300,000 people in and around Charleston, West Virginia, suffered an interruption

in their water supply.  See First Amended Consolidated Class Action Complaint ("Amended Compl."), Doc. No. 170, ¶ 1.  The interruption was caused by a spill into the Elk River of a chemical being stored in a tank at a riverside site owned and operated by Freedom Industries ("Freedom") upstream from the municipal drinking water intake.  Id.  The spilled chemical was mixed on-site by Freedom and marketed, for coal cleaning purposes, as "Shurflot 944."  Shurflot was composed primarily of methylcyclohexanethanol ("MCHM") manufactured by Eastman, and mixed by Freedom with propylene glycol phenyl ether ("PPH"), hydrochloric acid, and other chemicals Eastman describes only as a "blend of alcohols, glycol ethers and carboxylates."  See Eastman's Summary Judgment Motion ("Eastman Mot."), Doc. No. 756, Ex. A, Shurflot Material Safety Data Sheet; Ex. B, Skiles Deposition ("Dep."), pp. 19-23 (describing origin of Shurflot); Ex. C, Burdette Dep., pp. 30-35 (describing Shurflot manufacturing process).

   Freedom used at least three different chemical tanks to manufacture Shurflot.  Tank 395 contained MCHM, Tank 397 was used to blend MCHM with other chemicals to create Shurflot, and Tank 396, which is the tank that leaked its contents into the Elk River, was used to store the finished product before sale and distribution.  See Burdette Dep., pp. 31-33; Eastman Mot.,

Ex. F, West Virginia Attorney General's Report, pp. 2-3, 19-28 (providing maps and diagrams). Eastman prepared an informational document, referred to by the parties as a "material safety data sheet" (herein, "MSDS"), describing the various chemical properties of MCHM. See Eastman Mot., Ex. H, MCHM MSDS. Freedom, for its part, prepared a separate MSDS for Shurflot. See Eastman Mot., Ex. A, Shurflot MSDS.

### B.

In its order of October 8, 2015, the court granted in part the plaintiffs' motion for class certification, authorizing the certification of an "issues" class on the question of liability for the spill and resulting infiltration and contamination of the water supply. Among other claims in the consolidated class action complaint, the plaintiffs charge Eastman with negligence (Counts 1 and 3, found at ¶¶ 140-41 and 150-61 of the amended complaint, respectively), gross negligence (Count 7, found at ¶¶ 184-88), negligent infliction of emotional distress (Count 11, found at ¶¶ 213-21), strict liability failure to warn (Count 13, found at ¶¶ 229-50), and strict liability for ultra hazardous activity (Count 14, found at ¶¶ 251-63).

According to Eastman, the "plaintiffs' negligence and strict liability . . . claims . . . [depend] upon the alleged

3

inadequacy" of the MSDS that Eastman developed for MCHM. Eastman's Memorandum in Support ("Eastman Mem."), Doc. No. 757, p. 5. Eastman claims that, "[b]ecause the undisputed material facts make clear that Freedom released its own product[,] Shurflot, which was subject to its own MSDS, Eastman cannot be liable and is entitled to judgment as a matter of law" on counts 1, 3, 7, and 13 of the amended class action complaint.[1] Id. In particular, Eastman asserts that Eastman's MSDS for MCHM complied fully with federal law, preempting the plaintiffs' tort claims; that the plaintiffs cannot demonstrate the element of duty or proximate cause; and that, in any event, the "sophisticated user" rule shields Eastman from liability. See id. at pp. 13, 6, 9, 11, respectively.

The plaintiffs, in their response in opposition, contend that they seek to hold Eastman to the requirements of federal law regarding MSDS information, but that their claims do not seek to impose a standard more expansive or burdensome than that imposed by federal law. Plaintiffs' Response in Opposition ("Resp."), Doc. No. 835, pp. 13-16. They further assert that Eastman had a duty to warn Freedom of the corrosive effects of

---

[1] Eastman's motion does not address Count 11 (Negligent Infliction of Emotional Distress). Count 14 (Strict Liability for Ultra Hazardous Activity) is treated by Eastman as having been abandoned by the plaintiffs, citing Plaintiff's Reply in Support of Proposed Trial Plan (ECF No. 717, p. 7).

4

MCHM, specifically through the MCHM MSDS, which lacks that information.  See id. at p. 7.  Lastly, the plaintiffs maintain that Eastman's failure to include corrosivity information in the MSDS proximately caused their injuries, see id. at pp. 7-10, and that the exception for sophisticated user (Freedom) does not protect Eastman because Eastman failed in the first instance to adequately inform Freedom of MCHM's corrosive properties, see id. at p. 10.

## II.  Standard governing motions for summary judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010) (same).  A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party.  Anderson, 477 U.S. at 248.

The moving party has the initial burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the non-moving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). If the moving party satisfies this burden, then the non-moving party must set forth specific facts, admissible in evidence, that demonstrate the existence of a genuine issue of material fact for trial. <u>Id.</u> at 322-23; <u>see</u> <u>also</u> Fed. R. Civ. P. 56(c), (e) (same).

### III. <u>Discussion</u>

#### A. <u>Federal standards applicable to material safety data sheets</u>

Eastman claims that it provided Freedom with an MSDS that complied fully with federal law governing hazardous chemical labeling. <u>See</u> Eastman Mem., pp. 13-15. According to Eastman, the plaintiffs' expert, Dr. Simonton, who is the subject of a motion to exclude, "agrees that Eastman's MSDS complied with the standards as [they] pertain[] to the testing information required" by federal law. <u>Id.</u> at p. 15. Eastman contends that, despite this, the plaintiffs "seek to impose a higher standard of compliance than what [federal] law requires, namely, that Eastman should have provided toxicity studies to accompany the MSDS and more information concerning corrosivity."

Id. (citing Amended Compl. at ¶¶ 199, 245-247).

The Occupational Safety and Health Act's Hazard Communication Standard, 29 C.F.R. § 1910.1200 (generally referred to as "the HazCom Standard"), requires that those who manufacture hazardous chemicals "obtain or develop a safety data sheet for each hazardous chemical they produce." Id. at § 1910.1200(g)(1). The HazCom Standard is meant to "address comprehensively the issue of classifying the potential hazards of chemicals, and communicating information concerning hazards and appropriate protective measures." Id. at § 1910.1200(a)(2); see also id. at § 1910.1200(a)(1) (The HazCom Standard is also intended to "ensure that the hazards of all chemicals produced or imported are classified, and that information concerning the classified hazards is transmitted to employers and employees. . . ."). The HazCom Standard expressly directs chemical manufacturers to "classify the hazards of the chemicals including determinations regarding when mixtures of the classified chemicals are covered by this section." Id. at § 1910.1200(d). In order to address the labelling of hazardous chemicals "comprehensively," the HazCom Standard purports to "preempt any legislative or regulatory enactments of a state, or political subdivision of a state, pertaining to this subject. . . ." Id. at § 1910.1200(a)(2).

The plaintiffs allege that Eastman completely neglected to include corrosivity data, among other things, in its MSDS for MCHM.  See, e.g., Amended Compl. ¶¶ 151, 233, 318-19.  Eastman argues that such disclosures were not required by federal law governing hazardous chemical labeling, and that plaintiffs' claims are thus preempted.  Contrary to Eastman's suggestion, the plaintiffs do not appear to have alleged that "Eastman should have provided toxicity studies to accompany their MSDS."  See Eastman Mem., p. 15.  Rather, the plaintiffs present evidence that Eastman possessed certain information about the toxicity and corrosivity of MCHM, but omitted the information from the MSDS that was prepared for the chemical and given to Freedom.

There is some evidence in an internal product profile suggesting that Eastman knew of potential hazards posed by its chemical.  See Plaintiffs' Ex. 2, Special Materials Business Unit ("SMBU") Product Profile (indicating that Eastman was aware that MCHM might have corrosive properties).  Such information is of the kind that may be required for the MSDS relating to MCHM by the HazCom Standard.  In particular, 29 C.F.R. § 1910.1200(g)(2) and 1910.1200, Appendix D, require chemical manufacturers to include "at least" information on "handling and storage" such as "precautions for safe handling" and "conditions

for safe storage, including any incompatibilities." See App'x D, "Safety Data Sheets (Mandatory)." However, this information appears not to have been included in the MCHM MSDS. See Eastman Mot., Ex. H, MCHM MSDS. Instead, the MSDS states, in the relevant section, only that buyers should "[k]eep container closed," and nothing more. See id. at p. 3. If, as the plaintiffs and their experts claim, Eastman's MCHM was highly corrosive of carbon steel, this information was required under the provisions of Appendix D; on the other hand, if, as Eastman and its experts maintain, there was no appreciable risk of corrosion posed by MCHM, then the information would naturally not need to be included. Resolution of this question requires expert testimony and a decision by the fact-finder.

Along the same lines, each shipment of MCHM from Eastman to Freedom came with a "certificate of analysis," which was used, separately from the MSDS, to report the chemical constituents of each shipment of MCHM. See Resp. Ex. 13, Certificates of Analysis. Yet, the certificates available in the record list ingredient percentages by weight that consistently add up to less than 100 percent. When viewed in the light most favorable to the non-moving party, this creates a reasonable inference that some chemical or amount of chemical escaped detection and measurement.

9

B. Duty and proximate causation

In West Virginia, negligence is defined as "the violation of the duty of taking care under the given circumstances."[2] Syl. Pt. 7, Strahin v. Cleavenger, 216 W. Va. 175 (2004) (quoting Syl. Pt. 1, Dicken v. Liverpool Salt & Coal Co., 41 W. Va. 511 (1895)). The inquiry "is not absolute," but rather "relative to some circumstances of time, place, manner, or person." Id.

It is well known that "[t]he resolution of any question of tort liability must," in the first instance, "be premised upon [a] duty owed by the tortfeasor." Aikens v. Debow, 208 W. Va. 486, 490 (2000); see also id. ("[T]o establish a prima facie case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff.") (citing Syl. Pt. 1, Parsley v. General Motors Acceptance Corp., 167 W. Va. 866 (1981) (same)). "The ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. The test is, would the ordinary man in

---

[2] Ordinary negligence and gross negligence generally require proof of the same basic elements, differing only in the degree of actionable inattention on the defendant's part. See Wood v. Shrewsbury, 117 W. Va. 569, ---, 186 S.E. 294, 297 (1936) (Where the plaintiff seeks to establish gross negligence, he must present "affirmative proof tending to magnify the negligence.").

the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?" Syl. Pt. 3, Hersh v. E-T Enters., 232 W. Va. 305 (2014) (citing Syl. Pt. 3, Sewell v. Gregory, 179 W. Va. 585 (1988)). Eastman's position is that "[a]ny duty to warn . . . was the sole obligation of Freedom Industries . . . since Crude MCHM was not the product released into the Elk River." Eastman Mem., p. 6.

The plaintiffs must also present evidence of proximate causation. See Morningstar v. Black & Decker Mfg. Co., 162 W. Va. 857, 883 (1979); see also Ilosky v. Michelin Tire Corp., 172 W. Va. 435, 441 (1983) ("[I]n order to fix liability on the manufacturer" of a hazardous product, the alleged failure to warn must be shown to have proximately caused the plaintiff's injury). In West Virginia, the proximate cause of a tortious injury is defined as "the last negligent act contributing to the injury and without which the injury would not have occurred." Syl. Pt. 5, Hartley v. Crede, 140 W. Va. 133 (1954) (overruled on other grounds by State v. Kopa, 173 W. Va. 43 (1983)); see also Mays v. Chang, 213 W. Va. 220 (2003) (stating same). Cast in different terms, "[o]ne requisite of proximate cause is an act or omission which a person of ordinary prudence could reasonably foresee might naturally or probably produce an

11

injury, and the other requisite is that such act or omission did produce the injury." Syl. Pt. 4, McCoy v. Cohen, 149 W. Va. 197 (1965). However, "[a] party in a tort action is not required to prove that the negligence of one sought to be charged with an injury was the sole proximate cause of the injury." Syl. Pt. 2, Everly v. Columbia Gas of West Virginia, Inc., 171 W. Va. 534 (1999) (emphasis supplied).

The court notes, first, that to some extent the parties seem to be talking past each other in their briefing on these issues. Eastman frames the issue in its pending motion in terms of the duty to warn the public generally or the rather large group of plaintiffs specifically, about the dangers of MCHM. See, e.g. Eastman Mem., pp. 1-4. The plaintiffs, on the other hand, frame the issue in terms of Eastman's duty to warn Freedom about the dangers of corrosivity, among other properties, of MCHM. See Resp., p. 1 ("Eastman's primary negligence in the fault phase of this trial is its negligence associated with its failure to warn Freedom Industries of the corrosive nature of MCHM."). The operative complaint, in turn, alleges that Eastman "failed to properly characterize and warn the class members of the adverse health effects of Crude MCHM," Amended Compl. ¶ 151, but also that "Eastman failed to adequately warn about the . . . need for proper practices in

12

the storage and handling of Crude MCHM it . . . sold," id. at ¶ 232.

Eastman asserts that "Shurflot, although it was made with [Eastman's] Crude MCHM, was Freedom's product, with its own chemistry and its own MSDS." Eastman Mem., p. 10. Eastman claims that it provided Freedom with a sufficiently informative MSDS for MCHM, that it thereby satisfied its obligations, and that any remaining problems with Shurflot are causally removed from Eastman's responsibility. See id. at pp. 10-11. In short, the essence of Eastman's argument is that, because the Freedom product Shurflot, not Crude MCHM, leaked into the river, Eastman owed no duty to warn the plaintiffs of the leak, nor did Eastman proximately cause the injuries to the plaintiffs. Any duty Eastman owed to Freedom, Eastman asserts, was satisfied by Eastman's provision of the MSDS for MCHM. The MSDS for MCHM that Eastman provided to Freedom, however, contains no mention of any potentially corrosive nature of MCHM. The court has ruled, in a separate order in this case, that factual issues remain for resolution at trial on the question of whether MCHM is corrosive of carbon steel and, if so, to what extent MCHM contributed to the leak of Tank 396. In view of that ruling, the court concludes that there are genuine factual disputes regarding Eastman's duty to warn Freedom respecting a corrosive

nature of MCHM, the adequacy of the MSDS, and whether Eastman proximately caused the injury to plaintiffs. Consequently, summary judgment is not appropriate on this basis.

### C. Sophisticated User

Seeking to avoid this result, Eastman asserts that it is shielded from liability by the "sophisticated user" and closely related "bulk supplier" doctrines. See Eastman Mem., p. 11. These doctrines are an exception to the general rule imposing a common law duty upon manufacturers to warn end users about the hazardous nature of their products. See Roney v. Gencorp, 654 F. Supp. 2d 501, 507 (S.D. W. Va. 2009) (Chambers, J.) (citing, inter alia, Ilosky, 172 W. Va. at 607-08, 611 n. 8).

The sophisticated user doctrine is based on language found in official comment "n" to Section 388 of the Restatement (Second) of Torts. See Pl. Resp., p. 10; see also Roney, 654 F. Supp. 2d at 503-04 (referring several times to Section 388). According to Section 388 itself, liability for physical harm to the user of a hazardous chattel will attach to the manufacturer of a hazardous chattel where the manufacturer: (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, (b) has no reason to believe that those for whose use the chattel is supplied will

14

realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition. See Restatement (Second) of Torts § 388. The sophisticated user exception is an inversion of the second consideration referred to immediately above applicable where the manufacturer reasonably relies on its customer to generate or pass on warning to the end-user. Roney, 654 F. Supp. 2d at 505 (citing Goodbar v. Whitehead Bros., 591 F. Supp. 552 (W.D. Va. 1984) (observing same) (aff'd by Beale v. Hardy, 769 F.2d 213 (4th Cir. 1985))).

The West Virginia Supreme Court of Appeals has not expressly adopted the sophisticated user doctrine, although in Roney the district court concluded that the West Virginia Supreme Court likely would adopt the defense in applying comment n to § 388 of the Restatement (Second) of Torts. 654 F. Supp. 2d at 507. Nonetheless, the court believes that the sophisticated user doctrine is inapplicable in situations where, as here, members of the public are unintentionally exposed to hazardous chemicals. Eastman supplied MCHM to Freedom for the production of Shurflot, a chemical marketed to coal companies for the purposes of cleaning coal. Eastman's invocation of the doctrine rests on the novel characterization and treatment of members of the public involuntarily exposed to Shurflot, as if they were "end-users" of the product. In the limited instances in which

15

courts in West Virginia have addressed the sophisticated user defense, the end-users of the alleged tortfeasor's product were either the ultimate purchasers of the product, see Ilosky, 172 W.Va. at 439, or employees of the purchaser exposed to the product through their work, see Roney, 654 F. Supp. 2d at 502. Though it may be that an employee's exposure to a hazardous product is accidental or unwitting, the sophisticated user doctrine can apply in those situations because a manufacturer may reasonably believe the employer will act to protect employees from hazards. See id. at 506, discussing Willis v. Raymark Industries, Inc., 905 F. 2d 793, 797 (4th Cir. 1990). There is no such expectation as to the public at large.

Moreover, Eastman could not in any event benefit from the sophisticated user doctrine even if it applied, unless Eastman gave appropriate notice to Freedom of the hazards of MCHM, or Freedom was sufficiently aware of the hazards as to generate and pass on a warning itself. See id. at 506-507. Genuine questions of material fact remain that preclude summary judgment as to both of these issues, neither of which can be determined at this stage.[3]

---

[3] The court notes that the bulk supplier defense is designed to relieve a supplier of a duty to warn the end-users of a product where the supplier has provided warnings to the intermediary purchaser. See Roney 654 F. Supp. 2d at 507, citing Goodbar,

16

IV.   <u>Conclusion</u>

For the foregoing reasons, the court ORDERS that the motion for summary judgment, Document No. 756, filed by defendant Eastman Chemical Company on May 10, 2016, be, and it hereby is, denied.

The Clerk is requested to transmit copies of this order to all counsel of record and any unrepresented parties.

DATED: September 26, 2016

John T. Copenhaver, Jr.
United States District Judge

---

591 F. Supp. at 557.  Eastman's motion relating to the bulk supplier defense fails for similar reasons.