UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CRYSTAL GOOD, individually and as
parent and next friend of minor children
M.T.S., N.T.K., and A.M.S.,
and MELISSA JOHNSON,
individually and as parent of her unborn child,
MARY LACY and JOAN GREEN and JAMILA AISHA OLIVER,
WENDY RENEE RUIZ and KIMBERLY OGIER and ROY J. McNEAL and
GEORGIA HAMRA and MADDIE FIELDS and BRENDA BAISDEN, d/b/a
FRIENDLY FACES DAYCARE, and ALADDIN RESTAURANT, INC., and
R. G. GUNNOE FARMS LLC, and DUNBAR PLAZA, INC.,
d/b/a DUNBAR PLAZA HOTEL,
on behalf of themselves and all others
similarly situated,

          Plaintiffs,

v.                                    Civil Action No. 14-1374

AMERICAN WATER WORKS COMPANY, INC., and
AMERICAN WATER WORKS SERVICE COMPANY, INC., and
EASTMAN CHEMICAL COMPANY and
WEST VIRGINIA-AMERICAN WATER COMPANY,
d/b/a WEST VIRGINIA AMERICAN WATER, and
GARY SOUTHERN and DENNIS P. FARRELL,

          Defendants.


MEMORANDUM OPINION AND ORDER

          Pending are two motions for partial summary judgment,

each on the issue of the economic loss doctrine.  One is filed

jointly by defendants American Water Works Service Company, Inc.

("Service Company"), West Virginia-American Water Company ("WV

American"), and now dismissed defendant American Water Works

Company, Inc. ("American") (collectively, "the water company

defendants") on May 10, 2016.  The other is filed by defendant Eastman Chemical Company ("Eastman") on the same date.

## I.  Factual and procedural background

### A.  The Incident

On January 9, 2014, approximately 300,000 residents in Charleston, West Virginia, and the surrounding area suffered an interruption in their water supply.  The interruption was caused by a spill into the Elk River of a mixture composed primarily of a chemical known as Crude MCHM, sold and distributed exclusively by Eastman.  Crude MCHM consists primarily of the chemical 4-methylcyclohexane methanol.  The mixture was prepared and owned by and being stored in a facility owned and operated by Freedom Industries, Inc. ("Freedom Industries").  Freedom Industries called the mixture that spilled into the Elk River "Shurflot 944" and marketed it to coal companies for coal cleaning purposes.  Shurflot 944 mixed Crude MCHM with other elements, present in relatively small proportion.  The mixture containing Crude MCHM infiltrated and contaminated the WV American water treatment plant in Charleston, known as the Kanawha Valley Treatment Plant ("KVTP"), which draws its water from the Elk River.

2

Following the spill, the water company defendants issued a "do not use" order to all affected customers, advising them not to use water in affected areas for any purpose other than fire control or flushing toilets.  See Eastman Mem. in Supp. of Mot. for Summ. J., ECF No. 720 (hereinafter "Eastman Mem.") Ex. A ("do-not-use" order).  In addition, water company customers were notified that their water pipes, water heaters, and any other water-bearing appliances should be flushed, according to instructions, in order to remove Crude MCHM.  See Pls.' Mem. in Opp. to Eastman's Mot. for Summ. J., ECF No. 810 (hereinafter "Pl. Resp. Eastman") Ex. 1 (flush notice).  The flushing notice further advised that all water filters should be discarded and replaced.  Id.

B.   "Wage-earner" plaintiffs' claims against

the water company defendants

The motion of the water company defendants seeks summary judgment barring the claims of Maddie Fields and wage earners like her by application of the economic loss rule. Certain class members – those seeking recovery of lost wages incurred during the period that the "do not use" order was in effect – brought claims against the water company defendants to recover wages lost during the temporary closures of their places

3

of employment following the spill.  <u>See</u> First Am. Consolidated Class Action Compl. ¶ 129 (hereinafter "Compl.").

Earlier, WV American and the Service Company moved to dismiss, among other things, the wage earners' claims on the ground that they were barred by the economic loss rule.  <u>See</u> Defs.' Mem. in Supp. of Mot. to Dismiss Pls.' Compl., ECF. No. 194.  In an order entered on June 3, 2015, at the motion to dismiss stage of this case, the court observed that the wage earners' claims would be barred by the economic loss rule, as set out in <u>Aikens v. Debow</u>, 208 W. Va. 486 (2000), in the absence of a "special relationship" with the water company defendants.  Mem. Op. and Order 14, ECF No. 378 ("<u>Aikens</u> stands for the principle that an individual who sustains purely economic loss due to another's negligence can only recover, when there is neither a contract nor physical harm to person or property, when some special relationship exists between the parties.").  In opposition to the motion to dismiss, plaintiffs contended that, among other things, sections 24-3-1 and 24-4-7 of the West Virginia Code created such a relationship.  Although the court found that there were "arguably . . . indicia of a special relationship" created by section 24-3-1 and 24-4-7, the court found the issue unresolvable at the Rule 12(b)(6) juncture.  <u>See id.</u> 13-22.  The water company defendants have

filed a motion for summary judgment asserting the same grounds.

The court certified an issues class for trial in order to determine liability on October 8, 2015.  The class consists of three groups of plaintiffs, each of which having claims that arose on January 9, 2014 as a result of the loss of potable water.  These groups are (1) "persons residing in dwellings supplied tap water by KVTP," (2) "persons or entities who owned businesses operating in real property supplied tap water by KVTP," (3) and "persons who were regularly employed as hourly wage earners for business that operated in real property supplied tap water by KVTP."  <u>See</u> Mem. Op. and Order 59, ECF No. 470 (hereinafter "Certification Order").  Significantly, the latter group's damages involve only economic losses, with respect to which the water company defendants move for summary judgment.

### C.   <u>Plaintiffs' claims against Eastman</u>

Plaintiffs allege numerous failures on Eastman's part in its manufacturing, testing, and distribution of Crude MCHM. <u>See</u> Compl. ¶¶ 28, 39, 57-81.  In particular, plaintiffs contend that Eastman failed to warn of the dangers posed by a release of Crude MCHM, mischaracterized the environmental and health risks

posed by it, and sold the chemical to an untrustworthy facility situated upstream from a municipal water supply.  <u>Id.</u> ¶¶ 57-81.

On October 8, 2015, the court entered an order granting in part plaintiffs' motion for class certification. Among other things, the court ruled that the "plaintiffs . . . satisfied their burden to demonstrate the Rule 23(a) factors as to the issues of fault and comparative fault," and that plaintiffs' "proposed liability issue certification [was] appropriate under Rule 23(c)(4)."[1]  Certification Order 46, 48. Some class members are businesses that claim lost revenue from the interruption in water service caused by the spill, Compl. ¶¶ 10, 21-24, while others suffered physical injuries or property damage caused by the spill, <u>see id.</u> ¶¶ 11-19.  All claim to have incurred costs for water replacement, travel, and other expenses.  <u>See id.</u> ¶ 8.  Plaintiffs make no claim against Eastman for wage-earner plaintiffs such as Maddie Fields.

Earlier, Eastman filed a motion to dismiss, in which it challenged, in pertinent part, Counts 1, 3, 7, and 11 (negligence), and 13 and 14 (strict liability) of the operative complaint on the ground that those claims were barred by the

---

[1]  The court denied plaintiffs' request for the certification of a Rule 23(b)(3) damages class, as well as plaintiffs' request to certify for class treatment the issue of punitive damages.  <u>See</u> Mem. Op. and Order 39, 42, ECF No. 470.

common law rule against recovery of purely economic losses in tort.  <u>See</u> Eastman Mot. 1.  In its order of June 4, 2015, the court denied that part of Eastman's motion inasmuch as it was "unclear that purely economic losses [we]re at issue."  <u>See</u> Mem. Op. and Order 8-9, ECF No. 379 (observing that plaintiffs had alleged various personal injuries and property damage).  As noted, Eastman has now filed a motion seeking summary judgment based on the economic loss rule.

## II.   <u>Standard governing motions</u>

### <u>for summary judgment</u>

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to establish the elements of a party's cause of action.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.</u>, 597 F.3d 570, 576 (4th Cir. 2010) (same).  A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party.  <u>Anderson</u>, 477 U.S. at 248.

At bottom, a party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find for the non-moving party.  <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).  Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at 248.

### III.  <u>Discussion</u>

The economic loss rule is meant to prevent the possibility of unlimited liability to remote and unforeseeable parties.  <u>See</u> <u>Eastern Steel Constr., Inc. v. City of Salem</u>, 209 W. Va. 392, 398 (2001).  It is an extension of the basic principle that, "[i]n order to establish a <u>prima facie</u> case of negligence . . . it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff."  Syl. Pt. 3, <u>Aikens</u>, 208 W. Va. at 488.

In <u>Eastern Steel</u>, the Supreme Court of Appeals of West Virginia summarized the development of the doctrine by reference to <u>Aikens</u>:

> Having established the existence of a well settled
> general rule against permitting recovery in negligence
> for purely economic damages, however, the <u>Aikens</u> Court
> acknowledged that a minority of jurisdictions have

8

permitted such recovery "under certain limited circumstances." 208 W. Va. at 497, 541 S.E.2d at 587. After a thorough review of case law from jurisdictions strictly adhering to the general rule of no economic recovery, as well as that from jurisdictions that have developed and applied exceptions to that general rule in order to permit economic recovery, we expressed "our belief that a hybrid approach must be fabricated to authorize recovery of meritorious claims while simultaneously providing a barrier against limitless liability."

Eastern Steel, 209 W. Va. at 398.   West Virginia law, then,

recognizes a limited middle pathway, between "limitless

liability" and no liability, where "meritorious claims" of

economic loss arise.

       The economic loss rule was stated by the Supreme Court

of Appeals in Aikens as follows:

[A]n individual who sustains purely economic loss from an interruption in commerce caused by another's negligence may not recover damages in the absence of physical harm to that individual's person or property, a contractual relationship with the alleged tortfeasor, or some other special relationship between the alleged tortfeasor and the individual who sustains purely economic damages sufficient to compel the conclusion that the tortfeasor had a duty to the particular plaintiff and that the injury complained of was clearly foreseeable to the tortfeasor.

Aikens, 208 W. Va. at 499.   In other words, a negligence action

to recover economic losses cannot, in the absence of a

contractual relationship, be sustained unless there is either

(1) actual, physical harm to the plaintiff or his property,

9

along with the economic harm, or (2) some "special relationship" between the plaintiff and defendant.  Under West Virginia law,

> [t]he existence of a special relationship will be determined largely by the extent to which the particular plaintiff is affected differently from society in general. It may be evident from the defendant's knowledge or specific reason to know of the potential consequences of the wrongdoing, the persons likely to be injured, and the damages likely to be suffered. <u>Such special relationship may be proven through evidence of foreseeability of the nature of the harm to be suffered by the particular plaintiff or an identifiable class and can arise from contractual privity or other close nexus</u>.

<u>Id.</u> (emphasis added).

### A.  <u>The water company defendants' motion for summary judgment</u>

Wage-earner class representative Maddie Fields "was employed as a crew member at an Arby's restaurant" in Cross Lanes, West Virginia, during the time period immediately following the spill.  <u>See</u> Water Company Defs.' Mem. in Supp. of Mot. for Summ. J. 2, ECF. No. 742 (hereinafter "Water Mem."); <u>see also</u> Water Mem. Ex. A., at 48 (Fields Dep.).  Ms. Fields is a resident of St. Albans, West Virginia, and is not a customer of any of the water company defendants.  Water Mem. 8, 13-14; <u>see also</u> Compl. ¶ 20.  It is undisputed that Ms. Fields was not physically harmed by the spill and suffered no property damage.  <u>See</u> Pls.' Resp. to Water Mot. for Summ. J. 2, ECF. No. 815 (hereinafter "Pl. Resp. Water Defs.") (conceding the foregoing).

Rather, Ms. Fields seeks to recover lost wages from the water company defendants on the theory that they breached their contractual obligation to her employer – a public utility customer - to provide potable water, as a result of which she was unemployed while Arby's was closed.  <u>See</u> Water Mem. 2; Compl. ¶ 20.  Maddie Fields' employer had a public utility contract with WV American.  <u>Id.</u>  Although not physically harmed by the spill, the "wage-earner" class suffered financial loss when their places of employment were closed during the period that the "do not use" order was in effect.

The water company defendants assert that <u>Aikens</u> stands for the proposition that the economic loss rule limits recovery from a public utility exclusively to customers of that utility. <u>See</u> Water Mem. 5.  <u>Aikens</u>, however, did not reach so far.  As stated by the <u>Aikens</u> court, "[t]he sole issue presented . . . is whether economic loss from an interruption in commerce in the absence of damage to a plaintiff's person or property is recoverable in a tort action."  208 W. Va. at 493.  Though the court acknowledged that "a contractual relationship with the alleged tortfeasor" would be sufficient, the court noted that a special relationship could exist even in the absence of a contract.  <u>Id.</u> at 499 (referring to "a contractual relationship . . . or <u>some other special relationship</u>" (emphasis added)).

11

In the absence of a contract or physical injury to persons or property, "[t]he common thread which permeates the analysis of potential economic recovery . . . is the recognition of the underlying concept of duty created by the existence of some 'special relationship.'" <u>Aikens</u>, 208 W. Va. at 500. Whether a special relationship exists is a question of law, to be determined "largely by the extent to which the particular plaintiff is affected differently from society in general." <u>Aikens</u>, 208 W. Va. at 499. A special relationship "may be proven through evidence of foreseeability of the nature of the harm to be suffered by the particular plaintiff or an identifiable class and can arise from contractual privity or other close nexus." <u>Id.</u> "[T]he existence of a special relationship between two parties 'will differ depending upon the facts of each relationship[.]'" <u>White v. AAMG Constr. Lending Ctr.</u>, 226 W. Va. 339, 347 (2010) (<u>quoting</u> <u>Aikens</u>, 208 W. Va. at 500). In <u>Eastern Steel</u>, for instance, the court found that an architect owed a duty to a contractor building the architect's design for a third party, although the architect and the contractor were not in contractual privity, due to the special relationship created by the contractor's necessary and foreseeable reliance on the architect's work. <u>See</u> 209 W. Va. at 401.

Here, plaintiffs claim that a special relationship between the wage earners and the water company defendants exists by operation of two statutes, namely, sections 24-3-1 and 24-4-7 of the West Virginia Code.  <u>See</u> Pl. Resp. Water Defs. 2-3. Section 24-3-1 provides, in relevant part, as follows:

> Every public utility . . . shall establish and maintain adequate and suitable facilities, safety appliances or other suitable devices, and shall perform such service in respect thereto as shall be reasonable, safe and sufficient for the security and convenience of the public. . . .

W. Va. Code § 24-3-1.  Section 24-4-7, in turn, provides that:

> <u>Any person</u> . . . claiming to be damaged by any violation of this chapter by any public utility subject to the provisions of this chapter, may . . . bring suit in his own behalf for the recovery of the damages for which such public utility may be liable under this chapter in any circuit court having jurisdiction. . . .

W. Va. Code § 24-4-7 (emphasis added).  The water company defendants maintain that section 24-4-7 permits an action under section 24-3-1 only by "customers" of the relevant utility, bound to it by contract, as would be the case at common law, but not by any person generally.  <u>See</u> Water Mem. 5-7.  However, the Supreme Court of Appeals has given section 24-4-7's reference to "any person" its ordinary meaning, without further comment or qualification, in an instance where the complainant was not a customer.  <u>See, e.g.</u>, <u>Cmty. Antenna Serv., Inc. v. Charter</u>

Commc'ns VI, LLC, 227 W. Va. 595, 603 (2011) ("Chapter 24
permits any 'person, firm or corporation,' damaged by a public
utility's violation of the duties created by Chapter 24, to
bring a suit for the recovery of the damages in any circuit
court.").

          The text and history of the various provisions in
Chapter 24 tend to support a broader reading than that
championed by the defendants.  As the court observed in an
earlier order, the substance of section 24-4-7 first appeared in
the West Virginia state code in 1913.  The term "customer,"
however, was added to section 24-1-2, Chapter 24's definitions
section, only in 1978.  That definition reads as follows:

> Whenever used in this chapter, "customer" shall mean and
> include any person, firm, corporation, municipality,
> public service district or any other entity who
> purchases a product or services of any utility and shall
> include any such person, firm, corporation,
> municipality, public service district or any other
> entity who purchases such services or product for
> resale.

W. Va. Code § 24-1-2 (emphasis added).  In the decades since the
introduction of "customer" into Chapter 24, the term propagated
rapidly, and was added to one section as recently as 2006.  Yet,
"customer" has not been added to section 24-4-7, so as to cabin
its reach, in the more than one hundred years since that
section's enactment, despite changes to similar language

elsewhere in Chapter 24.  Section 24-4-7 instead continues to refer to "any person," without any apparent requirement for contractual privity.

The water company defendants assert that section 24-3-1 cannot create or expand substantive duties beyond those provided for by common law.  <u>See</u> Water Mem. 16 (citing <u>Nichol v. Huntington Water Co.</u>, 53 W. Va. 348 (1903)).  Instead, they say that the statute can only codify preexisting common law rules. <u>See</u> <u>id.</u> 14-15 (quoting <u>Chesapeake & O. Ry. v. Pub. Serv. Comm'n</u>, 75 W. Va. 100 (1914) ("At common law . . . railroad companies . . . owe to [the public] certain duties, performance of which they cannot evade. . . .  Such duties have always existed.")).

To be sure, "[t]he common law is not to be construed as altered or changed by statute," as plaintiffs would have the court do, "unless legislative intent to do so be plainly manifested."  Syl. Pt. 4, <u>Seagraves v. Legg</u>, 147 W. Va. 331 (1962) (citing <u>Shifflette v. Lilly</u>, 130 W. Va. 297 (1947)); <u>cf.</u> <u>Phillips v. Larry's Drive-In Pharm.</u>, 220 W. Va. 484 (2007).  But that intent is manifested here by the legislature's continued use of the term "any person" rather than the narrower, yet more frequently used, word "customer."

At base, Section 24-4-7 provides for tort-based

15

statutory claims by "any person" to enforce the standard set forth, in this case, by section 24-3-1.  See W. Va. Code § 24-4-7.  The unqualified clarity of the reference to "any person," however, is precisely what defeats any attempt to characterize the general right of action in section 24-4-7 as a special relationship.  While the right of action is a kind of relationship, a right of action guaranteed to "any person" is general and not specific.  It cannot be that just any person who claims economic injury as a result of the KVTP spill can recover under the "special relationship" exception, for such a relationship would be, by definition, not special.  Consequently, section 24-4-7 cannot generate the type of special relationship contemplated by the economic loss rule in West Virginia.

        Yet, even if the statute does not generate a special relationship, other characteristics of the "wage-earner" class may.  The foreseeability of harm determines whether a special relationship exists in West Virginia, if there is a "close nexus" between the plaintiff and the other parties involved in the tort.  Aikens, 208 W. Va. at 499 (a "special relationship may be proven through evidence of foreseeability of the nature of the harm to be suffered by the particular plaintiff or an identifiable class and can arise from contractual privity or

16

other close nexus").  The Aikens court expressly declined to
elaborate further on the "parameters" of such a relationship
because, it noted, to do so "would create more confusion than
clarity."  Id.  Plaintiffs aptly argue that "the loss of wages
of those employed by WVAW's customers is entirely foreseeable."
Pl. Resp. Water Defs. 5.  But that is not enough where, in the
absence of contractual privity, a close nexus is required.

        The wage-earner plaintiffs have an employment
relationship with businesses directly affected by the spill.
The Aikens court observed that "courts have generally recognized
that public policy and social considerations, as well as
foreseeability, are important factors in determining whether a
duty will be held to exist in a particular situation."  208 W.
Va. at 493 (emphasis removed) (quoting Harris v. R.A. Martin,
Inc., 204 W. Va. 397, 403 (1998) (Maynard, J. dissenting),
abrogated by Aikens, 208 W. Va. 486).  Aikens involved an
incident where a passing truck driver struck a highway bridge,
causing the bridge to close and resulting in the loss of
customers for a nearby restaurant/motel owner.  208 W. Va. at
488.  The court denied recovery to the restaurant/motel owner
and found that a "close nexus" had not existed between the
plaintiff and the alleged tortfeasor.  Id. at 498.

        The West Virginia Supreme Court of Appeals has shown

17

little inclination in practice to extend exceptions to the economic loss rule beyond close relationships between a specific, particularized plaintiff and the tortfeasor, as found in Eastern Steel, 209 W. Va. at 395 (architect and contractor involved on designing and building the same structure), and Glascock v. City Nat. Bank of W. Virginia, 213 W. Va. 61, 65 (2002) (lender bank that maintained oversight of construction had special relationship with borrower that required bank to reveal to borrower lapses in the quality of the construction).

Importantly, the Aikens court did discuss instances in which other courts have found liability for purely economic loss in the oil spill context, citing In re Exxon Valdez. Id. at 492-93 (quoting In re Exxon Valdez, No. A89-0095-CV (HRH), 1994 WL 182856, at *6 (D. Alaska Mar. 23, 1994), aff'd, 104 F.3d 1196 (9th Cir. 1997)). The Exxon Valdez litigation involved the application of a "limited exception" to the economic loss rule for fishermen, a traditional exception developed by the Ninth Circuit in earlier oil spill litigation that recognized the importance of a healthy marine environment to the functioning of fisheries. See 1994 WL 182856, at *5; Union Oil Co. v. Oppen, 501 F.2d 558, 565-70 (9th Cir. 1974) (recognizing liability to fishermen for "lost profits" because oil company was "the best cost-avoider"). Unlike the case at bar, however, the rule

18

applied in the Exxon Valdez litigation had a foundation in maritime traditions that had long protected fishermen.  See, e.g., Carbone v. Ursich, 209 F.2d 178, 182 (9th Cir. 1953) (noting that "seamen are the favorites of admiralty").

Similarly, the Fourth Circuit has upheld liability for lost profits in the case of fishermen on a fishing voyage truncated by a ship-to-ship collision.  Yarmouth Sea Prod. Ltd. v. Scully, 131 F.3d 389, 397-99 (4th Cir. 1997).  Yet, the court distinguished these fishermen from wage earners in other contexts, including dredge workers at shipyards who were "compensated on the basis of a fixed wage scale."  Id. at 398. Unlike dredge workers, the fishermen in Yarmouth were on a lay, meaning that they had "invest[ed] in a voyage . . . [and] they [were] typically paid a percentage of the profits."  Id.  Wage earners like Maddie Fields, of course, were neither traditionally dependent (as fishermen or otherwise) on the fruits of the sea or rivers, nor is there evidence that they were co-investors or joint-venturers in the businesses in which they were employed.

Lifting the economic loss rule for the benefit of the wage-earner plaintiffs would merit recovery as well for a host of others.  The list would include salesmen on commission who make sales of goods and supplies to the affected businesses for

19

whom the wage earners work, along with the supplier of such goods and supplies who will have lost profits from the sales not made by virtue of the shutdown.  It would also include the gas and electric utilities who lost the sale of their products, as well as landlords entitled to a percentage of total sales as rent, and doubtless many others.

The court's responsibility in such an instance as this is aptly stated by the West Virginia Supreme Court of Appeals in its conclusion in Aikens:

> Tort law is essentially a recognition of limitations expressing finite boundaries of recovery. . . .  [C]ourts and commentators have expressed disdain for limitless liability and have also cautioned against the potential injustices which might result. This Court's obligation is to draw a line beyond which the law will not extend its protection in tort, and to declare, as a matter of law, that no duty exists beyond that court-created line. It is not a matter of protection of a certain class of defendants; nor is it a matter of championing the causes of a certain class of plaintiffs. It is a question of public policy. Each segment of society will suffer injustice, whether situated as plaintiff or defendant, if there are no finite boundaries to liability and no confines within which the rights of plaintiffs and defendants can be determined. We accept the wise admonition expressed over a century ago, in language both simple and eloquent, proven by the passage of time and the lessons of experience: "There would be no bounds to actions and litigious intricacies, if the ill effects of the negligences of men could be followed down the chain of results to the final effect."  [Kahl v. Love, 37 N.J.L. 5, 8 (Sup. Ct. 1874).]

20

208 W. Va. at 502.

The wage-earner plaintiffs have not shown that there is a sufficiently "close nexus" between them and WV American, the utility company, to justify the application of the "special relationship" exception.  As a result, wage earners like Maddie Fields do not have a cognizable claim for economic loss against the water company defendants, and the water company defendants' motion for partial summary judgment as to the wage earners must be granted.[2]

## B.  Eastman's motion for summary judgment

The court's October 8, 2015 order granted plaintiffs' request for Rule 23(c)(4) issue class certification on the fault and comparative fault issues for claims resulting from plaintiffs' "common water loss experience."  Certification Order 46-48.  Eastman asserts that plaintiffs intentionally excluded all non-economic categories of damages, namely, those stemming from personal injury or property damage.  See Eastman Mem. 3-6.  According to Eastman, the only damages sought in the certified claims are purely economic in character, and because no special relationship binds Eastman and plaintiffs, plaintiffs' claims

---

[2] American's motion to dismiss has been granted by a separate order dated September 26, 2016.

are barred by the economic loss rule.  See id. 7, 10.

Plaintiffs, in their response, challenge Eastman's interpretation of the certification briefing and order.  See Pl. Resp. Eastman 1-3.  Additionally, they point to evidence in the record showing that Eastman's Crude MCHM physically invaded plaintiffs' persons or property, and therefore caused plaintiffs to suffer class-wide, non-economic injuries.  See id. 1-4. Consequently, plaintiffs contend that the economic loss rule is inapplicable to this case.  Id. 1-3, 4-7.  As earlier noted, plaintiffs make no claims against Eastman for wage-earner plaintiffs such as Maddie Fields.

In an ordinary negligence action, the plaintiff will be denied recovery for economic losses that result solely because of the defendant's negligence to a third person, with resulting business losses to the plaintiff that are unaccompanied by some injury to person or property.  See, e.g., Local Joint Exec. Bd. of Las Vegas Culinary Workers Union, Local No. 226 v. Stern, 651 P.2d 637, 637 (Nev. 1982) (union could not recover lost union dues, which were not collected due to fire that caused members' unemployment, from designers of building). In the products liability context, if the only property that was damaged was the product at issue, the plaintiff typically cannot recover for economic loss against the manufacturer except on a

contract theory.  See East River S.S. Corp. v. Transamerica
Delaval, Inc., 476 U.S. 858, 859-60 (1968) (whether under a
negligence theory or a strict liability theory, no products
liability claim lies in admiralty when a commercial party
alleges injury only to the product itself resulting in purely
economic loss).

On the other hand, any tort can potentially result in
the plaintiff suffering some financial loss - a battery causes
medical expenses and lost wages; a trespass leads to a reduction
in value or necessitates costly repairs, and so on.  In such
cases, the economic harm is merely an item of damages resulting
from a personal or a property tort, and the economic loss rule
is inapposite.  See, e.g., Bayer CropScience LP v. Schafer, 385
S.W. 3d 822, 832 (Ark. 2011) (economic loss rule inapplicable
where plaintiff farmers showed that defendant caused physical
harm to their land, crops, and farming equipment).  The result
is the same if the defendant causes an interruption of service
that causes actual physical harm to the plaintiff's person or
property.  Consol. Aluminum Corp. v. C.F. Bean Corp., 772 F.2d
1217, 1222-23 (5th Cir. 1985) (action for physical losses, as
well as attendant economic damages, could be maintained by plant
owner for dredge operator's alleged negligence in rupturing
pipeline and thereby damaging plant equipment).

23

Here, the record reflects that class members who are customers of the water company defendants and whose water was supplied by the Kanawha Valley Treatment Plant ("KVTP") were advised that their water pipes, water heaters, and other appliances needed to be flushed for "health and safety" reasons, and that their water filters had to be replaced after contamination of the water supply.  See Pl. Resp. Eastman Ex. 1 (flush notice).

Each of the individual class representatives testified about the need to flush or otherwise repair plumbing in order to clear out any Crude MCHM that had infiltrated the water.  See Pl. Resp. Eastman Ex. 7 (Good Dep.), at 20; Ex. 8 (Lacy Dep.), at 46–47; Ex. 9 (Green Dep.), at 111; Ex. 10 (McNeal Dep.), at 31 (each describing the flushing process).  In addition, the record contains evidence of damage to plaintiffs' property, including bathing tubs, cookware, gaskets, and the like.  See, e.g., Good Dep. at 102; Pl. Resp. Eastman Ex. 3 (Gunnoe Dep.), at vol. II, 30.

Some plaintiffs also testified about various physical injuries caused by contamination of their water supplies with Crude MCHM.  Plaintiff Crystal Good suffered eye irritation and flu-like symptoms after exposure.  See Good Dep. at 29; see also Pl. Resp. Eastman Ex. 11 (Werntz Report) (finding Ms. Good's eye

24

symptoms to be consistent with the effects of exposure to Crude MCHM).[3]  Plaintiff Joan Green suffered worsened symptoms of a pre-existing skin condition following topical exposure to Crude MCHM in the water.  See Green Dep. at 58, 70, 90, 147. Plaintiff Mary Lacy went to the emergency room after experiencing difficulty breathing - she had inhaled vaporized Crude MCHM during a shower.  See Lacy Dep. at 53-58.  Likewise, plaintiffs Wendy Ruiz and Kim Ogier both sought medical care after developing rashes following showers taken after they had flushed their systems.  See Pl. Resp. Eastman Ex. 13 (Ruiz Dep.), at 51-70; Ex. 14 (Ogier Dep.), at 15.

As for the businesses that are class representatives, the record indicates that their injuries, too, include non-economic losses.  Plaintiff R. G. Gunnoe Farms, LLC, could not operate for some time after the spill because equipment belonging to the firm remained contaminated with Crude MCHM, even after flushing, and needed to be sanitized.  See Gunnoe Dep., at vol. I, 148.  Ms. Gunnoe, the owner of the business, testified that the facility's pipes were flushed eight times, and that after the initial flushing, several tons of

---

[3]  The West Virginia Poison Control published data indicating that thousands of other area residents called complaining of the same symptoms that Ms. Good has claimed.  See Pl. Resp. Eastman Ex. 12 (WV Poison Control Abstract).

contaminated or potentially contaminated product still had to be destroyed.  Id. at 121.  Similarly, the owner of plaintiff Aladdin's, Ayman Hossino, testified that he paid $450 to flush the business's plumbing and sanitize an ice machine.  See Pl. Resp. Eastman Ex. 4 (Hossino Dep.), at 23.  Similarly, the owner of Friendly Faces Day Care, Brenda Baisden, testified that her staff had to flush all the pipes in their building, see Pl. Resp. Eastman Ex. 5 (Baisden Dep.), at 51, and the manager of the Dunbar Motor Inn, Denise Massey, testified that her staff spent an entire day flushing toilets and counter appliances using water in the hotel's rooms, see Pl. Resp. Eastman Ex. 6 (Massey Dep.), at 8, 115.  See also id. at 89, 116 (indicating that it was necessary to replace or repair several dozen toilets and a coffee maker).

It is correct, as Eastman represents, that plaintiffs, in their briefing on class certification, stated as follows:

> Class members' claims of personal injury and other losses that are not dependent upon the common water loss experience are not proposed to be addressed as part of the class-damages trial phase.

Pls.' Mem. in Supp. of Mot. for Class Certification 6, ECF No. 414 (hereinafter "Certification Mem.").  Eastman relies on this, and other similar statements in plaintiffs' certification briefing, to support its contention that only economic losses

26

are at issue in the certified claims.  See Eastman Mem. 4-6.
Eastman claims that the "[p]laintiffs chose to confine class
certification to liability for alleged damages resulting from
purely economic losses related to the issuance of [the]
temporary 'do not use' order[.]"  Id. at p. 1.  According to
Eastman, the court "granted plaintiffs' motion for class
certification limited to the fault and comparative fault issue -
i.e., class certification concerning liability for economic
damages resulting from class-wide loss of water. . . ."  Id. at
p. 5.

        It is significant that the portions of plaintiffs'
briefing upon which Eastman relies dealt with plaintiffs'
proposed damages class.  The court declined to certify a damages
class.  See Certification Order 39 ("It is . . . ORDERED that
the motion for class certification of a damages class be, and it
hereby is, denied.").  Further, contrary to Eastman's
suggestion, the court's certification order did not limit the
liability issue class to liability concerning economic damages
only.  See id. 59.  The classes that were certified specifically
included "persons residing in dwellings supplied tap water by
KVTP" and "persons or entities who owned businesses operating in
real property supplied tap water by KVTP."  Certification Order
59.  The certified class therefore includes residents and

27

businesses supplied by the KVTP – precisely those residents and businesses who, as just discussed, allege various injuries to person and property.  This class cannot be characterized as a class involving economic damages only.

Moreover, plaintiffs' allegations against Eastman, which were addressed in the certification briefing and proposed to be determined pursuant to Rule 23(c)(4), center on Eastman's alleged negligence by failing to inspect the Freedom facility and to provide adequate warning about the corrosive nature of Crude MCHM.  <u>See</u> Certification Mem. 10, 18-19.  The essence of plaintiffs' claims is that the plaintiff's persons or property were injured by the invasion of Crude MCHM.  <u>See</u> Compl. ¶¶ 57-81.  In addition, under the circumstances there appears to be little risk that Eastman will be exposed to limitless liability here, inasmuch as plaintiffs have amassed considerable evidence of actual, physical harm to person and property.  <u>See generally</u> Pl. Resp. Eastman Exs. 1-13 (as discussed <u>supra</u>, pp. 24-27).

With respect to those plaintiffs who allege only the injury of contamination of their property, Eastman claims that they have in fact asserted a purely economic loss.  <u>See</u> Eastman's Reply Mem. in Supp. of Mot. for Summ. J. 3-6, ECF No. 895 (hereinafter "Eastman Reply").  As discussed above, West Virginia law states that "an individual who sustains purely

28

economic loss from an interruption in commerce caused by another's negligence" cannot recover damages absent injury to person or property, a contract, or some other special relationship.  <u>Aikens</u>, 208 W. Va. at 499.  Two considerations mitigate against the application of this doctrine to plaintiffs' contamination of property claims at this juncture.

First, the economic loss rule applies in the commercial context.  <u>Aikens</u> observed that the rule governs persons who suffer a loss "from an interruption in commerce." <u>Id.</u>  As has been noted, <u>Aikens</u> applied the rule to a restaurant and motel owner who alleged a loss of revenue resulting from the negligence of the driver of a truck that struck a bridge, resulting in its closure while being repaired, and in turn resulting in loss of customers for Aikens's business.  <u>Id.</u> at 488.  <u>See also</u> <u>Eastern Steel</u>, 209 W. Va. at 401 (declining to apply the economic loss rule where poor design caused delays impacting the profitability of a construction contract); <u>Philip Morris, Inc. v. Emerson</u>, 235 Va. 380, 405-06 (1988) (applying economic loss rule to a campground that lost business revenue from prospective campers when toxic gas released).  In the instant case, persons whose property was contaminated by Crude MCHM did not suffer merely from an interruption in commerce or lost earnings — though they might have suffered that as well.

Rather, plaintiffs allege injuries to two categories of property
– the water itself, and the pipes and appliances infiltrated by
the water – that plaintiffs had to remediate financially by
paying to flush their plumbing.  These alleged injuries do not
involve commercial earnings, lost profits, or the like.

Second, Eastman appears to argue that "flushing the
pipes alone" does not constitute property damage because the
"temporary" presence of contaminated water is not sufficient to
show an injury.  See Eastman Reply 3-6.  Plaintiffs view that
matter quite differently, as will be seen.

In formulating the economic loss rule, the Aikens
court discussed a case having some similarity to the instant
case that was decided by the Third Circuit, Commonwealth of
Pennsylvania v. General Public Utilities Corp.  See 208 W. Va.
at 498.  Plaintiffs in that case alleged that "radioactivity and
radioactive materials emitted during [a] nuclear incident . . .
rendered [plaintiffs' properties] unsafe for a temporary period
of time, and constituted a physical intrusion upon the
plaintiffs' properties."  Com. of Pa. v. Gen. Pub. Utils. Corp.,
710 F.2d 117, 122 (3d Cir. 1983).  The Aikens court noted that,
in General Public, "[t]he Third Circuit found that the
plaintiffs' contentions were sufficient to defeat a motion for
summary judgment, permitting the plaintiffs an opportunity to

prove that an invasion by an invisible substance may still constitute a physical damage warranting recovery of economic loss." Id. Consequently, the invisibility of a contaminant does not defeat its ability to cause injury to property, nor does it preclude the development of evidence regarding the actual nature and extent of injury.

Somewhat similarly, plaintiffs here allege that the contamination of the property, not the flushing, was the injury. See Pl. Resp. Eastman 9-10. Plaintiffs distinguish two types of contamination that occurred: contamination of the water itself, and contamination of the "pipes, water heaters, and appliances." Id. With respect to the former, plaintiffs specifically allege that Eastman caused the "contamination of the water itself," a commodity that plaintiffs purchased under their contract with WV American. Id. 9. Eastman appears to argue that "the brief passage of water" contaminated with MCHM did not constitute harm to physical property. Eastman Reply 3-6. It asserts that the "temporary presence of water" containing a harmful chemical does not constitute injury. Id. 6. Plaintiffs contend, however, that the injury was, among other things, to the water itself as their property, and that this injury required plaintiffs to remediate by flushing to obtain entirely new water. Put differently, the contamination of the water by an alien

31

substance, Crude MCHM, was precisely what injured the water –
the plaintiffs' property acquired by contract - by rendering it
unfit for its purpose.  As to plaintiffs' property generally,
the mere fact that the contamination was temporary does not
defeat an injury to property, if any there were, any more than
the brevity of an illness defeats an injury to person.

     With respect to plaintiffs' pipes, water heaters, and
appliances, there is no reason to think that because a substance
merely "passes through" property, it necessarily does not cause
injury in so doing.  The injury caused might simply be the
residue left in the pipes, leakage into adjacent joints and
seals, and the concomitant contamination of the plumbing system.
At least in theory, these injuries were real and had to be
remedied by the flushing protocol, just as, at least in theory,
injuries caused by radiation were real in <u>General Public</u>.  <u>See</u>
710 F.2d at 122.  As in <u>General Public</u>, the nature and extent of
the injury to plaintiffs' real property here as a result of
contamination must be developed further in the damages phase of
this litigation; if no injury to person or property can be
shown, plaintiffs of course cannot recover.  Damages to pipes,
water heaters, and other appliances, however, are at least
susceptible of proof.  Accordingly, Eastman's motion for partial
summary judgment must be denied.

32

## IV.   Conclusion

For the foregoing reasons, it is ORDERED that the motion for partial summary judgment filed jointly by defendants American Water Works Service Company, Inc., West Virginia-American Water Company, and now dismissed defendant American Water Works Company, Inc., on May 10, 2016, relating to the economic loss doctrine be, and it hereby is, granted.  It is further ORDERED that the motion for partial summary judgment filed by defendant Eastman Chemical Company on the same subject on May 10, 2016, be, and it hereby is, denied.

The Clerk is requested to transmit copies of this order to all counsel of record and any unrepresented parties.

DATED:  October 6, 2016

John T. Copenhaver, Jr.
United States District Judge