UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CRYSTAL GOOD, individually and as
parent and next friend of minor children
M.T.S., N.T.K., and A.M.S.,
and MELISSA JOHNSON,
individually and as parent of her unborn child,
MARY LACY and JOAN GREEN and JAMILA AISHA OLIVER,
WENDY RENEE RUIZ and KIMBERLY OGIER and ROY J. McNEAL and
GEORGIA HAMRA and MADDIE FIELDS and BRENDA BAISDEN, d/b/a
FRIENDLY FACES DAYCARE, and ALADDIN RESTAURANT, INC., and
R. G. GUNNOE FARMS LLC, and DUNBAR PLAZA, INC.,
d/b/a DUNBAR PLAZA HOTEL,
on behalf of themselves and all others
similarly situated,

        Plaintiffs,

v.                         Civil Action No. 14-1374

WEST VIRGINIA-AMERICAN WATER COMPANY,
d/b/a WEST VIRGINIA AMERICAN WATER,
and AMERICAN WATER WORKS SERVICE
COMPANY, INC., and AMERICAN WATER
WORKS COMPANY, INC., and
EASTMAN CHEMICAL COMPANY and
GARY SOUTHERN and DENNIS P. FARRELL,

        Defendants.

MEMORANDUM OPINION AND ORDER

Pending is the parties' Joint Motion for Preliminary
Approval of Class Settlement, Conditional Class Certification,
Directing Notice to the Class, and Entry of Scheduling Order,
filed April 27, 2017 (ECF No. 1136). Also pending is
plaintiffs' Motion for Award of Attorneys' Fees, Reimbursement
of Costs and Incentive Awards, filed May 8, 2017 (ECF No. 1140).

After reviewing the procedural history of this case and the terms of the proposed Settlement Agreement, the court will turn first to the motion for certification and preliminary approval and then to the motion for attorneys' fees and costs.

<u>FACTS AND PROCEDURAL HISTORY</u>

A.    Background

On January 9, 2014, over 224,000 residents in Charleston, West Virginia, and the surrounding area suffered an interruption in their water supply.  The interruption was caused by a spill into the Elk River of a mixture composed primarily of a chemical known as Crude MCHM.  Crude MCHM consists primarily of the chemical 4-methylcyclohexane methanol.  The mixture was prepared and owned by, and being stored in a facility owned and operated by, Freedom Industries, Inc. ("Freedom Industries"). Freedom Industries called the mixture that spilled into the Elk River "Shurflot 944" and marketed it to coal companies for coal cleaning purposes.  Shurflot 944 mixed Crude MCHM with other elements, present in relatively small proportion.  The mixture containing Crude MCHM infiltrated and contaminated the water treatment plant in Charleston, known as the Kanawha Valley Treatment Plant, which draws its water from the Elk River.

Following the spill, individuals and businesses asserting claims against various defendants commenced dozens of civil actions in federal and state courts. This action was filed in federal court on January 14, 2014, and later consolidated with several other cases. See Good v. Am. Water Works Co., 2:14-CV-01374, 2014 WL 2481821, at *1 (S.D.W. Va. June 3, 2014). Other similar litigation, including putative class actions against the same defendants, was filed in state court, and some of it was removed to this court, consolidated, and then remanded to state court. Desimone Hosp. Servs., LLC v. W. Va.-Am. Water Co., 2:14-CV-14845, 2015 WL 9244434, at *5 (S.D.W. Va. Dec. 17, 2015). Following remand, the state court consolidated the various cases before the West Virginia Mass Litigation Panel ("MLP") in the case captioned In re Water Contamination Litigation, Civil Action No. 16-C-6000, which has been stayed.

Plaintiffs filed a First Amended Consolidated Class Action Complaint in this case on December 9, 2014. Plaintiffs' class action allegations stated that they intended to represent "[a]ll persons and businesses supplied with, using, or exposed to water contaminated with Crude MCHM and provided by West Virginia-American Water Company in Logan, Clay, Lincoln, Roane, Jackson, Boone, Putnam, and Kanawha Counties and the Culloden

area of Cabell County, West Virginia as of January 9, 2014."
First Am. Consolidated Class Action Compl. ¶ 123. Plaintiffs
brought suit against West Virginia-American Water Company ("WV
American Water"), American Water Works Service Company, Inc.,
and American Water Works Company, Inc. (collectively, "the water
company defendants," although at times referred to simply as WV
American Water), as well as Eastman Chemical Company
("Eastman"), Gary Southern, and Dennis P. Farrell.

Plaintiffs asserted that the water company defendants
and Eastman could have prevented the incident with better
precautions, regulatory compliance, and use of reasonable care.
Some class members operated businesses that lost revenue due to
the interruption. Others claimed physical injuries, asserting
that exposure to Crude MCHM in the environment through human
pathways caused bodily injury and necessitated medical
monitoring. Still others were alleged to have incurred costs
for property damage, water replacement, travel, and other
associated expenses.

On October 8, 2015, the court granted plaintiffs' class
certification motion and certified an issues class under Fed. R.
Civ. P. 23(c)(4) respecting fault and comparative fault issues
defined by the court. Good v. Am. Water Works Co., Inc., 310
F.R.D. 274, 299 (S.D.W. Va. 2015). The certified class included

residents and businesses served by WV American Water and all persons who were hourly wage earners working for businesses served by WV American Water, all of whom are also included within the proposed settlement class. *Id.* at 299–300.

In late October 2016, on the eve of the Phase I fault trial in this court, the parties participated in extended settlement negotiations. These negotiations resulted in settlements with Eastman and WV American Water that were memorialized in Term Sheets lodged with the court on October 25 and October 31, 2016, respectively (ECF Nos. 1096, 1108).

After extensive negotiations, the parties submitted the pending Settlement Agreement for preliminary approval on April 27, 2017 as a resolution of all claims — both claims at issue in this case and claims at issue in the various state court actions filed against defendants in relation to the Freedom Industries spill. Class Counsel in this case allied themselves with state MLP counsel to reach a global settlement, and consequently intend that the proposed settlement will remunerate both federal and state counsel, their clients, and all other proposed class members. The parties represent that the settlement of this action may affect a class composed of over 224,000 class members in some 105,000 households and over 7,000 businesses and governmental entities. Pls.' Mem. in Supp.

Joint Mot. Prelim. Approval 19 (ECF No. 1137) [hereinafter "Mot. for Prelim. Approval"].

The parties' proposed settlement has a two-tier common fund from which the Settlement Administrator will pay monies to class-member claimants through a claims submission process. The first tier, dubbed the guaranteed fund, consists of $101 million supplied separately by funds from each of Eastman and WV American Water.[1] The guaranteed fund is intended to pay "Simple Claims" that do not require documentary support or proof of causation. The parties have estimated amounts for each type of Simple Claim, although those amounts are subject to change depending on the number of Simple Claims actually paid out of the funds. After attorney fees and costs are paid, the guaranteed fund will be used to pay Simple Claims, to pay checks mailed to WV American Water's residential customers who did not submit claims, to pay claimants who submit claims through an "Individual Review Claim" process with more stringent proof and

---

[1] When referring to "the guaranteed funds" or "the guaranteed fund" in this Order, the court refers to both the Eastman Fund and the West Virginia American Water Guaranteed Fund, together totaling $101 million. Both of these funds seem likely to be fully exhausted by the claims process and are frequently treated as a single guaranteed fund. Because the individual defendants' settlement has not been finalized, the court will refer to the associated settlement funds proposed by the two individual defendants as the Individual Settlement Funds and will not consider them part of the guaranteed funds for purposes of this Order.

causation requirements, and, if the guaranteed fund is not exhausted, to make additional payments to Residential Simple Claimants, in that order. It is likely that all or almost all of the guaranteed fund will be paid out to class members through this process.

The second tier, dubbed the contingent fund, consists of $50 million supplied entirely by WV American Water to pay Individual Review Claims only if the guaranteed fund is exhausted. The Settlement Agreement requires the Settlement Administrator to seek permission from the court before issuing either Simple Claim or Individual Review Claim payments.

### B.  Settlement Class

The Settlement Agreement defines the Settlement Class in this matter as follows:

> 1) All natural persons, including adults and minors (including in utero), who resided in residential dwellings that were supplied tap water by West Virginia American's Kanawha Valley Water Treatment Plant ("KVTP") on January 9, 2014.
>
> 2) All businesses, and non-profit and governmental entities, that operated in real property locations that were supplied tap water by the KVTP on January 9, 2014.
>
> 3) All natural persons who were regularly employed as hourly wage earners for businesses that operated in real property locations that were supplied tap water by West

Virginia American's KVTP on January 9, 2014.[2]

## C.  Settlement Agreement Terms

### 1. Types of Claims

The settlement contemplates payment of four types of claims: Residential Claims, Business Claims, Wage Earner Claims, and Medical Claims.[3]  In order to submit any type of claim, a claimant must be a member of the defined class.  Within each category, however, various distinctions exist that may affect the amount of money a claimant can receive.

### a. Residential Claims

_____

[2] Additionally, the following persons and entities are excluded from the Settlement Class:

- The water company defendants and their officers, directors, and employees, and any affiliates of the water company defendants and their officers, directors, and employees;
- Eastman and its officers, directors, and employees, and any affiliates of Eastman and their officers, directors, and employees;
- Judicial officers and their immediate family members and associated court staff assigned to this case;
- Settlement Class Counsel and attorneys who have made an appearance for defendants in this case;
- The Settlement Administrator, Notice Administrator, guardian ad litem, or other consultants and associated staff assigned to this case; and
- Persons or entities who exclude themselves from the settlement class ("opt outs").

[3] The agreement also provides for Pregnancy Claims, which for the sake of brevity this Order will treat under the heading of Medical Claims.

Residential Claims are claims by residents of homes and multiunit residences within the area affected by the incident who were customers of WV American Water. The residents have claims for damages arising from physical damage to their property caused by the presence of contaminated water within their pipes. Residents may also have claims that arise from expenses incurred in buying bottled water, throwing out and replacing food, repairing or replacing appliances affected with contaminated water, seeking alternate lodging, and other extra expenses.

To be entitled to file a Residential Claim, a person must have been a resident of the affected area on January 9, 2014. Residents include both renters and homeowners. Relatedly, a person may file a Residential Claim whether their water was supplied under a contract between them and WV American Water or a contract their landlord had with WV American Water. Consequently, a resident that lived in a multi-unit apartment building is entitled to recover under the same terms as a resident that lived in a single family home, even if the apartment resident was not a direct customer of the water company.

Under the Settlement Agreement, only one Residential Claim may be filed per household. "Household" includes all

residents of a single family home or unit within a multi-unit residential building as of January 9, 2014, whether related or unrelated.  The individual making the claim is generally responsible for distributing it to other household members, although the Settlement Administrator may also issue separate payments to individual household members.

To file a Residential Claim, a resident may submit a Simple Claim Form or an Individual Review Claim Form.  On the Individual Review Claim Form, the resident is required to state the amount of damage suffered because of the incident, with documentation to support the claim for damages.  The Settlement Administrator will review claims submitted using the Individual Review Claim Form and accompanying documentation to determine if the resident is entitled to the full amount sought, or some lesser amount.

Alternatively, a resident my file a claim using the Simple Claim Form.  The Simple Claim Form requires the resident, on behalf of the household, to sign an attestation that he or she suffered property damage, including the presence of contaminated water in his or her pipes, due to the incident, but does not require the resident to itemize his or her damage or provide documentation.  Residents submitting claims using the Simple Claim Form will receive a fixed payment based on the size

of their household in January 2014. Based on the parties'
estimates, a resident submitting a Residential Claim using the
Simple Claim Form will receive a base payment of $525, plus $170
for each additional resident of the household. For example, a
resident submitting a claim on behalf of a household of four
people would be entitled to receive $1,035 ($525 base + $170 x 3
additional residents). Residents must evaluate whether they can
prove more extensive damages than the estimated amount before
determining whether to submit an Individual Review Claim Form or
a Simple Claim Form. If a resident submits an Individual Review
Claim Form and the Settlement Administrator determines that the
resident would be entitled to a greater amount with the Simple
Claim Form, the Settlement Administrator will notify the
resident and provide the opportunity to resubmit the claim using
the Simple Claim Form.[4]

b. Business Claims

Business Claims are claims made by or on behalf of a
business that conducted operations at real property supplied
with tap water by the KVTP on January 9, 2014. Businesses may
have claims that arise from physical damage to their property

---

[4] The court notes that this process seems unduly duplicative of
the work a claimant has already done. In this instance, it
would be more efficient simply to award a Simple Claim payment
based on a claimant's submission of the Individual Review Form.

caused by the presence of contaminated water within their pipes, repair/replacement costs for affected appliances and equipment, lost profits, lost revenue, lost inventory, and reasonable extra expenses.

The Settlement Agreement distinguishes between three types of businesses that may file claims: commercial businesses that were shut down or partially shut down by government order during the incident; lodging (hospitality) businesses; and "other" eligible business locations, including government and non-profits. Commercial businesses that were "shut down or partially shut down" are those that: 1) were conducted at a location where the business possessed a West Virginia Business Registration Certificate for the location; and 2) respecting that location, were subject to a regulation requiring them to cease operations or a direct order or instruction from a regulatory agency to cease operations as a result of the incident, extending from January 9 to as long as January 18, 2014, when the cessation order was lifted for the last affected area. This category excludes non-profit and governmental entities.[5]

_____

[5] The court notes that the parties should limit the number of governmental entities that may recover, for instance by setting a cap on the number of state government agencies, county government agencies, and municipal government agencies allowed

Lodging businesses are those that provide traveler accommodation and have the characteristics for classification under the North American Industry Classification System prefix "721." This category excludes RV parks and campgrounds. Other eligible business locations include all other businesses located at real property supplied with tap water by the KVTP on January 9, 2014. This category includes non-profit and governmental entities.

As with Residential Claims, business claimants may submit either an Individual Review Claim Form, which requires the claimant to provide documentation of damages, or a Simple Claim Form, which provides a fixed compensation per claim. The amount of compensation available under the Simple Claim Form varies based on the type of Business Claim and the business's annual revenue. For the category of commercial businesses that were shut down or partially shut down, there are three tiers of payment. For those businesses with annual revenue above zero up to $250,000, the parties estimate a fixed payment amount of $6,250. For businesses with annual revenue greater than $250,000 up to $1 million, the parties estimate a fixed payment amount of $12,500. Finally, for a commercial business shut down or partially shut down with annual revenue above $1 million, the

---

to make claims.

parties estimate a fixed payment of $25,000.

For lodging business claimants using the Simple Claim Form, the Settlement Agreement also establishes three tiers of payment. For lodging businesses with annual revenue up to $500,000, the parties estimate a fixed payment of $10,000. For lodging businesses with annual revenue greater than $500,000 up to $2 million, the parties estimate a fixed payment of $20,000. For lodging businesses with annual revenue greater than $2 million, the parties estimate a fixed payment of $40,000.

For other eligible business claimants submitting a Simple Claim Form, the parties estimate a fixed payment of $1,875.

c. Medical Claims

Medical Claims are those submitted by or on behalf of class members that suffered illness or injury because of exposure to contaminated water, sought medical treatment for a reaction or illness attributed to the incident, or had existing medical conditions exacerbated by the incident. The Settlement Agreement recognizes three different types of Medical Claims: contemporaneous medical treatment claims, other medical issues claims, and water interruption medical issues claims. All Medical Claims must be submitted using an Individual Review

Claim Form with appropriate documentation; there is no Simple Claim Form option. A class member with a Medical Claim may also file a Residential Claim and/or Wage Earner Claim, if eligible.

Contemporaneous medical treatment claims may be filed by those who (1) were exposed to contaminated tap water between January 9 and February 15, 2014 and (2) sought and received a diagnostic evaluation or treatment, between January 9 and February 15, for a physical injury or condition the claimant believed[6] to have been caused by exposure to the contaminated tap water. Claimants with contemporary medical treatment claims may receive a payment equal to the unreimbursed cost of their documented medical care, up to a maximum of $5,000, plus an additional payment of $750.

Other medical issues claims may be filed by or on behalf of class members that suffered illness or death because of exposure to contaminated water. In order to be eligible for an other medical issues claim, a class member must demonstrate with appropriate documentation the following: (1) that the class member sought and received medical care for an illness, injury, or exacerbation of an existing condition; (2) that the condition

_____

[6] The court notes that the Settlement Administrator needs to be provided with express authority to question and require reasonably necessary proof that a given condition was in fact related to contaminated tap water.

was diagnosed by a licensed health care provider; (3) that the condition is causally related to exposure to contaminated water from the incident; and (4) that the complained-of condition manifested between January 9 and February 28, 2014. Other medical issues claims do not include physical injuries or illnesses that are subject to contemporaneous treatment claims. Claimants must demonstrate medical expenses in excess of $5,000. If a claimant fails to demonstrate expenses in excess of $5,000, the claim must proceed as a contemporaneous treatment claim. For valid other medical issues claims, a claimant may receive a base payment of $50,000, plus two times medical costs. Claimants sustaining permanent visual impairment may receive a base payment of $150,000, plus two times medical costs. Claimants sustaining wrongful death may receive a base payment of $350,000 plus four times medical costs, up to a total maximum cap of $750,000. Claimants sustaining total occupational disability may receive a base payment of $500,000 plus five times medical costs, up to a total maximum cap of $1,000,000. Claims for permanent visual impairment, wrongful death, or total occupational disability may also be presented as water interruption medical issues claims, with the same base payments and limits.

Water interruption medical issues claims may be filed

by those class members who experienced a delay in treatment for an existing chronic illness because of an interruption in water service resulting from the Freedom Industries spill.[7]  In order to be eligible for a water interruption medical issue claim, a class member must demonstrate, with appropriate documentation, (1) that the delay directly caused an aggravation or progression of an illness or condition and (2) that the aggravation or progression of the illness would not have occurred but for the delay.  The claimant must also have medical expenses in excess of $5,000; if medical expenses are less than $5,000, the claim must proceed as a contemporaneous medical treatment claim.

Finally, class member residents of the affected area who were pregnant on January 9, 2014, were exposed to contaminated water, and who do not submit any other type of Medical Claim may also file a Pregnancy Claim.  Persons submitting valid Pregnancy Claims may receive a single payment of $1,500.

d. Wage Earner Claims

Wage Earner Claims are those submitted by or on behalf of individuals who were hourly employees at business locations

---

[7] The parties must clarify whether the interruption must have been to the services of the medical provider or to some other person or entity.

that shut down because of the incident and lost wages because of the shutdown.  All Wage Earner Claims must be submitted using an Individual Review Claim Form with appropriate documentation; there is no Simple Claim Form option or fixed payment.  Only documented lost wages may be reimbursed.  A resident with a wage earner claim may also file a Residential Claim and/or Medical Claim, if eligible.  Under the Settlement Agreement, the aggregate payment of Wage Earner Claims is capped at $4 million. As with other claims, in the event Wage Earner Claims exceed $4 million, the payment to each claimant will be reduced, pro rata.

Wage Earner Claims may be filed by class members that resided within the affected area on January 9, 2014, or by those living outside the area.  To be eligible to file a Wage Earner Claim, a class member (1) must have been employed as an hourly employee at an eligible business location that was shut down or partially shut down and (2) must have been scheduled to work during the period in which the business was shut down or partially shut down.  Regarding businesses that were partially shut down, the claimant must have been scheduled to work at the portion of the business that was partially shut down.

2. Settlement Funds and Payment Distribution

Under the Settlement Agreement, defendants have agreed to pay a sum of money ranging between $101 million and $151

million.  The amount of money paid will depend on the type of claims and the total value of claims filed.  The money will come from four separate funds: the Eastman Fund, the WV American Water Guaranteed Fund, the WV American Water Contingent Fund, and the two Individual Settlement Funds.  The type of claim filed, and the order in which a claim is processed relative to other claims, determines the fund from which the Settlement Administrator will pay a claim.

The Eastman Fund consists of $25 million.  The Eastman Fund will first be used to pay Residential and Business Claims that attest to property damage[8] submitted using the Simple Claim Form.  If the claims made with the Simple Claim Form do not exhaust the Eastman Fund, the fund will next be used to pay any claims alleging property damage or physical injury submitted using the Individual Review Claim Form.  The Eastman Fund will not be used to pay Wage Earner Claims.

After the Eastman Fund is exhausted, claims are next paid from the Individual Settlement Funds.  The Individual Settlement Funds consist of the money collected, if any, from the settlements of Gary Southern and Dennis Farrell.  The Individual Settlement Funds will be used to pay Residential

---

[8] All Simple Claim Forms require a claimant to attest to property damage.

Claims submitted under the Simple Claim Form option.

After the Individual Settlement Funds are exhausted, the Settlement Administrator will pay claims using the WV American Water Guaranteed Fund ("AW Guaranteed Fund"). The AW Guaranteed Fund consists of $76 million paid by WV American Water. The fund is first used to pay Residential and Business claims submitted using the Simple Claim Form. If money remains in the AW Guaranteed Fund after Simple Claims have been paid, the fund will then be used to pay claims under the "Check Distribution" method.[9] Finally, if money remains in the AW Guaranteed Fund after the payment of Simple Claim Form claims and the distribution of checks, the fund will be used to pay claims submitted with the Individual Review Claim Form.

If the $101 million in the Eastman Guaranteed Fund and AW Guaranteed Fund is not enough to satisfy all claims, then the WV American Water Contingent Fund ("AW Contingent Fund") will be used to pay remaining claims submitted with the Individual Review Claim Form.[10] The AW Contingent Fund consists of an

---

[9] Under the Check Distribution method, the Settlement Administrator will mail payments of $525 to any customers of WV American Water (as of January 9, 2014) that the Settlement Administrator identifies as having failed to file a Residential Claim.

[10] In the event that all claims submitted using the Simple Claim Form cannot be fully paid from the AW Guaranteed Fund, those

amount of money, up to a maximum of $50 million, funded by the
WV American Water only in the event that additional funds beyond
the guaranteed funds just discussed are required to satisfy
claims.  WV American Water will contribute to the fund only to
the extent required to satisfy remaining claims submitted using
the Individual Review Claim Form.

3.  Attorneys' Fees, Costs, and Awards

        The Settlement Agreement also governs the payment of
attorneys' fees, costs, and incentive awards.  With respect to
attorneys' fees, the parties propose that the current Class
Counsel in this case be designated Lead Settlement Class Counsel
and that the firms who serve as Lead Counsel in the state MLP
cases be designated Settlement Class Counsel.  The proposed
Settlement Agreement awards attorneys' fees to both Class
Counsel and state MLP counsel (together, "counsel" or
"Settlement Class Counsel") as follows:

•    Settlement Class Counsel will conjointly receive 30% of the
     combined Eastman and AW Guaranteed Funds (the combination
     of which the court refers to as "the guaranteed fund"),
     without regard to whether claimants exhaust the remainder

_____

claims will be reduced on a pro rata basis.

of the guaranteed fund.  The proposed total fee on the $101 million guaranteed fund is therefore $30,300,000,[11] but, as will be noted, additional contingent attorney fees may be levied on Individual Review claims paid out of the guaranteed fund.

- Settlement Class Counsel will receive 25% of the aggregate amounts paid out of the AW Contingent Fund, which pays only Individual Review Claims.  If the entire $50 million AW Contingent Fund were to be exhausted, though it is unlikely, this would amount to an additional $12,500,000.

- Attorneys may not seek fees for assisting with filing Simple Claims.

- For some reason, Settlement Class Counsel will also receive 25% of the aggregate Individual Review Claim amounts paid out of the Eastman Fund.  This 25% fee would be in addition to the 30% fee paid at the outset from the guaranteed fund, which of course includes the $25 million Eastman Fund. Consequently, this combination of fees makes for at least a 55% fee on Individual Review Claims paid out of the Eastman Fund.

---

[11] Settlement Class Counsel also seek 30% of the settlement with defendants Southern and Farrell, but as that settlement has not yet been accepted, the court will not analyze fees on those funds at this time.

- Finally, any attorneys — whether Settlement Class Counsel or not — representing claimants in the Individual Review process under a contract of representation may earn a contingency fee on such claims that is not constrained by the Settlement Agreement, unless an attorney entered into such a contract on or after October 31, 2016, in which case the fee is limited to 15% of the recovery. But no such 15% limitation applies to contracts entered into before October 31st, which will be the decided majority of such contracts.

- The only other limit placed on contingent attorneys' fees on an Individual Review award in the Settlement Agreement is that, in an instance where an attorney is limited to 15% of an award because he or she entered into a contract on or after October 31, 2016, the "net payment" to the claimant must exceed the relevant Simple Claim amount (assuming there is a corresponding Simple Claim). Joint Mot. for Prelim. Approval Ex. A § 13.2 [hereinafter "Settlement Agreement"]. The term "net payment" is undefined but presumably means the payment to the claimant after the attorneys' contingency fee has been deducted.

With respect to administrative costs, counsel have not submitted estimates or analysis of these costs in conjunction

with their motion for attorneys' fees and costs.  In a letter[12]
independently sent to the court, counsel estimate administrative
costs to be $1,973,500 for the Settlement Administrator,
SmithCochranHicks PLLC ("SCH"), and $681,591 for the Notice
Administrator[13] totaling $2,655,091.  The Notice Administrator
has directly provided notice cost estimates to the parties.
Costs for settlement administration, on the other hand, appear
to be estimates based on an itemized fee schedule reflecting
each administrative processing function that SCH will perform.
The parties calculated the total settlement administration costs
for SCH by multiplying the fee estimate for each processing
function by the number of anticipated claims requiring that
function.  They appear to assume that 37,000 simple residential
claims will be processed, 5,000 simple business claims will be
processed, 57,000 residential checks will be mailed, and
approximately 3,100 Individual Review Claims (residential,

---

[12] Pursuant to Order entered this same date, the court directs
the clerk to enter the fee letter on the docket.

[13] The parties have not submitted any documentation with their
petition for fees that explains the notice costs anticipated by
the proposed notice program, although they have identified the
proposed Notice Administrator as Kinsella Media, LLC.  In the
parties' prior fee letter, however, the parties did itemize
notice costs, which the court will use for assessment purposes
here.  In that letter, the parties proposed both Rust Consulting
and Kinsella Media, LLC, as Notice Administrators.  Since Rust
Consulting does not appear in the parties' recent filings, the
court will refer to Kinsella Media, LLC, as the only Notice
Administrator.

business, and medical) will be processed.

With respect to litigation costs, counsel represent that these costs now total $2,377,376.93.  Counsel have provided data in support of this figure that itemizes costs, including court reporter costs for depositions, travel costs for out-of-state attorneys and others, legal research costs, mediation costs, and the costs of retained experts.  This figure will presumably rise somewhat due to the accretion of additional post-settlement duties.  These costs include expenses from both federal and state lawyers and firms.  The parties also propose $15,000 incentive awards for the fourteen class representatives in this case and $10,000 incentive awards for ten named plaintiffs in the state court case captioned In re Water Contamination Litigation, No. 16-C-6000.

## I. Rule 23 Certification and Approval

### a. Applicable Law

The court's ultimate role in overseeing class action settlements is to ensure that any settlement proposed by the parties is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). After assessing the fairness of a proposed settlement, "[t]he trial judge must then make a determination as to whether or not to approve the settlement, or he may make suggestions to the parties for modifications of the proposal. Approval must then be given or withheld." Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977). See also Evans v. Jeff D., 475 U.S. 717, 727 (1986) (district court "might have advised petitioners and respondents that it would not approve their proposal unless one or more of its provisions was deleted or modified").

Settlement negotiations, even when they are arms-length, often involve only the attorneys who have been litigating the case. "While [those attorneys'] representation is no doubt vigorous in most cases, on occasion the negotiating parties may find that their individual interests can best be served by a settlement which is not in the best interests of the

class as a whole." **Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee**, 616 F.2d 305, 313 (7th Cir. 1980) **overruled on other grounds by** **Felzen v. Andreas**, 134 F.3d 873, 876 (7th Cir. 1998). Consequently, Rule 23(e) is concerned particularly with "the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations." **In re Jiffy Lube Sec. Litig.**, 927 F.2d 155, 158 (4th Cir. 1991). **See also** **Berry v. Schulman**, 807 F.3d 600, 612 (4th Cir. 2015), **cert. denied sub nom.** **Schulman v. LexisNexis Risk & Info. Analytics Grp., Inc.**, 137 S. Ct. 77 (2016).

Courts often employ a two-stage review process of proposed settlement agreements, consisting of a preliminary and a final approval stage. **See, e.g.**, **Armstrong**, 616 F.2d at 313. The preliminary approval stage requires analysis of Rules 23(a) and 23(b), governing certification, as well as the fairness and adequacy of the settlement under Rule 23(e).

> [At preliminary approval,] counsel submit the proposed terms of settlement and the judge makes a preliminary fairness evaluation. . . . The judge should make a preliminary determination that the proposed class satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b). . . . The judge must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms [under Rule 23(e)] and must direct the preparation of notice of the certification, proposed settlement, and date of the final fairness hearing.

<u>Manual for Complex Litigation (Fourth)</u> § 21.632 (2004).

Following preliminary approval, the court directs reasonable

notice to the class.  The second stage, final approval, occurs

after the court issues notice, the period for opting out or

objecting to the settlement has passed, and the court has

conducted a "fairness hearing."  Fed. R. Civ. P. 23(e)(2).

Rule 23 of the Federal Rules of Civil Procedure

governs the two components of a district court's review of class

action settlements — certification and approval.  In general, a

district court's certification decision is "accorded great

deference."  <u>Simmons v. Poe</u>, 47 F.3d 1370, 1380 (4th Cir. 1995).

Certification, moreover, is equally as important in the

settlement context as in the litigation context.  <u>See</u> <u>Amchem</u>

<u>Prod., Inc. v. Windsor</u>, 521 U.S. 591, 619 (1997) ("Settlement is

relevant to a class certification.").

> The safeguards provided by the Rule 23(a) and (b)
> class-qualifying criteria, we emphasize, are not
> impractical impediments — checks shorn of utility — in
> the settlement-class context. . . .  [T]he standards
> set for the protection of absent class members serve
> to inhibit appraisals of the chancellor's foot kind —
> class certifications dependent upon the court's
> gestalt judgment or overarching impression of the
> settlement's fairness.

<u>Id.</u> at 621.  Certification, in other words, provides some

measure of objectivity to counterbalance what might become a

subjective evaluation by a court.

Class certification requires the parties to meet the prerequisites of Rule 23(a) and at least one of the three conditions of Rule 23(b).  <u>See</u> <u>id.</u> at 614.  First, the parties must demonstrate the following in order to fulfill the requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

<u>Berry</u>, 807 F.3d at 608; Fed. R. Civ. P. 23(a).  The Fourth Circuit has summarized these four aspects as "(1) numerosity of parties; (2) commonality of factual and legal issues; (3) typicality of claims and defenses of class representatives; and (4) adequacy of representation."  <u>Gunnells v. Healthplan Servs., Inc.</u>, 348 F.3d 417, 423 (4th Cir. 2003).

Additionally, certification can proceed only if the proposed class "fit[s] within one of the three types of classes listed in Rule 23(b)."  <u>Berry</u>, 807 F.3d at 608.  Rule 23(b)(3), under which plaintiffs have sought certification here, provides that a class action may proceed if "the court finds that the questions of law or fact common to class members predominate

over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23. Courts refer to these two prongs of Rule 23(b)(3) as its predominance and superiority requirements. See, e.g., Gunnells, 348 F.3d at 424. Rule 23(b)(3) also sets forth the following factors relevant to analyzing both predominance and superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

In addition to certification, a court must also decide whether to approve a proposed settlement. Approval is governed by Rule 23(e), which provides that "[i]f the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Simply put, fairness and adequacy are the two touchstones of class action settlement approval. See Jiffy Lube, 927 F.2d at 158. The Fourth Circuit has observed that

> Rule 23(e)'s settlement approval process provides additional protection, ensuring that . . . class members receive notice of a proposed settlement and an

> opportunity to object, and that a settlement will not
> take effect unless the trial judge — after analyzing
> the facts and law of the case and considering all
> objections to the proposed settlement — determines it
> to be fair, adequate, and reasonable.

Berry, 807 F.3d at 612.  See also Amchem, 521 U.S. at 621.

Importantly, courts approach Rule 23(e)'s requirements with "a

liberal rather than a restrictive construction, adopting a

standard of flexibility in application which will in the

particular case best serve the ends of justice for the affected

parties and . . . promote judicial efficiency."  Gunnells, 348

F.3d at 424 (quotation marks omitted).


As earlier noted, the parties propose to define the

Settlement Class to which the Settlement Agreement applies as

follows:

> 1) All natural persons, including adults and minors
> (including in utero), who resided in residential dwellings
> that were supplied tap water by West Virginia American's
> Kanawha Valley Water Treatment Plant ("KVTP") on January 9,
> 2014.
>
> 2) All businesses, and non-profit and governmental
> entities, that operated in real property locations that
> were supplied tap water by the KVTP on January 9, 2014.
>
> 3) All natural persons who were regularly employed as
> hourly wage earners for businesses that operated in real
> property locations that were supplied tap water by the KVTP
> on January 9, 2014.

The court will apply the Rule 23 analysis with this definition

in mind.

## b.   Certification: Rules 23(a) and 23(b)

### i.   Rule 23(a) Prerequisites

The four factors governing certification of a settlement class under Rule 23(a) are, succinctly, (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. <u>Gunnells</u>, 348 F.3d at 423.  Importantly, "Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification." <u>Id.</u> at 427–28.

## 1.   Numerosity

With respect to numerosity, the proposed settlement class numbers over 224,000 residents and 7,000 businesses, non-profits, and governmental entities at locations supplied tap water by the Kanawha Valley Treatment Plant on January 9, 2014. "Joinder is thus impracticable and the numerosity requirement is satisfied." <u>Good</u>, 310 F.R.D. at 294.

## 2.   Commonality

The Supreme Court has found that "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions

common to the class 'predominate over' other questions."
<u>Amchem</u>, 521 U.S. at 609.  Accordingly, commonality will be
analyzed in conjunction with Rule 23(b)(3) predominance as set
forth below.

3.    Typicality

        To ensure typicality, "a class representative must be
part of the class and possess the same interest and suffer the
same injury as the class members. . . .  That is not to say that
typicality requires that the plaintiff's claim and the claims of
class members be perfectly identical or perfectly aligned."
<u>Deiter v. Microsoft Corp.</u>, 436 F.3d 461, 466 (4th Cir. 2006)
(quotation marks omitted).  As the court noted in its prior
certification opinion, the class representatives each allege
harms in contract or tort arising out of the spill.  These
interests run the gamut of claims and suffice to qualify the
representatives as surrogates for the class.  <u>See</u> <u>Good</u>, 310
F.R.D. at 295.

4.    Adequacy of Representation

        Adequacy hinges on whether a "fundamental" conflict of
interest exists sufficient to defeat the propriety of
representation.  <u>Gunnells</u>, 348 F.3d at 430.  As noted in the

court's prior opinion, the class representatives here have the same interests as the class at large, namely, to establish the liability of Eastman and WV American Water. Good, 310 F.R.D. at 295 ("[T]here is no suggestion that the representatives are anything other than adequate.").

ii.      <u>Rule 23(b)(3) Certification</u>

Rule 23(b) states as follows:

> A class action may be maintained if Rule 23(a) is satisfied and if:
>
> > . . . .
>
> > (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
> >
> > > (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> > >
> > > (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> > >
> > > (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> > >
> > > (D) the likely difficulties in managing a class action.

34

Fed. R. Civ. P. 23(b).  Put simply, Rule 23(b)(3) is satisfied
when common issues of law and fact predominate over individual
issues and when the class action mechanism is superior to other
methods of resolution.  Gunnells, 348 F.3d at 424.

        In a class action, common issues of law and fact must
predominate over concerns that are more protean.  "[A] class-
wide proceeding must be able to generate common answers that
drive the litigation."  Brown v. Nucor Corp., 785 F.3d 895, 909
(4th Cir. 2015).  Predominance in fact merges with and
"subsumes" the commonality inquiry in the settlement context
under Rule 23(b)(3).  Amchem, 521 U.S. at 609.  A settlement,
however, "obviates the difficulties inherent in proving the
elements of varied claims at trial," and consequently, "courts
are more inclined to find the predominance test met [in the
settlement context]."  Sullivan v. DB Invs., Inc., 667 F.3d 273,
304 & n.29 (3d Cir. 2011) (alteration in original).

        The Supreme Court in Wal-Mart Stores, Inc. v. Dukes,
564 U.S. 338 (2011), emphasized that a recitation of just any
common questions is not sufficient to fulfill this requirement:
"[c]ommonality requires the plaintiff to demonstrate that the
class members have suffered the same injury."  564 U.S. at 350
(quotation marks omitted) (finding a lack of commonality where a
class of approximately 1.5 million Wal-Mart employees alleged

sex discrimination by different local managers making a variety of employment-related decisions). As the Fifth Circuit has noted, however, "the legal requirement that class members have all 'suffered the same injury' can be satisfied by an instance of the defendant's injurious conduct, even when the resulting injurious effects — the damages — are diverse." In re Deepwater Horizon, 739 F.3d 790, 810–11 (5th Cir. 2014) (quoting Dukes, 564 U.S. at 350) (affirming district court's certification of settlement class whose injuries arose from British Petroleum's allegedly injurious conduct in connection with the Deepwater Horizon oil spill, even when injuries differed).

As the parties emphasize, courts since Dukes have continued to find predominance in the mass tort arena when a single common event or common cause gave rise to the claims of each class member. See, e.g., In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 434 (3d Cir.) (finding that common questions as to National Football League's knowledge and conduct in light of medical evidence regarding concussions in players predominated even in the mass tort context), as amended (May 2, 2016); In re Deepwater Horizon, 739 F.3d 790, 817 (5th Cir. 2014) (affirming finding that common questions of law and fact arising from the Deepwater Horizon oil spill predominated). Furthermore, Fourth Circuit law permits a

court to find predominance and commonality in the mass tort
context.  In cases where a single accident putatively gives rise
to tort damages, "[the Fourth Circuit] has embraced the view
that the mass tort action for damages may . . . be appropriate
for class action, either partially o[r] in whole."  Cent.
Wesleyan Coll. v. W.R. Grace & Co., 6 F.3d 177, 185 (4th Cir.
1993) (quotation marks omitted and second alteration in
original) (affirming the use of subclasses in suit by colleges
and universities alleging liability for asbestos-related
property damage in a variety of states and settings).

     In cautioning against too ready a use of the class
certification tool, the court in Central Wesleyan contrasted the
easily ramifying complexities of asbestos litigation with "a
mass tort suit involving only a single defendant . . . and a
single product."  6 F.3d at 189.  In this case, the facts are
more closely analogous to a mass tort suit arising from a
singular occurrence than to asbestos litigation.  Although there
are, in effect, two major defendants, their relationship to
plaintiffs and alleged liability stem from the same event, the
Freedom Industries spill.  The common issues raised by their
association with the spill are determinative of their liability
and predominate over the individual differences in, for example,
damages claimed by particular class members.  See Good, 310

F.R.D. at 296.  Although Eastman and WV American Water may be
liable under somewhat different theories, both residential and
business class members allege breach of similar duties.  Where
different kinds of injuries are alleged — e.g., personal
injuries versus property damage — objective criteria assist in
providing the appropriate compensation to victims.  Here, those
criteria are set forth in the distribution protocols and claims
forms.

        The fact that the parties have agreed on a settlement
itself recommends finding that ample commonality exists to
justify certification of a settlement class.  Sullivan, 667 F.3d
at 304 n.29.  Moreover, in its prior certification opinion, the
court found that common issues of fact and law predominate,
including "the water company defendants' liability for their
alleged negligent failure to prepare for the spill or react
swiftly enough once alerted to the approaching Crude MCHM, the
impracticability defense of those same defendants to the breach
of contract, and defendant Eastman's liability for its alleged
inadequate product stewardship and negligent failure to warn."
Good, 310 F.R.D. at 294.  These issues each arise from a single
common event, the Freedom Industries spill, and the court will
not disturb its prior findings at this juncture.

        Additionally, superiority considerations recommend in

favor of certification here.  As the Fourth Circuit noted in

Gunnells,

> it appears likely that in the absence of class
> certification, very few claims would be brought
> against [the defendant], making "the adjudication of
> [the] matter through a class action . . . superior to
> no adjudication of the matter at all."  Thus, class
> certification will provide access to the courts for
> those with claims that would be uneconomical if
> brought in an individual action.

348 F.3d at 426 (quoting 5 James Moore et al., Moore's Federal

Practice § 23.48[1] (1997)).  No deluge of individual small-

claims litigation has arisen in tandem with this litigation.

Nor is it economical for residents, in particular, to bring

claims alleging hundreds of dollars in damages using individual

litigation that accrues thousands of dollars in fees.  Rule 23's

class mechanism is a far superior path to relief in a mass tort

case such as this one, where an identifiable class suffered

discrete harms resulting from a singular tragedy.

        Analysis of the four factors established in Rule

23(b)(3) further supports certification.  In the settlement

context, the fourth factor concerning manageability is no longer

relevant:

> Confronted with a request for settlement-only class
> certification, a district court need not inquire
> whether the case, if tried, would present intractable
> management problems, see Fed. Rule Civ. Proc.

> 23(b)(3)(D), for the proposal is that there be no
> trial.

Amchem, 521 U.S. at 620.  As noted in the court's prior opinion,

the first three factors of the Rule 23(b)(3) analysis recommend

in favor of certification here.  See Good, 310 F.R.D. at 297.

Accordingly, both predominance and superiority are satisfied and

serve firmly to support commonality as well.  Thus, the

requirements of both Rule 23(a) and Rule 23(b)(3) are met so

that certification of a settlement class as proposed by the

parties here is plainly warranted.

          For reasons elaborated in the following section,

however, the court will defer entering an Order effecting

settlement class certification.  Class certification will

proceed if and when the parties meet the conditions for

preliminary approval now explained.

c.    **Approval: Rule 23(e)**

Fairness and adequacy are the touchstones of class action settlement approval.  <u>Jiffy Lube</u>, 927 F.2d at 158.  Rule 23, however, does not provide a specific set of guidelines for the approval process.  Rather, the rule states simply that "[i]f the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e).

Generally, preliminary approval precedes notice of a proposed settlement to the class.  <u>See</u> <u>In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.</u>, 55 F.3d 768, 785 (3d Cir. 1995) ("Before sending notice of the settlement to the class, the court will usually approve the settlement preliminarily.").

> Although Rule 23(e) does not delineate a procedure for
> court approval of settlements of class actions, the
> courts generally have followed a two-step procedure.
> <u>See</u> <u>Armstrong v. Bd. of Sch. Dirs.</u>, 616 F.2d 305, 312
> (7th Cir. 1980); <u>In Re Mid-Atlantic Toyota Antitrust
> Litig.</u>, 564 F. Supp. 1379, 1384 (D. Md. 1983). First,
> the court conducts a preliminary approval or pre-
> notification hearing to determine whether the proposed
> settlement is "within the range of possible approval"
> or, in other words, whether there is "probable cause"
> to notify the class of the proposed settlement. <u>See
> Armstrong</u>, 616 F.2d at 314; <u>Toyota Antitrust Litig.</u>,
> 564 F.Supp. at 1384. Second, assuming that the court
> grants preliminary approval and notice is sent to the
> class, the court conducts a "fairness" hearing, at
> which all interested parties are afforded an

> opportunity to be heard on the proposed settlement.
> The ultimate purpose of the fairness hearing is to
> determine if the proposed settlement is "fair,
> reasonable, and adequate."

Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 855 F.
Supp. 825, 827-28 (E.D.N.C. 1994). See also, e.g., Whitlock v.
FSL Mgmt., LLC, 843 F.3d 1084, 1094 (6th Cir. 2016) (discussing
district court's preliminary approval of settlement); Smith v.
Res-Care, Inc., No. CV 3:13-5211, 2015 WL 6479658, at *4 (S.D.W.
Va. Oct. 27, 2015) (reaffirming two-stage approval process
adumbrated in Horton).  Much of the court's role in protecting
the interests of litigants and ensuring the fairness and
adequacy of a proposed settlement will happen after class
members have had the opportunity to object at the final approval
stage.  The Fifth Circuit has noted that

> [b]y weighing the competing evidence and evaluating
> the legal arguments, we think the court should be able
> to reach a just conclusion. It is for this reason that
> the court can generally fulfill its responsibilities
> by "examin(ing) the settlement(s) in light of the
> objections raised [prior to final approval] and (by)
> set(ting) forth on the record a reasoned response to
> the objections including findings of fact and
> conclusions of law necessary to support the response."

In re Corrugated Container Antitrust Litig., 643 F.2d 195, 213
(5th Cir. 1981) (parenthetical alterations in original) (quoting
Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977)).

   The court's role is more circumscribed at the

preliminary approval stage than at the final approval stage.  As one court has explained,

> [a]t the preliminary approval stage, the bar to meet the fair, reasonable and adequate standard is lowered, and the court is required to determine whether the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys, and whether it appears to fall within the range of possible approval.

In re Nat'l Football League Players' Concussion Injury Litig., 961 F. Supp. 2d 708, 714 (E.D. Pa. 2014) (quotation marks omitted); Horton, 855 F. Supp. at 827 ("[T]he court conducts a preliminary approval or pre-notification hearing to determine whether the proposed settlement is within the range of possible approval . . . ." (quotation marks omitted)).  However, "[p]reliminary approval is not merely a judicial rubber-stamp of the parties' agreement, and must be exacting and thorough." Winingear v. City of Norfolk, No. 2:12CV560, 2014 WL 12526327, at *1 (E.D. Va. June 5, 2014) (citing In re Nat'l Football League, 961 F. Supp. 2d at 714).[14]

_____

[14] Another court has explained that the preliminary approval process is a response to the need to notice the class.

> Rule 23 does not provide for "preliminary approval" or a "preliminary fairness determination."  Over the years, however, the Complex Litigation Manual has come to use that term for what a court does in deciding to

A district court's role at the preliminary review
stage is to determine whether a particular settlement is "within
the range of possible approval" and, if so, to submit that
settlement to class members.  Armstrong, 616 F.2d at 314.  In
making this evaluation, the court must be mindful of the general
concerns that supervene on all judicial review of settlement
agreements.  "The court's role in reviewing a negotiated class
settlement is to [sic] 'to ensure that the agreement is not the
product of fraud or collusion and that, taken as a whole, it is
fair, adequate, and reasonable to all concerned.'"  Marshall v.
Nat'l Football League, 787 F.3d 502, 509 (8th Cir. 2015)
(quoting In re Wireless Tel. Fed. Cost Recovery Fees Litig., 396
F.3d 922, 934 (8th Cir. 2005)), cert. denied, 136 S. Ct. 1166
(2016).  The factors that merit consideration during the
approval process may be broken into "two major categories: those
which go to 'fairness' and those which go to 'adequacy' of a
settlement."  In re Montgomery Cty. Real Estate Antitrust

---

order notice to the class of a settlement. Before
incurring the expense of widescale notice, it makes
sense for a judge to say that a particular settlement
has no chance of approval.

In re New Motor Vehicles Canadian Exp. Antitrust Litig., 236
F.R.D. 53, 55–56 (D. Me. 2006).  See also, 7B Charles Alan
Wright & Arthur R. Miller, Federal Practice and Procedure Civil
§ 1797.5 (3d ed. April 2017) ("[T]he rule does not require or
suggest that the court should preliminarily approve the fairness
of a proposed settlement before sending notice to the class,
although some courts have followed that approach.").

Litig., 83 F.R.D. 305, 315 (D. Md. 1979); Jiffy Lube, 927 F.2d
at 158.

     i.    Fairness and Adequacy of the Proposed Settlement

     Fairness analysis aims to "ensure that a settlement
[is] reached as a result of good-faith bargaining at arm's
length, without collusion." Berry, 807 F.3d at 614 (quotation
marks omitted). Courts sometimes use the following factors in
analyzing the question of fairness: "(1) the posture of the case
at the time settlement was proposed, (2) the extent of discovery
that had been conducted, (3) the circumstances surrounding the
negotiations, and (4) the experience of counsel in the area of
[mass tort] class action litigation." Jiffy Lube, 927 F.2d at
159 (citing In re Montgomery, 83 F.R.D.).

     In this instance, the parties reached a settlement
proposal in principle after three years of litigation on the eve
of trial of liability issues. Cf. Flinn v. FMC Corp., 528 F.2d
1169, 1174 (4th Cir. 1975) (approving a settlement that followed
"protracted discussions and was reached on the eve of trial
after prior negotiations had failed"). While settlement during
the pre-discovery stages of litigation would "rais[e] questions
of possible collusion among the settling parties," Jiffy Lube,
927 F.2d at 159, no such inference arises here. Indeed,

discovery closed on April 22, 2016, a full six months before the parties reached an agreement in principle as set forth in their settlement term sheets.  It would take the parties another six months of negotiations before they finalized their settlement on April 27, 2017.

"The fact that all discovery has been completed and the cause is ready for trial is important, since it ordinarily assures sufficient development of the facts to permit a reasonable judgment on the possible merits of the case."  Flinn, 528 F.2d at 1173.  The parties note that they "participated in more than 100 depositions, including 20 experts, and approximately 500 hundred [sic] thousand pages of documents were exchanged."  Mot. for Prelim. Approval 14.

Simultaneously, some of the attorneys who now seek to be named Settlement Class Counsel were engaged in litigating similar claims in West Virginia state court.  The proposed Settlement Agreement is global in nature in that it purports to resolve not only the federal claims specifically alleged in this case but also any other claims arising out of the Freedom Industries spill that were raised or capable of being raised in a forum other than bankruptcy court.  The parties note that various individuals and businesses involved in this litigation were also involved in the hearings before the West Virginia

Public Service Commission ("PSC") and in the Freedom Industries
bankruptcy litigation. Mot. for Prelim. Approval 14-15. The
West Virginia cases were consolidated before the Mass Litigation
Panel ("MLP"), and MLP Lead Counsel have been actively involved
in the negotiations leading to this global settlement.
Consequently, their expertise and contributions further
demonstrate that the issues in this litigation have been
exhaustively vetted and the relevant bargaining positions
clarified.

The motions practice in this case was also extensive.
The parties seriously contested motions over the adequacy of the
pleadings, and the class certification stage involved
substantial controversy over the nature and dimensions of the
class. Following discovery, plaintiffs, Eastman, and WV
American Water each submitted multiple motions for summary
judgment at the dispositive motions stage. The parties also
proffered and responded to various aspects of the proposed Trial
Plan and submitted dozens of Daubert motions and motions in
limine in the weeks prior to the trial date.

Furthermore, the court sees no evidence of chicanery
in the circumstances surrounding settlement. The parties
reached settlement during negotiations in order to attempt a
resolution of the class litigation that did not incur the

enormous time and expense required by a liability phase trial followed by a number of separate damages trials.  The parties' negotiations were exhaustive: they included a number of insurers and associated non-parties in negotiations over the settlement terms, and both plaintiffs and defendants endeavored to reach global settlement in consultation with parties in the West Virginia state cases.

Moreover, the attorneys for the parties possess an abundance of experience.  The three lead Class Counsel in this case alone conjointly possess over seventy years of class action and mass tort litigation experience, see Pls.' Mem. in Supp. Mot. for Award of Attys.' Fees [hereinafter "Pet. for Fees"] (ECF No. 1140) Exs. 1-3, and the attorneys for defendants are well-known and accomplished litigators.  No one has challenged the "good faith and competency" of these lawyers.  See Flinn, 528 F.2d at 1174.  Class members will have the opportunity to raise objections to these observations during the objection period.

Adequacy is also relevant to determining whether a settlement is ready for preliminary approval under Rule 23(e). Factors that courts use to guide analysis of a settlement's adequacy include

> (1) the relative strength of the plaintiffs' case on
> the merits, (2) the existence of any difficulties of
> proof or strong defenses the plaintiffs are likely to
> encounter if the case goes to trial, (3) the
> anticipated duration and expense of additional
> litigation, (4) the solvency of the defendants and the
> likelihood of recovery on a litigated judgment, and
> (5) the degree of opposition to the settlement.

Jiffy Lube, 927 F.2d at 159 (citing In re Montgomery, 83

F.R.D.).  Without yet having received objections from class

members, the court will defer consideration of the fifth

adequacy factor.  Further, the solvency of defendants is not

here disputed, and insolvent defendants presumably would not

agree to a $151 million settlement proposal.


"The strength of the plaintiffs' claims on the merits"

is "the most important factor in weighing the substantive

reasonableness of a settlement agreement." Berry, 807 F.3d at

614.  In order to assess how adequate a proposed settlement is,

the court must consider the rights that class members are giving

up in the bargain.  Id.  The Settlement Agreement releases any

claims that class members in this or other litigation might

otherwise bring against Eastman and WV American Water in

relation to the Freedom Industries spill, save for those class

members who opt out of the agreement.  The field of possible

claims is expansive, and it includes, inter alia, breach of

contract claims by WV American Water's customers as well as tort

claims for negligence and gross negligence in preparing for and

responding to the spill.  Both the breach of contract and the negligence claims survived dispositive motions and, consequently, had sufficient merit to give plaintiffs leverage in negotiations.  Those same observations apply to the tort claims against Eastman.

The proposed settlement is the result of negotiations taken up in light of the potential merits of plaintiffs' claims, and it represents a strong result in two primary respects. First, the proposal entitles class members to substantial compensation based on their status as residents or businesses at the time of the spill, as earlier outlined.  The anticipated sums represent substantial amounts that few claimants could expect to recoup through independent litigation that would likely engulf similar compensation amounts with high litigation costs and fees.

Second, the Settlement Agreement provides substantial flexibility to address the claims of those class members who deem their injuries insusceptible of redress through the Simple Claims process.  The agreement provides for an Individual Review process through which claimants can present claims, with supporting documentation, that they posit exceed the flat amounts available under the Simple Claims process.  The Individual Review mechanism represents an outstanding result for

class members: individuals and businesses may tailor their
claims based on whether they claim, for example, medical injury
(of various types), lost wages or profits, or property damage.
The proposal circumvents the enormous expense of taking these
matters to individual or bellwether trials, and it strikes a
balance between claimants who would have difficulty proving
their damages — who may use the Simple Claims process — and
those who are prepared to go forward in the Individual Review
process.  The option of individually tailored remedies is a
hallmark of a strong outcome for the class.[15]

        The court's discretion, however, extends most
importantly to determining whether the settlement's terms are,
on the whole, "fair, adequate, and reasonable to all concerned."
Marshall, 787 F.3d at 509; Fed. R. Civ. P. 23(e).  "The primary
concern addressed by Rule 23(e) is the protection of class
members whose rights may not have been given adequate
consideration during the settlement negotiations."  Jiffy Lube,
927 F.2d at 158.  Thus, the court remains particularly concerned
by four aspects of the proposed settlement: (1) the tiered

---

[15] Defendants, furthermore, achieve a global resolution of their
claims through this proposal, which reduces their exposure to
ongoing litigation by orders of magnitude.  They have the option
to terminate the agreement in the event that the number of opt
outs reaches a certain threshold, and they may dispute claims
issued through the IR process.  Consequently, defendants'
interests are also well protected.

compensation structure for certain businesses, (2) the review and "appeals" process when disputes over claims arise, (3) the fixed base payments to certain medical claimants, and (4) the delay of payments pending appellate review.[16]

First, the tiered compensation structure generates unfairness to business claimants whose revenues are at the upper margins of the various tiers. For businesses shut down or partially shut down by the public health authorities in the wake of the spill, claimants with annual revenue under $250,000 can receive an estimated payment of $6,250; businesses with annual revenue between $250,000 and $1 million, $12,500; and businesses with $1 million or more in annual revenue, $25,000. Consequently, for a business earning just under the $250,000 cap, the Settlement Agreement provides a payment of $6,250 equaling approximately 2.5% of the business's annual revenue, whereas a self-employed individual with annual revenue of $20,000 would receive the same $6,250, or 31.2% of annual revenue, for a nine-day shut down period. For a business earning just under the $1 million cap, the Settlement Agreement provides a payment of $12,500 equaling approximately 1.25% of the business's annual revenue. For businesses with just over

_____

[16] The court is also concerned with the attorneys' fees and costs requested by plaintiffs' counsel, but it will address those concerns in a separate section of this opinion, infra.

$250,000 in revenue, the Settlement Agreement provides for a payment of $12,500 that equals approximately 5% of the business's annual revenue, yielding a recovery that is four times the rate of that for a business just below the $1 million mark. A similar tiered structure generates analogous problems for business claimants in the lodging and hospitality industry as well.

A tiered compensation structure is of course a mechanism sometimes used to allocate economic rewards proportionately. A tiered structure is sometimes also used to apportion compensation in a class action settlement. See, e.g., In re Baby Prod. Antitrust Litig., 708 F.3d 163, 174 (3d Cir. 2013) (settlement included tiers for cash distributions, based not on claimant's income or revenue but on whether they could prove their damages). An allocation plan, however, must be fair to all claimants, see Jiffy Lube, 927 F.2d at 158, and must have some rational justification, see, e.g., In re Global Crossing Securities and ERISA Litigation, 225 F.R.D. 436, 462 (S.D.N.Y. 2004). In this instance, the tiered structure is a blunt instrument where a more surgical approach is required.

Although tiers may allow the parties better to forecast the compensation that the settlement will distribute through the Simple Claim process, they cannot do so at the

expense of fairness to the claimants.  When one business

receives 5% of its revenues through the claims process and

another 1.25%, the disparity calls into question the fairness of

the proposal to those parties.  Although certain costs imposed

by the spill and water contamination might be equivalent for

many businesses, surely others were costs in proportion to the

size of a given business.  A 3.75% variance, which may be

significant especially for small businesses, does not appear

rationally related to any relevant facts about the particular

businesses.  The tiered structure instead appears to provide a

windfall to certain businesses on no account of their own.  More

equitable, however, would be a structure that allowed business

claimants — those currently categorized under the tiered

structures — to recover the same or a less disparate percentage

of their annual revenues in the Simple Claims process as other

business claimants under the same structure.  The court

therefore deems this aspect of the Settlement Agreement unfair

to many business class members currently categorized under the

tiered structures, and it will require the parties to amend

these structures in order for the Settlement Agreement to

achieve preliminary approval.

Second, the court is concerned with the procedure for

resolving disputes over claims filed under the Settlement

Agreement.  Currently, the settlement proposal envisions a tripartite review process, with ultimate discretion allocated to the Settlement Administrator in most cases.  First, the Settlement Administrator reviews a claimant's eligibility and evaluates the appropriate amount of compensation in accordance with the terms of the agreement.  Second, claimants who dispute their awards may "appeal" to the Settlement Administrator for reconsideration.  Third, the Settlement Administrator may refer any issues or questions about the Settlement Agreement that arise during implementation of the claims process to a "Claims Oversight Panel" composed of four members, two selected by plaintiffs and one selected by each of Eastman and WV American Water.  Interpretations of the Settlement Agreement by the Claims Oversight Panel only have binding authority on the Settlement Administrator when issued unanimously.  Settlement Agreement § 6.2.5-6.2.6.

Given the sprawling complexity of this litigation, one mark in favor of the settlement is that it provides a mechanism by which to address differences between the various damages claims without embroiling the parties in further litigation. That justification suffers appreciably, however, when the review process is not exhaustive enough to prevent the court's further involvement in administrative matters.  It is not difficult to

imagine scenarios in which claimants unsatisfied with the singular authority of the Settlement Administrator will look to the court to resolve disputes over claims and other matters entrusted to the Settlement Administrator.  Absent some kind of independent review panel that can hear appeals directly, rather than merely advise the Settlement Administrator, the court is concerned that one of the key justifications for settlement — avoidance of further litigation — evaporates.

An appeals or mediation panel, or both, would facilitate resolution of claims without the court's involvement and the concomitant expense and drain on judicial resources. Regarding certain lost profits and lost revenues claims, the Settlement Agreement already incorporates an appeals process under which disputants (including the parties in this case) may select and submit disputes to an experienced, independent third party for final determination.  The court sees no reason to confine this process to lost profits and lost revenues claims. So it is that the court deems this aspect of the Settlement Agreement to be inadequate, and it will direct the parties to include a more robust dispute resolution process in the proposed Settlement Agreement.

Third, fixed base payments for other medical issues claims and water interruption medical issues claims also raise

concerns.  Both types of claim provide for a fixed base payment of $50,000, which can be higher for permanent visual impairment ($150,000), wrongful death ($350,000), and total occupational disability ($500,000).  Fixed payments of that magnitude fail to account for inevitable and substantial differences between claims, and such payments for those with minor injuries or lesser losses tend to disparage the integrity of the distribution process and may serve to diminish the sums ultimately recovered by other claimants.  An appropriate award will depend on the facts of a particular claim.  Accordingly, the parties may institute a cap on the base payment for these types of claim, such that a claimant may receive an award of "up to" a certain dollar amount, but they may not use fixed base payments for these types of claim that do not allow for adjustment based on particular circumstances.  Consequently, the court deems this further aspect of the Settlement Agreement to be unfair, and it directs the parties to provide a more flexible compensation mechanism in any updated Settlement Agreement.

Fourth, the court is concerned by provisions of the Settlement Agreement that will cause delay in the distribution of claims payments.  As drafted, the Settlement Agreement does not allow payments to claimants to begin until all appeals have been resolved and any further appeals period has expired.

Delays of over a year are not uncommon for a case on appeal, and an appeal of relatively minor issues should not be allowed to stall the timely issuance of claims payments.  If particular appeals present substantial risks to defendants, a mechanism may be devised in the Settlement Agreement that sequesters adequate funds to meet an adverse determination.  However, they may not occlude the entire claims payment process until resolution of all appeals.  The court deems this aspect of the Settlement Agreement to be inadequate, and the parties are directed to devise a provision that meets the court's concerns.

Consequently, the court does not direct notice at this time.  Fed. R. Civ. P. 23(e)(1).  Likewise, the court postpones appointing the Notice Administrator, Settlement Administrator, Settlement Class Representatives, and Settlement Class Counsel until the court grants preliminary approval.  Instead, the court declines to approve the proposed Settlement Agreement until the parties submit an agreement and preliminary approval motion meeting the foregoing conditions.  See Evans v. Jeff D., 475 U.S. 717, 727 (1986) (district court may "advise[] petitioners and respondents that it [will] not approve their proposal unless one or more of its provisions was deleted or modified").

II.  Attorneys' Fees, Costs, and Incentive Awards

A.  Attorneys' Fees

Generally, there are two competing methods by which courts evaluate attorneys' fees in the class action context: the percentage-of-recovery method and the lodestar method.

> The percentage-of-recovery method is generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure.  The lodestar method is more commonly applied in statutory fee-shifting cases, and is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation.

In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 732 (3d Cir. 2001) (citations and quotation marks omitted).  The lodestar method uses an attorney's billable rate and the number of hours worked to arrive at a fee.  See Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 (3d Cir. 2000).

"The Fourth Circuit has neither announced a preferred method for determining the reasonableness of attorneys' fees in common fund class actions nor identified factors for district courts to apply when using the percentage method."  Kay Co. v. Equitable Prod. Co., 749 F. Supp. 2d 455, 463 (S.D.W. Va. 2010). The circuits to consider the percentage method have found that trial courts may use that method in class actions in order to

assess attorneys' fees.  See Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000); Cook v. Niedert, 142 F.3d 1004, 1013 (7th Cir. 1998); In re Thirteen Appeals Arising out of San Juan DuPont Plaza Hotel Fire Litig., 56 F.3d 295, 307 (1st Cir. 1995); In re Wash. Pub. Power Supply Sys. Litig., 19 F.3d 1291, 1295 (9th Cir. 1994); Gottlieb v. Barry, 43 F.3d 474 (10th Cir. 1994); Rawlings v. Prudential–Bache Props., Inc., 9 F.3d 513, 516 (6th Cir. 1993); Longden v. Sunderman, 979 F.2d 1095, 1099 (5th Cir. 1992); In re Cont'l Ill. Sec. Litig., 962 F.2d 566 (7th Cir. 1992); Camden I Condo. Ass'n, 946 F.2d 768, 773–74 (11th Cir. 1991); Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir. 1989); Brown v. Phillips Petroleum Co., 838 F.2d 451, 454, 456 (10th Cir.), cert. denied, 488 U.S. 822 (1988); Bebchick v. Wash. Met. Area Transit Comm'n, 805 F.2d 396, 406–07 (D.C. Cir. 1986).[17]  Perhaps most important, the Fourth Circuit has stated that "despite our very deferential review in this area, we do require district courts to set forth

---

[17] "District courts within the Fourth Circuit have consistently endorsed the percentage method."  Deem v. Ames True Temper, Inc., 6:10-CV-01339, 2013 WL 2285972, at *4 (S.D.W. Va. May 23, 2013) (citing, e.g., Muhammad v. Nat'l City Mortg., Inc., Civil Action 2:07-CV-0423, 2008 WL 5377783, at *7 (S.D.W. Va. Dec. 19, 2008); In re Royal Ahold N.V. Sec. & ERISA Litig., 461 F. Supp. 2d 383, 385 (D. Md. 2006); League v. Bakker, 213 F. Supp. 2d 571, 583 (W.D.N.C. 2002); Goldenberg v. Marriott PLP Corp., 33 F. Supp. 2d 434, 438 (D. Md. 1998); Strang v. JHM Mortg. Sec. Ltd. P'ship, 890 F. Supp. 499, 502 (E.D. Va. 1995)).

clearly findings of fact for fee awards so that we have an adequate basis to review for abuse of discretion." Berry, 807 F.3d at 617.

The court here adopts the percentage method rather than the lodestar method in order to evaluate the fee request, although the court will employ a "lodestar cross-check" as one element of the analysis.

### 1. The Benchmark Approach

Settlement Class Counsel[18] rely on cases out of the Ninth Circuit to argue that their requested award of 30% is reasonable because it represents a justifiable departure from a typical "benchmark" fee of 25% in common fund cases. The Ninth Circuit has in one case "note[d] with approval that one [lower] court has concluded that the 'bench mark' percentage for the fee award should be 25 percent." Paul, 886 F.2d at 272. Even the Ninth Circuit has cautioned that the benchmark approach should not be applied indiscriminately to every common fund case. See Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1048 (9th Cir. 2002)

---

[18] Plaintiffs filed their petition for fees through their proposed Settlement Class Counsel, a group comprising (A) three attorneys and associated firms who are Class Counsel in this federal case — Van Bunch, Kevin Thompson, and Stuart Calwell — and (B) three attorneys and associated firms who are lead counsel in the state MLP cases — Anthony Majestro, Benjamin Bailey, and Marvin Masters.

("The 25% benchmark rate, although a starting point for analysis, may be inappropriate in some cases."). More generally, the Ninth Circuit has found that often "fee awards range from 20 percent to 30 percent of the fund created." Paul, 886 F.2d at 272.

The Eleventh Circuit has observed the following:

> [T]his court has often stated that the majority of fees in these cases are reasonable where they fall between 20–25% of the claims. Id. Where the requested fee exceeds 25%, the court is instructed to apply the twelve Johnson factors. Id. The Johnson factors include: (1) the time and labor required; (2) the difficulty of the issues; (3) the skill required; (4) the preclusion of other employment by the attorney because he accepted the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Faught v. Am. Home Shield Corp., 668 F.3d 1233, 1242–43 (11th Cir. 2011). In their fee request, counsel cite to empirical studies by Professors Thomas Eisenberg and Geoffrey P. Miller finding that the mean percentage fee in 69 cases ranging from approximately $70 million to approximately $175 million was 19.4%. Pet. for Fees 20-21. See Thomas Eisenberg & Geoffrey P. Miller, Attorney Fees and Expenses in Class Action Settlements: 1993-2008, 7 J.

Empirical Legal Stud. 248 (2010) [hereinafter "<u>Attorney Fees . . . 1993-2008</u>"]; Thomas Eisenberg & Geoffrey P. Miller, <u>Attorney Fees in Class Action Settlements: An Empirical Study</u>, 1 J. Empirical Legal Stud. 27 (2004) [hereinafter "<u>Attorney Fees . . . An Empirical Study</u>"].

Settlement Class Counsel champion Eisenberg and Miller's argument that "fee requests falling within one standard deviation above or below the mean should be viewed as generally reasonable and approved by the court unless reasons are shown to question the fee." Pet. for Fees 20; Eisenberg & Miller, <u>Attorney Fees . . . An Empirical Study</u>, <u>supra</u>, at 74. In addition, Settlement Class Counsel urge the authors' argument that "fee requests falling between one and two standard deviations above or below the mean should be viewed as potentially reasonable but in need of affirmative justification." Pet. for Fees 20; Eisenberg & Miller, <u>Attorney Fees . . . An Empirical Study</u>, <u>supra</u>, at 74. The authors, Eisenberg and Miller, report the mean for common funds ranging from $70 to $175 million as 19.4% with a standard deviation of 8.4%, placing the fee request here in the second category — that lying between one and two standard deviations from the mean. <u>Attorney Fees . . . An</u>

Empirical Study, supra, at 74.  The court, however, does
not endorse the recommendations of the authors.

First, it is not apparent why fee awards that are
8.4% higher or lower than the mean should be presumptively
reasonable absent an affirmative showing that such a fee is
inappropriate.  When, as in the case of common fund fee
awards, the parties' relationship is no longer adversarial,
who would bear the burden of such a showing?  Second and
more important, such an approach would appear to place an
imprimatur of reasonableness on a 27.8% award, which is
8.4% higher than the mean, regardless of fund size.  This
approach subverts precisely the concerns about a windfall
with which courts are regularly so concerned when applying
the percentage-of-recovery method.  The better approach is
the one that this court adopts: that common fund fee
requests require affirmative justification regardless of
the percentage fee.

Some circuits have expressly disagreed with a
benchmark approach.  William B. Rubenstein, Newberg on Class
Actions § 15:78 (5th ed.) ("Both the Second and Third Circuits
have explicitly rejected the benchmark approach.").  The Second
Circuit has declined to adopt a simple benchmark approach,
instead noting the importance of distinctions between common

fund cases of various types and sizes:

> We are . . . disturbed by the essential notion of a
> benchmark. We agree that many class actions serve a
> useful purpose, that lawyers who successfully
> prosecute them deserve reasonable compensation, and
> that market rates, where available, are the ideal
> proxy for their compensation. The problem is that we
> cannot know precisely what fees common fund plaintiffs
> in an efficient market for legal services would agree
> to, given an understanding of the particular case and
> the ability to engage in collective arm's-length
> negotiation with counsel. . . .
>
> Moreover, even a theoretical construct as flexible as
> a "benchmark" seems to offer an all too tempting
> substitute for the searching assessment that should
> properly be performed in each case. Starting an
> analysis with a benchmark could easily lead to routine
> windfalls where the recovered fund runs into the
> multi-millions. "Obviously, it is not ten times as
> difficult to prepare, and try or settle a 10 million
> dollar case as it is to try a 1 million dollar case."
> [In re Union Carbide Corp. Consumer Prod. Bus. Sec.
> Litig., 724 F. Supp. 160, 166 (S.D.N.Y. 1989).]
> Indeed, empirical analyses demonstrate that in cases
> like this one, with recoveries of between $50 and $75
> million, courts have traditionally accounted for these
> economies of scale by awarding fees in the lower range
> of about 11% to 19%.

Goldberger, 209 F.3d at 51-52.

Even without accounting for fund size, the empirical

literature clearly demonstrates that a 30% fee is higher than

that awarded in the vast majority of class actions.  Recent

empirical studies have found the mean fee awards for circuits

using a "benchmark" across all fund sizes to be between 21% and

28%.  Rubenstein, supra, § 15:78 tbl.1.  In the Fourth Circuit,

three empirical studies have found mean fee awards on funds of

all sizes in the last two decades to range from 20% to 27.7%, with the latter figure of 27.7% coming from the most recent study of cases from 2006 to 2011.  Id. § 15:83 tbl.2.  In one case, the Ninth Circuit compiled a table of class actions between $50 million and $200 million, finding that "most . . . awards [were] around 10-30% and a bare majority . . . clustered in the 20-30% range."  Vizcaino, 290 F.3d at 1050 n.4 & app.

The case at bar provides even less reason to adopt a 25% benchmark fee because of the size of the common fund. Courts have found through empirical analysis that larger common funds typically have smaller percentage fees.  See, e.g., In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 339 (3d Cir. 1998) (fees in common fund cases exceeding $100 million "ranged from 4.1% to 17.92%"); Carlson v. Xerox Corp., 596 F. Supp. 2d 400, 405 (D. Conn.), aff'd, 355 F. App'x 523 (2d Cir. 2009) (providing a chart of some of the largest class action settlements and noting that in only 6 of the top 26 cases was the fee awarded higher than 20% and in no case was it higher than 28%).  As the Third Circuit has noted, there is an "inverse relationship" between fund size and attorney fee percentage.  In re Prudential, 148 F.3d at 339. See also Rubenstein, supra, § 15:81 (Eisenberg and Miller's studies show that "the mean award for recoveries of $1.1 million

and less was 37.9%, while the mean for recoveries over $175.5
million was 12%").

Commentators have noted the differences between fees
awarded on large and small recoveries.  The American Bar
Association's Task Force on Contingent Fees has endorsed
Eisenberg and Miller's conclusions regarding the scaling effect
of contingent fees.  See Report on Contingent Fees in Class
Action Litigation January 11, 2006 Task Force on Contingent
Fees, Tort Trial and Insurance Practice Section of the American
Bar Association, 25 Rev. Litig. 459, 486 (2006) [hereinafter
"Report on Contingent Fees"] ("[Eisenberg and Miller] also
discovered that the percentage fee awarded declines as the size
of the fund grows, a so-called 'scale effect.'").  In addition,
one study found that

> the average award for funds under $750,000 was 28.8%,
> while the average award for funds over $72.5 million
> was 18.4%; as the recoveries increased over $72.5
> million, the effect continued, with recoveries up to
> $100 million receiving a 23.7% fee on average, while
> those with $1 billion or more received 13.7%.

Rubenstein, supra, § 15:81 (citing Brian T. Fitzpatrick, An
Empirical Study of Class Action Settlements and Their Fee
Awards, 7 J. Empirical Legal Stud. 811, 839 (2010)).

The court need not here decide that the benchmark
approach is the appropriate starting point.  Instead, the court

simply notes that the Ninth Circuit's 25% benchmark is a
relevant consideration in assessing the reasonableness of the
parties' requested 30% fee on the guaranteed fund and 25% fee on
the contingent fund.  The court further observes that a fee of
approximately 30% is, by any comparative metric, at the high end
of the range in class actions generally, and well beyond the
high end of the usual range for class actions of this size.
See, as earlier noted, In re Prudential, 148 F.3d at 339
(finding that fees in settlements over $100 million "ranged from
4.1% to 17.92%").

        Counsel argue that in fact the overall percentage
award will be lower than the 30% number when fees on contingent
funds are included.  They request a 25% fee on all monies
actually paid out of the $50 million AW Contingent Fund, and
note that, in the unlikely event that the entire contingent fund
is fully exhausted, the blended fee requested would amount to
only 28.3%.  Counsel are of course correct that the total fee
may be lower than 30%.  Conversely, there is a risk that
claimants will not access the contingent fund at all.  Indeed,
the court is mindful that it may be particularly difficult for
many claimants to access contingent funds, which require
submission of an Individual Review Claim, because the
documentation and causation thresholds adopted by the parties

for Individual Review Claims are more onerous than the
requirements for Simple Claims.  The court will keep in mind all
of these considerations when making its fee determination below.

## 2.    Analysis of Relevant Factors

Courts commonly focus particular attention on the
following factors to assist in evaluating the reasonableness of
a common fund fee award: (1) the benefits obtained for the
class, (2) the quality, skill, and efficiency of the attorneys,
(3) the complexity and duration of the litigation, (4) the risk
of nonpayment, (5) awards in similar cases, (6) objections, and
(7) public policy.[19]  See Kay, 749 F. Supp. 2d at 464; PRIDES,
243 F.3d at 733.  At the preliminary approval stage, the sixth
factor relating to objections will not yet be relevant, although
it will be of great importance at the final approval stage.  The
court will analyze each of the other factors in turn and will
balance them in considering a fee determination at the

---

[19] These factors simply consolidate the twelve Johnson/Barber
factors that are relevant to the assessment of attorneys' fees
awards under the lodestar method.  See Barber v. Kimbrell's,
Inc., 577 F.2d 216, 226 (4th Cir. 1978) (citing Johnson v.
Georgia Highway Exp., Inc., 488 F.2d 714, 718 (5th Cir. 1974)).
The seven factors analyzed here "are substantially similar to
the [Johnson/Barber] factors mandated in this Circuit when
employing the lodestar method."  In re The Mills Corp., 265
F.R.D. at 265.  See also Berry, 807 F.3d at 617.

preliminary approval stage.

### i.    The Benefits Obtained

Counsel argue persuasively that they have obtained a substantial benefit for the class.  The most critical factor in calculating a reasonable fee award is "the degree of success obtained."  _McDonnell v. Miller Oil Co._, 134 F.3d 638, 641 (4th Cir. 1998).  Both Class Counsel in this action and state counsel in a variety of related matters have coordinated their efforts to achieve an outstanding financial result.  First, the right to a recovery for injuries stemming from the Freedom Industries spill is itself a significant benefit to class members.  Second, even beyond the mere right, class members may obtain a material benefit by submitting claims for reimbursement.  The amounts may be substantial, with awards of $1,035 for a household of four, tens of thousands of dollars for some businesses, and potentially far greater awards for those who have suffered personal injuries.

Additionally, the benefit to the public of a prophylactic against future water contamination should not be underestimated.  Counsel represent that they have, _inter alia_, advocated before the PSC and secured measures to improve the water system generally and the level of emergency response by the water company.  Furthermore, WV American Water has developed

technologies that may be used in the future to detect and
prevent water contamination and has agreed to provide local
authorities with access to these technologies.  Pet. for Fees 8.
Consequently, the substantial public benefits obtained through
this litigation weigh in favor of a substantial fee award.

### ii.    The Quality, Skill, and Efficiency of the Attorneys

Counsel in this case have advocated assiduously for
their class over approximately three and one-half years.  The
percentage-of-recovery method, unlike the lodestar method, aims
to increase the efficiency of litigation by "reward[ing] counsel
for success and penaliz[ing] it for failure."  PRIDES, 243 F.3d
at 732.  Settlement negotiations in this case were spurred on
particularly as trial approached, although counsel's skillful
motions practice doubtless assisted in clarifying the issues and
motivating settlement considerations.  Counsel also correctly
note that they generated and advanced important arguments
regarding liability by investigating WV American Water's complex
water system.  In particular, they advanced the proposition that
WV American Water's plant should have included a proposed second
water intake or continued operation of a pre-existing intake at
Coonskin Shoals on the Elk River.  Pet. for Fees 13.  They
advocated as well that, had the water company fully used its

water storage facilities to capacity, sufficient storage water
would have been available to serve the system while the
contaminated spill flowed by.  These arguments required
substantial dedication to the case and a learned familiarity
with a complex water system that had been largely foreign to
counsel prior to filing this case.  Counsel also rightly contend
that developing the case against Eastman required diligent
research and still further education.  Their work endeavored to
understand the chemical properties of the MCHM compound and the
concomitant effects on the Freedom Industries tank in which it
was stored.  The court has been confident in counsel's
qualifications, diligence, and skill throughout this litigation.

### iii.    The Complexity and Duration of the Case

The case has taken several years to resolve,
illustrating the tension between the second and third factors in
the analysis — the former rewarding efficiency and the latter
emphasizing duration.  In terms of duration, while it is true
that plaintiffs filed this civil action in January 2014, the
case has not lasted orders of magnitude longer than a typical
federal class action case of this size.  Indeed, class actions
of this scope often last multiple years.  See, e.g., Vizcaino,
290 F.3d at 1050 (affirming a $96 million settlement fund and a
28% fee in a case that lasted eleven years); Sullivan, 667 F.3d

at 285 (affirming a $295 million settlement fund in a case in which, prior to settlement, numerous individual cases had been in litigation for years); Kay, 749 F. Supp. 2d (approximately $30 million settlement negotiated after four years); In re Cardinal Health Inc. Sec. Litigations, 528 F. Supp. 2d 752, 756 (S.D. Ohio 2007) (class action litigated for three years and ending in $600 million settlement).

With respect to complexity, there are good reasons to award higher-than-typical fees when the issues in a case are particularly "novel and complex." See PRIDES, 243 F.3d at 740. Counsel argue that the approximate 30% fee in this case is justified by the complexity of this class action. They cite the existence of the complicated class certification litigation, extensive discovery, use of numerous expert and counter-expert witnesses on both sides, quite extensive motion practice, and prolonged preparations for trial. They likewise note that they have been involved in ancillary litigation and negotiations surrounding the spill, including the Freedom Industries bankruptcy which complicated progress in this case, the remediation of the site, and related proceedings before the PSC. Pet. for Fees 14-16. They do not show, however, that this is unusual for a class action of this size and scope. In fact, many of the characteristics just listed are endemic to

substantial class actions, and as such, they do not warrant awarding an atypically high fee.

Further, this case has not involved the generation or application of new law, nor did it involve appellate relief, unlike cases where fee awards have been larger. Cf. PRIDES, 243 F.3d at 740. In Vizcaino, for example, the court justified an award of 28% on a $96 million settlement fund in part because plaintiffs lost in district court twice on the merits, only to revive their claims on appeal "in the absence of supporting precedents." 290 F.3d at 1048. Instead, the arguments here have generally revolved around the application of largely settled law to the particular facts of the Freedom Industries spill. Consequently, although Class Counsel have been skillful and diligent and have been resisted by equally formidable counsel for defendants, the complexity and duration of this case have not been so extraordinary as to justify the requested fee award.

### iv. The Risk of Nonpayment

Counsel also emphasize that they bore significant risks in undertaking this litigation, as indeed they did. Like all class action litigation, this case imposed the risk of nonpayment upon counsel. This is not alone, however, the relevant risk. The risks relevant to assessing an atypically

large or small fee request are the distinctive risks specific to a particular litigation.  <u>Goldberger</u>, 209 F.3d at 54 ("Risk falls along a spectrum, and should be accounted for accordingly."); <u>Kay</u>, 749 F. Supp. 2d at 466 (noting that "[i]n determining the reasonableness of an attorneys' fee award, courts consider the relative risk involved in litigating the specific matter").

In this case, Class Counsel pursued water contamination claims of an exceptional nature against venerable water company opponents.  But counsel soon learned that they were doing so with the benefit of their opponents' alleged failure to maintain either a second intake or adequate water storage, by virtue of which they were enabled to contend that the contaminated water was allowed to invade the water system instead of the system being closed off while the spill flowed by.  Adding Eastman to the mix became a safe decision inasmuch as Eastman was quickly known to have supplied the contaminated substance, MCHM, to Freedom, where it was stored in the tank that leaked it into the Elk River.  While Class Counsel soundly built their case against both the water company and Eastman at considerable expenditure of skilled and determined effort and some $2 million in out-of-pocket expenses, the ultimate risk of nonpayment was not so great as to merit an atypically high

award.

v.     Awards in Similar Cases

The fee request here — which with respect to certain claims will be substantially greater than 30% — is significantly higher than awards in many similar cases.  As canvassed above in subsection 1, empirical analyses have attempted to gauge the universe of attorneys' fees in class actions, although the Fourth Circuit has not spoken directly to this question.  In general, the empirical literature and case surveys strongly support the conclusion that class actions ranging from $100 million to $150 million tend to have an average award of less than 25% of the common fund.  See, e.g. Goldberger, 209 F.3d at 51–52 (percentages in common fund cases between $50 and $75 million ranged between 11% and 19%); In re Prudential, 148 F.3d at 339 (fee percentages in common fund cases exceeding $100 million "ranged from 4.1% to 17.92%"); Eisenberg & Miller, Attorney Fees . . . 1993-2008, supra (average percentage fee in 69 cases ranging approximately from $70 million to $175 million was 19.4%).

It is true as Settlement Class Counsel point out that state and federal courts in West Virginia sometimes speak of a one-third contingency fee as the going rate in West Virginia. Counsel cite to, for instance, decisions by courts in West

76

Virginia noting the "presumptive reasonableness" of a one-third common fund fee.  Pet. for Fees 19-20.  Importantly, however, these cases involve common funds that are far less substantial than the fund contemplated here, which reaches nine figures. See Deem, 2013 WL 2285972, at *7 (awarding a one-third fee totaling only $135,000); Archbold v. Wells Fargo Bank, N.A., 3:13-CV-24599, 2015 WL 4276295, at *7 (S.D.W. Va. July 14, 2015) (awarding a one-third fee totaling approximately $185,000); Helmick v. Columbia Gas Transmission, 2:07-CV-00743, 2010 WL 2671506, at *7 (S.D.W. Va. July 1, 2010) (awarding a one-third fee totaling approximately $141,000); Muhammad, 2008 WL 5377783, at *10 (awarding a one-third fee totaling $233,333). Consequently, these cases are not relevant here.

Furthermore, percentage fees are inversely correlated with the size of the fund, and this "scaling" effect strongly mitigates against awarding the requested fee here.  See, e.g., In re Prudential, 148 F.3d at 339.  "[D]istrict courts setting attorneys' fees in cases involving large settlements must avoid basing their awards on percentages derived from cases where the settlement amounts were much smaller."  PRIDES, 243 F.3d at 736. Even a 25% award in this case would be higher than most attorneys' fee awards on common funds of this magnitude.

        Two competing policy considerations influence the
award of attorneys' fees in common fund cases.  First, the court
must act to "prevent windfalls" to plaintiff attorneys.  Hensley
v. Eckerhart, 461 U.S. 424, 444 (1983) (quotation marks
omitted).  The risk of a windfall arises because defendants
typically agree to a single fund amount, regardless of how that
amount is divided among class members and attorneys.  Subsequent
to settling on that amount, defendants are often no longer
concerned with the specifics of dividing the fund and no longer
ensure an adversarial relationship, although the water company
defendants in particular do have an interest in limiting the
total payout to the guaranteed fund.  See Boeing Co. v. Van
Gemert, 444 U.S. 472, 482 (1980) (defendant "had no cognizable
interest in further litigation between the class and its lawyers
over the amount of the fees ultimately awarded from money
belonging to the class"); Report on Contingent Fees, 25 Rev.
Litig. at 489.

        Second, public policy promotes attorneys taking on
class claims that might otherwise go unremedied because the
financial incentives are not high enough to justify standard
litigation, and that policy counsels in favor of a substantial
fee.  See Amchem, 521 U.S. at 617.  The court's challenge is to

                                78

award a fee that both compensates the attorneys with a risk premium on their skill and labor and avoids a windfall.  In making this determination, the court is mindful that a larger case does not necessarily mean a proportionally larger amount of work, simply because "increasing the number of class action plaintiffs does not necessarily increase the amount of time class counsel spends on a case."  Kay, 749 F. Supp. 2d at 469.  Counsel have provided no reasons to think that awarding a fee lower than 30% here will dissuade future litigators from taking on similar cases.  Consequently, public policy tends to counsel against awarding the requested, above-average fee of 30%.

### 3.    The Lodestar Cross-Check

Courts have also incorporated a "lodestar cross-check" in order to provide an independent metric against which to measure the percentage fee.  Manual for Complex Litigation (Fourth) § 14.121 (2004); Goldberger, 209 F.3d at 50; Gen. Motors, 55 F.3d at 820. "The central concern about the pure percentage method is that it may produce windfall fees; the purpose of the lodestar cross-check is to guard against this concern by enabling a court to ascertain the relationship of the percentage award to counsel's billing for the case."  Rubenstein, supra, § 15:85.  Importantly, however, employing the lodestar as a cross-check does not require the same level of

exhaustive scrutiny as employing the lodestar method alone. <u>Goldberger</u>, 209 F.3d at 50.

The Third Circuit has analyzed common fund awards in excess of $100 million and noted that the multipliers "range from 1.35 to 2.99." <u>PRIDES</u>, 243 F.3d at 742. Other guidance on the acceptable range of numerical values for multipliers is sparse, but the empirical literature suggests that "most multipliers are in the relatively modest 1-2 range." Rubenstein, <u>supra</u>, § 15:87 (citing Fitzpatrick, <u>supra</u>, at 833–34 (noting that in 204 cases employing a lodestar cross-check the "lodestar multiplier . . . ranged from 0.07 to 10.3, with a mean of 1.65 and a median of 1.34")). <u>See also</u> Eisenberg & Miller, <u>Attorney Fees . . . 1993–2008</u>, <u>supra</u>, at 273 (noting that in nearly 700 state and federal cases over a 16-year period, "the mean multiplier ranged from 1.19 in the Eleventh Circuit to 2.43 in the Fourth Circuit").

Counsel in the case at bar have provided documentation breaking down the hourly rates of attorneys and staff into six categories, including numerous categories of attorney (by name and/or billing rate) and staff. Counsel represent that the highest billable rate is $575 per hour, applicable only to certain Class Counsel and MLP Lead Counsel, and that the blended average of all billable rates is $360 per hour. Pet. for Fees

21-22.  Counsel helpfully itemize the hours and rates of all individual attorneys and staff who worked toward the settlement of this action.  They have submitted a total of 46,904 hours, for a total lodestar of $16,907,591.25.  Id.  Assuming these calculations are correct, the multiplier on the first $101 million of the settlement at the requested fee amount of 30% ($30,300,000) is approximately 1.79.  Importantly, this multiplier rests on one crucial assumption: that the entire guaranteed fund will be completely exhausted by Simple Claims, Check Distributions, Individual Review Claims paid out of the guaranteed fund, and finally additional payments to Simple Claimants.  While the likelihood of these claims exhausting the guaranteed funds is high, it is not certain.

Furthermore, when including the additional $50 million contingent fund agreed to by the parties, for which counsel seek a 25% fee of all claims paid, the maximum possible compensation rises to $42,800,000 and the maximum possible multiplier to 2.53.  It is true that compensation on the contingent $50 million is speculative and that it is unlikely that claimants will exhaust the contingent fund given the more complex claims process for contingent claims.  Still, the proposed multiplier can fairly be characterized as ranging from a low of 1.79 to a high of 2.53.  This multiplier is in fact at the border of the

range usually deemed reasonable by courts where common funds
reach similar magnitudes.

### 4.    Final Balancing

The award of attorneys' fees "is within the judicial
discretion of the trial judge." <u>Barber v. Kimbrell's, Inc.</u>, 577
F.2d 216, 226 (4th Cir. 1978) (citing <u>Lea v. Cone Mills Corp.</u>,
467 F.2d 277, 279 (4th Cir. 1972)).  Importantly, "the
reasonableness of the claimed lodestar can be tested by the
court's familiarity with the case." <u>Goldberger</u>, 209 F.3d at 50.
Put differently, the cross-check does not "'supplant the court's
detailed inquiry into the attorneys' skill and efficiency in
recovering the settlement. . . .'" <u>Kay</u>, 749 F. Supp. 2d at 470.
That inquiry, detailed in subsection (ii) above, demonstrates
that counsel have not provided compelling reasons for awarding a
fee with a 5% surplusage over a putative 25% level that is
itself generous for class actions of this size.

In summary of that inquiry, the court finds that the
public benefit afforded by the settlement, the skill and
diligence of the attorneys, and the risks of nonpayment do
combine to mitigate in favor of an above-average fee award.
Above-average does not, however, equate to a 30% fee.  Rather,
there is evidence that an above-average fee on a common fund of
this size is anything higher than 19.4%.  <u>See</u> Eisenberg &

82

Miller, Attorney Fees . . . 1993-2008, supra.  Public policy

generally cautions against awarding too high a fee, and the

court finds that awards in similar cases as well as the

complexity and duration of this particular litigation

demonstrate that the requested fee of 30% is too high.

Furthermore, a lodestar of 1.79 is not so low as to be an

absolute floor below which the fee cannot go.  In fact, awarding

a fee of 25% would result in a lodestar of approximately 1.5, a

figure squarely within the empirical literature's normal range

of 1 to 2.  See Fitzpatrick, supra, at 833-34.

     Accordingly, the court is persuaded that a 25% fee

award is appropriate rather than the requested 30% award in this

case.  The public benefit obtained and the scope of the

litigation justify a fee at the higher end of the usual range.

See, e.g., Faught, 668 F.3d at 1242-43 (suggesting that class

actions normally award fees ranging from 20% to 25%).  In

conjunction with the other factors analyzed in subsection 2

above, however, they do not justify an unusually high fee of 30%

in a case of this size.  See, e.g., In re Microstrategy, Inc.,

172 F. Supp. 2d 778, 790 (E.D. Va. 2001) (reducing a requested

27% fee to 18% fee on a common fund "valued at $98.5-137.5

million").  The court therefore declines to award the fee

structure requested by counsel.  Instead, assuming that the

current settlement proposal retains its basic structure in any renewed motion for preliminary approval, the court will approve preliminarily an award of a 25% fee on the guaranteed funds and a 25% fee on any amounts paid out of the contingent fund.

In evaluating the fee award, the court further observes that fees may be awarded either on the actual payout to claimants or on the total common fund made available to class members. In at least one other context, Congress has clarified that fees should be tied to the actual payout:

> Congress has changed [the approach to awarding fees] for coupon settlements in federal court. Under the Class Action Fairness Act, fees that are tied to the value of coupons must be calculated according to the value of the coupons actually redeemed. Predicted redemption, or (worse) face value, no longer can be a basis for a percentage attorneys' fees award in federal court. Fees are tied to actual results.

Report on Contingent Fees, 25 Rev. Litig. at 473. See 28 U.S.C. § 1712.

Congressional concerns over coupon settlements likewise obtain in a settlement like the one proposed here, where the awards contemplated by the settlement require verification through a claims process — referred to as a "claims-made" settlement. Of course, a "claims-made" settlement confers some benefit on the class even if no class member exercises the right to recovery. Boeing Co. v. Van Gemert, 444

U.S. 472, 480 (1980) ("[Class members'] right to share the
harvest of the lawsuit upon proof of their identity, whether or
not they exercise it, is a benefit in the fund created by the
efforts of the class representatives and their counsel.").
Still, the American Bar Association's Task Force has highlighted
the importance of Congress's concerns over coupons even outside
the coupon settlement context:

> The Task Force endorses the policy of payment of class
> counsel fees only as and when class members receive
> compensation. The Class Action Fairness Act creates
> such a system for coupon settlements, <u>but the policy
> behind that change is generally applicable to
> settlements in which payments are made in uncertain
> amounts over time</u>.

<u>Report on Contingent Fees</u>, 25 Rev. Litig. at 476 (emphasis
added).

Class Counsel do not discuss, and the court to this
point has not critiqued, the quite troubling provision in the
Settlement Agreement that calls for additional contingency fees
for an attorney who aids the filing and presentation of an
Individual Review claim.  Attorneys engaged prior to October 31,
2016, as most of them will have been, are under no limitation.
Those engaged after October 31st are limited to 15% and, for
them, the net payment to the claimant must exceed the applicable
Simple Claim amount, if there is one.  The additional fee of 15%
for some, and the unlimited fee for most others, would send the

total attorneys' fees in this case soaring well above the 25%
figure preliminarily approved by the court.  The parties must
bring all attorney fees in this case under control.  That
includes the added premium of 25% on Individual Review claims
paid out of the Eastman Fund, for which the court has not been
provided a rational basis.

The court understands that counsel for nearly all
prospective claimants have reached a joint prosecution
agreement.  An exception is understood to be some West Virginia
Hospitality claimants.  The court is unaware of the terms of
that agreement, but has assumed it is a fee sharing arrangement
under which the overall award of 25% would be divided among all
participating counsel.  The court entertains some doubt about
the breadth of that understanding inasmuch as there was received
on June 12, 2017, a motion to intervene and to stay these
proceedings on the ground that the motion for attorneys' fees
now under consideration fails to reflect the hours of the Bell
Law Firm and three other firms claiming to represent some 300
class members.  The motion was withdrawn eight days later, from
which the court infers that the demands of the movants were met.
Perhaps there are still others with whom no agreement has been
achieved.

## B.    Administrative Costs

It is appropriate for courts to award administrative costs out of a common fund when reasonable.  See, e.g., Staton v. Boeing Co., 327 F.3d 938, 974 (9th Cir. 2003) (approving award of notice costs out of a common fund).  However, the record must develop evidence by which the court can assess the amounts and reasonableness of proposed costs.  In re Katrina Canal Breaches Litig., 628 F.3d 185, 195 (5th Cir. 2010) (overturning district court's approval of settlement where there "[wa]s no indication in the record as to what these attorneys' costs and expenses will be").  Costs should "reflect a reasonable amount of expenditures for a case of [a certain] magnitude . . . and also bear a reasonable relationship to the time and effort expended and the result achieved."  Jones v. Dominion Res. Servs., Inc., 601 F. Supp. 2d 756, 767 (S.D.W. Va. 2009) (citations and quotation marks omitted).

Counsel have not provided support for the administrative costs necessarily implicated by this proposed Settlement Agreement in their petition for costs and fees.  See Pet. for Fees 24-25.  They have, however, independently lodged with the court a separate Fee Letter detailing the administrative costs incurred under the settlement.  They submitted a fee schedule provided by the proposed Settlement

Administrator, SCH, and estimated administrative costs to include $1,973,500 of settlement administration costs for SCH and $681,591 in notice costs for the Notice Administrator. The notice cost estimates have been submitted directly by the Notice Administrator, and the court will presume them to be reasonable. The entire class numbers over 100,000 residential and business addresses, and such a large volume of notices will no doubt incur substantial costs. Notice will also necessitate tracking down and advertising for class members who have relocated from the addresses that WV American Water had for them as customers — no mean feat. The costs of mailings and advertising will likely be substantial, and the court is not inclined to question the notice cost estimates at this stage.

With respect to settlement administration costs, however, the parties appear to anticipate a lower "take rate" than suggested previously to the court. They estimate the number of Simple Claims at 37,000 residential and 5,000 business claims, out of a set of 105,000 eligible residential households and 7,000 possible business claims. They further anticipate approximately 2,700 residential, and 400 business, Individual Review Claims, as well as distributing 57,000 checks to customers who fail to file claims. The so-called "take rates" for residential and business claimants on these assumptions

amount therefore to 38% of residential claimants and 77% of
business claimants filing claims.  Assuming these take rates,
the settlement administration cost estimate of $1,973,500 may be
reasonable, although the attorneys have not submitted any
documentation or satisfactory rationale in support of this
amount.  The court will require counsel to file with any renewed
motion for approval of attorneys' fees and costs an analysis of
administrative costs — to be distinguished from "litigation
costs" already incurred in the course of this litigation by the
various firms.  See Katrina Canal, 628 F.3d at 195.

### C.    Litigation Costs and Incentive Awards

Courts regularly award reasonable litigation costs to
counsel seeking remuneration in an action for which they request
attorneys' fees.  The Fourth Circuit has held that such costs
may include "those reasonable out-of-pocket expenses incurred by
the attorney which are normally charged to a fee-paying client,
in the course of providing legal services."  Spell v. McDaniel,
852 F.2d 762, 771 (4th Cir. 1988) (quotation marks omitted).
Generally, lawyers tend to bill "variable costs" associated with
the specifics of a particular case separately from the labor
costs covered by the attorneys' fees.  InvesSys, Inc. v. McGraw-
Hill Cos., Ltd., 369 F.3d 16, 23 (1st Cir. 2004).  Courts within
the Fourth Circuit have found costs such as "necessary travel,

depositions and transcripts, computer research, postage, court costs, and photocopying" to be reasonable. <u>Andrade v. Aerotek, Inc.</u>, 852 F. Supp. 2d 637, 644 (D. Md. 2012). <u>See also</u> <u>In re The Mills Corp.</u>, 265 F.R.D. at 265 (reasonable costs include expert fees).

Here, the parties submit litigation costs totaling $2,377,376.93. Pet. for Fees 24. This is consistent with litigation cost awards in similarly sized cases. <u>See, e.g.</u>, <u>In re Microstrategy</u>, 172 F. Supp. 2d at 791 (approving costs of $2.63 million where the common fund totaled $98.5 to 137.5 million). The parties' submission provides a list of experts, but does not identify the industry or services performed by each expert. Additionally, it appears to identify numerous law firms that incurred various types of costs, including expert costs. Some costs appear to have been incurred by a litigation fund, with which the court is unfamiliar. The petition for costs and fees appears to include, in the reimbursement request, litigation fund contributions from several firms. However, some of those firms appear to request reimbursement of what has actually been spent from the litigation fund, and others reimbursement of whatever they contributed to the fund. <u>Compare, e.g.</u>, Pls.' Mot. for Award of Attys.' Fees Ex. 1 ¶ 10 <u>with</u> Ex. 3 ¶ 9. Only costs that have been actually expended by

the litigation fund should be reimbursed out of the settlement

monies.  Any contributions by the various firms to the

litigation fund that are not expended need to be remitted to

those firms by that fund itself and should not be included in

those firms' litigation costs tallies.  Consequently, without

further information on the nature of various expert services and

of the litigation fund, the court can only conditionally approve

the litigation costs submitted to date.  Counsel will need to

provide further analysis of litigation costs, including an

explanation of any litigation fund costs, prior to final

approval.

        Courts also appropriately reward class representatives

who come forward to protect the rights of the class as well as

their own rights.  See Thornton v. E. Texas Motor Freight, 497

F.2d 416, 420 (6th Cir. 1974).

    Incentive awards are routinely approved in class
    actions to encourage socially beneficial litigation by
    compensating named plaintiffs for their expenses on
    travel and other incidental costs, as well as their
    personal time spent advancing the litigation on behalf
    of the class and for any personal risk they undertook.

Domonoske v. Bank of Am., N.A., 790 F. Supp. 2d 466, 476–77

(W.D. Va. 2011) (quotation marks omitted).  Courts in other

contexts have approved awards of $15,000, the amount sought by

each of the fourteen plaintiffs in this case, and the court

finds that such amounts, as well as awards of $10,000 to ten

named plaintiffs in the state court case In re Water
Contamination Litigation, No. 16-C-6000, may be reasonable in
this case.  See, e.g., Kay, 749 F. Supp. 2d at 473 (awarding
$15,000 incentive awards to six class representatives); Berry,
807 F.3d at 614 (affirming award of $5,000 to each of seven
class representatives); Glass v. UBS Fin. Servs., Inc., No. C-
06-4068 MMC, 2007 WL 221862, at *16 (N.D. Cal. Jan. 26, 2007),
aff'd, 331 F. App'x 452 (9th Cir. 2009) (awarding $25,000
incentive awards to four named plaintiffs).  Before
preliminarily approving their awards, the court will require
Class Counsel to file declarations explaining why each of the
twenty-four to be compensated is entitled to awards at the level
requested.  See, e.g., Barbosa v. Cargill Meat Sols. Corp., 297
F.R.D. 431, 454 (E.D. Cal. 2013) (approving a $15,000 award for
class representatives after they each filed declarations).

## CONCLUSION

For the foregoing reasons, it is ORDERED that the parties' Joint Motion for Preliminary Approval of Class Settlement, Conditional Class Certification, Directing Notice to the Class, and Entry of Scheduling Order be, and it hereby is, denied without prejudice.  The parties are directed to file such modified settlement agreement as they may wish that is consistent with this opinion and order.

Additionally, it is ORDERED that plaintiffs' Motion for Award of Attorneys' Fees, Reimbursement of Costs, and Incentive Awards be, and it hereby is, denied in part and granted in part in accordance with Part II of this opinion.

The Clerk is requested to transmit copies of this order to all counsel of record and any unrepresented parties.

DATED:  July 6, 2017

John T. Copenhaver, Jr.
United States District Judge