UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CRYSTAL GOOD, et al.,

    Plaintiffs,

v.

                                    Civil Action No. 2:14-cv-1374
                                    John T. Copenhaver, Senior Judge

WEST VIRGINIA-AMERICAN
WATER COMPANY, et al.,

    Defendants.

## CLAIMANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO ENFORCE THE AMENDED SETTLEMENT AGREEMENT

**COME NOW** Claimants Bryan Goodson, the Estate of Daniel Stewart, the Estate of Linda Stayer, Duane Maddy, and John Varney, by their respective counsel, and submit *Claimants' Memorandum of Law in Support of Their Motion to Enforce the Amended Settlement Agreement.* This Court should reverse the Final Rulings of the Settlement Administrator and order the West Virginia-American Water Company ("Water Company" or "defendant") to pay the Claimants the amounts originally awarded by the Settlement Administrator. In the alternative, the Claimants request the entry of an order allowing them to file their cases in court again.

### General Factual Background

Based on the Claimants' submissions in compliance with the Amended Settlement Agreement ("ASA") and the Distribution Protocols ("DPs"), the Settlement Administrator initially awarded substantial sums in accordance with the terms negotiated by the parties. However, the Water Company filed objections and submitted reports from experts that the defendant retained on its own. The Settlement Administrator then consulted with John Brick, M.D., without the consent

of Class Counsel. Relying on reports from Dr. Brick and the Water Company's experts, the Appeal
Adjudicator substantially reduced the value of the claims. Based on those decisions, the Settlement
Administrator then issued final rulings.

<u>Issue</u>

**Should this Court Enforce the ASA by Reversing the Final Rulings and
Ordering Payment of the Amounts Originally Awarded by the Settlement
Administrator?**

<u>Arguments</u>

I.      **The Finality of the Appeal Adjudicator's Decisions Does Not Divest this
Court of the Authority to Ensure Compliance with the Settlement
Agreement.**

This Court has jurisdiction to resolve disputes over the implementation of the ASA and the

DPs.   In class actions where the district court has entered a final dismissal order, the court has

ancillary jurisdiction to resolve disputes over the settlement agreement in two instances. *Kokkonen*

*v. Guardian Life Ins. Co. of Am.*, 511 U. S. 375, 381, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994).

The district court retains decision making authority in the case "if the district court explicitly

retains jurisdiction over the settlement agreement to ensure compliance." *Benipayo v. Volkswagen*

*Grp. of Am., Inc. (In re Volkswagen "Clean Diesel" Mktg., Dales Practices & Prods. Liab. Litig.)*,

2020 U.S. App. LEXIS 28651 (9th Cir. 2020).

The district court also has authority to resolve disputes concerning compliance with a

settlement agreement if the court incorporates the terms of the agreement in its dismissal order.

which is common in class action settlements. *Kokkonen; Benipayo*. In such cases, a breach of the

agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement

can exist. *Id*. A district court must have "power to enforce" its order approving a settlement "to

protect the integrity of  a complex class settlement over which it retained jurisdiction." *In re*

*Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 367-68 (3d Cir. 2001).

In *Benipayo*, the district court expressly retained jurisdiction to ensure compliance with the settlement agreement. Because the plaintiffs alleged a breach of the settlement agreement with Volkswagen, the district court had ancillary jurisdiction over the plaintiffs' motions. *Id.* "[T]he party seeking enforcement of the settlement agreement must allege a violation of the settlement agreement in order to establish ancillary jurisdiction." *Alvarado v. Table Mountain Rancheria*, 509 F.3d 1008, 1017 (9th Cir. 2007).

In this case, just as in *Benipayo*, the Claimants have alleged violations of the class action settlement agreement. However, this Court has not yet entered a final order of dismissal in this class action. If a district court can retain ancillary jurisdiction to resolve disputes over compliance with a settlement agreement after the class action has been dismissed, then this Court has the authority to ensure compliance with the settlement agreement while the action is still pending.

## II.     The ASA Does Not Permit the Water Company to Retain Its Own Experts, and the Use of Those Experts Violated the ASA.

A settlement agreement is to be construed as any other contract. *Floyd v. Watson*, 163 W.Va. 65, 254 S. E. 2d 687 (1979). Where the terms of a contract are clear and unambiguous, they must be applied and not construed. *Orteza v. Monongalia County Gen. Hosp.*, 173 W. Va. 461, 318 S. E. 2d 40 (1984). In *Orteza*, Dr. Orteza's contract of employment with the hospital provided for cancellation by either party upon 120 days notice. Pursuant to that contractual provision, the hospital terminated the doctor's employment with 120 days notice. Dr. Orteza filed an action against the hospital alleging, in part, wrongful discharge based on a lack of good cause. The jury rendered a verdict in Dr. Orteza's favor, and the hospital appealed. *Orteza*.

The *Orteza* court reversed the judgment in the doctor's favor, holding that the trial court erred when it allowed the jury to construe a contractual provision that was unambiguous on its face. The court noted that the provision in the contract concerning termination of employment could not have been clearer. If the parties had intended to provide that discharge could be effected

only for good cause "they would have said so." *Orteza.*

In this case, there are no provisions in the ASA or the DPs that authorize the use of experts by the defendant. Just as in *Orteza*, if the parties had intended to authorize the Water Company to hire its own experts, they would have said so. Indeed, the only experts authorized by the settlement documents are experts retained by the Claimants and the Settlement Administrator. Reference to the use of experts appears twenty-two times in the DPs, eighteen of those references pertain to experts retained by the claimants.[1] The only remaining references to experts in the DPs are four references pertaining to the use of experts by the Settlement Administrator.[2] These are the only experts authorized by the settlement documents. There is absolutely no mention of a right of the Water Company to use expert witnesses. (*See en toto*, the ASA and DPs, ECF 1163-1.) In the absence of any provision authorizing the Water Company to retain its own experts in the claims process, that right simply does not exist. *Orteza.* The Water Company's use of its own experts to substantially reduce these claims constitutes breaches of the ASA. These Claimants gave up their right to a jury trial in reliance on receiving the benefit of a settlement process prescribed by the ASA and the DPs. However, that process did not take place in these five claims. Therefore, the Final Rulings in these claims, based on unauthorized opinions, should be reversed.

### III.   Class Counsel Did Not Agree on the Use Of Dr. Brick, Who Admitted that He Was Not Qualified to Render Opinions in this Case.

Class counsel did not agree to the Settlement Administrator's use of John Brick, M.D. During the settlement process, this Court instructed the parties to agree on a consulting medical expert for the Settlement Administrator. The Defendant rejected all six physicians suggested by

---

[1] DP § VIII.B.3(iv) *Id* at 112 (for claimants in Other Medical Issues Claims) (6 times); DP § VIII.C.2(iv), *Id* at 113 (for claimants in Water Interruption Medical Issues Claims) (6 times); DP § VIII.D.1(i), *Id* at 114 (for claimants in Water Interruption Claims and Other Medical Issues Claims) (2 times); DP § VIII.D.1(ii), *Id* at 114 (for claimants in Visual Impairment Claims); DP § VIII.D.1(iii), *Id* at 115 (for wrongful death claimants in Water Interruption Claims and Other Medical Issues Claims); and DP § VIII.D.1(iv), *Id* at 115 (for claimants in occupational disability claims); and DP § VI.F.5.v.b.2, *Id* at 109 (for claimants in Lost Profit Claims).

[2] DP § VIII.B. 4 & 5; DP § VIII.C. 3 & 4.

the Plaintiffs, claiming that those doctors were "biased." The defendant also objected to Rahul Gupta, M.D, who was recommended by John Jenkins, the Settlement Administrator. The Water Company rejected Dr. Gupta in spite of the fact that he was a public health official who was already familiar with the details of the exposures during the water crisis. (*See* the Declaration of Class Counsel Kevin Thompson, Esq., pp. 2 - 3, which is attached as Claimants' Exhibit 1.)

The Water Company suggested Dr. Brick, a semi-retired professor at the West Virginia University School of Medicine. His specialties are neurology and vision problems. Dr. Brick has no experience in toxic exposure cases, including the determination of causation. Dr. Brick also has no training or experience in treating pulmonary disorders. He has admitted that he is not qualified to make these determinations. (*See* the June 3, 2019 E-mail from the Settlement Administrator, John Jenkins, which is attached as Claimants' Exhibit 2.)

In a conference in chambers, this Court instructed the Settlement Administrator to provide Dr. Brick with three medical claimants' files to review to determine whether he could competently advise the Settlement Administrator. After that conference, the Claimants never heard anything from the Settlement Administrator, the Water Company, or anyone else until suddenly, the Claimants began receiving Dr. Brick's decisions. Only then did the Claimants learn that, instead of a trial run of only a few claims, Dr. Brick had swept through all remaining medical claims, denying, or effectively denying, nearly all of them based on only cursory, abrupt findings. The only communications from Dr. Brick or the Settlement Administrator, after the conference in chambers, were opinion letters from Dr. Brick that reduced the amount of the initial decisions by over 99%. (*See* Claimants' Exhibit 1, page 3.)

When discussing Dr. Brick's possible involvement in this case, the Court suggested that he consult with other experts. However, Dr. Brick, rendered his opinions in only broad strokes, with no mention of any consultation with other experts, or any research he conducted. Dr. Brick's lack

of qualifications is also shown by his failure to apply the correct standards concerning causation.

### IV.   The Opinions of Dr. Brick and the Experts Retained by the Water Company Should Also Be Rejected Because They Failed to Apply the Correct Standards for Causation.

In addition to the lack of authorization for the use of experts by the Defendant, the opinions of these experts are invalid because they did not apply the correct standards for causation.  Pursuant to the applicable DPs, the Claimants are only required to show there was a "causal relationship" between exposure to the contaminated water and the Claimant's illness.  DP § VIII.B, at 111.  The standard of proof is only "to a reasonable degree of medical probability."[3] Because this standard is not defined in the ASA, the common law rules regarding proximate causation apply in these claims.  Under the common law, an actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm.  *Restatement (Second) Torts* § 431.  The word "substantial" denotes the fact that the defendant's conduct has such an effect producing the harm as to lead reasonable persons to regard it as a cause, using that word in the popular sense.  *Id.*, Comment a.

"Negligence, to be actionable, must be the proximate cause of the injury complained of and must be such as might have been reasonably expected to produce an injury." *Sergent v. City of Charleston*, 209 W. Va. 437, 446, 549 S.E.2d 311, 320 (2001); *McCoy v. Cohen*, 149 W. Va. 197, 140 S.E.2d 427 (1965). "A tortfeasor whose negligence is a **substantial factor** in bringing about injuries is not relieved from liability by the intervening acts of third persons if those acts were reasonably foreseeable by the original tortfeasor at the time of his negligent conduct." *Anderson v. Moulder*, 183 W. Va. 77, 394 S.E.2d 61 (1990) (emphasis added). Under the "substantial contributing factor" test, the negligence of the tortfeasor need not be the only cause of

---

[3] DP § VIII.B.3(iv), ECF 1163-1, p. 112; DP § VIII.C.2(ii) and (iv), at 113;  DP § VIII.D.1(i) and (iii), at 114-115.

the injury. *Everly v. Columbia Gas of West Virginia, Inc.*, 171 W. Va. 534, 301 S. E. 2d 165 (1982). The plaintiff in a tort action is not required to prove that the negligence of the defendant is the sole proximate cause of the injury. *Id.* It is sufficient that the negligence of the defendant is a proximate cause of the injury. *Tracy v. Cottrell*, 206 W. Va. 363, 524 S. E. 2d 8798 (1991).

**Bryan Goodson:**[4] Bryan Goodson experienced respiratory problems after his exposure to crude MCHM in January, 2014. Charles L. Werntz, D.O., the Claimants' expert, opined to a reasonable degree of medical probability that Mr. Goodson suffered from chemical pneumonitis resulting from that exposure. (*See* Dr. Werntz's affidavit and report, which are attached as Claimants' Exhibit 3.) Dr. Brick challenged this by writing that Mr. Goodson's respiratory problems were caused by an infectious process, pneumonia. (*See* Dr. Brick's report, attached as Claimants' Exhibit 4.) The Water Company's improperly retained expert, Gary R. Krieger, M.D. also opined that Mr. Goodson's breathing problems were due to Influenza A pneumonia. (*See* Dr. Krieger's report, which is attached as Claimants' Exhibit 5.) Despite the fact that MCHM is a known pulmonary irritant, neither physician considered whether Mr. Goodson's exposure to contaminated water substantially contributed to his illness. Both physicians simply ignored the standard for proximate cause.

**Linda Stayer:** The same omissions occurred in the claim of the Estate of Linda Stayer, who also suffered from respiratory problems. Dr. Werntz opined that Mrs. Stayer developed chemical pneumonitis as a result of her exposure to MCHM vapors in home, allowing for the development of a secondary bacterial infection of her lungs, necrotizing pneumonia, which was the ultimate cause of her death by ARDS in March 2014. (*See* Dr. Werntz's affidavit and report, which are attached as Claimants' Exhibit 6.) In response Dr. Brick focused on the fact that Mrs.

---

[4] Claimants provide these paragraphs to discuss evaluators' erroneous failures to follow the obvious proximate cause standards articulated in the ASA and DPs. The Claimants' well-supported claims are summarized later in this brief.

Stayer's "records clearly indicate that her condition had preceded the chemical spill." (*See* Dr. Brick's report, attached as Claimants' Exhibit 7.) Dr. Krieger took the same myopic approach as Dr. Brick, writing that the "Claimant **likely** had a complex rheumatological disorder of uncertain etiology." (*See* Dr. Krieger's report, attached as Claimants' Exhibit 8 (emphasis added.)

The other Water Company expert in this claim, Joseph A. Govert, M.D., wrote that it "appears" from Mrs. Stayer's medical records that her medical condition "clearly predated her chemical exposure." (*See* Dr. Govert's report, attached which are attached as Claimants' Exhibit 9.) Just as in the claim of Bryan Goodson, these reviewing physicians failed to consider whether chemical exposure from the Incident substantially contributed to Mrs. Stayer's respiratory problems and death. The opinions of Dr. Brick and the other physicians are flawed because the defendant's conduct is not required to be the sole cause of the plaintiff's injury.

**Daniel Stewart:** The claim of the Estate of Daniel Stewart is a Water Interruption claim. Mr. Stewart died after his kidney transplant surgery was delayed by three weeks due the shortage of water cause by the spill. During that time frame, Mr. Stewart had to undergo additional dialysis treatments. According to Dr. Werntz, this delay and additional treatment rendered Mr. Stewart less robust and was a substantial contributing factor in is death. (*See* the report and affidavit of Dr. Werntz, which are attached as Claimants' Exhibit 10.)

Dr. Brick attributed Mr. Stewart's death to risk factors such as coronary artery disease (*See* Dr. Brick's report, attached as Claimants' Exhibit 11.) Another expert improperly retained by the Water Company, Steven D. Weisbord, M.D., wrote that Mr. Stewart's clinical condition was unremarkable, and that there was no evidence of an active cardiac complaint. (*See* Dr. Weisbord's report, attached as Claimants' Exhibit 12.) Again, these reviewing physicians focused only on the Claimant's existing conditions, and unlike Dr. Werntz, failed to consider whether the delay as a substantial contributing factor in Mr. Stewart's death.

**Duane Maddy:**  Duane Maddy had a deviated septum.  After the spill, he began to suffer from daily nose bleeds.  He ultimately required a septoplasty procedure.  The constant nose bleeds and surgery were caused by Mr. Maddy's exposure to contaminated water.  (*See* the affidavit and report of Dr. Werntz, which are attached as Claimants' Exhibit 13.) Despite the temporal relationship between Mr. Maddy's chemical exposure and the recurring nose bleeds, Dr. Brick attributed the nose bleeds to diabetes and an ulcer in Mr. Maddy's nose.  (*See* Dr. Brick's report, attached as Claimants' Exhibit 14.)   Robert C. Kern, M.D., who was improperly retained by the Water Company to review Mr. Maddy's claim, simply wrote that nose bleeds are common and that there was no connection between Mr. Maddy's problems and chemical spill. (*See* Dr. Kern's report, attached as Claimants' Exhibit 15.)   Neither physician considered whether the chemical irritants in the water substantially contributed to Mr. Maddy's nasal problems.

**John Varney:**   John Varney had history of an inverted papilloma in his left nostril that was removed in 2014.  Exposure to the contaminated water irritated Mr. Varney's nasal passages to the point that he needed surgery.  (*See* the affidavit and report of Dr. Werntz, which are attached as Claimants' Exhibit 16.) The Water Company's physician, Dr. Kern, once again failed to consider whether Mr. Varney's chemical exposure was a substantial contributing factor in Mr. Varney's injury.  (*See* Dr. Kern's report, attached as Claimants' Exhibit 17.)

Under the substantial contributing factor test these Claimants' exposure to contaminated water need not be the only cause of their injuries or death.  In all of these claims, the failures by Dr. Brick and the experts improperly retained by the Water Company to apply basic proximate cause standards in accordance with the provisions of the ASA, render their opinions fatally flawed, and render the Final Rulings based on those opinions invalid.

This fatal error in ignoring the proper standards is apparent from the blame assigned to the Claimants' preexisting conditions in the opinions of Dr. Brick, the Water Company's Experts, the

Settlement Administrator and the Appeal Adjudicator. They ignored a key component of the applicable standard, "exacerbation of an existing condition." A claimant is only required to submit a contemporaneous record documenting "medical care for an illness or injury, or exacerbation of an existing condition, which a treating licensed health care provider diagnosed and which is demonstrated to be causally related to exposure to contaminated water from the Incident as set forth in Section VIII.B.3(iv) below." DP § VIII.B.3.(ii), ECF 1163-1, p. 111-112. This demonstration of a causal connection by a qualified expert repeats the same low threshold, which requires the expert's affidavit or declaration to establish that the illness or injury, or exacerbation of an existing condition, is causally related to exposure. DP § VIII.B.3.(iv), ECF 1163-1, p. 112. (emphasis added.)

All of these claims involve the exacerbation of existing conditions. Bryan Goodson's Influenza A pneumonia was made worse by exposure to contaminated water. The chemical spill exacerbated Linda Stayer's shortness of breath, ultimately resulting in death by ARDS after chemical pneumonitis allowed for the development of a pneumonia in her lungs. The delay in Daniel Stewart's kidney transplant exacerbated his overall medical condition by making him less robust and rendering the surgery more dangerous for him. The chemical spill exacerbated Duane Maddy's deviated septum to the point of causing daily nose bleeds and necessitating corrective surgery. John Varney's already constricted left nostril was further constricted by his exposure to contaminated water and ultimately damaged his vision.

As expressly acknowledged in the ASA, the presence of an existing condition at the time of the Incident does not render a claim invalid if that condition has been exacerbated by exposure to contaminated water. Unfortunately, rather than acknowledging and applying the exacerbation component when evaluating these claims, Dr. Brick and the Water Company's experts have improperly used the existing conditions of these Claimants to defeat causation and to reject their

claims.  Because claims are fully compensable even when injuries are mere exacerbations of existing medical conditions under the ASA's low threshold, the decisions of the Appeal Adjudicator and the Final Rulings of the Settlement Administrator are invalid and should be reversed.

V.     **The Claimants Have Proven Their Claims, and Should Be Paid the Amounts Originally Awarded by the Settlement Administrator.**

Charles L. Werntz, III, D.O., M.P.H, FACOEM, is the Claimants' primary medical expert. Dr. Werntz specializes in occupational medicine.  He has been licensed to practice medicine in West Virginia since June, 1997.  He served on the faculty at West Virginia University for twenty years.  Dr. Werntz is now in private practice. (*See* the *Curriculum Vitae* of Dr. Werntz, *attached* as Claimants' Exhibit 18.)  His opinions establish proximate cause in these five claims.

**Bryan Goodson:**  Bryan Goodson developed symptoms soon after his exposure to contaminated water.  During the relevant treatment period, from January 21, 2014, through August 27, 2014, Mr. Goodson received three diagnoses: influenza, chemical pneumonitis and bronchiolitis obliterans. When rendering opinions on causation, Dr. Werntz wrote that Mr. Goodson's lung problems were less likely to be from bacterial pneumonia due to the lack of response to antibiotics and the prolonged recovery that he required.  Dr. Werntz has opined, to a reasonable degree of medical probability, that Mr. Goodson's chemical pneumonitis was caused by his exposure to crude MCHM in January, 2014.  (*See* Claimants' Exhibit 3.)

Despite the three diagnoses rendered by Mr. Goodson's treating physicians, the Water Company's expert, Dr. Krieger, opined that Influenza A was the sole cause of Mr. Goodson's condition. (*See* Claimant's Exhibit 5.) Dr. Krieger, however, also acknowledged that bronchiolitis obliterans could be the result of Mr. Goodson's influenza.  Dr. Brick disagreed with Dr. Krieger's diagnosis, opining that Mr. Goodson suffered from pneumonia, not bronchiolitis obliterans and/or chemical pneumonitis.  (*See* Claimant's Exhibit 4.)  Neither Dr. Krieger nor Dr. Brick properly

applied the substantial contributing factor test or the existing condition component of other medical issues claims when rendering their opinions on causation. (*See* Claimants' Exhibits 5 and 4.)

On April 22, 2019, Dr. Werntz submitted a report in rebuttal to Dr. Krieger's opinion. Dr. Werntz wrote that the presence of influenza does not preclude Mr. Goodson's pulmonary irritation being made worse by exposure to MCHM, a possibility that Dr. Krieger and Dr. Brick ignored. (*See* Dr. Werntz's rebuttal report, which is attached as Claimant's Exhibit 19.) Dr. Werntz also opined that Mr. Goodson's exposure substantially contributed to the severity and duration of his pulmonary disease. (*Id.*)  Regardless of the diagnosis, it is clear that Mr. Goodson's respiratory problems did not resolve from antibiotic therapy as expected if the condition was caused by bacteria.  Dr. Werntz, therefore, correctly opined that Mr. Goodson's lung problems were less likely to be from bacterial pneumonia due to the lack of response to antibiotics, and the prolonged recovery the Claimant experienced.  From January, 2014, through August, 2014, Mr. Goodson's lung problems would have been less severe if he had not been exposed to MCHM. (*See* Claimants' Exhibit 3.)  Dr. Werntz ultimately opined that, due to the lack of a positive response to antibiotics Mr. Goodson's symptoms were compatible with chemical pneumonitis or bronchiolitis. He added that the presence of flu-like symptoms does not preclude Mr. Goodson's pulmonary irritation being made worse by exposure to MCHM. (*See* Claimants' Exhibit 19.)

Indeed, the Water Company's expert opinion flies in the face its admission in the ASA that respiratory problems, including flu-like illnesses, can be caused by the contaminated water.  As set forth in the ASA, "Eligible Physical Injury includes: skin rash or dermatitis, eye irritations, gastrointestinal or respiratory distress or flu-like illness . . ." ASA § 3.86, ECF 1163-1, p. 21-22.

**Linda Stayer:**   Mrs. Stayer also suffered from respiratory problems.  Whereas she was in a good state of health in December, 2013, Mrs. Stayer had significant sensitivities to common substances in a standard environment, such as household cleaning solutions, cosmetics, perfumes

and aerosols, and naturally occurring allergens such as pollens.  Exposure to these items irritated Mrs. Stayer's skin, eyes, and respiratory tract.  (*See* Claimant's Exhibit 6.)

Linda Stayer used the contaminated water in her home until the Do-Not-Use order was issued in the evening of January 9, 2014.  On January 13, 2014, she was hospitalized at Thomas Memorial Hospital ("Thomas") in South Charleston, West Virginia, with a six week history of swelling and pain and color changes in her fingers.  (*Id.*)  However, her primary spill-related exposure occurred weeks later.  About one week after Mrs. Stayer returned home from her first hospitalization, on or about January 23, 2014, her husband flushed the plumbing in their house pursuant to the directions of the Water Company.  A strong odor accompanied the flushing.  Mrs. Stayer began experiencing breathing symptoms after she washed her hair soon after the flushing. On January 30, 2014, Mrs. Stayer was once again hospitalized at Thomas, this time for shortness of breath. Her lung problems worsened, and she was transferred to CAMC, then ultimately to Cleveland Clinic, where unfortunately Mrs. Stayer died on March 28, 2014.  According to the Death Certificate, she died from Acute Respiratory Failure secondary to ARDS. (*See* Mrs. Stayer's Death Certificate, which is attached as Claimant's Exhibit 20.) An autopsy that was performed after the completion of the death certificate revealed acute and organizing diffuse alveolar damage with bilateral lower lobe acute necrotizing pneumonia. (*See* Mrs. Stayer's Autopsy Report, which is attached as Claimant's Exhibit 21.) Dr. Werntz noted that this autopsy was very thorough and did not reveal any other underlying disease. (*See* Claimants' Exhibit 6, p. 4.)

Dr. Werntz wrote in his affidavit about crude MCHM's ability to significantly impact the lungs and respiratory function, and about a scientific study labeled TX-97-306. Based on Linda Stayer's history of exposure and the records from her medical care, Dr. Werntz opined that Mrs. Stayer developed chemical pneumonitis as a result of her exposure to MCHM vapors in home, allowing for the development of a secondary bacterial infection of her lungs, which was the

necrotizing pneumonia found in her autopsy, and which was the ultimate cause of her death from ARDS. *Id.*

On behalf of the Water Company, Dr. Krieger and Dr. Govert disagreed with Dr. Werntz, as did Dr. Brick. These experts failed to apply the proper proximate cause standards. Dr. Krieger failed to give any cause at all for Linda Stayer's pulmonary problems, while Dr. Govert and Dr. Brick incorrectly used Ms. Stayer's existing condition as a barrier to her claim, rather than determining whether the exposure exacerbated her existing condition, as required by the DPs. (*See* Claimants' Exhibits 9 and 7.)

Dr. Govert declared that "her medical condition clearly predated her chemical exposure," blaming Mrs. Stayer's existing condition, rather than including her shortness of breath and other factors to support her claim under the exacerbation component in the ASA and DPs. (*See* Claimants' Exhibit 9.) Dr. Govert also contradicted himself, writing that it seems likely volatile chemical irritants such as MCHM and propylene glycol phenyl would temporarily exacerbate airway diseases, such as asthma or COPD, but would not cause ARDS. *Id.* As later noted by Dr. Werntz, Dr. Govert failed to notice that the type of exacerbation of underlying disease that he described as "likely" is precisely what occurred with Mrs. Stayer. (*See* Dr. Werntz's rebuttal, which is attached as Claimants' Exhibit 22.) Because her lungs were in a previously weakened state they did not recover, but continued to worsen. The ARDS was a common end-point of worsening lung function following her exposure to the contaminated water. *Id.*

Dr. Brick did not establish a cause for the miscellaneous "complex rheumatological disorder," from which he declared Mrs. Stayer must have suffered, focusing instead on the contention that this disorder, which he did not specify, "preceded the chemical spill." (*See* Claimants' Exhibit 7.)   Apparently Dr. Brick ignored Mrs. Stayer's autopsy. Autoimmune disease, such as the "complex rheumatological disorder" mentioned by Dr. Brick, was not found

during the thorough autopsy. (*See* Claimants' Exhibit 21.)  Likewise, Dr. Krieger and Dr. Govert also ignored Linda Stayer's autopsy findings.  Neither of their reports mentions any autopsy findings.  Both physicians, instead, relied on the vague diagnosis of ARDS from the death certificate, which had been completed before information could be reviewed from the autopsy. The death certificate, dated March 27, 2014, confirmed in Box 29b that the cause of death was completed before autopsy findings were available. (*See* Linda Stayer's Death Certificate, Box 29b. and Linda Stayer's Autopsy Report, which are attached as Claimants' Exhibits 20 and 21.)

No competent health care provider can disagree that autopsies are the "Gold Standard" for diagnoses.[5]  Despite this fact, Dr. Brick, Dr. Krieger and Dr. Govert all ignored the autopsy findings in favor of vague findings from the death certificate.  They incorrectly decided that Mrs. Stayer died of "idiopathic ARDS," guessing that this "unknown" cause was an "unrecognized infection" or "underlying autoimmune disease."  (*See* Claimants' Exhibits 7, 8, and 9.)  Beyond that no "autoimmune disease" or "rheumatological disorder" was found in a very thorough autopsy, it had been ruled out by myriad tests performed during Mrs. Stayer's fifty-eight day treatment in three hospitals. (*See* Claimants' Exhibit 21.)  More importantly, the autopsy did, in fact, determine the cause of Mrs. Stayer's ARDS: necrotizing pneumonia.  *Id*.  Pneumonia is far from being an "unrecognized infection" or "unknown cause" for Mrs. Stayer's ARDS, as Dr. Brick and the Water Company's experts incorrectly guessed.  Necrotizing pneumonia, diagnosed during Mrs. Stayer's autopsy, formed an integral part of the medical opinions from Dr. Werntz that support Mrs. Stayer's claim.

Dr. Werntz is the only physician among the four who applied the correct standards for causation.  Dr. Werntz is the only physician who considered the entire record, including the most

---

[5] Goldman, L, MD, MPH, "Autopsy 2018 Still Necessary, Even if Occasionally Not Sufficient," American Heart Association Journals, June 19/26, 2018 Circulation. 2018; 137:2686–2688, 2686. DOI: 10.1161/ CIRCULATIONAHA.118.033236, October 4, 2019.

important document, the autopsy report. Dr. Wertz concluded, to a reasonable degree of medical probability, that the necrotizing pneumonia found in Mrs. Stayer's autopsy and resulting in her death by ARDS was caused by chemical pneumonitis from her exposure to Crude MCHM and exacerbation of her breathing problems. (Claimants Exhibit 6.)

**Daniel Stewart:**   The Estate of Daniel Stewart is a Water Interruption claim arising from his death. Mr. Stewart suffered from severe kidney disease and required a kidney transplant. Due to the water shortage caused by the chemical spill, his kidney transplant surgery was delayed by three weeks. During that period, Mr. Stewart underwent additional dialysis treatments. Due to the delay in time and the additional treatment, Mr. Stewart was in a less robust condition than he would have been in had the surgery occurred as originally scheduled in early January, 2014. (*See* Dr. Werntz's affidavit and report, which are attached as Claimants' Exhibit 10.) Mr. Stewart died soon after the kidney transplant surgery. Because Mr. Stewart was less robust and, thus, more susceptible to the dangers and stress of surgery under general anesthesia, Dr. Werntz concluded that the delay for the surgery was a substantial contributing factor in his death. (*Id.*)

Dr. Brick's conclusion concerning the cause of Daniel Stewart's death is erroneous. Dr. Brick wrote that Mr. Stewart had multiple risk factors for surgical complications. (Claimants' Exhibit 11.) Obviously, Dr. Brick failed to apply the substantial contributing factor test, under which a claimant is not required to show that the chemical spill was the only cause of injury or death. Instead, claimants need only show it was a proximate cause of injury or death. Dr. Weisbord, another physician improperly retained by the Water Company, made light of the fact that Mr. Stewart's surgery was delayed. Dr. Weisbord wrote in his report that delays happen all the time. (*See* Dr. Weisbord's report, which is attached as Claimants' Exhibit 12.) This statement ignores the fact that, in this case, Daniel Stewart's surgery was delayed as a direct result of the chemical spill caused by the negligence of the defendants.

Dr. Weisbord and Dr. Brick's opinions are also erroneous because they ignored the fact that a claimant can recover under the ASA if the chemical spill exacerbated an existing condition. In Mr. Stewart's case, the spill did just that. The delay of his surgery caused by the spill increased the chance of surgical complications.

**Duane Maddy:** Duane Maddy has a deviated septum. For six months after his exposure to contaminated water in January, 2014, he suffered from nose bleeds in his right nostril daily. Mr. Maddy did not have nose bleeds on a regular basis before his exposure. This temporal relationship supports Dr. Werntz's opinion that Mr. Maddy's nose bleeds became chronic as a direct result of his exposure to contaminated water (Claimants' Exhibit 13.) Dr. Brick has rejected Dr. Werntz's opinion because Mr. Maddy's nose bleeds occurred only from the right nostril. (Claimants' Exhibit 14.) That assessment makes no sense. The key factor in regard to causation is that Mr. Maddy's nose did not bleed every day before his exposure.

Robert C. Kern, M.D., who was also improperly retained by the Water Company, dismissed the causal connection between the Incident and Mr. Maddy's chronic nose bleeds, which only became chronic after the chemical spill. Dr. Kern ignored this fact and only noted that nose bleeds are a common problem. (*See* Dr. Kern's report, which is attached as Claimants' Exhibit 15.) This overly simplistic statement ignores the fact that Mr. Maddy did not suffer from daily nose bleeds before he was exposed to contaminated water in January 2014.

**John Varney:** John Varney had a history of nasal polyps. While the underlying nasal polys pre-dated Mr. Varney's exposure to contaminated water, the chemicals in the water, including MCHM, caused the polyps to swell. The swelling was so severe that Mr. Varney required surgery. He ultimately sustained vision loss as a result of the inflammation. Dr. Werntz has opined that the swelling and loss of vision was the result of exposure to MCHM-contaminated water. (Claimants' Exhibit 16.) As in Duane Maddy's case, the swelling in Mr. Varney's nose

only occurred after his exposure to the contaminated water. Despite the fact that the chemicals in the water are known irritants, Water Company expert Dr. Kern found no connection between Mr. Varney's nasal problems and the spill. This conclusion ignores the fact that the swelling in Mr. Varney's nose only occurred in direct temporal relation to his exposure to contaminated water.

**VI.    The Decisions of the Appeal Adjudicator Should Be Rejected in the Goodson and Stayer Claims Because He Failed to Consider All Of the Evidence.**

Bryan Goodson and Estate of Linda Stayer proved their claims by submitting reports from two medical experts. Those experts are Dr. Werntz, an occupational medicine specialist and Stephen King, Ph.D., M.Div., M.P.H., a toxicologist and epidemiologist. (*See* Dr. King's *Curriculum Vitae*, which is attached as Claimants' Exhibit 23.) The Appeal Adjudicator effectively rejected both of these claims by discounting the opinions of Dr. Werntz. However, The Appeal Adjudicator failed to address the opinions of Dr. King. (*See* the decisions of the Appeal Adjudicator, which are attached as Claimants' Exhibits 24 and 25, respectively.)

Dr. King rendered opinions concerning the toxicity and respiratory effects caused by exposure to crude 4-methylcyclohexanemethanol ("MCHM") and to stripped propylene glycol phenyl ether compound. That compound was primarily comprised of propylene glycol either ("PPH") and dipropylene glycol ether ("DiPPH"). Dr. King has opined that MCHM, PPH, and DiPPH released in the water supply in January, 2014, caused the respiratory problems of Bryan Goodson and Linda Stayer. (*See* Dr. King's report, which is attached as Claimant's Exhibit 26.)

The Appeal Adjudicator must "evaluate the claim and the objections and all supporting and opposing statements . . ." ASA section 6.2.5.4.    Pursuant to ASA section 6.2.5.8., the "Appeal Adjudicator's decision shall be based on the **claim record**, including the submissions for review and second review by the Settlement Administrator . . ." (emphasis added.)  Thus, the Appeal Adjudicator had a duty to consider all of the evidence before rendering his decisions. However,

in the claims of Bryan Goodson and Linda Stayer, the Appeal Adjudicator ignored the report of Dr. King.  Thus, the Appeal Adjudicator failed to comply with his duty to consider the entire record, and to evaluate all supporting statements.  This failure constitutes error that prevents the decisions in these two claims from being "final."  Consequently, because the Final Rulings of the Settlement Administrator are based on the incomplete decisions of the Appeal Adjudicator, those rulings should be found to be in violation of the ASA, and invalid.

> **VII.  Because the Water Company Has Breached the Amended Settlement Agreement, the Claimants Are Not Barred from Pursuing Their Claims Outside of the Agreement.**

Courts evaluating the parties' compliance with settlement agreements do so under principles of contract law.  *Hewitt v. Biscaro*, 353 S. W. 3d 304 (Tx. Ct. App. 2011); *Freeman v. Potter*, 2005 U.S. Dist. LEXIS 3488 (W. D. Va. 2005). A breach of contract includes prevention or hindrance by a party to a contract of any occurrence or performance under the contract for the creation or continuance of a right of the other party.  Breach of contract, *Black's Law Dictionary* (6th Ed. 1991).  A material breach is a violation of a contract which is substantial and significant. A material breach by one party excuses the other party from further performance under the contract.  Material breach, *Black's Law Dictionary* (6th Ed. 1991); *Emerson Shoe Co. v. Neely*, 99 W. Va. 657, 661, 129 S.E. 718, 719 (1925).

The Water Company's use of experts was not authorized by any provision in the ASA. After committing to very precise settlement terms negotiated in detail over a period of many months, the Water Company  unilaterally 'wrote in' an additional right it had not bargained for and instituted an entirely new phase of claims litigation in this case. This use of its experts has prevented the performance of the claimants' rights by resulting in the reduction of the Claimants' awards by over 99%, which is tantamount to denials of these claims despite the Claimants' full compliance with the ASA and the DPs. Breaches of this magnitude are substantial and significant,

and constitute material breaches of the ASA that excuse the Claimants from their obligations under the settlement agreement. <u>Material breach</u>, *Black's Law Dictionary* (6th Ed. 1991); *Emerson Shoe Co.*; *J. W. Ellison, Son & Co. v. Flat Top Grocery Co.*, 69 W. Va. 380, 71 S. E. 391 (1911). If this Court does not reinstate the Settlement Administrator's initial awards, the Claimants should be allowed to once again pursue their claims in court. *Id.*

## Conclusion

For the reasons discussed above, the Final Rulings of the Settlement Administrator are invalid, and should be reversed. Therefore, the Claimants move this Honorable Court to enforce the Amended Settlement Agreement by reinstating the amounts initially awarded by the Settlement Administrator and by ordering payment of those amounts to these Claimants. In the alternative, Claimants request an order permitting them to pursue their claims in court. These Claimants also ask for any other relief in their favor deemed just and proper.

Respectfully submitted,

/s/ Robert H. Miller, II
John E. Sutter (WVSB # 4216)
Robert H. Miller, II (WVSB # 6278)
*Counsel for Bryan Goodson and*
*the Estate of Daniel Stewart*

William C. Forbes (WVSB # 1238)
W. Jesse Forbes (WVSB # 9956)
*Co-Counsel for the Estate of Daniel Stewart*

W. Stuart Calwell (WVST # 595)
Christopher Hedges (WVSB # 7894)
*Counsel for the Estate of Linda Stayer*

Jonathan Mani (WVSB # 8824)
Damon Ellis (WVSB # 8802)
Bernard E. Layne, III, Esq. (WVSB # 7991)
*Co-Counsel for Bryan Goodson*

David R. Barney (WVSB # 7958)
*Counsel for Duane Maddy and John Varney*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

**CRYSTAL GOOD**, *et al.*,

      **Plaintiffs,**

v.

                                       Civil Action No. 2:14-cv-1374
                                       John T. Copenhaver, Senior Judge

**WEST VIRGINIA-AMERICAN**
**WATER COMPANY**, *et al.*,

      **Defendants.**

## CERTIFICATE OF SERVICE

      I, Robert H. Miller, II, hereby certify that a true copy of **Claimants' Memorandum of Law in Support of Their Motion to Enforce the Amended Settlement Agreement** was served by this Court's CM/ECT system on August 3, 2021, on all parties having registered in this case under the Court's CM/ECF system for service.

                                    /s/ Robert H. Miller, II
                                    John E. Sutter, (WVSB # 4216)
                                    Robert H. Miller, II, (WVS # 6278)
                                    The Sutter Law Firm, PLLC
                                    1598 Kanawha Boulevard, East
                                    Charleston, WV  25311
                                    (304) 343-1514
                                    (304) 343-1519 *facsimile*