UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CRYSTAL GOOD, individually and as parent
and next friend of minor children M.T.S.,
N.T.K., and A.M.S., and MELISSA JOHNSON,
individually and as a parent of an unborn
child T.A.J., and JOAN GREEN and SUMMER
JOHNSON and MARY LACY and WENDY RENEE RUIZ
and KIMBERLY OGIER and ROY J. McNEAL and
GEORGIA HAMRA and MADDIE FIELDS and BRENDA
BAISEDN, d/b/a FRIENDLY FACES DAYCARE, and
ALADDIN RESTAURANT, INC. and R.G. GUNNOE
FARMS LLC and DUNBAR PLAZA, INC., d/b/a
DUNBAR PLAZA HOTEL, on behalf of themselves
and all others similarly situated,

            Plaintiffs,

v.                               Civil Action No. 2:14-cv-1374

WEST VIRGINIA-AMERICAN WATER COMPANY,
d/b/a WEST VIRGINIA AMERICAN WATER, and
AMERICAN WATER WORKS SERVICE COMPANY, INC.
and AMERICAN WATER WORKS COMPANY, INC. and
EASTMAN CHEMICAL COMPANY and GARY SOUTHERN
and DENNIS P. FARRELL,

            Defendants.


MEMORANDUM OPINION AND ORDER


        This matter is before the court on the Parties'

Application for Approval to Pay Simple [Late] Claims, Individual

Review Option [Late] Claims, Cy Pres Distribution, and

Settlement Administration Costs and upon the Parties' Joint

Motion for Cy Pres Distribution of Remaining Guaranteed Fund

Amounts, both filed August 10, 2020, and upon the Parties'

Revised Joint Motion for Cy Pres Distribution of Remaining Guaranteed Fund Amounts, filed February 16, 2021, which Revised Joint Motion seeks cy pres distributions only to specified organizations whose aim and purpose include the protection and restoration of watersheds in the nine counties impacted by the Freedom Chemical spill.

The Parties are represented by Lead Settlement Class Counsel (Van Bunch, Stuart Calwell, and Kevin W. Thompson), Settlement Class Counsel (Anthony J. Majestro, Benjamin L. Bailey, and Marvin W. Masters), counsel for West Virginia-American Water Company (Kent Mayo and Thomas J. Hurney, Jr.), and counsel for Eastman Chemical Company (Deborah Greenspan), along with the respective law firms of the named counsel.

In their Application the Parties request the court to order payment of approved late filed claims, which now aggregate $389,718.37, as set out next below, out of the sum of $186,473.47 that remains in undisbursed Guaranteed Funds[1] and then from uncashed checks issued to various claimants amounting

---

[1] The "Guaranteed Settlement Fund" refers to "the sum of $76 million which sum shall be used to pay certain claims, fees and expenses as set forth in Section 5.4.2 of this Amended Agreement and in the Settlement Fund Distribution Protocols." ASA at 7 (§ 3.7), ECF No. 1163-1 at 11.  The $76 million is exclusive of attorney fees and costs of litigation which are provided for out of other funds.

to $1,273,572.39.  The Parties request in both the Application and the Joint Motions that the court order payment of the remaining funds on a cy pres basis that is primarily the subject of the Joint Motions.

The court has received a report from the court-appointed Settlement Administrator, SmithCochranHicks PLLC ("SCH"), which report is attached to the parties' Application and is titled "Distribution Schedule," listing the total number of approved late filed claims as of August 10, 2020 after completing a review of deficient late filed claims.  SCH calculated the approved late filed claims as consisting of (i) 30 Individual Review claims, amounting to $12,827.48, (ii) 1,265 Simple Claims, consisting of 438 Residential Simple and 827 Residential Simple – AR (Additional Resident), amounting to $342,097.85, and (iii) 20 Business Simple claims, amounting to $34,793.04, aggregating $389,718.37.  Id.

The Application, Joint Motions, and the Distribution Schedule prompt two questions: (1) whether the Amended Class Action Settlement Agreement ("ASA") (ECF No. 1163-1) approved by the court's Order Granting Final Approval of the Good Class Settlement and Entering Judgment (ECF No. 1212), permits payment of late filed claims; and (2) how the remaining uncashed settlement checks should be disbursed.  To aid in resolution of

the latter question, there was also submitted a "Memorandum Regarding Disbursement of Unspent Funds Remaining in Simple Claim Fund" on April 28, 2020, focusing on the escheat issue. See ECF No. 1289.

I.   Late Filed Claims Under the ASA

First, the court must determine whether the ASA allows for the payment of late filed claims.

Section 5.4.2 of the ASA directs that the Guaranteed Fund should be used in the following order:

(a) to make Simple Claim Form payments to Eligible Claimants pursuant to the terms of this Amended Settlement Agreement; (b) to make payments under the Check Distribution Process; (c) to pay applicable Administrative Expenses; (d) to pay applicable Attorneys' Fees and Litigation Expenses awarded by the Court to Settlement Class Counsel; and (e) to pay applicable Class Representative Incentive Awards.  If not exhausted by the preceding payments, the remaining funds shall be considered Guaranteed Payment Remainder Funds to be used consistent with the Settlement Fund Distribution Protocols.

ASA at 32-33 (§ 5.4.2), ECF No. 1163-1 at 36-37.

The ASA defines "Guaranteed Payment Remainder Funds" to "have the meaning set forth in Section 5.4.2 and shall specifically include any funds associated with checks issued through the Check Distribution Process that were not cashed before their designated expiration date."  ASA at 13 (§ 3.57),

4

ECF No. 1163-1 at 17-18.  It further provides that "Guaranteed Payment Remainder Funds shall be used consistent with the Settlement Fund Distribution Protocols."  Id.

The Settlement Fund Distribution Protocols, Exhibit 3 to the ASA, explains the Check Distribution Process and provides that "[a]ny funds associated with checks mailed through the Check Distribution Process but not cashed before the applicable expiration date will be Guaranteed Payment Remainder Funds to be distributed pursuant to the terms of the Amended Settlement Agreement and the Distribution Protocols."  Distribution Protocols at 24-25 (§ XI.D.5), ECF No. 1163-1 at 117-18.

The court's June 8, 2018 Order Granting Final Approval of the Good Class Settlement and Entering Judgment stated as follows regarding the process of issuing checks for settlement payments:

> Payment of claims shall be by bank check and mailed at or within five days of the date of the check.  The check shall carry the notation on its face that "This check void, and the claim may be deemed waived, unless presented for payment within 90 days of issue date."  If the check is not presented to the bank on which it is drawn within 90 days of the date of the check, it shall be void and the claim may be deemed waived, and the sum for which the check is drawn shall be pooled with funds remaining for distribution that shall be distributed, along with any undistributed interest earned, to the claimants as the court may equitably direct in keeping with the provisions of the Amended Settlement Agreement and this order.

ECF No. 1212 at 14.

SCH has already attempted to locate claimants who did not cash their settlement checks.  In the event the Guaranteed Fund is not exhausted by eligible claims and expenses, Section XI.E.2 of the Distribution Protocols indicates that the Guaranteed Payment Remainder Funds should be used to pay approved Individual Review Claims:

> Guaranteed Payment Remainder Funds: Except as otherwise set forth in Section 5.4.3.1 of the Amended Settlement Agreement regarding the Initial Contingent Fund Contribution, any Guaranteed Payment Remainder Funds will be used first (before any funds in the American Water Contingent Settlement Fund, but after any applicable payments for Individual Review Options claims from the Net Eastman Fund) to pay approved Individual Review Option claims, associated Administrative Expenses and Attorneys' Fees in the Individual Review Option.

Distribution Protocols at 25 (§ XI.E.2), ECF No. 1163-1 at 118.[2] The only remaining individual review claims unpaid are the 30 late filed claims amounting to $12,827.48.

Inasmuch as the ASA, the Distribution Protocols and the Judgment Order do not bar the payment of late filed claims, as the court may equitably direct, the court finds that the

---

[2] The "Contingent Settlement Fund" refers to "the sum of up to $50 million which may be used to pay certain claims, fees and expenses as specified at Section 5.4.3 of this Amended Agreement and in the Settlement Fund Distribution Protocols."  ASA at 7 (§ 3.6), ECF No. 1163-1 at 11.

distribution of remaining assets to late filed claimants, which
is agreed to by all Parties, is in accordance with the
provisions of the ASA and Distribution Protocols.  It is,
accordingly, ORDERED that the late filed claims of $389,718.37,
together with the Settlement Administrator's fees of $18,902.50,
aggregating $408,620.87, be paid, first from the remaining
undisbursed Guaranteed Settlement Funds of $186,473.47 and then
from the remaining funds left over from uncashed checks.

## II.  Disbursement of Remaining Uncashed Checks

After providing for disbursements to late filed
claims, the court must decide how to allocate the remaining
balance of unclaimed funds, being $1,051,425.99, or about one
percent of the total amount of the original Guaranteed Fund.

The court must first give effect to the text of the
settlement agreement.  See <u>Klier v. Elf Atochem N. Am., Inc.</u>,
658 F.3d 468, 475-76 (5th Cir. 2011).  Regarding uncashed
checks, the ASA indicates that the "determination of any
Guaranteed Remainder Payment Funds" includes "funds associated
with uncashed checks issued through the Check Distribution
Process."  ASA at 34 (§ 5.4.3.2), ECF No. 1163-1 at 38.  For
purposes of determining whether the Guaranteed Funds, including
any Guaranteed Payment Remainder Funds, are exhausted, the

Distribution Protocols explain that "actual payment for checks mailed through the Check Distribution Process means that such checks have been cashed prior to their expiration date or that such checks have not been cashed prior to their expiration date but the funds associated with those uncashed checks have been distributed as Guaranteed Payment Remainder Funds."  ASA at 25 (§ XI.E.1), ECF No. 1163-1 at 118.  The next provision in the Distribution Protocols, Section XI.E.2, concludes that

> If the Guaranteed Payment Remainder Funds are not exhausted following payment of all Individual Review Option claims, associated Administrative Expenses and Attorneys' Fees in the Individual Review Option, then any remaining Guaranteed Payment Remainder Funds will be used to make an additional pro rata payment to all Residential Claimants who made approved Simple Claim Form claims.

Id.

As these provisions show, the settlement agreement contemplates the distribution of uncashed checks.  After paying out approved Individual Review Option claims, the settlement agreement provides that the remaining uncashed checks should be

distributed <u>pro rata</u> to all Residential Claimants who made approved Simple Claim Form claims.[3]

If that were done, the remaining $1,051,425.99 would be applied to 187,879 Residential Simple and Residential Simple-Additional Resident claimants (which excludes the 5,265 whose checks were not cashed) after deducting the costs of the distribution, including printing, mailing and postage, which is estimated by SCH to be $2.00 per distribution check for a total of $375,758.00.  That would leave for distribution $675,667.99.  Applying the $675,667.99 on a <u>pro rata</u> basis, the 77,701 Residential Simple claimants (each paid $482.74) would each receive $5.94 and the 110,678 Residential Simple-Additional Resident claimants (each paid $157.99) would each receive $1.94.  It is likely, as the Parties suggest, that a great many of the checks, in sums that small, particularly after the passage of over two years since the initial distribution, would never be cashed.

---

[3] The Parties' joint memorandum does not address the language in the settlement agreement referring to the distribution of "uncashed checks."  Nonetheless, the Parties assert that "[n]o specific provision is made for the circumstance, present here, where uncashed checks or unclaimed payments created unspent funds <u>after</u> the entirety of the Guaranteed Fund was allocated." ECF No. 1289 at 3 (emphasis in original).

In instances such as this, the courts have generally considered four options: (1) pro rata redistribution to the class members who filed claims; (2) allowing the funds to revert to the defendant; (3) escheat to the state or federal government; and (4) cy pres distribution.  See 4 William B. Rubenstein, Newberg on Class Actions § 12:28 (5th ed. June 2020 Update); accord Powell v. Georgia-Pac. Corp., 119 F.3d 703, 706 (8th Cir. 1997); Keepseagle v. Vilsack, 118 F. Supp. 3d 98, 117 (D.D.C. 2015).  In deciding among these options, the court recognizes that its "goal in distributing class action damages is to get as much of the money to the class members in as simple a manner as possible."  Keepseagle, 118 F. Supp. 3d at 117 (quoting Rubenstein, supra, § 12:28); Six (6) Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1307 (9th Cir. 1990) ("The district court's choice among distribution options should be guided by the objectives of the underlying statute and the interests of the silent class members.").

A. Reversion and Escheat

The court will not choose on its own to have the funds revert to defendants when neither the settlement agreement nor defendants themselves seek such a disbursement.  None of the settlement provisions provide for escheat, and the parties agree that West Virginia law does not require escheat to the state.

Memo, ECF No. 1289.  Moreover, the court's order approving the
class settlement and entering Judgment specifically deemed a
claimant's failure to cash the check as serving to void the
check and allowing the claim to be treated as waived.  The court
thus has no basis or reason to direct the funds under either
reversion or escheat.

B. **Pro Rata Distribution**

In recent years, many courts have followed the
recommendations of the 2010 report from the American Law
Institute ("ALI"), which express a preference for pro rata
distribution to the plaintiffs.  See In re BankAmerica Corp.
Sec. Litig., 775 F.3d 1060, 1063, 1066 (8th Cir. 2015)
(reversing a cy pres distribution but indicating it may be
permissible where the amount of funds to be distributed is de
minimis); In re Baby Prod. Antitrust Litig., 708 F.3d 163, 173
(3d Cir. 2013) (cautioning that "direct distributions to the
class are preferred over cy pres distributions"); In re Lupron
Mktg. & Sales Practices Litig., 677 F.3d 21, 33 (1st Cir. 2012);
Klier, 658 F.3d at 474-75; Rubenstein, supra, § 12:28.

Even so, the ALI approach recognizes that if the
unspent funds after distributions are too small to make
individual distributions economically viable, the court may, in

settlements where the parties agree to a cy pres remedy, resort to cy pres distribution:

> This Section generally permits *cy pres* awards only when direct distributions to class members are not feasible-either because class members cannot be reasonably identified or because distribution would involve such small amounts that, because of the administrative costs involved, such distribution would not be economically viable.  In such circumstances, there should be a presumed obligation to award any remaining funds to an entity that resembles, in either composition or purpose, the class members or their interests.

Am. Law Inst., Principles of the Law of Aggregate Litigation § 3.07, Comment (b) (2010).

In general, courts have found that the individual distributions are no longer "economically viable" or "economically feasible" where the cost of such distributions exceed or approach the value of the distribution itself.  See BankAmerica, 775 F.3d at 1063; In re Baby Prod. Antitrust Litig., 708 F.3d at 169 ("It may also be economically or administratively infeasible to distribute funds to class members if, for example, the cost of distributing individually to all class members exceeds the amount to be distributed.").

Although the settlement agreement contemplates a pro rata distribution, this does not end the court's analysis when the economic feasibility of such a distribution is lacking.  The Parties seek an alternate method of allocating the funds.

### C. Cy Pres

The Parties' joint memorandum proposes that the disbursement of the unspent funds should fall under the cy pres doctrine.  ECF No. 1289 at 8.  The doctrine originates from trusts and estates law, but courts have applied it in the class action context as a means of equitably distributing unclaimed funds for a charitable purpose related to the plaintiffs' injuries.  See In re Pharm. Indus. Average Wholesale Price Litig., 588 F.3d 24, 33 (1st Cir. 2009); Rubenstein, supra, § 12:28; Black Law's Dictionary (11th ed. 2019) (Cy pres, meaning "as near as," refers to "[t]he equitable doctrine under which a court reforms a written instrument with a gift to charity as closely to the donor's intention as possible, so that the gift does not fail.").  "[T]he purpose of Cy Pres distribution is to 'put[] the unclaimed fund to its next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class.'"  Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 436 (2d Cir. 2007) (emphasis omitted) (quoting 2 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 10:17 (4th ed. 2002)); Powell, 119 F.3d at 706.

Courts have widely accepted "that cy pres distributions are proper in connection with a class settlement, subject to court approval of the particular application of the

funds." _In re Pharm. Indus. Average Wholesale Price Litig._, 588 F.3d at 34 (internal quotation marks omitted) (citation omitted); Rubenstein, _supra_, § 12:32 (noting that "[c]ourts in every circuit, and appellate courts in most, have approved the use of _cy pres_ for unclaimed class action awards" and that _cy pres_ is "likely the most prevalent method for disposing of unclaimed funds").  Although the Fourth Circuit has yet to rule on the issue, district courts in this circuit have approved settlement agreements containing _cy pres_ provisions.  _See Decohen v. Abbasi, LLC_, 299 F.R.D. 469, 476 n.15 (D. Md. 2014) (citing _Singleton v. Domino's Pizza, LLC_, 976 F. Supp. 2d 665, 673 n.2 (D. Md. 2013)); _see also Reynolds v. Fid. Investments Institutional Operations Co., Inc._, No. 1:18-CV-423, 2020 WL 92092, at *1 (M.D.N.C. Jan. 8, 2020); _In re Outer Banks Power Outage Litig._, No. 4:17-CV-141, 2018 WL 2050141, at *2 (E.D.N.C. May 2, 2018); _Hooker v. Sirius XM Radio, Inc._, No. 4:13-CV-003, 2017 WL 4484258, at *1 (E.D. Va. May 11, 2017).

Nonetheless, "[w]here the terms of a settlement agreement are sufficiently clear, or, more accurately, insufficient to overcome the presumption that the settlement provides for further distribution to class members, there is no occasion for charitable gifts, and _cy pres_ must remain offstage." _Klier_, 658 F.3d at 479 (citation omitted).  "Cy pres

comes on stage only to rescue the objectives of the settlement when the agreement fails to do so."  Id. at 476.

Even though the ASA refers to pro rata distribution and has no provision for a cy pres remedy, the court need not distribute the funds pro rata if it is not economically feasible to do so.  On that point, courts have found that a distribution may no longer prove "economically viable" or "economically feasible" when the amount of distribution would be de minimis. In Lane v. Facebook, Inc., 696 F.3d 811, (9th Cir. 2012), the Ninth Circuit affirmed a cy pres remedy in a settlement agreement involving 3.6 million class members and a $9.5 million recovery which, after attorney fees and administrative costs, left only $6.5 million for distribution.  Even those who objected to the cy pres distribution of the $6.5 million conceded "that direct monetary payments to the class of remaining settlement funds would be infeasible given that each class member's direct recovery would be de minimis."  Id. at 821.  The appellate court, agreeing that it would be "inefficient to pay the $6.5 million . . . that remain after costs directly to the class because each class member's recovery

under a direct distribution would be <u>de minimis</u>," affirmed the

<u>cy pres</u> distribution.  <u>Id.</u> at 825.[4]

     While the Fifth circuit in <u>Klier</u> reversed the <u>cy pres</u>

order of the district court, the decision also dealt with the

question of economic viability.  There, in a three subclass case

in which subclass C had been fully paid, the appellate court

diverted a remaining $830,000 in funds from subclass B whose

12,657 members were entitled under the settlement agreement to

receive those funds on a <u>pro rata</u> basis.  The appellate court

directed instead that the $830,000 be paid to subclass A

claimants (totaling 447 according to the appellant's brief in

that case) who would thereby each receive far more for their

significant injuries.  As a result, the class B claimants

entitled to the money were deprived of it because the appellate

court found that it was not economically viable to pay what

would amount to $65 to each of them).  <u>Klier</u>, 658 F.3d at 476;

<u>see also</u> <u>Hughes v. Kore of Indiana Enter., Inc.</u>, 731 F.3d 672,

---

[4] District courts in the Ninth Circuit have also applied <u>Lane v.
Facebook, Inc.</u> to mean that <u>cy pres</u> distributions of uncashed
funds are appropriate where <u>pro rata</u> payments would be <u>de
minimis</u>.  <u>See</u>, e.g., <u>Maxin v. RHG & Co., Inc.</u>, No. 16-CV-2625
JLS (BLM), 2019 WL 4295325, at *2 (S.D. Cal. June 24, 2019)
(approving <u>cy pres</u> distribution under settlement agreement
because a <u>pro rata</u> payment of unclaimed funds in the amount of
$1.89 distribution after deducting administrative costs "would
be infeasible given that each class member's direct recovery
would be <u>de minimis</u>").

675 (7th Cir. 2013) (finding that class could be certified based on cy pres distribution while agreeing that "distribution of damages to the class members would provide no meaningful relief" where it only amounted to $3.57 per claimant).

The court finds here that the amount left in the Guaranteed Fund from uncashed checks would provide only $5.94 for 77,701 of the claimants and only $1.94 for the other 110,178.  The court deems these sums de minimis and warrants consideration of the disposal of the money pursuant to the cy pres doctrine.

D. Nexus Requirement – "Reasonable Approximation" Test

Upon the court's request, the Parties, by the Claims Oversight Panel ("COP"), have identified several potential recipients of the unspent funds.  This directive follows ALI Principles § 3.07(c), which provides that, in the event a court uses a cy pres approach, "[t]he court, when feasible, should require the parties to identify a recipient whose interests reasonably approximate those being pursued by the class."  ALI Principles § 3.07(c); accord BankAmerica, 775 F.3d at 1064; Lupron, 677 F.3d at 33; In re Citigroup Inc. Sec. Litig., 199 F. Supp. 3d 845, 849-54 (S.D.N.Y. 2016); Rubenstein, supra, § 12:33 (5th ed.) ("[M]ost circuits require that there be a connection —

17

or nexus — between the harm that the plaintiffs have suffered and the benefit the cy pres distribution will provide.").  The First Circuit has labeled this a "reasonable approximation" test, under which it considered a number of factors, including:

> the purposes of the underlying statutes claimed to have been violated, the nature of the injury to the class members, the characteristics and interests of the class members, the geographical scope of the class, the reasons why the settlement funds have gone unclaimed, and the closeness of the fit between the class and the cy pres recipient.

Lupron, 677 F.3d at 33.  Though the decision rests within a court's discretion, "[a]s a matter of best practices, courts should solicit suggestions for appropriate cy pres beneficiaries from the parties."  In re Polyurethane Foam Antitrust Litig., 178 F. Supp. 3d 621, 624 (N.D. Ohio 2016); Rubenstein, supra, § 12:34 ("[T]he ultimate decision will always be a judicial one.").

In the Joint Motion filed August 10, 2020, the Parties recommended adoption of the Claims Oversight Panel's proposal regarding potential recipients for residual fund cy pres distributions.  In evaluating potential recipients, the COP evaluated "(1) the connection between the entities and their missions and the nature of the lawsuit, and (2) the likely benefit that donation of the settlement funds can provide in the communities within the nine counties impacted by the Freedom

Chemical spill event." Id.  The nine counties are Boone,
Cabell, Clay, Jackson, Kanawha, Lincoln, Logan, Putnam, and
Roane Counties.  Based on these factors, it was recommended that
28 percent of the funds should go to six local watershed groups
named below that the West Virginia Department of Environmental
Protection helped identify.  The six watershed groups are active
local organizations that work on watershed education, protection
and/or restoration projects; have some track record of
successful project work; and operate within the broad areas of
the nine counties impacted by the Freedom Chemical spill.  It
was also recommended that 24 percent of the funds should go to
the West Virginia Land Trust, a statewide nonprofit dedicated to
protecting West Virginia's natural lands, scenic areas, water
quality, and recreational access; and the remaining 48 percent
of the funds would go to various community supports groups.

          While acknowledging the worthy and exceptional role of
the community support groups recommended by the Parties, the
court recognized that it was constrained to limit cy pres
distribution to those organizations whose mission and interests
reasonably approximate those being pursued by the Class in this
case.  Consequently, the Parties filed the Revised Joint Motion
on February 16, 2021, in which they recommended that the same
six watershed organizations each receive 10% of the cy pres

distribution of $1,051,424.99, with the remaining 40% to go to the West Virginia Land Trust.  The court adopts, for purposes only of watershed protection and stream restoration work projects, as further defined below, in the nine-county area, the list of recipients and the percentage of participation of each as recommended in the Revised Joint Motion, as follows:

>  Buffalo Creek Watershed Improvement Association (10%);
>
>  Coal River Group (10%);
>
>  Davis Creek Watershed Association (10%);
>
>  Fourpole Creek Watershed Improvement Association (10%);
>
>  Morris Creek Watershed Association, Inc. (10%);
>
>  Paint Creek Watershed Association (10%); and
>
>  the West Virginia Land Trust (40%).

The court finds that these organizations all have a connection to the nature of the injury to the class members, encompass the geographic scope of the class, and provide an indirect benefit to the interests of the class.  Given that these organizations meet the criteria described above, the court finds they are appropriate cy pres recipients.

### 1. The Six Watershed Associations

The distribution of a 10% share of the cy pres funds is conditioned upon the written agreement of each recipient watershed association, acting by and signed by its Chief

Executive Officer and its Treasurer, to the following, which agreement shall be executed and filed with the United States District Court in the Good case from which the cy pres funds arise before release of the cy pres funds to a given watershed association:

The Watershed Improvement Branch ("WIB") of the West Virginia Department of Environmental Protection ("DEP") has graciously agreed to monitor the use of the cy pres funds, granted to each of the six watershed associations in the anticipated amount of $105,142.60, by and through the same budget, approval and reporting procedures and with the same allowable funds use limitations that would be required of the recipient of the grant if it were made by the DEP as a Stream Partners Program grant except that the use of the cy pres funds is solely (100%) for stream restoration and clean-up and stream habitat rehabilitation in the nine counties of Boone, Cabell, Clay, Jackson, Kanawha, Lincoln, Logan, Putnam, and Roane, to be completed within the three-year period beginning January 1, 2022, a period which the WIB, in its discretion, may extend for any one or more of the six watershed associations for a fourth or fifth year.

Before any of the funds are committed, or expended on any project, it is a condition of the cy pres grant to each of

the six watershed associations that the funds be held by the watershed association in escrow until the proposed budget is filed with and approval is given by WIB to proceed with the proposed project, following which funds may be committed or expended to the extent of that project.

If funds are spent outside the approved budget, an equal amount must be promptly restored to the escrow before further projects are approved.  Should a given watershed association be unable or fail to appropriately expend the funds allotted to it, all such funds not appropriately expended shall be promptly returned to the United States District Court for deposit by the District Clerk in the Registry of the Court for disposition in the Good case.

If a given watershed association chooses to engage in more than one project with the cy pres funds, the portion of the funds not devoted to the first approved project shall be held in escrow until a second project is approved, and so on should there be additional projects to the end that funds not dedicated to a given approved project or projects shall continue to be held in escrow.

Any of the cy pres funds not sooner returned and not used in accordance herewith by December 31, 2024, or, if extended by DEP, by December 31, 2025, or December 31, 2026, as

the case may be, shall be deposited on or before the following January 20th by the watershed association with the United States District Clerk in the Registry of the Court for the <u>Good</u> case for redistribution to such entity and in such manner as may be approved by the Court in that case.

Each of the six watershed associations remains accountable to and subject to the jurisdiction of the United States District Court for the Southern District of West Virginia in the <u>Good</u> case for complete compliance with the terms of the agreement as specified herein.

2. The West Virginia Land Trust

The remaining 40% of the <u>cy pres</u> funds shall be allotted to the West Virginia Land Trust for use solely in the nine counties of Boone, Cabell, Clay, Jackson, Kanawha, Lincoln, Logan, Putnam, and Roane during the 3-year period ending December 31, 2024, with the emphasis on watershed and stream protection, as follows:

a. to protect land within public water supply watersheds (i.e. source water protection areas) that buffer or protect drinking water supplies.  Such areas include Zones of Critical Concern, Zones of Peripheral Concern, Wellhead Protection Areas or other significant landscapes located above drinking water intakes that are identified by the West Virginia Department of Health and Human Resources (or other relevant agency or organization) in Source Water Protection Plans or other watershed protection plans; and/or

23

> b. to protect lands in the target watersheds that
> connect or add to public lands or wild areas, such as
> State Forests, State Parks, and State Wildlife
> Management Areas, to extend aggregate forest cover
> that can buffer water bodies; and/or
>
> c. to support partner agencies and organizations in
> efforts to prevent and mitigate the risk of future
> impacts on the watersheds and to develop and implement
> plans to permanently protect lands that protect water,
> reduce impairments and development threats, restore
> riparian forests, and provide other "ecosystem
> services," following practices and protocols applied
> by WVLT to many of its conservation projects
> statewide.

Funds awarded from this settlement will be judiciously applied and maximally leveraged to permanently protect land and associated waters in the Freedom Chemical spill impact area and mitigate the risk of similar occurrences in the future.

The West Virginia Land Trust is to report to the United States District Court annually on December 31st of each of the years in which the cy pres funds herein allotted to it are expended by the Trust as to the use, including location and amount, during that calendar year.

### III. Conclusion

Based on the foregoing, the court finds that the disbursement of late filed claims and a subsequent cy pres distribution with the remaining simple claim funds are

24

consistent with the terms of the ASA and Distribution Protocols and a fair and reasonable resolution of the unspent funds.

It is so ORDERED.

It is further ORDERED that:

1.   The Settlement Administrator make payment of the late filed claims aggregating $389,718.37, together with payment of the administrative fees in connection therewith of $18,902.50.  The checks shall carry the notation on its face as set forth in the court's order of June 8, 2018, and the check shall be deemed void within 90 days from the date of the check.

2.   The remainder of the Guaranteed Funds, being $1,051,425.99, shall be disbursed by the Settlement Administrator to the cy pres recipients for the purpose noted at pages 20 to 24 supra, as follows:

Buffalo Creek Watershed Improvement Association (10%)

Coal River Group (10%)

Davis Creek Watershed Association (10%)

Fourpole Creek Watershed Improvement Association (10%)

Morris Creek Watershed Association, Inc. (10%)

Paint Creek Watershed Association (10%)

The West Virginia Land Trust (40%)

3.    Any funds remaining as a result of uncashed checks from the late filed claims distribution shall, subject to any costs or expenses that the court approves, be paid to the cy pres distributees above-named on the same pro rata basis established above.

The Clerk is requested to transmit copies of this order to all counsel of record.

ENTER: December 30, 2021

John T. Copenhaver, Jr.
Senior United States District Judge