UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CRYSTAL GOOD, et al.,

     Plaintiffs,

v.                                            Civil Action No. 2:14-cv-01374

WEST VIRGINIA-AMERICAN WATER       Consolidated with:
COMPANY, et al.,
                                   Civil Action No. 2:14-cv-11011
     Defendants.                Civil Action No. 2:14-cv-13164
                                   Civil Action No. 2:14-cv-13454
                                   Civil Action No. 2:16-cv-01606


<u>MEMORANDUM OPINION AND ORDER</u>


Pending is the motion by class members/movants Bryan Goodson ("Goodson"), the Estate of Daniel Stewart ("Stewart"), the Estate of Linda Stayer ("Stayer"), Duane Maddy ("Maddy"), and John Varney ("Varney") (together, "Movants") to enforce the amended settlement agreement, filed August 3, 2021.


I. Background


The class representatives instituted this class action in this court on January 13, 2014.  ECF No. 1.  On June 8, 2018, the court entered an order granting final approval of the Amended Class Action Settlement Agreement ("Settlement Agreement") agreed to by the parties and directing entry of judgment.  ECF No. 1212 (order approving settlement).  The class

representatives and the defendants negotiated the Settlement Agreement over a series of months, including the court's rejection of the parties' first proposed settlement agreement because, <u>inter</u> <u>alia</u>, it contained an insufficient "review and 'appeals' process when disputes over claims arise."  ECF No. 1146 at 52 (order rejecting initial settlement).  As the court recounted at the time, the proposed settlement agreement

> envision[ed] a tripartite review process, with ultimate discretion allocated to the Settlement Administrator in most cases.  First, the Settlement Administrator review[ed] a claimant's eligibility and evaluate[d] the appropriate amount of compensation in accordance with the terms of the agreement.  Second, claimants who dispute[d] their awards m[ight] "appeal" to the Settlement Administrator for reconsideration. Third, the Settlement Administrator m[ight] refer any issues or questions about the Settlement Agreement that ar[ose] during implementation of the claims process to a "Claims Oversight Panel" composed of four members, two selected by plaintiffs and one selected by each of [defendants] Eastman and WV American Water. Interpretations of the Settlement Agreement by the Claims Oversight Panel only ha[d] binding authority on the Settlement Administrator when issued unanimously.

<u>Id.</u> at 55 (citing initial proposed settlement agreement, ECF No. 1136-1, §§ 6.2.5-6.2.6).

The court was concerned that the proposed process was "not exhaustive enough to prevent the court's further involvement in administrative matters."  <u>Id.</u>  Namely, "[a]bsent some kind of independent review panel that can hear appeals directly, rather than merely advise the Settlement

Administrator, the court [was] concerned that one of the key justifications for settlement -- avoidance of further litigation -- evaporates." Id. at 56.  The court thus advised the parties that "[a]n appeals or mediation panel, or both, would facilitate resolution of claims without the court's involvement and the concomitant expense and drain on judicial resources."  Id.

The parties then proposed the Settlement Agreement. Settlement Agmt., ECF No. 1163-1.  The Settlement Agreement kept a tripartite review process, but the third stage of review fell to an Appeal Adjudicator -- agreed upon and nominated by the parties and approved by the court -- who reviewed claims de novo.  Id. § 6.2.5.2.  The Appeal Adjudicator's review was circumscribed by the terms of the Settlement Agreement and Distribution Protocols, which contain the criteria for evaluation of claims and are incorporated into the Settlement Agreement.  Id. § 6.2.5.5; see also Distrib. Protocols, ECF No. 1163-1.  Moreover, interpretations of the Settlement Agreement and Distribution Protocols by the Claims Oversight Panel were binding when a majority agreed; otherwise, the Appeal Adjudicator had the power to propose an interpretation that became binding unless a majority of the Claims Oversight Panel objected.  Settlement Agmt. § 6.2.6.  "The decision of the Appeal Adjudicator shall be final and there is no right to

3

appeal the decision of the Appeal Adjudicator to the Court."
Id. § 6.2.5.8.  In granting preliminary approval of the
Settlement Agreement, the court noted that the "Settlement
Agreement was entered [by the parties] only after extensive
arm's length negotiation by experienced counsel, and with
revisions resulting from the Parties' consideration of
additional issues identified in" the court's rejection of the
first proposed agreement.  ECF No. 1166 at 3.

Movants each submitted medical claims to the
Settlement Administrator and received an initial award.  See
Appeals Decisions, ECF No. 1328-6.  WV Water objected to each
award, and the Settlement Administrator significantly reduced
each award at the second-level review.  See id.  Last, Movants
appealed to the Appeal Adjudicator, who affirmed the reduced
awards.  See id. at 4, 7-8 (Goodson), 14, 21-23 (Stayer), 28,
32-33 (Stewart), 36-37, 40 (Maddy), 43, 48 (Varney).

On August 3, 2021, Movants filed a motion to enforce
the Settlement Agreement, which the court understands as a
motion alleging breach of contract.  See Movants' Mot. to
Enforce, ECF No. 1323.  Movants claim four breaches of the
Settlement Agreement: (1) by defendant West Virginia-American
Water Company ("WV Water") when it submitted reports of its own
experts, Mem. Supp. Movants' Mot. to Enforce 3-4, 19-20, ECF No.

4

1324; (2) by the Settlement Administrator when it retained John Brick, M.D. ("Dr. Brick"), as the consulting medical expert for Movants' claims, id. at 4-6; (3) by the Settlement Administrator and the Appeal Adjudicator when they relied upon medical testimony that allegedly failed to apply the correct standard for causation under the Settlement Agreement, id. at 6-11, see also id. at 11-18 (arguing that, by contrast, Movants' claims were properly supported); and (4) with respect to the claims of Goodson and Stayer, by the Appeal Adjudicator when he allegedly failed to consider all the evidence submitted, id. at 18-19. Movants seek an order directing payment of the amounts originally awarded by the Settlement Administrator or, alternatively, to terminate the contract as it pertains to them and allow them to pursue their claims in court.  Id. at 1.

## II. Discussion

### A. Jurisdiction

Although "[i]t is well-settled that a federal court may exercise ancillary jurisdiction to enforce its judgments," the "[e]nforcement of [a] settlement agreement . . . is more than just a continuation or renewal of the dismissed suit, and hence requires its own basis for jurisdiction."  Marino v.

Pioneer Edsel Sales, Inc., 349 F.3d 746, 752 (4th Cir. 2003)
(alterations in original) (first citing Peacock v. Thomas, 516
U.S. 349, 354 (1996); and 28 U.S.C. § 1367(a); and then quoting
Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 378 (1994)).
"[A] district court's ancillary jurisdiction 'to manage its
proceedings, vindicate its authority, and effectuate its
decrees' provides such an independent jurisdictional basis to
enforce a settlement agreement if 'the parties' obligation to
comply with the terms of the settlement agreement ha[s] been
made part of the order of dismissal.'" Id. (alterations in
original) (quoting Kokkonen, 511 U.S. at 381).  Such
incorporation may be accomplished in two ways: "either by
separate provision (such as a provision 'retaining jurisdiction'
over the settlement agreement) or by incorporating the terms of
the settlement agreement in the order." Id. (quoting Kokkonen,
511 U.S. at 381).

        Movants contend that the finality and non-
appealability of the Appeal Adjudicator's decision do not bar
the court from entertaining motions for breach of the Settlement
Agreement.  Mem. Supp. Movants' Mot. to Enforce 2-3.  In
response, WV Water argues that Movants are "barred by the
doctrine of res judicata from asserting claims arising out of
the incident leading to the settlement," WV Water Resp. 7, ECF

6

No. 1328, and "what [Movants] really seek is an unauthorized appeal from the final decisions of the Appeal Adjudicator," id. at 8.[1]  To be sure, the order granting final approval of the Settlement Agreement permanently barred class members from pursuing claims arising out of the underlying incident, ECF No. 1212, ¶ 17, and the Settlement Agreement bars all appeals from the Appeal Adjudicator's decisions, Settlement Agmt. § 6.2.5.8.

In this case, however, the order granting final approval of the Settlement Agreement and entering judgment incorporated the Settlement Agreement as follows:

> The [Settlement Agreement], along with all Exhibits thereto, is adopted and fully incorporated by reference into this Order and Judgment.
>
> The court shall retain continuing and exclusive jurisdiction over the interpretation, enforcement and implementation of the [Settlement Agreement] in accordance with its terms and this Order . . . .

ECF No. 1212, ¶¶ 7, 15.  Thus, the court has jurisdiction to address the merits of Movants' claims that the Settlement Agreement has been breached, insofar as such claims are not veiled attempts to subvert the permanent injunction or the bar of appeals of the Appeal Adjudicator's decisions.  Marino, 349 F.3d at 752-53 (finding that district court had jurisdiction

---

[1] Defendant Eastman Chemical Company submitted a brief generally expressing concern that Movants "in effect seek to unwind the class settlement and judgment."  Eastman Resp. 2, ECF No. 1329.

over motion for attorney fees arising out of class action where the order approving the final settlement provided for "exclusive jurisdiction" over applications for attorney fees); see also Benipayo v. Volkswagen Grp. of Am., Inc. (In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.), 975 F.3d 770, 775 (9th Cir. 2020) ("As the district court expressly retained authority to 'ensure compliance' with the settlement agreement's terms, the district court was well within its jurisdiction to determine whether the new Framework breached the agreement. . . .   Since Claimants alleged a breach of the . . . settlement, the district court properly exercised its ancillary jurisdiction over their motions.").

   B. Movants' claims

        A district court's review of alleged breaches of a class settlement agreement is limited.  It is constrained by the maxim that, "[b]ecause a district court's authority to administer a class-action settlement derives from Rule 23, the court cannot modify the bargained-for terms of the settlement agreement."  Klier v. Elf Atochem N. Am., Inc., 658 F.3d 468, 475 (5th Cir. 2011); see also Evans v. Jeff D., 475 U.S. 717, 726 (1986) ("Rule 23(e) wisely requires court approval of the terms of any settlement of a class action, but the power to

8

approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed."); Cox v. Shah, 187 F.3d 629, 1999 WL 492664, at *7 (4th Cir. 1999) (unpublished table decision).  Consequently, "[t]he terms of the settlement agreement are always to be given controlling effect." Klier, 658 F.3d at 476; accord Rawa v. Monsanto Co., 934 F.3d 862, 871 (8th Cir. 2019).

First, Movants argue that the Settlement Administrator and the Appeal Adjudicator relied upon medical testimony that allegedly applied the wrong standard for causation, see Mem. Supp. Movants' Mot. to Enforce 6-11, and that the Appeal Adjudicator allegedly failed to consider all the evidence submitted by Goodson and Stayer, see id. 18-19.  Movants couch those arguments as violations of duties under the Settlement Agreement; however, both arguments are patent appeals of the Appeal Adjudicator.  They rely on Movants' evidentiary positions, underscored by the fact that Movants directly argue that, by contrast, the evidence supported their claims.  See id. at 11-18.  Thus, the court cannot afford Movants relief on these grounds because doing so would be in contravention of the Settlement Agreement.

Nevertheless, the court finds it worthwhile to underscore the Appeal Adjudicator's thorough analysis of each Movant's claim in resolving their appeals.  Across the board, the Appeal Adjudicator appears to have spent significant time reviewing each appeal.  Each of the Appeal Adjudicator's final Determinations contains (1) a detailed history of the facts and procedural history underlying each Movant's claims; (2) the applicable standard of review under the Settlement Agreement and Distribution Protocols; (3) an impartial discussion of the Movant and WV Water's respective positions; and (4) an individualized determination of the relevant claim based on the evidence and argument submitted.  In addition, the Appeal Adjudicator takes care to credit -- and discount -- each party's expert submissions in view of the applicable provisions of the Settlement Agreement and Distribution Protocols.  Of relevance here, the Appeal Adjudicator does not make causation determinations or otherwise base his final decisions solely on the parties' dueling expert reports.  Instead, applying the requisite standards under the Settlement Agreement and Distribution Protocols, he gives weight to the content of each Movant's medical records to determine whether the Movants' evidence was sufficient to satisfy the burden of proof for their respective claims.  As discussed further herein, the Appeal Adjudicator conducted a thorough review of each claim,

10

considered the evidence submitted, and applied the requisite standards under the Settlement Agreement and Distribution Protocols to determine that each Movants' evidence was fundamentally deficient and thus failed to meet the threshold requirements for proving their claims.

### 1. Bryan Goodson

Goodson filed an "Other Medical Issues" claim alleging that he suffered a respiratory injury of chemical pneumonitis and/or bronchiolitis obliterans after consuming and showering in contaminated water.  See Appeal Adjudicator Determination, ECF No. 1323-6 at 2.  He relied on an Affidavit and report from Dr. Charles Werntz, an internist/occupational medicine physician. WV Water objected to the Settlement Administrator's initial award to Goodson and submitted an opposing report from Dr. Gary Krieger, a physician/toxicologist.  ECF No. 1324-5.  Goodson submitted rebuttal reports by Dr. Werntz and Dr. Stephen King, a toxicologist/epidemiologist.  ECF Nos. 1324-19, -26.  The Settlement Administrator consulted with Dr. John Brick to review Goodson's claim.  ECF No. 1324-4.  Upon review, the Settlement Administrator reclassified Goodson's claim as a Contemporaneous Medical Claim and reduced the award.

On appeal, the Appeal Adjudicator upheld the reclassification and associated reduction.  In doing so, he refrained from making a causation determination, instead focusing on the relevant binding provisions of the Settlement Agreement and Distribution Protocols to determine whether Goodson's evidence was enough to establish a "credible, documented causal relationship" between his alleged exposure to contaminated tap water and his claimed illness.  See Distrib. Protocols § VIII.B. (setting forth the requirements for proving Other Medical Issues claims).

In reviewing Goodson's medical records, the Appeal Adjudicator found it "clear that none of the claimant's treating physicians documented that Mr. Goodson's illness - whether influenza, chemical pneumonitis or bronchiolitis obliteran [sic] - was causally related to the exposure to contaminated water from the Incident."  ECF No. 1323-6 at 6.  He noted that Goodson had not submitted an affidavit from any of his treating health care providers to support a causal relationship.  Id.  He likewise noted that Goodson's appeal did not directly address Dr. Krieger's opinions regarding the lack of documentation of chemical exposure or his review of medical literature related to MCHM exposure.  Although the Appeal Adjudicator did not address the report of Dr. King, neither Goodson's individual appeal nor

12

the Claimants' Omnibus Memorandum mentioned Dr. King's report in relation to Goodson.  See ECF No. 1328-7.  In any event, the Appeal Adjudicator noted in Stayer's appeal, see infra, that Dr. King is not a medical physician and thus not a "qualified medical expert" under the Distribution Protocols.  ECF No. 1323-7 at 12; Distrib. Protocols § VIII.B.3.(iv) (for purposes of "Other Medical Issues" claims, defining a "qualified medical expert" as "a physician who is engaged in a specialty relevant to the Other Medical Issues Claim or engaged in relevant scientific research").

Ultimately, because Goodson's medical records did not "speak to . . . the role and relationship that any exposure to the contaminated tap water caused or contributed to Mr. Goodson's illness," and "the only study Dr. Werntz cited to and relied upon to support his opinion [fell] short of establishing a 'credible, documented causal relationship between the exposure to contaminated water and illness' [as required by Distrib. Protocols § VIII.B.]," the Appeal Adjudicator concluded that Goodson's evidence was not sufficient to establish the causal relationship required under the Settlement Agreement and Distribution Protocols.  Id.  In view of this shortcoming, he determined  that Goodson's claim was better categorized as a

13

"Contemporaneous Medical Treatment Claim" and reduced Goodson's award accordingly.   Id.

### 2. Estate of Linda Stayer

The Stayer Estate filed an Other Medical Issues claim alleging that Stayer's exposure to contaminated tap water and vapors from the chemical spill caused or substantially contributed to her death in March 2014.   See Appeal Adjudicator Determination, ECF No. 1323-7 at 1.   The Stayer Estate relied on the affidavit of Dr. Werntz.   ECF No. 1324-6.   The Estate also placed significance on Stayer's autopsy report, contending that Stayer was not correctly diagnosed until her autopsy.   ECF No. 1323-7 at 7.   WV Water submitted reports from Dr. Krieger, ECF No. 1324-8, and Dr. Charles Govert, a board-certified pulmonologist, ECF No. 1324-9.   Stayer submitted "rebuttal" reports from Dr. Werntz and Dr. Stephen King, a toxicologist/epidemiologist.   ECF Nos. 1324-22, -26.   Dr. Brick submitted a report to the Settlement Administrator. ECF No. 1324-7.   Following a second review, the Settlement Administrator reclassified Stayer's claim as a Contemporaneous Medical Treatment claim and reduced her award.

On appeal, the Appeal Adjudicator upheld the reclassification and reduction.   As with Goodson, he refrained

14

from making a causation determination regarding Stayer's death and instead focused on the sufficiency of the Estate's evidence under the relevant provisions of the Settlement Agreement and Distribution Protocols.  Specifically, the Appeal Adjudicator noted that wrongful death claims like Stayer's require not only evidence of "credible, documented causal relationship" between alleged exposure to contaminated tap water and a claimed illness, Distrib. Protocols § VIII.B., but also submission of a death certificate which "attributes the primary or contributing cause of death to a specific medical condition alleged to be caused by exposure to contaminated water," Distrib. Protocols § VIII.D.2.

Applying those standards, the Appeal Adjudicator found that Stayer's death certificate "contain[ed] no reference or mention of chemical pneumonia — the condition that the Estate contends initiated or lead [sic] to [Stayer's] necrotizing pneumonia and death by ARDS."  ECF No. 1323-7 at 12; see also Stayer Death Certificate, ECF No. 1324-20.  Likewise, he noted that her autopsy report from the Cleveland Clinic, despite listing several diagnoses, neither mentioned nor made any finding "that chemical pneumonitis lead [sic] to or played any role in the necrotizing pneumonia and death by ARDS."  ECF No. 1323-7 at 12; see also Stayer Autopsy Report, ECF No. 1324-21.

15

Indeed, despite healthcare providers at the Cleveland Clinic being informed of her exposure to the chemical spill, none of Stayer's records from the Clinic document that the chemical exposure caused or contributed to her condition.  ECF No. 1323-7 at 13.

In reviewing Stayer's evidence, the Appeal Adjudicator highlighted that Dr. Werntz's opinion hinged on Stayer having chemical pneumonitis but failed to identify any document in Stayer's medical records supporting that theory.  ECF No. 1323-7 at 13.  Likewise, he found that Dr. Werntz's reliance on a study involving rats' exposure to MCHM was "of questionable value in evaluating [Stayer's] wrongful death claim."  Id.  Further, and contrary to Stayer's argument, the Appeal Adjudicator considered the rebuttal report of Dr. King and rejected Dr. King's opinion on the basis that "he is not a medical physician and thus cannot be considered a medical expert under DP §VIII.B.3(iv), to which this Appeal Adjudicator is bound."  Id.  Regarding the Stayer Estate's argument that Stayer's exposure exacerbated a preexisting condition, the Appeal Adjudicator again noted that none of her submitted medical records mentioned prior experience or treatment related to "sensitivities to certain household items or irritants" or "that a preexisting breathing issue was exacerbated by the chemical exposure" and led to her death.  Id.

16

Accordingly, the Appeal Adjudicator determined that while Stayer's claim did not meet the criteria for a wrongful death Other Medical Issues claim, it was eligible for reduced compensation as a Contemporaneous Medical Treatment claim.  Id.

### 3. Estate of Daniel Stewart

The Stewart Estate sought an award for a Water Interruption Medical Issue claim, alleging that the three-week delay of Stewart's kidney transplant surgery following the chemical spill negatively impacted his health and ultimately caused or substantially contributed to his death.  See ECF No. 1323-8 at 2.  Like the other Movants, the Stewart Estate relied on an Affidavit from Dr. Werntz.  ECF No. 1324-10.  WV Water objected to the Settlement Administrator's initial determination and submitted a report from Dr. Steven D. Weisbord, a board-certified kidney specialist.  ECF No. 1324-12.  During the second review, Dr. Brick issued a report to the Settlement Administrator.  ECF No. 1324-11.  On second review, the Settlement Administrator reclassified Stewart's claim as a Contemporaneous Medical Treatment claim and reduced the award.

On appeal, the Appeal Adjudicator upheld the reclassification and reduction.  ECF No. 1323-8.  Applying the relevant provisions of the Settlement Agreement and Distribution

17

Protocols, the Appeal Adjudicator determined that a Water Interruption claimant "must prove a delay in treatment for an existing chronic illness that an Eligible Medical Claimant asserts was caused by the interruption of water service at the medical service provider's facility resulting from the Incident." Id. at 3 (citing Distrib. Protocols § VIII.C.1). To recover, the claimant "must produce contemporaneous medical records demonstrating that the delay was solely due to the water crises" during the applicable Do Not Use Period, id. (citing Distrib. Protocols § VIII.C.2(i)), and "evidence demonstrating to a reasonable probability: (a) the delay directly caused an aggravation or progression of the illness or condition; and (b) the aggravation or progression of the illness would not have occurred but for the delay," id. (citing Distrib. Protocols § VIII.C.2(ii)). In addition, the Appeal Adjudicator noted that claimants must have incurred medical expenses in excess of $5,000 as a result of the delay. Id. at 7; Distrib. Protocols § VIII.C.2(iii) (further providing that "[i]f medical expenses are less than or equal to $5,000, the claim must proceed as a Contemporaneous Medical Treatment Claim").

In reviewing the parties' evidence, the Appeal Adjudicator found that, while Dr. Werntz was qualified to opine as to causation, Stewart's medical records did not support Dr.

18

Werntz's opinion that the delay in surgery left Stewart in a less robust overall medical condition and ultimately caused his death.  ECF No. 13223-8 at 6.  He noted that the medical records did not "contain any note in which a physician or health care provider expressed any concern about [Stewart's] condition before the rescheduled January 31, 2014, surgery - or that his condition deteriorated or was any different than before the contemplated surgery on January 10, 2014."  Id.  Indeed, the Appeal Adjudicator highlighted that Stewart's transplant surgeon, Dr. Africa, had noted the transplant was successful, Stewart's postoperative cause was "unremarkable," and Stewart was improved at discharge.  Id.  When Stewart returned for a stint removal approximately five weeks later, his treating physician still did not express any concerns regarding his overall medical condition prior to his suffering a cardiac arrest while under general anesthesia for the removal procedure. Id. at 5-6.  Finally, the Appeal Adjudicator noted that, while the Stewart Estate did not address the issue of Stewart's medical expenses, on review he could not independently find that Stewart's medical expenses exceeded $5,000 as required by the Settlement Agreement and Distribution Protocols.

Accordingly, "[e]ven utilizing the lesser standard of proof (prima facie)" that the Stewart Estate advocated in favor

of applying to the claim, the Appeal Adjudicator concluded that "the claims file, submissions and Affidavit and the report of Dr. Werntz fall short" of demonstrating the causal relationship required by the Settlement Agreement and Distribution Protocols. Id. at 6.  Thus, the Appeal Adjudicator determined that the Stewart Estate's claim did not qualify as a Water Interruption Medical Issues claim.  Id. at 7.

### 4. Duane Maddy

Maddy filed an Other Medical Issues claim alleging that his exposure to contaminated water and vapor from the Incident in 2014 caused recurring nosebleeds, requiring him to undergo surgery in 2017 to correct a preexisting deviated septum and the nosebleeds.  See ECF No. 1323-9 at 2.  Maddy relied on Affidavits from Dr. Werntz, ECF No. 1324-13, and a nurse, Ms. Linda Hayes.  WV Water objected to the Settlement Administrator's initial determination and submitted a supporting report from Dr. Robert Kern, a board-certified ear, nose and throat specialist.  ECF No. 1324-15.  During the second review of Maddy's claim, Dr. Brick issued a report to the Settlement Administrator, ECF No. 1324-14, who ultimately reclassified Maddy's claim as one for Contemporaneous Medical Treatment and reduced the award.

20

On appeal, the Appeal Adjudicator upheld the reclassification and reduction, finding that the evidence submitted by Maddy did not support Dr. Werntz's opinion on causation under the relevant applicable standards in the Settlement Agreement and Distribution Protocols.  Specifically, as an Other Medical Issues claimant, Maddy was required to demonstrate "a credible, documented causal relationship between exposure to contaminated tap water and the illness" he suffered.  ECF No. 1323-9 at 3 (citing Distrib. Protocols § VIII.B).  The Appeal Adjudicator reviewed Maddy's medical records and the parties' expert submissions.  He considered but ultimately discounted Nurse Hayes's Affidavit because she failed to meet the requirements of a "qualified medical expert" as defined in the Settlement Agreement and Distribution Protocols.  Id. at 4-5 n.3 (citing Distrib. Protocols § VIII.B.3(iv)).  He also discounted Dr. Werntz's opinion on the basis that it was "directly premised upon Mr. Maddy having experienced continuing nosebleeds" for the entire period between the 2014 Incident and his 2017 surgery, despite Maddy submitting "no records to reflect treatment that he received for nosebleeds during that three year time period."  Id. at 6.  Although a January 2014 treatment record indicated that an Emergency Department physician suspected chemical exposure as the cause of Maddy's acute nosebleeds, Maddy's failure to submit medical records

21

between that visit and his 2017 surgery made it unclear whether Mr. Maddy sought further medical treatment for nosebleeds during that time.  See id.  Moreover, the Appeal Adjudicator noted that Maddy's surgeon did not provide an Affidavit.  Finally, he observed that Maddy did not submit medical bills related to his January 2014 treatment, thus failing to demonstrate that his medical expenses exceeded $5,000 as required by the Settlement Agreement and Distribution Protocols.  Id.; see Distrib. Protocols § VIII.B.3(iii).

Having discounted Nurse Hayes's opinion, and in view of Dr. Werntz's causation opinion being premised on continuous nose bleeds between 2014 and 2017, the Appeal Adjudicator concluded that Maddy's evidence was insufficient to support a credible, documented causal connection between his chemical exposure and the need for surgery three years later.  See id.  Accordingly, he found the claim did not qualify as an Other Medical Issues claim, but could be reclassified as a Contemporaneous Medical Treatment claim as set forth in the Settlement Agreement and Distribution Protocols.

5. John Varney

Varney submitted an Other Medical Issues claim for partial blindness or permanent visual impairment not corrected

by glasses that allegedly resulted from a surgery to remove preexisting nasal polyps which were irritated by chemical exposure following the Incident.  Like the other Movants, Varney relied on Dr. Werntz.  ECF No. 1324-16.  WV Water submitted another report from Dr. Kern to support its objection to the Settlement Administrator's initial determination.  ECF No. 1324-17.  In lieu of a second review, the parties agreed to submit Varney's claim directly to the Appeal Adjudicator.

The Appeal Adjudicator applied the relevant provisions of the Settlement Agreement and Distribution Protocols to determine whether Varney's evidence demonstrated a "credible, documented causal relationship" between Varney's exposure to contaminated tap water and his condition.  ECF No. 1323-10 at 3 (citing Distrib. Protocols § VIII.B).  He noted that the standard of proof for Other Medical Issues claims like Varney's "is intended to be more stringent than the proof required to demonstrate a Contemporaneous Medical Treatment Claim."  Id. (citing Distrib. Protocols § VIII.B.2).

The Appeal Adjudicator reviewed Varney's medical records, his detailed "Basic Timeline of Events," and the parties' respective expert submissions.  Id. at 4-7.  He found Varney's medical records documented that Varney had not only previously had surgery to remove his nasal polyps in 2008, but

that he had been advised again -- and, in fact, approved -- in 2013 to undergo another surgery for the polyps. Id. at 4. He did not undergo surgery at that time. After his chemical exposure in 2014, his sinus issues worsened and he was eventually able to be examined by another ENT, Dr. Katrib. However, the Appeal Adjudicator noted that Dr. Katrib's records "made no mention of chemical exposure." Id. at 5-6. Varney's medical records further show that he was not seen by an eye doctor until late 2017.

Regarding the parties' expert submissions, the Appeal Adjudicator found Dr. Kern's opinion more persuasive. Dr. Kern opined that there was "absolutely no connection" between Varney's chemical exposure and recurrence of the polyps. He based that conclusion on a CT scan from 2014 which indicated that Varney's polyps were "far advanced and had recurred long before the purported [chemical] exposure." See ECF No. 1323-10 at 6. In view of Dr. Kern's opinion, the Appeal Adjudicator found it significant that Dr. Werntz agreed in his rebuttal report that

> [g]iven that surgery had already been recommended based upon the severity of the inverted polyp prior to the MCHM exposure, one cannot say with any degree of medical certainty that there was a significant impact of the MCHM exposure on the timing or extent of the needed surgery for the inverted polyps.

Id. at 7.  Accordingly, based on the claim record, the Appeal Adjudicator concluded that Varney's chemical exposure "did not cause or contribute to the recurrence of the nasal tumor" or the necessity of the surgery.  Id.  As a result, he determined that the claim did not qualify as an Other Medical Issues claim, and reclassified it as a Contemporaneous Medical Treatment claim subject to a reduced award.

In view of the above, the court finds that the Movants were afforded a comprehensive and sufficient review of their respective appeals under the relevant, binding provisions of the Settlement Agreement and Distribution Protocols.

Second, Movants argue that WV Water breached the Settlement Agreement by submitting the reports of its own experts.  Id. at 3-4.  Movants contend that "there are no provisions in the [Settlement Agreement] or the [Distribution Protocols] that authorize the use of experts by [WV Water]."  Id. at 4.  Meanwhile, Movants note, the Distribution Protocols reference use of experts by claimants and the Settlement Administrator a combined twenty-two times.  See id. (citing sections of the Distribution Protocols).  Movants thus conclude that "[i]n the absence of any provision authorizing [WV Water] to retain its own experts in the claims process, that right simply does not exist."  Id.; see also Movants' Reply 6.

WV Water responds that the Settlement Agreement and Distribution Protocols outline a "detailed . . . review" and contain "no limiting language . . . regarding what aspects of the claims can be challenged, no prohibition on challenging claimants' causal proof, and no bar on submitting expert reports or other evidentiary materials addressing claimants' proof."  WV Water Resp. 14.  Where Movants argue prohibition by implication, WV Water counters that "[Movants] cannot impose such limitations where they do not exist."  Id.  Otherwise, WV Water asserts that its right to challenge the decisions of the Settlement Administrator would be a "hollow right."  Id. at 13.

The following portions of the Settlement Agreement and Distribution Protocols control this issue:

A Claimant . . . may seek a second review of the Claim by the Settlement Administrator.  Settlement Agmt. § 6.2.5.1.

A Claimant who is dissatisfied with the determination of the Settlement Administrator after the second review may appeal to the Appeal Adjudicator.  Id. § 6.2.5.2.

A Claimant may initiate an appeal with the Appeal Adjudicator by submitting a written appeal statement with the Settlement Administrator explaining the basis for the objection to the determination of the Settlement Administrator.  Id. § 6.2.5.3.

Defendants also may seek a second review by the Settlement Administrator and an appeal to the Appeal Adjudicator . . . .  Such appeals shall follow the procedures set forth in Section 6.2.5.2.  Id. § 6.2.5.10.

> Either the Claimant or any Party may file an objection
> with the Settlement Administrator . . . and seek a
> second review consistent with the administrative
> appeal procedures [Section 6.2.5 et seq.] in the
> [Settlement Agreement]. Distrib. Protocols §
> VIII.B.5; see also id. § VIII.C.4.

See generally Settlement Agmt. § 6.2.5 et seq.

From the above provisions, the Settlement Agreement and Distribution Protocols grant WV Water the right to seek a second review by the Settlement Administrator and to appeal to the Appeal Adjudicator. Settlement Agmt. § 6.2.5.10; Distrib. Protocols § VIII.B.5. The Settlement Agreement provides that "[s]uch appeals shall follow the procedures set forth in Section 6.2.5.2" of the Settlement Agreement, Settlement Agmt. § 6.2.5.10, although Section 6.2.5.2 merely provides the right to appeal to the Appeal Adjudicator and nothing else, id. § 6.2.5.2. The Distribution Protocols, meanwhile, state that WV Water can seek a second review consistent with "the administrative appeal procedures" of the Settlement Agreement, Distrib. Protocols §§ VIII.B.5, VIII.C.4, which includes all the subsections of Section 6.2.5, see Settlement Agmt. § 6.2.5 (titled "Administrative Appeal"). Thus, it is clear that WV Water is entitled to avail itself of the same appeal procedures as a claimant.

27

Next, the Settlement Agreement provides that an appeal comprises "a written appeal statement . . . explaining the basis for the objection." Id. § 6.2.5.3. "Written appeal statement" is not defined. A party objecting to a medical-based decision, however, naturally must rely on medical testimony of its own to make the right to "explain[] the basis for the objection" meaningful in any sense. Id. Accordingly, the court concludes that the Settlement Agreement and Distribution Protocols afford WV Water the right to submit the reports of its own experts. WV Water's doing so was not a breach of contract.

Third, Movants argue that the Settlement Administrator breached the Settlement Agreement when it retained Dr. Brick as the consulting medical expert for Movants' claims. Mem. Supp. Movants' Mot. to Enforce 4-6. Movants contend that they did not agree to Dr. Brick's retention and that Dr. Brick is unqualified, ostensibly even by his own admission. See id. In response, WV Water argues that Movants did agree to Dr. Brick's retention and that the Settlement Agreement does not require the parties to agree to a consulting medical expert anyway. WV Water Resp. 15. Additionally, WV Water notes that while Dr. Brick initially expressed reservations about his qualifications to review the medical claims, "counsel was subsequently advised that the Settlement Administrator reported to the Court that the

28

doctor felt qualified to provide advice after reviewing [some] initial claims." Id. 15-16.

To begin, whether the parties agreed to Dr. Brick is irrelevant. The Distribution Protocols simply do not require it. See Distrib. Protocols §§ VIII.B.4-.5, VIII.C.3-.4.

Next, the court notes that the Appeal Adjudicator and the Claims Oversight Panel explored pertinent interpretive questions regarding Dr. Brick:

> Question 2. Under the [Settlement Agreement] and [Distribution Protocols], is Dr. John Brick, the medical advisor retained by the Settlement Administrator, allowed or authorized to provide causation opinions regarding [medical claims]?
>
> > Interpretation of the Appeal Adjudicator: Yes, subject to any other applicable provisions or requirements of the [Settlement Agreement]/[Distribution Protocols].
>
> Question 3. . . . [A]s the Appeal Adjudicator I am requesting an interpretation from the [Claims Oversight] Panel of the language in Section [VIII.B.4] and 5 of the . . . Distribution Protocols regarding the scope and/or limitations of what the Settlement Administrator may or must request from a retained consulting medical expert in connection with [medical claims].
>
> > Interpretation of the Appeal Adjudicator: There is no stated limitation in the [Settlement Agreement] or [Distribution Protocols] on the scope of the consulting advice that the Settlement Administrator can request and receive from a retained consulting medical expert. The Settlement Administrator has the discretion to request one or more medical experts as needed. Further, the Settlement Administrator may rely

29

> upon or not rely upon all or part of the input or opinions of any such expert.  Any such expert is subject to the definition of a "qualified medical expert" contained in the [Distribution Protocols].

ECF No. 1328-5.  In other words, and of relevance to the current issue, the Settlement Administrator is unrestricted in the seeking of and relying upon advice from a consulting medical expert, so long as the consulting medical expert is "qualified."

The Distribution Protocols define "qualified medical expert" as "a physician who is engaged in a specialty relevant to the [medical claim] or engaged in relevant scientific research."  Distrib. Protocols § VIII.B.3.iv; see also id. § VIII.C.2.iv.  According to one of Class Counsel, Dr. Brick is "a semi-retired neurologist" whose area of specialty is "neurology and vision" and who "had no experience in the medical art of establishing a causal link between a given toxin and a given health effect."  Decl. of Class Counsel Kevin W. Thompson ¶¶ 7-8, ECF No. 1324-1.  WV Water does not contest that averment by Class Counsel, but instead states that Dr. Brick, as noted earlier, "felt qualified to provide advice after reviewing [some] claims."  See WV Water Resp. 15-16.

The Settlement Agreement required the Settlement Administrator to seek and rely upon consulting medical experts with specialties or scientific research related to the issues

30

presented by Movants.  Of Movants, only Varney complained of a condition related to Dr. Brick's specialties of neurology and vision.[2]  See Appeals Decisions, ECF No. 1328-6 at 43-48; see also id. at 3-6 (Goodson); 11-23 (Stayer); 28-33 (Stewart); 36-40 (Maddy).  Even so, the Settlement Administrator faced "difficulty in obtaining a consulting medical expert" and the parties objected to various proposed experts prior to Dr. Brick's retention.  See id. at 6 n.3.  Accordingly, with the exception of Varney, the Appeal Adjudicator "thoroughly reviewed and considered" that difficulty as well as the issue of Dr. Brick's qualifications in his determinations.  Id. at 6 n.3.  To that end, it appears the Appeal Adjudicator attempted to remedy any issue with Dr. Brick's qualifications as a consulting medical expert by focusing his final determinations on the evidence submitted by the parties rather than simply citing Dr. Brick's conclusions.  Indeed, of the Appeal Adjudicator's determinations at issue here, only one credits Dr. Brick in the conclusion -- albeit such credit is downplayed.  Id. at 40 (Maddy) ("Additionally, the opinions of Dr. Kern and, to a

---

[2] Notably, upon being advised of the difficulty the Settlement Administrator encountered with finding a medical specialist to review Varney's claim, the parties forewent a second review by the Settlement Administrator and opted instead to submit Varney's claim record directly to the Appeal Adjudicator.  See Varney Appeal Decision, ECF no. 1328-6 at 43.  As a result, Dr. Brick never reviewed Varney's claim.

lesser extent, Dr. Brick have merit.).  In view of the noted difficulty faced by the Settlement Administrator in obtaining a consulting medical expert, as well as the Appeal Adjudicator's effort to provide the parties with an impartial review of their claims, the court concludes that the Settlement Administrator did not breach the Settlement Agreement by retaining Dr. Brick.

Inasmuch as the court finds that neither the Settlement Administrator, Appeal Adjudicator, nor WV Water breached the Settlement Agreement as to any Movant, the court finds it unnecessary to reach WV Water's argument that Goodson, Stewart, Maddy, and Varney's acceptance of reduced final settlement award checks from the Settlement Administrator renders their breach of contract claims barred by the common-law doctrine of accord and satisfaction.[3]

### III. Conclusion

Each of the Movants' claims proceeded through the claims adjudication process as contemplated by the parties' Settlement Agreement and Distribution Protocols.  That the second review of each claim -- and appeals thereof -- resulted

---

[3] WV Water does not argue that Stayer is barred by accord and satisfaction.  WV Water Resp. 11, 11 n.7.

in reduced awards for all Movants may be unfortunate, but it does not rise to breach.  Accordingly, for the foregoing reasons, it is ORDERED that the motion of Goodson, Stewart, Stayer, Maddy, and Varney be, and hereby is, denied.

The Clerk is requested to transmit copies of this memorandum opinion and order to all counsel of record and to any unrepresented parties.

ENTER: March 27, 2026

John T. Copenhaver, Jr.
Senior United States District Judge